**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

---

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. ELLSWORTH ASSOCIATES, LLP,<br><br>    Plaintiff-Relator,<br><br>v.<br><br>CVS HEALTH CORPORATION, f/k/a CVS CAREMARK CORPORATION, SILVERSCRIPT INSURANCE COMPANY, LLC, CAREMARK LLC, f/k/a CAREMARK INC., CVS PHARMACY INC., and CVS CAREMARK PART D SERVICES LLC<br>    Defendants. | Civ. Action No. 19-cv-2553<br><br><br>(Plaintiff-Relator demands a trial by jury on all counts) |

---

## THIRD AMENDED COMPLAINT FOR FALSE CLAIMS ACT VIOLATIONS UNDER 31 U.S.C. § 3729, *ET SEQ.*

W. Scott Simmer (*pro hac vice*)
William G. Powers (PA Bar No. 316876)
Michael von Klemperer (*pro hac vice*)
BARON & BUDD, P.C.
The Watergate
600 New Hampshire Ave. NW,
10th Floor
Washington, DC 20037
Telephone: (202) 333-4562
Facsimile: (202) 337-1039

Joe H. Tucker, Jr., Esquire
Scott E. Diamond, Esquire
Ten Penn Center
1801 Market Street, Suite 2500
Philadelphia, PA 19103
(215) 875-0609
jtucker@tlgattorneys.com
sdiamond@tlgattorneys.com

## <u>TABLE OF CONTENTS</u>

I.     INTRODUCTION ....................................................................................... 1

II.    PERFECTION OF FILING AND STANDING ...................................... 10

III.   PARTIES ............................................................................................... 10

       A.    Relator....................................................................................... 10

       B.    Defendants CVS Health, SilverScript, , CVS Pharmacies, and CVS Caremark
             Entities ...................................................................................... 12

IV.    JURISDICTION AND VENUE ........................................................... 14

V.     NATURE OF ACTION ........................................................................ 15

       A.    The False Claims Act................................................................. 15

       B.    Antitrust Remedies Under the Clayton Act, Section 4A ....................... 18

       C.    Overview of Medicare Part D ..................................................... 19

             1.    Medicare Part D Relies on a Competitive Marketplace Where Plans
                   Negotiate Pricing that Provides Access to Affordable, Lifesaving

                   Drugs.................................................................................. 19

             2.    Medicare Part D Bids from PDPs Rely on Accurate, Complete, and
                   Truthful PDE Records Submitted to CMS.................................. 21

       D.    Maintaining an Effective Compliance Program Is a Prerequisite for a PDP
             Sponsor to Obtain and Retain Part D Payments .................................. 25

       E.    PDP Sponsors Are Obligated to Provide Beneficiaries a Full and Fair Process for
             Grievances and Coverage Determinations............................................ 32

             1.    Grievances............................................................................ 37

             2.    Coverage Determinations....................................................... 38

       F.    FDA Approval of Generic and "Authorized Generic" Drugs.............................. 39

       G.    PDP Sponsors Are Obligated to Provide Beneficiaries Information about Access
             to Generic Drugs, Including Information About Differential Pricing for Less
             Costly Generic Drugs.................................................................... 42

             1.    Medicare Part D Relies on Health Plans Competing Vigorously to Drive
                   Adoption of Less Costly Generic Drugs.................................... 42

             2.    Medicare Requires PDPs to Advise Beneficiaries of the Cost Differential
                   for the Lowest Price Generic Alternative. .............................. 43

       H.    CMS Requires Pharmacies to Report "Accurate, Complete and Truthful" Generic
             Substitution Instructions as Part of Each Part D Claim ........................ 46

             1.    Plans Must Submit Accurate DAW Coding as Part of Each Claim ......... 46

             2.    Inappropriate Use of DAW Codes May Be Indicative of Fraud, Waste
                   and Abuse............................................................................ 53

I.      Medicare Part D Claims for Unsubstituted Brand-Name Drugs Are Invalid Claims Under State Mandatory Generic Substitution Laws .......................................... 59

     1.     State Pharmacy Laws Apply to Determine Whether a Medicare Part D Prescription Is "Valid"........................................................................... 59

     2.     Sponsors Must Require That Pharmacies Comply with State Mandatory Generic Substitution Laws ........................................................................ 61

VI.    CVS HEALTH HAS ENGAGED IN SYSTEMATIC DECEPTION AND ANTICOMPETITIVE CONDUCT ....................................................................... 65

    A.    CVS Health's Compliance Program Was Inadequate to Prevent the SSG/DNS Scheme Fraud................................................................................................. 65

    B.    CVS Health Deceived SilverScript Beneficiaries.......................................... 67

     1.     SilverScript Failed to Provide Information Regarding the SSG/DNS Scheme to Prospective Part D Beneficiaries............................................. 68

     2.     SilverScript's Marketing Materials Were Materially Misleading and Deceptive ..................................................................................................... 73

    C.    In Order to Carry Out Its Illicit SSG/DNS Scheme, CVS Health Violated Its 2007 Firewall Agreement and the Terms of the 2012 FTC Consent Order.................. 79

     1.     CVS Health and Its Subsidiaries Breached the 2007 Firewall ................ 79

     2.     CVS Health and Its Subsidiaries Violated the 2012 Consent Order......... 81

     3.     The SSG/DNS Scheme Was Only Possible Because of Anticompetitive Conduct by CVS Health and Its Subsidiaries ........................................... 84

VII.   CVS HEALTH FRAUDULENT SINGLE SOURCE GENERIC SCHEME.................... 89

    A.    The SilverScript PDP ............................................................................... 90

    B.    CVS Health's False Public Statements Concerning Its Preference for Less Costly Generic Drugs and that Its SSG/DNS Scheme Would Not Increase Beneficiary Costs.......................................................................................................... 92

    C.    CVS Health Has Touted the SSG Strategy to Its Customers While It Conceals Its Deception of Medicare Part D Beneficiaries .................................................. 99

    D.    The Drugs Included in the SSG/DNS Scheme .................................................. 105

    E.    The CVS Defendants Have Submitted Invalid PDE Records or Statements in Support of Claims for Unsubstituted Brand-Name Drugs in Violation of State Mandatory Generic Substitution Laws .................................................. 106

    F.    CVS Deceptively Failed to Disclose Accurate Differential Prices Available for Less Costly (Often Identical) Generic Drugs..................................................... 115

VIII.  CVS HEALTH SYSTEMATICALLY DECEIVED SILVERSCRIPT BENEFICIARIES ................................................................................................................ 119

    A.    Copaxone .............................................................................................. 121

     1.     The CVS Caremark Entities Product Hopping Deal with Teva for Copaxone ..................................................................................................... 123

2.      SilverScript Deception Blocked Access to the Less Costly Generic
        Copaxone (glatiramer acetate) ............................................................... 127

3.      Beneficiary No. 1 ................................................................................... 132

B.      Invega ................................................................................................................. 135

1.      SilverScript Deception Blocked Access to Generic Invega (paliperidone
        tablets) .................................................................................................... 137

2.      Beneficiary No. 2 ................................................................................... 142

C.      Asacol HD ......................................................................................................... 143

1.      The Asacol HD SSG/DNS Deal Facilitated Allergan's "Pay-for-Delay"
        Tactics, Delaying Generic Competition................................................. 143

2.      SilverScript Deception Blocked Access to the Less Costly Generic
        Asacol HD (mesalamine-sofoamine)...................................................... 146

3.      Beneficiary No. 3 ................................................................................... 151

D.      Renvela Packets and Tablets............................................................................. 153

1.      CVS Blocked Access to the Less Costly Generic Version of the Brand-
        Name Renvela Packets (sevelamer carbonate) ..................................... 156

2.      SilverScript Deception Blocked Access to the Less Costly Generic for
        the Brand-Name Renvela Tablets .......................................................... 161

3.      Beneficiary No. 4 ................................................................................... 165

E.      Harvoni/Epclusa ............................................................................................... 167

1.      SilverScript Deception Blocked Access to the Less Costly Generic for
        the Brand-Name Epclusa ....................................................................... 170

2.      SilverScript Deception Blocked Access to the Less Costly Generic for
        the Brand-Name Harvoni ....................................................................... 175

3.      Beneficiary No. 5 ................................................................................... 180

4.      Beneficiary No. 6 ................................................................................... 181

5.      Beneficiary No. 7 ................................................................................... 183

6.      Beneficiary No. 8 ................................................................................... 188

7.      Beneficiary No. 9 ................................................................................... 193

8.      Beneficiary No. 10 ................................................................................. 195

9.      Beneficiary No. 11 ................................................................................. 196

10.     CVS Health Repeatedly Rejected Beneficiaries' Attempts to Fill Generic
        Harvoni and Epclusa .............................................................................. 198

F.      Ventolin HFA .................................................................................................... 203

1.      CVS Health Entered into SSG/DNS Deal to Facilitate Evergreening of
        GSK's Ventolin HFA Product ................................................................ 203

iii

2.     SilverScript Deception Blocked Access to the Less Costly Generic Ventolin HFA (albuterol sulfate HFA) .................................................. 207

3.     Beneficiary No. 12 ............................................................ 211

4.     CVS Health Rejected Thousands of Beneficiaries from Receiving Access to the Less Costly Generic Ventolin HFA (albuterol sulfate inhalation aerosol) ................................................................ 212

G.     Canasa Rectal Suppository ............................................................ 213

1.     SilverScript Blocked Access to the Less Costly Generic Canasa (mesalamine-sofoamine) ................................................................ 213

2.     Beneficiary No. 13 ............................................................ 218

3.     Beneficiary No. 14 ............................................................ 221

H.     Advair Diskus ............................................................ 222

1.     SilverScript Deception Blocked Access to the Less Costly Generic Advair Diskus (fluticasone propionate and salmeterol inhalation powder) ................................................................ 224

2.     Beneficiary No. 15 ............................................................ 229

3.     SilverScript Deception Blocked Access to Thousands of Beneficiaries Seeking Access to Generic Advair Discus .................................... 233

4.     CVS Health Senior Management Deception About Its "Proven Cost Management Strategies" To Block Beneficiary Access to the Less Costly Generic Advair Diskus .................................................... 234

COUNT I (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1); 31 U.S.C. § 3729(a)(1)(A)) ................................................................ 235

COUNT II (Violation of False Claims Act, 31 U.S.C. § 3729(a)(2); 31 U.S.C. § 3729(a)(1)(B)) ................................................................ 236

COUNT III (Violation of False Claims Act, 31 U.S.C. § 3729(a)(3); 31 U.S.C. § 3729(a)(1)(C)) ................................................................ 236

COUNT IV (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(G)) .................... 237

PRAYER FOR RELIEF ................................................................ 237

## <u>THIRD AMENDED COMPLAINT FOR FALSE CLAIMS ACT VIOLATIONS UNDER 31 U.S.C. § 3729, *ET SEQ.*</u>

On behalf of the United States of America ("United States"), Plaintiff-Relator Ellsworth Associates, LLP ("Relator") hereby files this Third Amended Complaint against Defendants CVS Health Corporation f/k/a CVS Caremark Corporation ("CVS Health"), SilverScript Insurance Company, LLC ("SilverScript"), CVS Pharmacy, Inc., Caremark LLC f/k/a Caremark Inc., and CVS Caremark Part D Services LLC (Caremark LLC and CVS Caremark Part D Services LLC are collectively referred to as "CVS Caremark Entities") (Defendants are collectively referred to as "the CVS Defendants," "CVS," or "CVS Health"), pursuant to the *qui tam* provisions of the Federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.* ("FCA"). Relator brings this action on behalf of the United States to recover damages and civil penalties under the FCA, arising from false and/or fraudulent records, statements and claims made, used and caused to be made, used, or presented by Defendants and/or their agents, predecessors, successors, and employees in violation of the FCA, as amended.

## I.    INTRODUCTION

1.    CVS Health has devised an intentionally fraudulent Single Source Generic/Do Not Substitute scheme (hereinafter the "SSG/DNS Scheme") to prevent Medicare Part D beneficiaries from accessing less costly, equivalent versions of numerous generic prescription drugs in favor of much costlier, multi-source brand-name drugs. In doing so, CVS Health has ensured astonishing profits for itself while passing the increased costs onto taxpayers and Part D beneficiaries. Sadly, the SSG/DNS Scheme has disproportionately affected many elderly, end stage renal disease ("ESRD"), and disabled SilverScript Part D beneficiaries who, given their cost sensitivities, have been forced to forgo critical treatment due to the higher cost shares resulting from the blocking of less expensive generic drugs.

2.      Medicare Part D relies on fair competition in private market negotiations between Part D plans, PBMs, pharmacies and drug makers to ensure that the benefits offered provide quality drugs at affordable prices. Unlike Medicare Parts A and B, which are administered by Medicare itself, the Medicare Part D prescription drug benefit was designed to be offered only by the private companies which contract with the government to provide competitive prescription benefits to attract beneficiaries.

3.      Here, the conduct of CVS Health and its subsidiaries cheated beneficiaries and taxpayers by selling off access to Part D formularies to the SSG/DNS Drug Makers in exchange for blocking access to less costly generic drugs.  In doing so, the CVS Health entities betrayed the marketing promise made to prospective members that SilverScript could be trusted to act only on their behalf "every day, in every way."

4.      In reality, behind closed doors CVS Health and its subsidiaries had sold off SilverScript Part D formulary access to the SSG/DNS Drug Makers who were intent on obstructing competition for their blockbuster drugs.

5.      The fraudulent conduct alleged herein has been implemented through the SSG/DNS Scheme and started at least as early as June 22, 2015 and continues up through today. The SSG/DNS Scheme has involved, in relevant part, at least the following fifteen drugs (and their manufacturers, collectively the "Drug Makers"): Copaxone (Teva), Exelon (Novartis), Voltaren Gel (Endo), Invega (Janssen), Asacol HD (Allergan), Xopenex HFA (Sunovion), Renvela Packets (Sanofi), Renvela Tablets (Sanofi), Istalol (Bausch & Lomb), Harvoni (Gilead), Epclusa (Gilead), Ventolin HFA (GSK), Canasa Rectal Suppository (Allergan), Advair Diskus (GSK), and Suboxone Sublingual Film (Indivior). Collectively herein these fifteen (15) drugs are referred to as the "SSG/DNS Drugs."

6. The secret SSG/DNS deals cut by the CVS Health entities became key to facilitating the Drug Makers' evergreening, pay-for-delay, product hopping, sham patent litigation, sham Citizen's Petitions, authorized generic and other schemes (used in combination or separately) to block generic competition. As such, the CVS Health entities' SSG/DNS Scheme has aided and abetted the Drug Makers competing not solely on the basis of innovation, but rather on their ability to obstruct access to generic competition.

7. The complicity among CVS Health's Part D Plan Sponsor (SilverScript), its pharmacy benefit manager (CVS Caremark Entities), and pharmacies (CVS Pharmacies) has created a veritable playground of opportunities to hold off generic competition, allowing the Drug Makers free reign to block beneficiary access to less costly generic drugs, frequently authorized generics. This obstruction would otherwise have been impossible if the CVS Health entities had not colluded together, particularly given their different competing interests, which were supposedly firewalled off from each other because of a 2007 agreement with the Federal Trade Commission ("FTC") at the time of the merger between CVS and Caremark.

8. Normally, arm's length competitive interactions between PDPs, PBMs and pharmacies would have served as a system of checks and balances to ensure that consumers had access to affordable medications. But with all its wholly-owned subsidiaries conspiring together, CVS Health has been able to achieve an "enterprise-wide benefit" from the anticompetitive deals with the Drug Makers that has padded its bottom line, but has harmed taxpayers as well as elderly, ESRD and disabled Part D beneficiaries.

9. The Scheme required collusion between the supposedly firewalled CVS Health entities. Under the terms of secret rebate agreements between the SSG Drug Makers and the CVS Caremark Entities, SilverScript was required to block substitution on its formularies of generic

drugs in favor of the much more expensive brand-name SSG/DNS Drugs.

10.    Most disturbing is SilverScript required its call center Customer Care Representatives ("CCRs") to provide intentionally misleading information to SilverScript beneficiaries about access to less costly generic drugs and, more troublingly, provide outright falsehoods that the brand-name SSG/DNS Drugs would be less costly for the beneficiary than the generic. These CCR representations were not only aimed at discouraging SilverScript beneficiaries into abandoning coverage determination requests to change to less costly drugs, they were palpably false.

11.    Along the way, SilverScript's CCRs became unsuspecting accomplices in the SSG/DNS Scheme, frequently themselves expressing confusion disappointment during beneficiary calls because (even though they could see on their computer screens that less costly generic alternatives should be available) they were unable to offer elderly, ESRD and disabled beneficiaries access to these less costly medications, which were blocked on the SilverScript formulary.

12.    Even if beneficiaries were occasionally able to fight through the misinformation they received from SilverScript, CVS Health ultimately has ensured the much costlier brand-name drug was still dispensed by requiring the CVS Pharmacies to block Part D claims for the less costly generic versions.

13.    At its core, the SSG/DNS Scheme has involved a calculated and widespread campaign of misinformation, deception, and outright lies to SilverScript beneficiaries. In doing so, CVS Health and its subsidiaries have denied Part D beneficiaries the opportunity to obtain less costly generic drugs by withholding information about generic options, lying to those who seek out pricing information on generic options, and denying formulary exceptions to those who are

occasionally able to get through the web of lies.

14.     If that were not enough, realizing there was even more profit to be made if beneficiaries' access to less costly options were eliminated entirely, the rebate deals that the CVS Caremark Entities had struck required the blanket denial of all formulary exceptions for certain of the SSG/DNS Scheme's most expensive drugs, specifically Gilead's Harvoni and Epclusa, driving elderly, ESRD and disabled beneficiaries into the Catastrophic Coverage Stage of their Part D benefits, where they faced substantial additional costs.

15.     Not just that, under the rebate agreements the CVS Caremark Entities had entered into with Gilead and GSK, the CVS Pharmacies were required to stop stocking not just the generic versions for Gilead's Harvoni and Epclusa but also GSK's Advair Diskus and Ventolin HFA, violating CMS's uniformity of benefits requirement.

16.     The sharing of sensitive competitive information across the CVS Health subsidiaries has ensured that the fraudulent SSG/DNS Scheme could be successful. Even though the fraudulent scheme violates Federal anticompetition laws as well as State laws requiring pharmacies to substitute generic medications for the costlier brand-name versions, because CVS Health owned (and therefore controlled) the SilverScript PDP, the Caremark PBM, and the CVS Pharmacies, any potential competitive discord between its goal of dispensing more expensive brand-name SSG/DNS Drugs and what Federal and State laws required would simply be ignored. Because of what they cynically termed internally as the "enterprise-wide" benefit to the parent CVS Health, they would simply flout any obligation to provide truthful, non-deceptive information to beneficiaries and/or to dispense the less costly generics.

17.     CVS Health's actions are particularly brazen because it had in 2012 entered into a Settlement Agreement and Consent Order with the FTC, under which it agreed for a period of

twenty (20) years that it would not make deceptive claims, directly or indirectly, "expressly or by implication, [in connection with] *the price or cost of Medicare Part D prescription drugs....*"[1]

18.     This fraudulent and deceptive conduct has had the blessing of the CVS Health Executive Committee, the committee of senior executives who were charged with overseeing activities across the parent corporation and its subsidiaries. Even though many in the organization (including the Relator) had raised concerns about the ethics and legality of the Scheme, and even though its Code of Conduct required these executives to "Do the Right Thing," the Executive Committee ignored these admonitions and approved it nonetheless because the financial benefit to the company was simply too tempting to pass up.

19.     The unfortunate casualties have been SilverScript elderly, ESRD and disabled beneficiaries.  In call after Customer Care call from these beneficiaries seeking less costly options, what comes through is that the increased cost for many would involve delaying or rationing needed lifesaving drugs, and for others the drugs would simply be unaffordable.  What also is clear is that the Executive Committee calibrated that the Scheme would be worth the risk because of their conclusion that only a few of the SilverScript beneficiaries would complain and, if they did call in to complain, would simply give up after being bounced from CCR to CCR.  Clearly, for CVS Health doing the "Right Thing" was only window dressing.

20.     But, as one caller, a 78-year-old retired nurse from Massachusetts, responded when told by the CCR she could only get the brand Advair Diskus she needed to treat her asthma instead of the 70% less costly generic: "It sounds like SilverScript just doesn't want to change because it's to their benefit.... I'm not feeling that they're thinking of the consumer.... It shouldn't be that way."

---

[1] FTC Agreement Containing Consent Order, *In the Matter of CVS Caremark Corporation,* File No: 112-3210, at Section VIII, p. 8 (emphasis added).

21.    Beyond the ethical and moral implications of deceiving SilverScript's vulnerable elderly, ESRD and disabled Part D beneficiaries, CVS Health's conduct also has violated numerous laws. Fundamentally, the SSG/DNS Scheme violates:

    a)    The FTC Consent Order that it would not, directly or indirectly, make deceptive claims about the price or cost of Medicare Part D prescription drugs, and is thereby liable for civil monetary penalties of up to $10,000 per violation, pursuant to Section 5(l) of the FTC Act.

    b)    Its obligation under the Federal antitrust laws not to engage in deceptive business practices that unreasonably deprive consumers of the benefits of competition.

    c)    Its obligation under the Federal antitrust laws not to share competitively sensitive information between its firewalled subsidiaries, which conduct was aimed at driving up prices for the SSG/DNS Drugs, thereby harming elderly, ESRD and disabled SilverScript beneficiaries.

    d)    Knowingly submitting or causing to be submitted hundreds of thousands of inaccurate, incomplete and untruthful prescription drug event ("PDE") records for the purpose of unlawfully obtaining reimbursement payments higher than those authorized by law.

    e)    Annually falsely attesting that, as a condition of participation, it had complied with Federal laws and regulations designed to prevent or ameliorate fraud and deceptive conduct, including compliance with the False Claims Act.

    f)    Submitting (or causing the submission of) what it knew to be false claims for the SSG/DNS Drugs furnished to SilverScript beneficiaries.

    g)    Submitting (or causing the submission of) what it knew to be materially false

records and statements in support of false claims presented to the Government.

22.    In furtherance of the illegal SSG/DNS Scheme, CVS Health has engaged in widespread fraudulent and deceptive conduct made possible by its derogation of:

a)  Its obligations to have in place a robust and effective compliance program.

b)  Its promise as spelled out in its Code of Conduct that it would operate fairly and ethically.

c)  Its obligation that it be honest and forthright in all its dealings with both the Government and Part D beneficiaries.

d)  Its obligation to fully and fairly adjudicate grievances and coverage determinations.

e)  Its duty to disclose differential pricing for less costly generic drugs to Part D beneficiaries.

f)  Its obligation to provide nondiscriminatory, uniform benefits under the Medicare Part D program.

g)  Its promise to submit truthful, accurate and complete records in support of Medicare Part D claims.

h)  Its agreement to pay only "valid" claims – *i.e.,* claims valid under State laws requiring mandatory generic substitution.

23.    CVS Health has made numerous false and misleading public statements and promises about its commitment to compliance and ensuring economical access to medication through competition. But these statements – like the falsehoods made to numerous Part D beneficiaries – were intended to help Defendants avoid detection and to conceal their fraudulent and deceptive conduct.

24.    As a direct result of Defendants' fraudulent, improper and illegal practices, the

United States has continued to:

   a)  Pay false or fraudulent claims related to invalid Part D prescriptions that would not have been paid but for CVS Health's intentional, illegal, improper, and reckless business practices.

   b)  Pay increased subsidies to SilverScript through direct advance monthly payments; reinsurance subsidies; low-income cost-sharing subsidies (or grants for low-income Part D individuals received in lieu of low-income subsidies); risk-sharing arrangements; and/or year-end retroactive adjustments and reconciliations.

   c)  Re-entered into contracts with CVS Health as a provider of Part D services through SilverScript, as a PBM through the CVS Caremark Entities, or contracted network pharmacies through the CVS Pharmacies, based on false annual attestations to the accuracy and truthfulness of its PDE data[2] and that they had complied "with . . . Federal laws and regulations designed to prevent or ameliorate fraud, waste, and abuse, including, but not limited to, applicable provisions of Federal criminal law [and] the False Claims Act (31 USC §§ 3729 et seq.)."[3]

25.    The aforementioned conduct is ongoing.

26.    The causes of action alleged herein are timely brought because, among other things, of efforts by Defendants to conceal from the United States its wrongdoing in connection with the allegations made herein.

---

[2] 42 C.F.R. § 423.505(k).

[3] 42 C.F.R. § 423.

## II.    PERFECTION OF FILING AND STANDING

27.    This Second Amended Complaint was properly filed in camera and under seal, as required by the FCA, and shall remain under seal for at least sixty days as required by said provisions.

28.    In advance of the filing of the Second Amended Complaint, Plaintiff properly served a copy of the Second Amended Complaint and written disclosure of substantially all material evidence and information supporting these allegations upon the United States.

29.    Relator is not aware of any "public disclosure," as that term is used in the FCA, of the allegations forming the core elements of the Counts against CVS Health.

30.    In the event there is found to be any such public disclosure, Relator is an "original source," as that term is used in the FCA, of the allegations or transactions forming the core elements of the cause(s) of action against CVS Health.

31.    In particular, Relator has direct and independent knowledge of the information on which the allegations are based, and voluntarily provided that information to the Federal Government before filing this action. Furthermore, and consistent with the meaning of "original source" under the FCA, Relator either "voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based" prior to any public disclosure under subsection (e)(4)(A), or has "knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions and voluntarily provided the information to the Government before filing" this action.

## III.    PARTIES

### A.    Relator

32.    Relator ELLSWORTH ASSOCIATES, LLP (hereinafter "Relator"), a Delaware limited liability partnership, brings this action on behalf of itself and the United States of America.

The registered office of Relator is located at 1925 Lovering Avenue, Wilmington, Delaware 19806, and the name of the registered agent at such address is The First State Registered Agent Company.

33.    Pursuant to Section 15-201(a) of the Delaware Revised Uniform Partnership Act, Relator is not distinct from its partners. At least one of its partners, Alexandra Miller, who by virtue of employment with CVS Health, at all times material hereto has had firsthand, personal knowledge of the false claims, statements, and concealments alleged herein.

34.    Ms. Miller was employed by CVS Health for 19 years, eventually being promoted to a senior executive position. She has extensive personal knowledge and experience regarding the SSG/DNS Scheme alleged herein, including personal contact with the CVS Health employees and executives who have committed violations of law alleged herein.

35.    When Ms. Miller complained to a supervisor that the SSG/DNS Scheme was unethical and violated the company Code of Conduct, the supervisor said that senior management on the Executive Committee (as well as the Chief of Compliance for CVS Health, Medicare, Patrick Jeswald) had already decided that the upside benefit to the "enterprise" was much greater than the risk that its wrongdoing would be detected by the Government.  As such, Relator had no recourse internally to redress these concerns.

36.    Relator thus has direct knowledge of the conduct alleged in this Second Amended Complaint and conducted an independent investigation to uncover false claims submitted to the United States. Accordingly, Relator is an "original source" of the non-public information alleged in this Second Amended Complaint within the meaning of the FCA.

**B.**     **Defendants CVS Health, SilverScript, , CVS Pharmacies, and CVS Caremark Entities**

37.     CVS HEALTH CORPORATION, formerly known as CVS Caremark Corporation, (hereinafter "CVS Health") is incorporated under the laws of the state of Delaware, and headquartered at One CVS Drive, Woonsocket, Rhode Island 02895.

38.     CVS Health has reported to the public that since at least 2007 it has been the largest provider of prescription and related healthcare services in the United States. During the year ended December 31, 2018, the Company's PBM filled or managed approximately 1.9 billion prescriptions on a 30-day equivalent basis. CVS Health operates three business segments: Pharmacy Services, Retail/Long-term Care, and Health Care Benefits:

- **The Pharmacy Services** segment provides a range of pharmacy benefit management ("PBM") plans, including plan design offerings and administration, formulary management, retail pharmacy network management services, mail order pharmacy, specialty pharmacy and infusion services, Medicare Part D services, clinical services, disease management services and medical spend management. The Pharmacy Services segment's clients include Medicare Part D prescription drug plans ("Part D plans" or "PDPs") throughout the United States. In addition, through SilverScript, CVS Health is a national provider of drug benefits to eligible beneficiaries under the Medicare Part D prescription drug program. The Pharmacy Services segment operates retail specialty pharmacy stores, specialty mail order pharmacies, mail order dispensing pharmacies, compounding pharmacies and branches for infusion and enteral nutrition services.

- **The Retail/Long-term Care ("LTC")** segment sells prescription drugs and general merchandise. As of December 31, 2018, the Retail/LTC segment operated

more than 9,900 retail locations. During the year ended December 31, 2018, the Retail/LTC segment filled approximately 1.3 billion prescriptions.

- **The Health Care Benefits** segment is one of the nation's largest diversified health care benefits providers, serving an estimated 38 million people as of December 31, 2018. The Health Care Benefits segment offers a range of traditional, voluntary and consumer-directed health insurance products and related services, including Medicare Advantage and Medicare Supplement plans, and PDPs.

39.    All prescriptions managed by CVS Health, whether filled at one of its own mail service pharmacies, its specialty pharmacies, or through one of its retail pharmacies, are uniformly and systematically analyzed, processed and documented by CVS Health's nationwide proprietary prescription management systems.

40.    According to CVS Health's own financial reports, these uniform computerized prescription management systems assist staff and network pharmacists in the processing of prescriptions by automating tests for various items, including plan eligibility, early refills, duplicate dispensing, appropriateness of dosage-drug interactions or allergies, over-utilization and potential fraud issues.

41.    SILVERSCRIPT INSURANCE COMPANY ("SilverScript") is a Tennessee corporation with its principal place of business located at 300 Montvue Rd., Knoxville, Tennessee. SilverScript is a corporate affiliate of CVS Health. SilverScript is the largest PDP in the United States and has the largest number of beneficiaries of any Medicare PDP in the country who are eligible for the low-income subsidy whereby the Government subsidizes most of the Part D premium, deductibles and cost sharing.

42.    CVS Health operates one of the largest PBMs in the United States, which includes

subsidiaries CAREMARK LLC, f/k/a CAREMARK INC. and CVS CAREMARK PART D SERVICES LLC (collectively "CVS Caremark Entities" or "Caremark"). The CVS Caremark Entities are headquartered in Woonsocket, Rhode Island. The CVS Caremark Entities, through SilverScript and other PDP Sponsors, provide PBM services (including formulary development and establishing and maintaining pharmacy networks) throughout the country. As reflected in quotes throughout this complaint and on its own website, CVS refers to the CVS Caremark Entities by various names, including "CVS Caremark" and as its "CVS Caremark PBM business."

43.    CVS PHARMACY, INC. ("CVS Pharmacy") is a Rhode Island corporation whose principal place of business is at the same location as CVS Health. CVS Pharmacy is owned and controlled by CVS Health. As alleged herein, CVS Pharmacy, Inc. includes its nearly 9,900 retail pharmacies located throughout the U.S., CVS Caremark Mail Service Pharmacy, Inc., CVS Specialty Pharmacy, Inc., Navarro Discount Pharmacies, Inc., and Longs Drugs, Inc. These entities shall collectively be referred herein as the "CVS Pharmacies."

44.    In short, CVS Health, through its subsidiaries, operates the Medicare PDP SilverScript, the CVS Caremark Entities, as well as retail, mail order, specialty mail order and retail pharmacies, the CVS Pharmacies, all of which conduct business throughout the United States and/or its legal territories, and in this District.

## IV.    JURISDICTION AND VENUE

45.    Pursuant to 28 U.S.C. § 1331, this District Court has original jurisdiction over the subject matter of this civil action since it arises under the laws of the United States—in particular, the FCA, 31 U.S.C. §§ 3729 *et seq.* ("FCA"). In addition, the FCA specifically confers jurisdiction upon the United States District Court.[4]

---

[4] 31 U.S.C. § 3732(b).

46.     This District Court has personal jurisdiction over CVS Health pursuant to 31 U.S.C. § 3732(a) because the FCA authorizes nationwide service of process and CVS Health has sufficient minimum contacts with the United States of America. Venue is proper in this district pursuant to 31 U.S.C. § 3732(a). CVS Health transacts business within this District, and acts proscribed by 31 U.S.C. § 3729, *et seq.* occurred in this district.

47.     CVS Health's operations within this District include numerous retail stores (operating fifty-eight CVS retail pharmacies in Philadelphia alone), along with offices in Blue Bell, Pennsylvania, and a substantial presence for its Medicare Part D Program SilverScript in this District, including some 96,419 enrolled SilverScript beneficiaries in Pennsylvania (many of whom reside in this District).  Moreover, at all times material hereto, the Philadelphia Regional Office for CMS has had direct oversight for the SilverScript plan.

## V.     NATURE OF ACTION

### A.     The False Claims Act

48.     The False Claims Act prohibits:

- "knowingly" presenting or causing to be presented to the United States any false or fraudulent claim for payment or approval, 31 U.S.C § 3729(a)(1)(A);

- "knowingly" making, using, or causing to be used or made, a false record or statement material to a false or fraudulent claim, *id.* § 3729(a)(1)(B); and

- conspiring to commit a violation of the FCA, *id.* § 3729(a)(1)(C).

49.     As defined under 31 U.S.C. § 3729(b), "knowing" and "knowingly" mean that a person: (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information.

50.     Under 31 U.S.C. § 3729(c), a "claim" includes "any request or demand, whether

under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded."[5] Under this language, Medicare claims submitted to Federal agencies are claims presented to the Federal Government and therefore give rise to liability under the FCA.

51.     Under the FCA, "the term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."[6]

52.     The FCA enforces certain principles that apply when one deals with the Federal Government. These include the fact that *caveat emptor* is replaced by a duty to "turn square corners" and be honest and forthright with the Government, and to deliver goods and services

---

[5] 31 U.S.C. § 3729(c).

[6] 3l U.S.C. § 3729(a)(D).

precisely according to the specifications mandated.[7] This principle is reflected in the fact that the

FCA mandates civil monetary penalties of not less than eleven thousand one hundred eighty-one

($11,181) or more than twenty-two thousand three hundred sixty-three dollars ($22,363) per

claim.[8]

      53.    In addition, when the misconduct results in the Government paying more than the

value it received, then that difference is subject to mandatory trebling. FCA damages are the

difference in value between what the Government paid and what it received.

      54.    According to Senator Charles Grassley, "when citizens contract with the

government, they contract with the taxpayers. When they cheat the government, they cheat the

taxpayers. Why does this matter so much? It matters because fraud on the government costs much

more than money . . . . '[F]raud erodes public confidence in the Government's ability to efficiently

---

[7] *Caveat emptor* does not apply when dealing with the Government. As stated long ago by Justice Holmes, "[m]en must turn square corners when they deal with the government." *Rock Island, Arkansas & Louisiana R.R. v. United States*, 254 U.S. 141, 143, 41 S.Ct. 55, 65 L.Ed. 188 (1920); *see also Fed. Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 385 (1947) (setting out the fact that "'[m]en must turn square corners when they deal with the Government,' does not reflect a callous outlook. It merely expresses the duty of all courts to observe the conditions defined by Congress for charging the public treasury"). Important here, the principle is also widely applied in FCA actions. *See, e.g., U.S. v. Rogan*, 517 F.3d 449, 452 (7th Cir. 2008); *U.S. ex rel. Compton v. Midwest Specialties, Inc*., 142 F. 3d 296, 302-05 & n.4 (6th Cir. 1998) (setting out that "parties that contract with the government are held to the letter of the contract – irrespective of whether the contract terms appear onerous from an ex post perspective, or whether the contract's purpose could be effectuated in some other way" and thus "the 'square-corners' rule applies fully in the False Claims Act context"), following *United States v. Aerodex, Inc*., 469 F.2d 1003, 1007 (5th Cir. 1972) (noting that '[t]he mere fact that the item supplied under contract is as good as the one contracted for does not relieve defendants of liability")(emphasis added); *U.S. v. Rivera*, 55 F.3d 703,709 (1st Cir. 1995) (setting out that "[b]y attaching liability to the claim or demand for payment [under (a)(l), the [FCA] encourages contractor [sic] to 'turn square corners when they deal with the government'"), quoted and followed by *Machado v. Sanjurjo*,559 F.Supp.2d 167, 174 (D. Puerto Rico 2008); *United States v. Bourseau*, No. 03-cv-907, 2006WL2961105, * 1 & n.l (S.D. Cal. 2006).

[8] 31 U.S.C. § 3729(a)(1).

and effectively manage its programs.'"[9]

**B.        Antitrust Remedies Under the Clayton Act, Section 4A**

55.    The antitrust laws prohibit business practices that unreasonably deprive consumers of the benefits of competition. In the case of access to affordable medications, no competition means higher prices, often resulting in inferior patient adherence to frequently lifesaving medicines.

56.    The three major antitrust laws are:

- The Sherman Antitrust Act prohibits all contracts, schemes and conspiracies that unreasonably restrain interstate and foreign trade. The law also prohibits monopolies.

- The Clayton Act prohibits mergers or acquisitions that materially diminish competition.

- The final piece of legislation in the government's antitrust arsenal is the Federal Trade Commission Act, which prohibits unfair methods of competition.

57.    Section 4A of the Clayton Act allows the government to recover treble damages for antitrust violations when the government itself is the victim.

58.    According to then Assistant Attorney General Makan Delrahim, "Section 4A of the Clayton Act is a powerful enforcement tool that empowers the United States to obtain treble

---

[9] Senator Charles Grassley, *Grassley: False Claims Act is Our Most Important Tool to Fight Fraud against Taxpayers*, Statement for the Record by Senator Chuck Grassley of Iowa, Chairman, Senate Judiciary Committee at a House Judiciary Subcommittee on the Constitution and Civil Justice Hearing on "Oversight of the False Claims Act," (April 28, 2016), https://www.grassley.senate.gov/news/news-releases/grassley-false-claims-act-our-most-important-tool-fight-fraud-against-taxpayers.

damages for anticompetitive conduct when the government is itself the victim."[10]

59.     Indeed, in 1955, Congress amended the Clayton Act to add Section 4A to ensure that the government fell within the statute's scope and could bring claims to recover damages where it was the victim of an antitrust violation. Originally, Section 4A allowed the government to recover only single damages; however, in 1990, Congress further amended the Clayton Act to allow the government to seek treble damages pursuant to that provision.[11]

**C.**     **Overview of Medicare Part D**

*1.     Medicare Part D Relies on a Competitive Marketplace Where Plans Negotiate Pricing that Provides Access to Affordable, Lifesaving Drugs*

60.     Medicare is a federally funded and administered health insurance program for certain groups, primarily elderly, ESRD and disabled persons. The Department of Health and Human Services ("HHS") administers the Medicare program through CMS. Medicare Part D, one of four parts of Medicare, is the voluntary prescription drug benefit program established in 2003 by the Medicare Prescription Drug, Improvement, and Modernization Act, Pub. L. 108-173, 117 Stat. 2066. It became effective January 1, 2006.[12]

61.     Medicare Part D is based on a private market model in which CMS contracts with private entities, known as "Sponsors" to administer prescription drug plans or "PDPs."[13]

---

[10] Makan Delrahim, *"November Rain"": Antitrust Enforcement on Behalf of American Consumers and Taxpayers* (Nov. 15, 2018) (Remarks as Prepared for Delivery at the American Bar Association Antitrust Section Fall Forum), available at https://www.justice.gov/opa/speech/assistant-attorneygeneral-makan-delrahim-remarks-american-bar-association-antitrust.

[11] *Id.*

[12] 42 U.S.C. § 1395w-101(a)(2).

[13] *Id*. § 423.265.

62.    For the Medicare Part D private model to operate successfully, according to the HHS Office of Health Policy, "[t]he United States relies on the interactions of private entities – drug manufacturers, health plans and pharmaceutical benefit managers (PBMs) – to achieve value by negotiating prices, operating formularies and implementing other benefit management strategies."[14]

63.    Policymakers envisioned the Part D program would rely on private plan sponsors that bear insurance risk competing in the marketplace to provide attractive benefit packages and drug prices that are fairly negotiated in order to make these often lifesaving medications more affordable.

64.    Plan sponsors that collude with others to increase prices for Part D drugs not only rob taxpayers, they cheat beneficiaries who often are forced to ration or abandon their medications altogether.  This is particularly insidious when this conduct increases prices for expensive drugs that force their Part D coverage into the Catastrophic Coverage Stage where beneficiaries face substantial additional costs.

65.    According to the Kaiser Family Foundation, between 2010 and 2019, the number of Part D beneficiaries with out-of-pocket spending above the Catastrophic Coverage threshold had tripled, and by 2019 nearly 1.5 million Medicare Part D enrollees had out-of-pocket spending

---

[14] HHS Assistant Secretary of Planning and Evaluation, *Medicare Part D: Competition and Generic Drug Prices* (Jan. 19, 2021), 2007-2018, at 2; *see also* Douglas Holtz-Eakin, Robert Book, *Competition and the Medicare Part D Program* (Sep. 11, 2013), available at https://www.americanactionforum.org/research/competition-and-the-medicare-part-d-program/

above the threshold.[15]

### 2. Medicare Part D Bids from PDPs Rely on Accurate, Complete, and Truthful PDE Records Submitted to CMS

66.    Instead of setting payments to Part D plans, Medicare's payments are based on bids submitted by private plan sponsors that reflect their average cost (including administrative expenses and an operating margin) of providing a basic outpatient drug benefit to an enrollee of average health.

67.    Under Part D, a PDP Sponsor submits a bid in the year prior to the calendar year in which benefits will actually be delivered, which contains a per member per month cost estimate for providing benefits to an average Medicare beneficiary in a particular geographic region.[16]

68.    From the bids, CMS calculates nationwide and regional benchmarks, which represent the average per member, per month cost.[17] If the Sponsor's bid exceeds the benchmark, the enrolled beneficiary must pay the difference as part of a monthly premium.[18] CMS then provides each PDP Sponsor with advance monthly payments equal to the Sponsor's standardized bid, risk-adjusted for health status, minus other amounts that the Sponsor is expected to receive from other sources.[19]

---

[15] Juliette Cubanski, Tricia Neuman, and Anthony Damico, *Millions of Medicare Part D Enrollees Have Had Out-of-Pocket Drug Spending Above the Catastrophic Threshold Over Time*, Kaiser Family Foundation (July 23, 2021), available at https://www.kff.org/medicare/issue-brief/millions-of-medicare-part-d-enrollees-have-had-out-of-pocket-drug-spending-above-the-catastrophic-threshold-over-time/

[16] *Id*. at §§ 423.265, 423.272.

[17] *Id*. at § 423.279.

[18] *Id*. at § 423.286.

[19] 42 C.F.R. § 423.293.

69.    When a PDP network pharmacy dispenses a drug to a Medicare beneficiary, it submits an electronic claim to the beneficiary's PDP and receives reimbursement from the Sponsor for the costs not paid by the beneficiary. The Sponsor (or its PBM) then submits a Prescription Drug Event ("PDE") record to CMS that reflects a drug has been purchased and dispensed. The PDE record includes the amount paid to the pharmacy by the beneficiary. The PDE is an electronically created document that includes multiple transactional and calculated fields about a specific drug dispensed.

70.    CMS uses this information in the PDE at the end of the payment year to reconcile its advance payments to the Sponsor with actual costs the PDP Sponsor incurred.[20] If a PDP Sponsor's actual costs exceed the estimated costs, the Sponsor may be able to recoup some of its losses through a risk sharing agreement with CMS.[21]  If a Sponsor's estimated costs exceed its actual costs by a specified amount, payments to the PDP Sponsor for the year are reduced and the Sponsor will have to pay back some its estimated payments.[22]

71.    PDP Sponsors subcontract with multiple entities to provide drugs to the Medicare Part D beneficiaries enrolled in their PDPs, including subcontracts with pharmacy benefits managers or "PBMs," which administer at minimum the PDP's formulary and pharmacy benefit and arrange for various pharmacies to participate in the plan's pharmacy network so members have "access to their needed drugs. As a condition for receiving its monthly payment from CMS, a PDP Sponsor must certify as to the accuracy, completeness, and truthfulness of all data related to the

---

[20] Instructions: Requirements for Submitting Prescription Drug Event Data ("CMS Instructions").

[21] *Id*. at 9–10.

[22] *Id*.

payment, which may include enrollment information, claims data, bid submission data, and any other data specified by CMS."[23]

72.      If the claims data has been generated by a subcontractor of a PDP Sponsor, such as a PBM, that entity must "similarly certify" that the claims data it has generated is accurate, complete and truthful, and must acknowledge that it will be used to obtain Federal reimbursement.[24]

73.      PDP Sponsors must also certify in their contracts with CMS that they agree to comply with all Federal laws and regulations designed to prevent fraud, waste, and abuse, including the False Claims Act.[25] CMS regulations require that all subcontracts between PDP Sponsors and downstream entities, including PBMs and pharmacies, require compliance by those entities with all applicable Federal laws, regulations, and CMS instructions.[26]

74.      Part D beneficiaries' coverage varies by the benefit design and cost of drug usage over the course of a plan year:

    a)  <u>Deductible</u>: As with most insurance plans, beneficiaries do not receive any benefits under Medicare Part D until their out-of-pocket costs for prescription drugs meets a modest deductible amount (up to $415 for 2019).  LIS 1, 2, and 3 beneficiaries do not have a deductible.  LIS 4 beneficiaries do have a reduced deductible.

    b)  <u>Initial Coverage Limits ("ICL")</u>: Once a beneficiary meets his or her deductible,

---

[23] 42 C.F.R. § 423.505(k)(1).

[24] *Id*. at § 452.505(k)(3).

[25] *Id.* at § 423.505(h)(1).

[26] *Id.* at § 423.505(i)(4)(iv).

they receive prescription drug benefits up to an annual cap ($3,820 for 2019).

c) <u>Coverage Gap (the "Donut Hole")</u>: After the beneficiary reaches the cap of the initial coverage, they fall into a coverage gap until their total out-of-pocket costs reach a threshold for catastrophic coverage ($5,100 for 2019). In the coverage gap, a beneficiary pays more for a brand-name drug that is more expensive than its generic alternative. The coverage gap discount program does not apply to LIS beneficiaries.

d) <u>Catastrophic Coverage</u>: After the beneficiary meets the threshold amount, they are again entitled to prescription drug benefits under a reinsurance scheme in which the United States Treasury pays 80% of drug costs, the PDP Sponsor pays 15% and the beneficiary pays 5%.

75.     Between 2007 and 2017, PDP responsibility for the basic non-Low Income Subsidy (non-LIS) benefit dropped significantly from 53 percent to 29 percent while the PDP responsibility for the basic LIS benefit dropped from 30 percent to 19 percent. Meanwhile, Medicare's share of benefits rose commensurately through reinsurance and LIS. According to a MedPac June 2020 report to Congress: "The magnitude of decreases in plans' share of [Part D] benefit liability raises significant concerns because it shifts substantial financial risk to the Medicare program and taxpayers and undermines a key feature of the Part D program: providing incentives for competing private plans that bear insurance risk for their enrollees' spending to negotiate prices with pharmacies and pharmaceutical manufacturers."[27]

76.     The MedPac concerns were in no small part the result of the collusion across CVS

---

[27] MedPac, Chapter 5: *Realigning incentives in Medicare Part D* (June 2020), at 120.

Health subsidiaries to require SilverScript formularies to include only more expensive brand-name drugs instead of lower cost, generic drugs.

### D.    Maintaining an Effective Compliance Program Is a Prerequisite for a PDP Sponsor to Obtain and Retain Part D Payments

77.    PDP Sponsors' obligations to the Medicare Program and the requirements for them to participate in the Program are set forth in CMS regulations and, each year, the PDP Sponsors must agree in writing to comply with those regulations.[28] In addition, PDP Sponsors must comply with requirements set forth in statutes, such as the FCA, and guidance documents, such as the Medicare Managed Care Manual and the Medicare Prescription Drug Benefit Manual.

78.    Among their other obligations, Medicare PDP Sponsors are required[29] to (i) maintain a compliance program to ensure the integrity of their payment data[30]; (ii) annually attest to the accuracy and truthfulness of that data[31]; and (iii) "comply with . . . Federal laws and regulations designed to prevent or ameliorate fraud, waste, and abuse, including, but not limited to, applicable provisions of Federal criminal law [and] the False Claims Act (31 USC §§ 3729 et seq.)."[32]

79.    Medicare PDP Sponsors are required[33] (i) to ensure the integrity of their payment

---

[28] 42 C.F.R. §§ 423.504, 423.505.

[29] 42 C.F.R. § 423.504(b)(4)(vi); IOM Pub. 100-18 Prescription Drug Benefit Manual Chapter 9.

[30] 42 C.F.R. § 423.504(b)(4)(vi).

[31] 42 C.F.R. § 423.505(k).

[32] 42 C.F.R. § 423.

[33] 42 C.F.R. § 423.504(b)(4)(vi); IOM Pub. 100-18 Prescription Drug Benefit Manual Chapter 9.

data[34]; (ii) annually attest to the accuracy and truthfulness of that data[35]; and (iii) "comply with . . . Federal laws and regulations designed to prevent or ameliorate fraud, waste, and abuse, including, but not limited to, applicable provisions of Federal criminal law [and] the False Claims Act (31 USC §§ 3729 et seq.)."[36]

80.     CMS requires PDP Sponsors must have a compliance program which is effective in detecting, correcting, and preventing Medicare program noncompliance.[37]

81.     The implementation of an effective compliance program is a prerequisite to a PDP Sponsor obtaining and retaining payments under Part D of the Medicare Program.[38] One purpose of requiring a compliance program is to ensure that the PDP Sponsor submits accurate and truthful information to CMS.

82.     The compliance program "must, at a minimum, include [certain] core requirements,"[39] including (but not limited to):

. . .

(F) Establishment and implementation of an effective system for routine monitoring and identification of compliance risks. The system should include internal monitoring and audits and, as appropriate, external audits, to evaluate the PDP, including first tier entities',

---

[34] 42 C.F.R. § 423.504(b)(4)(vi).

[35] 42 C.F.R. § 423.505(k).

[36] 42 C.F.R. § 423.

[37] 42 C.F.R. § 423.504(b)(4)(vi).

[38] *Id.*

[39] 42 C.F.R. § 422.504(b)(4)(vi).

compliance with CMS requirements and the overall effectiveness of the compliance program.

(G)   Establishment and implementation of procedures and a system for promptly responding to compliance issues as they are raised, investigating potential compliance problems as identified in the course of self-evaluations and audits, correcting such problems promptly and thoroughly to reduce the potential for recurrence, and ensuring ongoing compliance with CMS requirements.

> (1) If the PDP organization discovers evidence of misconduct related to payment or delivery of items or services under the contract, it must conduct a timely, reasonable inquiry into that conduct.

> (2) The PDP organization must conduct appropriate corrective actions (for example, repayment of overpayments, disciplinary actions against responsible employees) in response to the potential violation.

> (3) The PDP organization should have procedures to voluntarily self-report potential fraud or misconduct related to the Plan to CMS or its designee.[40]

83.   As part of an effective compliance program, a Sponsor must establish and implement systems to monitor and audit its First Tier, Downstream, and Related Entities ("FDRs"). Sponsors may enter into contracts with FDRs to provide administrative or health care services for enrollees on behalf of the Sponsor (*e.g.*, a PBM or a Call Center). However, the Sponsor maintains the ultimate responsibility for fulfilling the terms and conditions of its contract with CMS, and for meeting the Medicare program requirements.

---

[40] 42 C.F.R. § 422.504(b)(4)(vi)(F)-(G).

84.     In its compliance training materials, CMS has spelled out the requirement that Part D Sponsors must "implement and maintain an effective compliance program for its Medicare Parts C and D plans." Furthermore, the CMS training states "[a]n effective compliance program must":

- Articulate and demonstrate an organization's commitment to legal and ethical conduct;

- Provide guidance on how to handle compliance questions and concerns; and

- Provide guidance on how to identify and report compliance violations.[41]

85.     CMS further defines an effective compliance program as one that "fosters a culture of compliance within an organization" and "promotes the organization's Standards of Conduct."[42]

86.     A fundamental part of compliance with CMS's Medicare Part D requirements is acting ethically and honestly. CMS states that, "[a]s part of the Medicare Program, [a Part D Plan] must conduct [itself] in an ethical and legal manner. It's about doing the right thing!" To do so, a Part D Plan must, "[a]ct fairly and honestly, [a]dhere to high ethical standards in all [it does], [c]omply with all applicable laws, regulations, and CMS requirements, [and r]eport suspected violations."[43]

87.     Non-compliant conduct is conduct that does "not conform to the law, Federal health care program requirements, or an organization's ethical and business policies."[44] Areas CMS has

---

[41] Medicare Parts C and D General Compliance Training Web-Based Training Course January 2019, available at: https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/Downloads/MedCandDGenCompdownload.pdf.

[42] *Id*.

[43] *Id*.

[44] *Id.*

identified as high risk include appeals and grievance review, ethics, as well as pharmacy, formulary, and benefit administration.[45]

88.     CVS Health's own training module for its 2018 Medicare Part D Annual Certification of Compliance (the "Module") mirrors CMS guidance nearly verbatim, acknowledging its obligation to act ethically, legally, fairly, and honestly.[46]

89.     The CVS Health Module clearly defines fraud, waste and abuse as "knowingly and willfully executing, or attempting to execute, a scheme or artifice to defraud any health care benefit program, or to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program."[47] It further explains "abuse" as "actions that may, directly or indirectly, result in unnecessary costs to the Medicare Program. Abuse involves payment for items or services when there is not legal entitlement to that payment and the provider has not knowingly and/or intentionally misrepresented facts to obtain payment."[48] Waste is the overutilization of services, or other practices that, directly or indirectly, results in unnecessary costs to the Medicare program.

90.     The Module acknowledges the role all of the various CVS Health components play in combatting fraud, waste, and abuse ("FWA"),[49] including the CMS Contractor (Part D Plan

---

[45] *Id.*

[46] SilverScript, *2018 Annual Certification Medicare Parts C and D General Compliance & Combating Fraud, Waste, and Abuse Training Course* (January 2017), p. 11, available at http://pfsinsurance.com/wp-content/uploads/2018-SilverScript-Certification-Guide.pdf.

[47] *Id.* at 31.

[48] *Id.* at 32.

[49] *Id.* at 49.

Sponsor), PBMs (First Tier) and pharmacies (Downstream):



91.     The Module also explains that beyond the ethical guidelines spelled out by CMS, CVS Health incorporates into its compliance plan its Code of Conduct, which states its "expectations and the principles and values" by which it operates.[50]

92.     In turn, the CVS Health Code of Conduct spells out its commitment to "upholding the highest ethical standards and complying with applicable laws and regulations" and "federal health care program requirements."[51] In all its dealings with customers, CVS Health says its interactions will "help us put people on a path to better health."[52]

93.     The Code of Conduct says the company is committed to "Doing the Right Thing."[53] This means that, in undertaking all of its "contractual promises," while it strives to outperform its

---

[50] *Id.* at 12.

[51] CVS Health Code of Conduct (2019) at 4, available at https://cvshealth.com/sites/default/files/cvs-health-code-of-conduct.pdf.

[52] *Id.* at 21.

[53] *Id.* at 26.

competition, it will "do so honestly, openly, fairly and with integrity.  We will deal fairly with our customers, members, providers, clients, suppliers, regulators, shareholders and others around the world with whom we do business."  The Code very clearly states CVS Health will refuse to participate in any conduct "intended to mislead, manipulate or take unfair advantage of anyone. . . ."[54]

94.     The Code also makes clear that choosing not to follow a Medicare Program policy "could be interpreted by the government as fraud or payment abuse."[55]  Likewise, its Code of Conduct is the "underlying framework for our Medicare Compliance Program. . . ."[56]

95.     The Code includes this specific language concerning "Business firewalls":

As a good business practice, CVS Health maintains firewalls between select businesses within the Company to separate and protect certain competitively-sensitive information each business possesses.  Colleagues may not use competitively sensitive information that is held by the Company, to compete unfairly in the marketplace.  Competitively sensitive information includes contract terms, pricing and other financial arrangements.  These firewalls become important in contract negotiations, bid preparation, pricing services, and establishing financial arrangements, in which the businesses must compete on the same terms as their competitors.  Information firewalls also maintain commercial relations with CVS Health clients and suppliers who may be competitors to certain CVS Health business units.

96.     The 2019 version of the Code also explained that CVS Health had entered into two (2) Corporate Integrity Agreements ("CIAs") with the HHS Office of the Inspector General in 2014 and 2016 as part of settlements for alleged wrongdoing related to Federal health care fraud. Its 2014 CIA states, for example, that CVS Health "in accordance with the terms of the CIA" has

---

[54] *Id.*

[55] *Id.* at 27-28.

[56] *Id.* at 29.

implemented a compliance program to cover all parts of the corporation that "conduct business with Federal health care programs."[57]

97.     These CIAs reinforce the CVS Health "strong commitment to compliance with the law and the highest ethical standards of our colleagues."[58]

98.     The Code spells out the obligation of CVS Health leadership to "walk the talk" and "demonstrate the Company's values in all of their dealings on its behalf."  CVS Health leadership is to "[m]ake certain that colleagues understand what is expected of them both professionally and ethically."[59]

E.     **PDP Sponsors Are Obligated to Provide Beneficiaries a Full and Fair Process for Grievances and Coverage Determinations**

99.     A PDP Sponsor's central mission is to provide beneficiaries access to needed Part D drugs through their prescription drug benefits within a framework of Medicare Part D requirements that provide enrollees with a number of protections.

100.     As alleged herein, there is an underlying obligation that PDP Sponsors must act ethically and honestly in all their dealings with Medicare Part D Beneficiaries.  For example, Medicare beneficiaries have clearly spelled out rights and protections. For example, the CMS guidance states that "[n]o matter how you get your Medicare, you have certain rights and protections designed to [p]rotect you when you get health care[;] [m]ake sure you get the health

---

[57] Corporate Integrity Agreement between the Office of Inspector General of the Department of Health and Human Services and CVS Health Corporation, at 2, available at https://oig.hhs.gov/fraud/cia/agreements/CVS_Health_Corporation_10112016.pdf.

[58] *Id.* at 32.

[59] *Id.* at 34.

care services that the law says you can get[;] and [p]rotect you against unethical practices."[60]

101.    A Medicare beneficiary is entitled to "[g]et clear and simple information about Medicare to help you make health care decisions, including [w]hat's covered[;] [w]hat Medicare pays[;] [h]ow much you have to pay[;] [and w]hat to do if you want to file a complaint or an appeal."[61]

102.    A Medicare beneficiary is entitled to "[r]equest an appeal to resolve differences with your plan. You have the right to ask your plan to provide or pay for an item or service you think should be covered, provided, or continued. If your plan denies your request, you have the right to appeal that decision."[62]

103.    A Medicare beneficiary is entitled to "[g]et a coverage decision or coverage information from your plan before getting services. Before you get an item, service, or supply, you can call your plan to find out if it will be covered or get information about your coverage rules. You can also call your plan if you have questions about home health care rights and protections. Your plan must tell you if you ask."[63]

104.    Medicare Part D requirements[64] apply to stand-alone PDP Sponsors like SilverScript that offer prescription drug benefits directly to beneficiaries.  Sponsors are required

---

[60] CMS, *Medicare Rights & Protections*, at 5 (rev. Jan. 2018), available at https://www.medicare.gov/Pubs/pdf/11534-medicare-rights-and-protections.pdf.

[61] *Id.* at 6.

[62] *Id.* at 11.

[63] *Id.* at 12.

[64] *See* 42 C.F.R. § 423, Subpart M: IOM Pub. 100-18 Medicare Prescription Drug Benefit Manual, Chapter 18.

to enter into an agreement with CMS by which the Sponsor agrees to comply with a number of requirements based upon the Medicare Part D statute, regulations, and program instructions.

105.    A Sponsor's grievance and coverage determination operations serve as a "safety net" for improper formulary administration.[65]

106.    Improper processing of grievances and coverage determinations denies beneficiaries due process and appeal rights and may delay a beneficiary's access to medically necessary or life-sustaining services or drugs.[66]

107.    Medicare enrollees have the right to contact their PDP Sponsor to express general dissatisfaction with the operations, activities, or behavior of the PDP Sponsor or to make a specific complaint about the denial of coverage for drugs or services to which the enrollee believes he or she is entitled.

108.    Federal regulations authorize CMS to impose intermediate sanctions (such as suspension of enrollment and marketing), civil monetary penalties, or to terminate PDPs if it determines that medically necessary items and services have not been provided as required.[67]

109.    SilverScript has been a serial offender under the CMS enforcement regime.  For example, SilverScript received a serious enrollment sanction on January 1, 2013, suspending all enrollment of Medicare beneficiaries (pursuant to 42 C.F.R. § 423.750(a)(1)) and all marketing

---

[65] CMS Letter to Smart Insurance Company, *Notice of Immediate Imposition of Intermediate Sanctions (Suspension of Enrollment and Marketing) for Prescription Drug Plan Contract Number: S0064*, at 5 (April 23, 2013), available at https://www.cms.gov/Medicare/Compliance-and-Audits/Part-C-and-Part-D-Compliance-and-Audits/Downloads/Smart-Immediate-Sanction-4_23_2013.pdf.

[66] *Id.*

[67] 42 C.F.R, §§ 423.7500; 423.752(a); 423,509(a).

activities to Medicare beneficiaries (pursuant to 42 C.F.R. § 423.750(a)(3)). CMS imposed

> "intermediate sanctions immediately, effective January 15, 2013 at 11:59 p.m. EST, pursuant to 42 C.F.R. § 423.756(c)(2), because it has determined that [SilverScript's] conduct poses a serious threat to the health and safety of Medicare beneficiaries. A significant number of the [SilverScript] enrollee complaints describe instances where the member had to pay more out of pocket than was required under the terms of the benefit plan because [SilverScript] systems could not correctly adjudicate the member's claims in real time. For some beneficiaries, this meant paying a higher copay amount while others were charged the full cost of the drug. In many instances, beneficiaries could not afford the higher charge and left the pharmacy without their medication. SSIC has acknowledged to CMS that many of its enrollees have had difficulty obtaining their medications or are being charged incorrect co-pay or cost-sharing amounts.

110.    As part of imposing these very serious sanctions, CMS determined that:

- "[SilverScript] substantially failed to carry out the terms of its Prescription Drug Plan contract with CMS (42 C.F.R. §423.509(a)(1)); and

- [SilverScript] is carrying out its contracts with CMS in a manner that is inconsistent with the effective and efficient implementation of the program (42 C.F.R. §423.509(a)(2))."

111.    Even after it released SilverScript from these sanctions in late 2013, CMS said it still "considers [SilverScript] to be a high-risk sponsor, and will continue to closely monitor and oversee [SilverScript's] operational activities. [SilverScript] will be subject to targeted monitoring, including heightened surveillance and oversight."

112.    Just two years later, on November 20, 2015, CMS sent a Notice of Imposition of Civil Money Penalty to SilverScript, fining it $594,100 based on the fact that it had failed to provide beneficiaries with prescription drug benefits within a framework of Medicare requirements.[68]

---

[68] *See* CMS letter to SilverScript (Nov. 20, 2015), https://www.cms.gov/Medicare/Compliance-and-Audits/Part-C-and-Part-D-Compliance-and-Audits/Downloads/SilverScript_CMP_11_20_2015.pdf.

113.    Coming off these two CMS sanctions, SilverScript was particularly concerned that its conduct not be subject to sanctions again. Rather than toe the line, instead this has meant that it took what it knew to be measures to conceal its illegal conduct.  For example, SilverScript knew what triggered the 2013 sanctions was that CMS had detected patterns in beneficiary grievances. SilverScript also knew that CMS continued to monitor trends in its beneficiary grievances even after it had been released from the sanctions in late 2013.  As a result, SilverScript made sure that the SSG/DNS Scheme would not apply to new enrollees whose grievances would immediately draw increased attention during CMS audits.

114.    Likewise, after CVS Health and its subsidiaries entered into the Harvoni and Epclusa deals with Gilead in late 2018, rather than carefully monitoring member grievances to ensure it was acting legally, CVS Health took steps to make sure its conduct would not be uncovered.

115.    In all other circumstances, CVS Health used a formal root cause tagging system for grievances to track trends and monitor for member disruption.  This system was used frequently to tag actual drug names in cases of formulary disruption or potential member dissatisfaction when a drug is not covered.

116.    During a December 17, 2018 meeting, Ms. Miller was instructed that, rather than use its formal tagging system, she was to informally monitor beneficiary grievances for Harvoni and Epclusa behind the scenes to watch for any "member disruption" and/or grievances related to generic block for these drugs, and notify management.

117.    It was highly unusual for this monitoring to be done informally in this way, but it was the only way to prevent a paper trail (showing that CVS Health was concerned about members being disrupted) and also was the only way to keep front-line colleagues from being asked about

trends, which would create more risk for CVS.

118.    When she raised concerns with Emily Pefanis, Vice President Medicare Operations, on January 11, 2019, Ms. Pefanis said the blocking scheme was "highly unethical" and that she had had multiple conversations about the issue with Amy Moyer-Carey, Vice President Coverage Determinations, who was apparently "sick over this."  However, Ms. Moyer-Carey had been told by Mitch Betses (EVP Member Services), Todd Meek (President of SilverScript), and Patrick Jeswald (Chief Compliance Office, Medicare Part D) that "this is a new strategy," and they were to do this anyway.

119.    With regard to the conduct at issue, a PDP Sponsor like SilverScript that fails to meet Part D grievance and coverage determination requirements has impeded enrollees' access to medications. This failure violates 42 C.F.R. §§ 423.564(b) and 423.566, subjecting the PDP Sponsor to a Civil Money Penalty[69] because it has directly and adversely affected (or had the substantial likelihood of adversely affecting) enrollees' access to medications.

### 1.    *Grievances*

120.    According to the Medicare Modernization Act, all PDP Sponsors must provide meaningful procedures for hearing and resolving grievances between an enrollee and the Sponsor, including an entity or individual through which the Sponsor provides benefits.[70]

121.    A grievance is any complaint or dispute, other than a coverage determination, or appeal about any aspect of the operations, activities, or behavior of a Part D organization,

---

[69] 42 C.F.R. §§ 423.752(c)(1); 423.760(b).

[70] CMS, Medicare Part D Reporting Requirements (Jan. 1, 2020), https://www.cms.gov/files/document/cy2020part-d-reporting-requirements082719.pdf.

regardless of whether remedial action is requested.[71]

122.    PDP Sponsors are required to notify enrollees of their decision no later than 30 days after receiving their grievance based on the enrollee's health condition. An extension up to 14 days is allowed if it is requested by the enrollee, or if the PDP Sponsor needs additional information and documents that this extension is in the interest of the enrollee. An expedited grievance that involves refusal by a PDP Sponsor to process an enrollee's request for an expedited coverage determination or redetermination requires a response from the PDP Sponsor within 24 hours.[72]

### 2. Coverage Determinations

123.    The first level of review is the coverage determination, which is conducted by the PDP Sponsor, and the point at which beneficiaries or their physicians submit justification for the benefit. The enrollee, the enrollee's representative, or the enrollee's treating physician or prescriber may make a request for a coverage determination.

124.    Each PDP Sponsor must conduct meaningful and thorough coverage determinations and redeterminations by attempting to contact prescribing physicians or other prescribers to obtain supporting statements and additional medical documentation necessary to evaluate a request, as appropriate.

125.    If the coverage determination is adverse (not in favor of the beneficiary), the beneficiary has the right to file an appeal. The first level of the appeal – called a redetermination (Part D) – is handled by the PDP Sponsor and must be conducted by a physician who was not involved in the organization determination or coverage determination decision. If the first level appeal is adverse,  a second level of appeal – called a reconsideration (Part D) – is made to an

---

[71] *Id.*

[72] *Id.*

independent review entity ("IRE") contracted by CMS.

126.    There are different decision-making timeframes for the review of coverage determinations. If the Sponsor does not issue timely decisions for Part D coverage determinations or redeterminations, the decision is considered to be unfavorable to the enrollee and must be automatically sent to the IRE. Failure to provide enrollees and/or their providers, notice of decisions for coverage determinations or appeals within the required timeframes can result in enrollees failing to receive the approved services or reimbursement, or delays with accessing services and/or appeal rights.

**F.    FDA Approval of Generic and "Authorized Generic" Drugs**

127.    When a brand-name pharmaceutical manufacturer receives approval from the Food & Drug Administration ("FDA") to market a new pharmaceutical, the manufacturer typically receives a period of "exclusivity" during which it has the sole right to market the drug in the United States. In addition to the FDA exclusivity period, the brand-name manufacturer typically holds patent rights that prevent competitors from producing and marketing the same chemical compound. Because brand-name manufacturers market their drugs under a proprietary name rather than the name of the drug's generic active ingredient, they are referred to as "brand-name drugs."

128.    After the exclusivity period and patent rights expire, however, other pharmaceutical manufacturers may submit to the FDA an Abbreviated New Drug Application ("ANDA") and receive approval to market a generic version of the brand-name drug.

129.    Congress has made clear that access to less costly equivalent generic pharmaceuticals is to be encouraged, and, to that end, in 1984 enacted the Hatch-Waxman Act ("Hatch-Waxman"), which established an abbreviated pathway for approval of generic counterparts to non-biologic brand-name drug products.

130.    A principal goal of Hatch-Waxman was to trigger generic access to originator

products, many of which had enjoyed longstanding exclusivity. That goal has been achieved: According to the FDA, the competition spurred by Hatch-Waxman has saved more than $1.6 trillion for patients and the health care system.[73]

131.    A "generic drug," as that term is commonly understood and referred to by health care providers and insurers, is a copy of a brand-name drug that is developed and made by a company other than the company that makes the brand-name drug. A generic drug is the same as the brand-name drug in active ingredient, conditions of use, dosage form, strength, route of administration, and (with certain permissible differences) labeling. However, a generic drug may have certain minor differences from the brand-name product, such as different inactive ingredients.

132.    To obtain approval of a generic drug, a company must submit an ANDA to FDA and prove that its product is the same as the brand-name drug in the ways described above, and that it is "bioequivalent," meaning it gets to the part of the body where the drug works at the same time and in the same amount. A generic drug must also meet the same standards of quality and manufacturing as the brand-name drug. An ANDA applicant is not required to provide independent evidence of the safety and effectiveness of a proposed generic drug. Instead, the applicant relies on FDA's finding that a previously approved drug product is safe and effective. Therefore, it is generally less costly to obtain approval of a generic drug than a brand-name drug.

133.    The term "authorized generic" drug is most commonly used to describe an approved brand-name drug that is marketed without the brand-name on its label. Other than the fact that it does not have the brand-name on its label, it is the exact same drug product as the brand-

---

[73] *See* Kathleen "Cook" Uhl, *2016: A Record-Setting Year for Generic Drugs, U.S. Food & Drug Administration* (Feb. 24, 2017), available at https://blogs.fda.gov/fdavoice/index.php/2017/02/2016-arecord-setting-year-for-generic-drugs/ (noting that "2016 was a record-setting year for FDA's generic drug program," and that "[o]ver the last 10 years, generic drugs have saved the U.S. healthcare system about $1.68 trillion").

name product. An authorized generic may be marketed by the brand-name drug company, or another company with the brand company's permission. In some cases, even though it is the same as the brand-name product, a company may choose to sell the authorized generic at a lower cost than the brand-name drug.

133.    An authorized generic drug is the same as the brand-name drug, but does not use the brand-name on the label. Because an authorized generic drug is marketed under the brand-name drug's NDA, it is not listed in FDA's Approved Drug Products with Therapeutic Equivalence Evaluations (the "Orange Book").

135.    An authorized generic is considered to be therapeutically equivalent to its brand-name drug because it is the same drug. This is true even if the brand-name drug is "single source," meaning there are no ANDAs approved for that product, or coded as non-equivalent by the FDA in the Orange Book. While a separate NDA is not required for marketing an authorized generic, FDA requires that the NDA holder notify the FDA if it markets an authorized generic. The NDA holder may market both the authorized generic and the brand-name product at the same time.

136.    FDA publishes a list of reported authorized generics and updates that list quarterly.[74]

137.    To be clear, these are "generics" in name only. In fact, these products are the actual brand-name medications. They are simply marketed as a generic for price and insurance purposes. To be clear, these are "generics" in name only. In fact, these products are the same as brand-name medications, but may have a different color or marking. They are simply marketed as a generic for

---

[74] *See, e.g.,* FDA Listing of Authorized Generics (April 1, 2020), available at https://www.fda.gov/about-fda/center-drug-evaluation-and-research-cder/fda-listing-authorized-generics.

price and insurance purposes.

138.    This often happens when the brand-name drug is nearing its patent expiration.[75] For example, to forestall competition from a generic manufacturer, the brand manufacturer strikes a deal: in exchange for dismissal of pending patent infringement litigation, the generic manufacturer (often a division of the brand manufacturer) can market its brand-name drug as an authorized generic if it delays making its own generics for a certain period of time.

139.    For the brand company, an authorized generic launch may provide a means to hold onto some of the monopoly revenue it would lose from the termination of brand-name exclusivity that would otherwise go to the generic first-filer.

G.    **PDP Sponsors Are Obligated to Provide Beneficiaries Information about Access to Generic Drugs, Including Information About Differential Pricing for Less Costly Generic Drugs**

1.    *Medicare Part D Relies on Health Plans Competing Vigorously to Drive Adoption of Less Costly Generic Drugs.*

140.    Policymakers have long recognized the need for robust generic competition to help bring down the cost brand-name prescription drug costs.[76] The Medicare Part D prescription drug program – which covers 43 million American elderly, ESRD and disabled beneficiaries – relies on the assumption that health plans like SilverScript would vigorously compete to drive adoption of less costly generic drugs.[77]

---

[75] *Authorized Generic Drugs: Short-Term Effects and Long-Term Impact*, Federal Trade Commission (Aug. 2011).

[76] *See, e.g.*, Minority Staff of the U.S. Senate Committee on Finance, A Tangled Web:  An Examination of the Drug Supply and Payment Chains (June 2018), at viii.

[77] Kaiser Family Foundation, *An Overview of the Medicare Part D Prescription Drug Benefit* (October 2018), https://www.kff.org/medicare/fact-sheet/an-overview-of-the-medicare-part-d-prescription-drug-benefit/.

141.    However, Part D plans like SilverScript have instead often preferred higher-cost brand-name products over lower-cost generics, blocking beneficiary access to generics and generating additional costs to the Medicare program as well as to elderly, ESRD and disabled beneficiaries.

142.    Specifically, CMS has noted there are "instances when Part D sponsors are not including generic alternatives when available. Instead, sponsors are covering only the brand drugs, which decreases generic substitution and increases beneficiary costs."[78]

### 2.    *Medicare Requires PDPs to Advise Beneficiaries of the Cost Differential for the Lowest Price Generic Alternative.*

143.    As part of the requirement that drugs are provided economically to the Government, Medicare requires PDP Sponsors to have a "cost-effective drug utilization management program." This provision specifically requires PDP Sponsors have "incentives to reduce costs when medically appropriate, such as through the use of multiple source drugs."[79] Thus, Medicare explicitly recognizes that generics drugs can provide Medicare and Part D beneficiaries with more affordable alternatives and should be utilized.

144.    Medicare Part D not only requires Sponsors to reduce costs through making multiple source drugs available to beneficiaries, the statute also states that Sponsors are to require that pharmacies that dispense drugs covered by Part D must advise beneficiaries of any differential between the price of the drug to the enrollee and the price of the lowest-priced equivalent generic

---

[78] Centers for Medicare & Medicaid Services, *Announcement of Calendar Year (CY) 2020 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies and Final Call Letter* (April 2019), https://www.cms.gov/Medicare/Health-Plans/ MedicareAdvtgSpecRateStats/Downloads/Announcement2020.pdf.

[79] 42 U.S.C.A. § 1395w-104(c)(1)(A).

that is therapeutically equivalent and bioequivalent available at the pharmacy.[80]

145.    In its June 28, 2005 Final Regulations, CMS explained this disclosure requirement as follows:

> Under section 1860D–4(k) of the Act, Part D plans must provide that each pharmacy in their networks complies with the requirement to disclose to beneficiaries information about less expensive therapeutically equivalent and bioequivalent covered Part D drugs. Specifically, Part D plans must provide information about the differential between the price of the covered Part D drug to the enrollee (factoring in any applicable cost-sharing) and the price of the lowest-priced therapeutically equivalent and bioequivalent drug available at that pharmacy.[81]

146.    Section § 423.132 makes clear the disclosure requirements: "[A] Part D sponsor must require a pharmacy that dispenses a covered Part D drug to inform an enrollee of any differential between the price of that drug and the price of the lowest priced generic version of that covered Part D drug that is therapeutically equivalent and bioequivalent and available at that pharmacy, unless the particular covered Part D drug being purchased is the lowest-priced therapeutically equivalent and bioequivalent version of that drug available at that pharmacy."[82]

147.    Nor is the disclosure requirement limited only to instances in which the beneficiary requested the generic pricing information. Industry comments to the proposed regulations asked that pharmacies not be required to disclose pricing information unless the beneficiary had requested this information. CMS rejected this suggestion, responding that pharmacies must in all

---

[80] Medicare Modernization Act § 1860D-4 (k)(1); 42 U.S.C. 1395w-104(k)(1).

[81] Final Regulations, Medicare Program; Medicare Prescription Drug Benefit, 70 Fed. Reg. 4194, 4274 (Jan. 28, 2005).

[82] *Id.* at 4446. *See also* CMS, Prescription Drug Benefit Manual, Chapter 5:  Benefits and Beneficiary Protections, at 70 (Sept. 20, 2011), available at
https://www.cms.gov/Medicare/Prescription-Drug-Coverage/PrescriptionDrugCovContra/Downloads/MemoPDBManualChapter5_093011.pdf.

instances disclose the price of equivalent generic drugs because this requirement is designed to protect against withholding "valuable" information of which consumers may not be aware and "will save money for beneficiaries, PDPs, and Medicare":

> *Comment*: One commenter concerned with the burden on pharmacies to disclose pricing information stated that the disclosure requirement should be limited to cases in which an enrollee asks for this information at the pharmacy.

> *Response*: . . . **Part D plans must require network pharmacies**, except for those which we have specifically exempted from the requirement, **to disclose information about price differentials. We cannot limit this requirement to circumstances in which an enrollee specifically asks for the information.** Furthermore, **we believe such disclosure will provide enrollees**—many of whom may not know that less expensive generic equivalents are available—**with valuable information that will save money for beneficiaries, Part D plans, and Medicare**.[83]

148.    Likewise, CMS rejected limiting pricing disclosure to only those instances when the prescriber has stated "Do Not Substitute" (*i.e.,* DAW 2) because disclosing prices for less costly generics provides "valuable information that will save money for beneficiaries, Part D plans, and Medicare":

> *Comment*: One commenter recommended disclosure only when a brand-name drug is prescribed and the prescriber has not stated ''Do Not Substitute.''

> *Response*: . . .  Part D plans must require network pharmacies, except for those which we have specifically exempted from the requirement, to disclose information about price differentials. **We cannot limit this requirement to circumstances in which a prescriber has written a prescription for a brand-name drug and has not specifically stated that the pharmacy must not substitute the brand-name drug for a generic drug. We believe such disclosure will provide enrollees many of whom may not know that less expensive generic equivalents are available with valuable information that will save money for beneficiaries, Part D plans, and Medicare**.[84]

149.    Furthermore, the comments make clear that the Medicare PDP Sponsor is to ensure

---

[83] *Id.* at 4725 (emphasis added).

[84] *Id.* (emphasis added).

the pharmacies in its network comply with the requirement to disclose price differentials for less costly generic options: "Under section 1860D–4(k) of the Act, PDPs must provide that each pharmacy in their networks complies with the requirement to disclose to beneficiaries information about less expensive, therapeutically equivalent, and bioequivalent covered Part D drugs. Specifically, PDPs must provide information about the differential between the price of the covered Part D drug to the enrollee (factoring in any applicable cost sharing) and the price of the lowest priced therapeutically equivalent and bioequivalent drug available at that pharmacy."[85]

150.    As recently as May 17, 2018, then CMS Administrator Seema Verma reminded PDP Sponsors "that they must require their network pharmacies to disclose any differential between the price of a Part D drug and the price of the lowest cost therapeutically-equivalent generic version of that Part D drug."[86]

**H.    CMS Requires Pharmacies to Report "Accurate, Complete and Truthful" Generic Substitution Instructions as Part of Each Part D Claim**

*1.    Plans Must Submit Accurate DAW Coding as Part of Each Claim*

151.    CMS requires Plan Sponsors to submit data, referred to as PDEs, for each prescription for which the Plan Sponsor has paid.[87] PDE data are used, in part, to validate claims, monitor quality, and make year-end risk corridor calculations.[88]

152.    When pharmacies dispense drugs to Medicare Part D enrollees, the pharmacies

---

[85] *Id.* at 4274.

[86] *See* Seema Verma letter to PDP Sponsors, *Unacceptable Pharmacy Gag Clauses* (May 17, 2018), available at https://www.cms.gov/Newsroom/MediaReleaseDatabase/Press-releases/Other-Content-Types/2018-05-17.pdf.

[87] 42 C.F.R. § 423.329(b)(3) ("data collection"); CMS, Updated Instructions: Requirements for Submitting Prescription Drug Event Data, at 5 (Apr. 27, 2006) ("PDE Instructions").

[88] *Id.* at 5-6.

submit claims electronically to the enrollees' PDP Sponsor (often via a PBM) comprised of several pieces of information, including the ingredient cost (the cost of the drug itself), a dispensing fee, and any sales or similar taxes paid, less any payments received from the enrollee and any rebates received from the drug's manufacturer or distributor.

153.    CMS requires PDP Sponsors to submit PDE records containing 36 CMS and 20 NCPDP fields. The PDE Instructions explain that the PDP Sponsor is responsible for the submission of PDE data.[89] The PDE Instructions also state that, "[a]s a condition of payment, all Part D plans must submit data and information necessary for CMS to carry out payment provisions (§1860D-15(c)(1)(C) and (d)(2) of the Act, and 42 CFR §423.322)."[90]

154.    The PDE Instructions make clear that CMS "employ[s] the National Council for Prescription Drug Programs (NCPDP) industry standard whenever possible. Most data elements represent existing NCPDP fields where [CMS] employ[s] the same definition and field values that are currently in use per the NCPDP version D.0 drug claim standard."[91]

155.    "[E]ach data element and its specific potential use for CMS's payment process" is included in the PDE Instructions.

156.    Field 18 is particularly at issue here. Field 18 is entitled "DAW/Product Selection Code" and "indicate[s] the prescriber's instruction regarding substitution of generic equivalents or order to dispense the specific product written."[92]

---

[89] *Id.* at 9 ("For each dispensing event, the plan must submit a prescription drug event or PDE record.").

[90] *Id.* at 5.

[91] *Id.* at 11.

[92] *Id.* at 13.

157.    Ten numbers (0-9), called DAW codes, may be entered into Field 18 of the PDE record to indicate information about the prescriber's generic substitution instructions or lack thereof. The DAW Code indicates whether a generic drug was substituted for a brand-name one, and if not, why no substitution was made.

158.    The 2022 CMS PDE inbound file layout describes the DAW as follows:[93]

| FIELD NO. | FIELD NAME | NCPDP FIELD | POSITION | PICTURE | NCPDP, CMS OR PDFS DEFINED | DEFINITION / VALUES |
|---|---|---|---|---|---|---|
| 18 | DISPENSE AS WRITTEN (DAW) PRODUCT SELECTION CODE | 408-D8 | 170 - 170 | X(1) | NCPDP | 0=No Product Selection Indicated<br>1=Substitution Not Allowed by Prescriber<br>2=Substitution Allowed - Patient Requested Product Dispensed<br>3=Substitution Allowed - Pharmacist Selected Product Dispensed<br>4=Substitution Allowed - Generic Drug Not in Stock<br>5=Substitution Allowed - Brand Drug Dispensed as Generic<br>6=Override<br>7=Substitution Not Allowed - Brand Drug Mandated by Law<br>8=Substitution Allowed Generic Drug Not Available in Marketplace<br>9=Other |

159.    NCPDP has defined the ten numbers for filling the DAW Code as: [94]

| CODE | DESCRIPTION |
|---|---|
| 0 | No Product Selection Indicated - This is the field default value that is appropriately used for prescriptions for single source brand, co-branded/co-licensed, or generic products. For a multi-source branded product with available generic(s), DAW 0 is not appropriate, and may result in a reject. |
| 1 | Substitution Not Allowed by Prescriber – This value is used when the prescriber indicates, in a manner specified by prevailing law, that the product is Medically Necessary to be Dispensed As Written. DAW 1 is based on prescriber instruction and not product classification. |

---

[93] *See* CMS, "Prescription Drug Program (Part D)", https://www.csscoperations.com/internet/csscw3.nsf/DID/C7NXNZ6PBK

[94] *The Proper Use of the NCPDP® Telecommunication Standard Version D.0 as it applies to the Implementation of Medicaid Reimbursement Methodologies Based on Actual Acquisition Cost (AAC) Plus a Professional Dispensing Fee* Version 1.1 April 2017, available at https://www.ncpdp.org/NCPDP/media/pdf/wp/NCPDPTelecommMedicaidReimbursement.pdf.

| 2 | Substitution Allowed-Patient Requested Product Dispensed-This value is used when the prescriber has indicated, in a manner specified by prevailing law, that generic substitution is permitted and the patient requests the brand product. This situation can occur when the prescriber writes the prescription using either the brand or generic name and the product is available from multiple sources. |
| 3 | Substitution Allowed-Pharmacist Selected Product Dispensed-This value is used when the prescriber has indicated, in a manner specified by prevailing law, that generic substitution is permitted and the pharmacist determines that the brand product should be dispensed. This can occur when the prescriber writes the prescription using either the brand or generic name and the product is available from multiple sources. |
| 4 | Substitution Allowed-Generic Drug Not in Stock-This value is used when the prescriber has indicated, in a manner specified by prevailing law, that generic substitution is permitted and the brand product is dispensed since a currently marketed generic is not stocked in the pharmacy. This situation exists due to the buying habits of the pharmacist, not because of the unavailability of the generic product in the marketplace. |
| 5 | Substitution Allowed-Brand Drug Dispensed as a Generic-This value is used when the prescriber has indicated, in a manner specified by prevailing law, that generic substitution is permitted and the pharmacist is utilizing the brand product as the generic entity. |
| 6 | Override-This value is used by various claims processors in very specific instances as defined by that claims' processor and/or its client(s). |
| 7 | Substitution Not Allowed-Brand Drug Mandated by Law-This value is used when the prescriber has indicated, in a manner specified by prevailing law, that generic substitution is permitted but prevailing law or regulation prohibits the substitution of a brand product even though generic versions of the product may be available in the marketplace. |
| 8 | Substitution Allowed-Generic Drug Not Available in Marketplace-This value is used when the prescriber has indicated, in a manner specified by prevailing law, that generic substitution is permitted and the brand product is dispensed since the generic is not currently manufactured, distributed, or is temporarily unavailable. |
| 9 | Substitution Allowed By Prescriber but Plan Requests Brand – Patient's Plan Requested Brand Product To Be Dispensed - This value is used when the prescriber has indicated, in a manner specified by prevailing law, that generic substitution is permitted, **but** the plan's formulary requests the brand product. This situation can occur when the prescriber writes the prescription using either the brand or generic name and the product is available from multiple sources. |

160. As the NCPDP has stated, "[p]harmacy systems are coded to maintain compliance with the HIPAA-named NCPDP Telecommunication Standard and cannot alter the DAW code logic to support other situations. Manual exception override processes also create significant barriers to pharmacy workflow processes and negate training and policies that ensure standardization and compliance with the Telecommunication Standard."[95]

161. While Code 0 is the "default," NCPDP makes clear that, for "a multi-source

---

[95] *Id.* at 7.

branded product with available generic(s), *DAW 0 is not appropriate, and may result in a reject*."[96] (emphasis added)

162.    Caremark's own "Caremark Participating Pharmacy Administrative Manual" includes guidance on DAW Codes as well. As the manual says, "CAREMARK supports the NCPDP standard (Dispense As Written) DAW codes. To ensure accurate reimbursement, always include the correct (DAW) code when you submit a claim."[97]

163.    Caremark's Administrative Manual provides further guidance on DAW Codes:

| Dispense As Written (DAW) |
| --- |
| **DAW 0 - NO DISPENSE AS WRITTEN (Substitution Allowed) (or no product selection indicated)**<br>• Use the DAW 0 code when dispensing a generic drug; that is, when no party (i.e., neither Prescribing Provider, nor pharmacist, nor Participant) requests the branded version of a multi-source product.<br>• Use the DAW 0 code when dispensing a multi-source generic, even if the Prescribing Provider indicates the DAW code for the generic product and does not specify a manufacturer.<br>• Also, use the DAW 0 code when dispensing single-source brands (e.g., Lipitor®), because generic substitution is not possible. |
| **DAW 1 – PHYSICIAN writes DISPENSE AS WRITTEN**<br>• Use when the **Prescribing Provider** specifies the branded version of a drug on the hard copy prescription or in the orally communicated instructions.<br>• If Participant requests brand, and it is not a Prescribing Provider-initiated instruction, transmit the DAW 2 code. (See following instruction.) |
| **DAW 2 - PATIENT REQUESTED**<br>• Use this code when the **Participant** requested the branded drug even though the original prescription did not indicate "Dispense As Written". |
| **DAW 3 - PHARMACIST SELECTED BRAND** |
| **DAW 4 - GENERIC NOT IN STOCK** |

---

[96] Authorized generics are considered single-source if the product is only available from one labeler. A product with an authorized generic will become multi-source when products are available from additional labelers.

[97] Exhibit 1 (CVS-002944).

| Dispense As Written (DAW) continued |
| --- |
| **DAW 5 - BRAND DISPENSED, PRICED AS GENERIC**<br>• Use when dispensing a brand as a generic.<br>• Claims submitted with DAW 5 will be reimbursed at the generic price. |
| **DAW 6 - OVERRIDE** |
| **DAW 7 - SUBSTITUTION NOT ALLOWED; BRAND MANDATED BY LAW** |
| **DAW 8 - GENERIC NOT AVAILABLE** |
| **DAW 9 - OTHER** |
| **Remember:** Most Participants have a choice between brand and generic drugs. However, in some programs, the Participant will pay the difference between the cost of the brand and the available generic drug. Accordingly, correct DAW submissions indicate if a penalty is applicable. |

164.    If a pharmacy dispenses a brand-name multisource drug (a drug for which there is a brand-name and approved generic alternative from another labeler), the pharmacy must provide the basis for its decision not to substitute a generic in the form of a "Dispense as Written/Product Selection Code," or "DAW Code."

165.    CMS recognizes that "excessive use of certain DAW codes may raise red flags from an audit perspective, especially the use of DAW 1 on multi-source products. Review acceptable use of DAW 1 and DAW 9 codes with staff and emphasize appropriate documentation procedures."[98]

166.    The PDP Sponsor then is to use the information provided by the pharmacies, reformat it, and submit it to CMS as part of the PDE record. CMS uses the PDE information at the end of the payment year when it reconciles its advance payments to the PDP Sponsor with the

---

[98] Centers for Medicare and Medicaid Services, *Pharmacy Self-Auditing: Control Practices to Improve Medicaid Program Integrity and Quality Patient Care; Booklet 4: Billing Practices*, December 2015, available at: https://www.cms.gov/Medicare-Medicaid-Coordination/Fraud-Prevention/Medicaid-Integrity-Education/Downloads/pharmacy-selfaudit-booklet4-billing-practice.pdf.

costs the Sponsor has incurred throughout the year.

167.    Medicare Part D requires that, as a condition of payment, all PDP Sponsors must submit data and information necessary for CMS to carry out Part D's payment provisions, including claims information provided by the pharmacy for use in the PDE.[99]

168.    PDP Sponsors like SilverScript are "Health Care Providers" and "Covered Entities" under the Health Insurance Portability and Accountability Act ("HIPAA").[100]

169.    As HIPAA Covered Entities, PDP Sponsors and pharmacies are required to comply with certain electronic data transmission standards that CMS has adopted by regulation for pharmacy claims processing, including standards developed by NCPDP.[101]

170.    The CVS Pharmacies and all non-CVS owned pharmacies in its networks were also required by their contracts with the CVS Caremark Entities to comply with NCPDP's standards regarding the electronic processing of claims. For example, the CVS Caremark Entities' standard contract with network pharmacies required, for "on-line claim submissions," that the "Pharmacy Provider" "shall submit" "required fields identified in the NCPDP Telecommunication Standard format."

171.    Relying on the integrity of the claim information provided by the PBM and/or the network pharmacies, PDP Sponsors certify to CMS that the PDE information is accurate, complete, and truthful. 42 C.F.R. § 423.505(k)(3), entitled "Certification of data that determine payment," provides in relevant part:

---

[99] 42 U.S.C. § 1395w-115(c)(l)(C), (d)(2); 42 C.F.R. § 423.32.

[100] 42 U.S.C. 1320(d); 45 C.F.R. § 160.103.

[101] See 45 C.F.R. § 162 et seq.

CEO, CFO, or an individual delegated with the authority to sign on behalf of one of these officers, and who reports directly to the officer, must certify (based on best knowledge, information, and belief) that the claims data it submits under § 423.329(b)(3) ... **are accurate, complete, and truthful** and acknowledge that the claims data will be used for the purpose of obtaining Federal reimbursement. If the claims data are generated by a related entity, contractor, or subcontractor of a Part D plan sponsor, **the entity, contractor, or subcontractor must similarly certify (based on best knowledge, information, and belief) the accuracy, completeness, and truthfulness of the data** and acknowledge that the claims data will be used for the purposes of obtaining Federal reimbursement. [102]

172.    Section 423.329(b)(3) thus "relate[s] directly to the payment of Part D claims" and required the certification by SilverScript and its subcontractors that "the submitted data is accurate, complete and truthful."[103]

### 2. *Inappropriate Use of DAW Codes May Be Indicative of Fraud, Waste and Abuse*

173.    DAW codes are a crucial part of the PDE submission for multiple reasons. As one state Medicaid system put it, the codes are "an integral part of accurate billing" and provide "the reason why a specific brand or generic is dispensed based on the prescriber's instructions. Failure to accurately use DAW codes results in misinformation to the Pharmacy program and its decision making process. Misinformation on claims may also result in retrospective pharmacy review and/or recoupment. Inaccurate usage of DAW codes is among one of the discrepancies found during an audit . . . ."[104]

174.    CMS has specifically identified as an example of potential pharmacy fraud, waste

---

[102] 42 C.F.R. § 423.505(k)(3) (emphasis added).

[103] *U.S. ex rel. Fox Rx, Inc. v. Omnicare, Inc.*, 38 F.Supp.3d 398, 411 (S.D.N.Y. 2014).

[104] Alabama Medicaid Program, *Appropriate Utilization of Dispense As Written (DAW) Codes*, available at https://medicaid.alabama.gov/documents/4.0_Programs/4.3_Pharmacy-DME/4.3.2_Billing_Policy_Info/4.3.2_Appropriate_Utilization_DAW_Codes_10-3-12.pdf.

and abuse the "inappropriate use of dispense as written ('DAW') codes."[105] Furthermore, in a December 2015 guidance document, CMS also asked pharmacies to "[c]onsider the risk for fraud, waste, or abuse if pharmacy staff members adjudicate claims with inaccurate product selection [DAW] codes."[106]

175.    Whether a brand-name or generic drug ultimately is dispensed at the pharmacy starts with the prescriber writing the prescription. Most of the time a prescriber does not indicate one way or another whether the pharmacy should dispense the brand-name or the generic drug. In those cases, except in States that require mandatory generic substitution, the pharmacy is allowed to, and will typically, dispense the less costly option for the beneficiary and more profitable for the pharmacy. In limited circumstances, however, the prescriber may determine in his or her clinical judgment that a brand-name version of a drug is medically necessary. If that is the case, the prescriber indicates on the prescription in accordance with applicable law that the pharmacy is to dispense the brand-name product.[107]

176.    Once the prescription is received by the pharmacy, the pharmacy is responsible for

---

[105] Centers for Medicare and Medicaid Services, "Prescription Drug Benefit Manual, Chapter 9 -- Part D Program to Control Fraud, Waste and Abuse," Rev. 5, 09-26-08 at 51.

[106] Centers for Medicare and Medicaid Services, *Pharmacy Self-Auditing: Control Practices to Improve Medicaid Program Integrity and Quality Patient Care; Booklet 4: Billing Practices*, December 2015, available at: https://www.cms.gov/Medicare-Medicaid-Coordination/Fraud-Prevention/Medicaid-Integrity-Education/Downloads/pharmacy-selfaudit-booklet4-billing-practice.pdf.

[107] While these seventeen state mandatory generic substitution laws differ slightly in how prescribers may override the obligation to substitute with the generic, they all generally require prescribers to indicate that the brand is medically necessary, and are explicitly required to write "dispense as written," "no substitution allowed," or similar clear instruction on hard-copy prescriptions or to select the "dispense as written" field for e-prescriptions.

selecting at the point of sale the DAW code to include on the PDE record.[108]

177.    When submitting PDE records for reimbursement, however, the PDP Sponsor is responsible for assuring and certifying that the information in the PDE – such as the DAW Code – is "accurate, complete, and truthful" and "acknowledge that the claims data will be used for the purposes of obtaining Federal reimbursement."[109]

178.    The PDP Sponsor's responsibility to ensure the accuracy, completeness, and truthfulness of the data "includes if the claims data are generated by a related entity, contractor, or subcontractor of a Part D plan sponsor, the entity, contractor, or subcontractor must similarly certify (based on best knowledge, information, and belief) the accuracy, completeness, and truthfulness of the data and acknowledge that the claims data will be used for the purposes of obtaining Federal reimbursement."[110]

179.    Which DAW code the pharmacy chooses (and which is then certified as accurate by the PDP Sponsor) is determined by several variables, such as the prescriber's instructions, the patient's request for a brand-name or generic drug, state pharmacy law, and whether there are different versions of the prescribed drug (*e.g.,* if there is a generic version and a brand-name version). The combinations of these variables result in scenarios that are reflected in the DAW Codes submitted as part of the PDE record.

---

[108] *See The Proper Use of the NCPDP® Telecommunication Standard Version D.0 as it applies to the Implementation of Medicaid Reimbursement Methodologies Based on Actual Acquisition Cost (AAC) Plus a Professional Dispensing Fee* Version 1.1 April 2017, available at https://www.ncpdp.org/NCPDP/media/pdf/wp/NCPDPTelecommMedicaidReimbursement.pdf. ("[T]he data field Dispense as Written (DAW)/Product Selection Code (408-D8) is required to be sent by the pharmacy to the processor/PBM.").

[109] 42 C.F.R. § 423.505(k)(3).

[110] *Id.*

180.    Medicare uses the NCPDP standards to define the proper use of DAW Codes.[111] The most up-to-date NCPDP standards, NCPDP Telecommunication Standard Version D.0 (2017), define DAW Code 0 as:

> No Product Selection Indicated - This is the field default value that is appropriately used for prescriptions for single source brand, co-branded/co-licensed, or generic products. For a multi-source branded product with available generic(s), DAW 0 is not appropriate, and may result in a reject.

181.    While the title of DAW Code 0 indicates that Code 0 is for use when "no product is selected," the definition of DAW Code 0 indicates that it should only be used when dispensing generic products or single source brand-name products – not in every circumstance in which no product selection is indicated. As the NCPDP definitions make clear, a DAW Code 0 "is not appropriate" for brand-name drugs with an available generic.

182.    The conclusion that DAW Code 0 is not the correct DAW code when dispensing a brand-name product that has an available generic is supported by numerous other sources, including CVS Health's own internal guidance:

> CVS Caremark's Administrative Manual instructs pharmacists to "*Use the DAW 0 code when dispensing a generic drug*; that is, when no party (*i.e.*, neither Prescribing Provider, nor pharmacist, nor Participant) requests the branded version of a multi-source product." (emphasis added).[112]

183.    CVS's Provider Manual also includes a Reject Code for using a DAW Code 0 when dispensing a brand-name drug with available generics: "DAW 0 cannot be submitted on a multi-source drug with available generics. 407-D7, 408-D8."[113]

---

[111] *See Moeckel v. Caremark, Inc.*, 622 F. Supp. 2d 663, 683 (M.D. Tenn. 2007).

[112] Exhibit 1 (CVS-002944).

[113] *See* CVS, "Reject Codes: Provider Manual Appendix B," at p. 33 (June 1, 2019), https://www.caremark.com/portal/asset/CVSCaremarkPayerSheetRejectCodes.pdf

184.    Use of DAW Code 0 is therefore false when dispensing brand-name products that have generics available. This means that in the seventeen states where generic substitution is required, there is no correct DAW Code when a pharmacy chooses not to dispense an available generic drug in favor of a more expensive brand-name drug.  Any DAW Code submitted in those situations would thus be false.

185.    It makes sense that the DAW codes would not cover situations in which a pharmacy chooses to violate state law by not substituting a generic. When substitution of a generic is mandatory, the correct action is for the pharmacist to substitute the generic product and use DAW Code 0 (unless there are other extenuating circumstances like the generic not being in stock or the patient requesting the brand-name specifically). Even if a formulary only covers the brand-name product, these seventeen mandatory generic substitution States require that, if the generic cash price is less costly for the beneficiary, the pharmacy must dispense the generic.[114]

186.    Even in states that do not mandate generic substitution, DAW Code 0 is not correct when dispensing the brand-name product. Simply put, if a pharmacy dispenses a brand-name when a generic was available, the DAW code needs to reflect an accepted reason why.[115] The DAW codes provide the acceptable reasons (*e.g.,* prescriber indicates that the brand-name is medically necessary (DAW Code 1), the patient requests the brand-name (DAW Code 2), the generic drug

---

[114] In all but four mandatory substitution States (Florida, Minnesota, Nevada, and Tennessee), there is no requirement that the lower cost generic be on the formulary.

[115] *See The Proper Use of the NCPDP® Telecommunication Standard Version D.0 as it applies to the Implementation of Medicaid Reimbursement Methodologies Based on Actual Acquisition Cost (AAC) Plus a Professional Dispensing Fee* Version 1.1 April 2017, https://www.ncpdp.org/NCPDP/media/pdf/wp/NCPDPTelecommMedicaidReimbursement.pdf. ("[The DAW] field was intended to communicate to the processor/PBM the prescriber's instructions as to whether generic substitution is allowed, or alternate reasons as to why the multi-source brand-name product is being dispensed.").

is not in stock (DAW Code 4, *etc*.). The most up-to-date version of the NCPDP DAW codes also includes DAW Code 9.[116] NCPDP defines DAW Code 9 as:

> **Substitution Allowed By Prescriber but Plan Requests Brand – Patient's Plan Requested Brand Product To Be Dispensed** - This value is used when the prescriber has indicated, in a manner specified by prevailing law, that generic substitution is permitted, **but** the plan's formulary requests the brand product. This situation can occur when the prescriber writes the prescription using either the brand or generic name and the product is available from multiple sources.

187.    Thus, if a pharmacy in a non-mandatory substitution state chooses to dispense a brand-name version of a drug because of formulary considerations even though there is a generic available, the proper Code is DAW Code 9 – not DAW Code 0. Because the pharmacy does not have an obligation to dispense a less costly generic, it can choose to dispense the brand-name version even though it is more expensive if the plan wishes it to do so.[117] What the pharmacy cannot do, however, is to mispresent the reason why it chose to dispense the brand-name drug.

188.    Yet, following the instructions of the plan to dispense the brand-name drug and submitting the PDE with DAW Code 9 is not always correct. Using DAW Code 9 is incorrect if a pharmacy is in a mandatory substitution State when there are less costly generics available. Even though the DAW Code 9 can be used to indicate situations in which the plan requests the brand-name product instead of the generic, the DAW Code cannot be used to supersede state law. This Third Amended Complaint contains examples of DAW Code 9 being used when dispensing a

---

[116] Previous versions just had an "other" category as Code 9. CMS's 2022 PDE Inbound File Layout Effective 01/01/2022 also continues to use Code 9 as "Other."

[117] However, according to the CMS required provisions in the retail pharmacy contract include "Provisions governing informing the Part D enrollee at the point of sale (or at the point of delivery for mail order drugs) of the lowest-priced, generically equivalent drug, if one exists for the beneficiary's prescription, as well as any associated differential in price." 42 CFR §423.132. One in fact did exist with the applicable authorized generics and the "enterprise wide benefit" CVS sought negated pharmacies fulfilling this CMS required contractual element.

brand-name product in violation of state mandatory substitution laws.

189.    As part of the PDE record, SilverScript had to submit accurate DAW coding information indicating that the brand-name versions of the SSG/DNS Drugs were dispensed at the pharmacy in order to receive the correct – *i.e.*, higher –  reimbursement amounts for the brand-name versions.

190.    A pharmacy may only lawfully dispense a brand-name product in States requiring generic substitution in very limited circumstances. These circumstances include when the prescriber specifies that substitution is not allowed (DAW Code 1), when the generic product is not in stock (DAW Code 4), when prescriber has indicated that generic substitution is permitted and the pharmacist is utilizing the brand product as the generic entity (DAW 5), or when there is no generic product in the marketplace (DAW Code 8).

191.    There simply is no DAW Code for blocking the dispensing of an available generic drug in favor of a more expensive brand-name drug when generic substitution is mandated by State law.

I.    **Medicare Part D Claims for Unsubstituted Brand-Name Drugs Are Invalid Claims Under State Mandatory Generic Substitution Laws**

1.    *State Pharmacy Laws Apply to Determine Whether a Medicare Part D Prescription Is "Valid"*

192.    All contracts between CMS and PDP Sponsors must include the requirement that the Sponsor agrees to comply with state law.[118]

193.    Under the relevant Medicare Part D regulations,[119] a "Valid Prescription" is a "prescription that complies with applicable state law requirements constituting a valid

---

[118] 42 C.F.R. § 423.505(b)(15).

[119] 42 C.F.R. §§ 423.100, 423.104(h).

prescription." As such, the Part D regulations defer, "when applicable, to state law to determine whether a prescription is valid such that the prescribed drug may be eligible for Part D coverage."[120]

194.    This means that "State law applies in determining what constitutes a valid prescription and that Part D benefits should be available only for otherwise covered drugs that are dispensed upon a valid prescription."[121]

195.    Medicare regulations thus explicitly incorporate state law to determine whether a prescription is valid. The validity of a prescription is a necessary condition precedent for a prescription to be reimbursable by Medicare. All contracts between CMS and PDP Sponsors must include the requirement that the Sponsor agrees to comply with state law.[122]

196.    The 2012 changes to Medicare Part D regulations reflect "CMS codification of longstanding policy merely specifies in regulation that applicable State law applies in determining whether a prescription is valid."[123] This means that "State law applies in determining what constitutes a valid prescription and that Part D benefits should be available only for otherwise covered drugs that are dispensed upon a valid prescription."[124]

---

[120] *Medicare Program, Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Programs for Contract Year 2013 and Other Changes*, 77 Fed. Reg. 22072, 22152, 22159 (April 12, 2012), https://www.govinfo.gov/content/pkg/FR-2012-04-12/pdf/2012-8071.pdf. The 2012 changes to Medicare Part D regulations reflect "CMS codification of longstanding policy merely specifies in regulation that applicable State law applies in determining whether a prescription is valid." *Id*. at 22139.

[121] *Id.* at 22139.

[122] 42 C.F.R. § 423.505(b)(15).

[123] *Id.* at 22139.

[124] *Id.*

197.    It is the PDP Sponsor's obligation to ensure that its PBM and contracted network pharmacies are complying with the Part D requirement that prescriptions be valid under applicable state law.[125]

198.    Likewise, all pharmacies dispensing drugs to Medicare Part D beneficiaries remain subject to state pharmacy laws.[126]

199.    As part of their minimum pharmacy standards, seventeen States require that generic drugs must be substituted for brand-name drugs for all payors, including Medicare Part D, when the generic version of the brand-name drug is less costly for the beneficiary.[127]

200.    A PDP Sponsor (or its PBM) that submits PDE records to Medicare when it knows (or should have known) that the pharmacies in its network are not complying with the minimum pharmacy standards in that state, such as mandatory generic substitution laws, therefore has knowingly submitted (or caused to be submitted) false PDE records or statements which are untruthful, inaccurate and incomplete.

201.    It is the PDP Sponsor's obligation to ensure that its PBM and contracted network pharmacies are complying with the Part D requirement that prescriptions be valid under applicable state law.[128]

### 2.    *Sponsors Must Require That Pharmacies Comply with State Mandatory Generic Substitution Laws*

202.    Buying generic versions of prescription drugs instead of their brand-name equivalents can significantly reduce overall prescription drug costs across the health care system. Generics make up approximately 90% of all prescriptions, but they are only a fraction of overall

---

[125] *Id.*

[126] *Id.*

costs. Brand-name drugs make up the remaining 10%, but account for 79% of all drug spending. Furthermore, generic drugs have saved the U.S. health care system $1.67 trillion from 2007 to 2016.[129]

203.    State law dictates whether a pharmacist may substitute a brand-name drug with a less expensive generic version when dispensing a prescription.

204.    To increase access to generic drugs and reduce costs, state lawmakers have pursued allowing a pharmacist to make a generic drug substitution. Nearly every state allows pharmacists to substitute less costly generic drugs for brand-name drugs in certain circumstances.[130] In fact, as explained *infra*, many States have mandated substitution of less costly generic drugs instead of more expensive brand-name drugs.

205.    Medicare Part D mandates that the PDP must require that pharmacies providing services comply with minimum standards for pharmacy practice as established by the States.

206.    The standard pharmacy contracts such as those between SilverScript and the CVS Pharmacies require compliance with all state laws of the jurisdiction in which each prescription service was received, as well as regulations necessary to lawfully perform the duties required under the contract. Further, the contracts condition any payments thereunder upon the CVS Pharmacies'

---

[129] National Conference of State Legislatures, *Prescription Drug Resource Center, Generic Substitution Laws* (May 3, 2019), available at https://www.ncsl.org/portals/1/documents/health/Generic_Drug_Substitution_Laws_32193.pdf.

[130] *See, e.g.*, Ariz. Rev. Stat. Ann. § 32-1963.01(A) ("If a medical practitioner prescribes a brand-name drug and does not indicate an intent to prevent substitution as prescribed in subsection E of this section, a pharmacist may fill the prescription with a generic equivalent drug."); Ohio Revised Code ORC § 4729.38 ("Unless instructed otherwise by the person receiving the drug pursuant to the prescription, a pharmacist filling a prescription for a drug prescribed by its brand-name may, subject to the following conditions, select a generically equivalent drug, or in the case of a drug that is a biological product, select an interchangeable biological product:").

compliance with such applicable Federal and State laws, rules and regulations.[131]

207.    As part of their minimum pharmacy standards, seventeen States (hereinafter, the "States" or "State") require that generic drugs must be substituted for brand-name drugs for all payors, including Medicare Part D, when the generic version of the brand-name drug is less costly for the beneficiary.[132] These States' laws mandating generic substitution constitute the minimum standards for pharmacy practice with which Medicare Part D requires compliance. The relevant State laws include[133]:

|     | State | Citation |
| --- | --- | --- |
| 1.  | Florida | Fla. Stat. § 465.025 |
| 2.  | Hawaii | Haw. Rev. Stat. § 328-92 |
| 3.  | Kentucky | KRS 217.822 |
| 4.  | Maine | Me. Rev. Stat. Ann. Tit. 32, § 13781 |
| 5.  | Maryland | Md. Code Ann., Health–Gen. § 15-118(a) |
| 6.  | Massachusetts | Mass. Gen. Laws ch. 112, § 12D |
| 7.  | Minnesota | Minn. Stat. § 151.21(3) |
| 8.  | Nevada | Nev. Rev. Stat. § 639.2583 |
| 9.  | New Jersey | N.J. Stat. Ann. §24:6E-7 |
| 10. | New York | N.Y. Educ. Law §6816-a |
| 11. | Pennsylvania | 35 Pa. Cons. Stat. § 960.3 |
| 12. | Puerto Rico | P.R. Laws tit. 20, § 410b |
| 13. | Rhode Island | R.I. Gen. Laws § 5-19.1-19 |
| 14. | Tennessee | Tenn. Code Ann. § 53-10-205 |
| 15. | Vermont | VT. Stat. Ann. Tit. 18, § 4605(a) |
| 16. | West Virginia | W.Va. Code § 30-5-12b |

---

[131] 42 C.F.R. § 423.505(h)(15).

[132] Even with mandatory substitution laws, all States allow prescribers to block pharmacist substitutions. Most involve the prescriber specifically prohibiting a substitution by stating that the brand-name drug is (medically) necessary for the patient. The prescriber must also use language such as "no substitution should be made", "do not interchange" or "dispense as written/D.A.W."

[133] Certain other states require substitution in particular instances. Michigan and Mississippi require generic substitution if the patient requests it. *See* MCL 333.17755; Miss. Code. Ann. § 72-21-117. Washington requires generic substitution, but only for biologics. *See* WI ST 450.13.

| 17. | Wisconsin | WI ST 450.13 | |
|-----|-----------|--------------|--|

208.    The failure to substitute generic drugs for more costly brand-name drugs, and the submission of (or causing the submission of) false PDE records or statements in support of claims for payment to the Medicare Part D program is a violation of the State laws mandating generic substitution.

209.    All such unsubstituted claims so paid by PDP Sponsors like SilverScript were false as a result of unlawful conduct in refusing to require network pharmacies comply with State laws requiring mandatory substitution of generic drugs instead of costlier brand-name bioequivalent drugs.

210.    PDP Sponsors must certify that the information submitted in their PDE records and statements is truthful and complies with Medicare Part D's requirements to follow State laws. By virtue of their Electronic Data Interchange Agreements with CMS, PDP Sponsors and their subcontractor PBMs also expressly certify, among other things, that the data they transmitted in the PDE was "accurate and complete" to their "best knowledge, information and belief."

211.    A PDP Sponsor (or its PBM) that submits PDE records to Medicare when it knows (or should have known) that the pharmacies in its network are not complying with the minimum pharmacy standards in that State, such as mandatory generic substitution laws, knowingly has submitted (or caused to be submitted) false PDE records or statements which are untruthful, inaccurate and incomplete.

## VI.    CVS HEALTH HAS ENGAGED IN SYSTEMATIC DECEPTION AND ANTICOMPETITIVE CONDUCT

### A.    CVS Health's Compliance Program Was Inadequate to Prevent the SSG/DNS Scheme Fraud

212.    At all times material hereto, CVS Health was obligated to (i) maintain a compliance program to ensure the integrity of their payment data[134]; (ii) annually attest to the accuracy and truthfulness of that data[135]; and (iii) "comply with . . . Federal laws and regulations designed to prevent or ameliorate fraud, waste, and abuse, including, but not limited to, applicable provisions of Federal criminal law [and] the False Claims Act (31 USC §§ 3729 *et seq*.)."[136] The CVS Health compliance program must be effective in detecting, correcting, and preventing Medicare program noncompliance.[137]

213.    However, even after CVS Health entered into two (2) CIAs with the Office of Inspector General of the Department of Health and Human Services in 2014 and 2016, wherein it agreed to enhance its compliance programs, it nonetheless still included insufficient controls to prevent the SSG/DNS Scheme of deception and outright lies to Medicare and Part D beneficiaries as alleged herein.

214.    However, as alleged herein, the CVS Health compliance program and its Code of Conduct were a sham. In reality, CVS Health has systematically, unethically and illegally conspired across its subsidiaries to deceive program beneficiaries and the Government through their SSG/DNS Scheme to deny access to less costly generic drugs.

---

[134] 42 C.F.R. § 423.504(b)(4)(vi).

[135] 42 C.F.R. § 423.505(k).

[136] 42 C.F.R. § 423.

[137] 42 C.F.R. § 423.504(b)(4)(vi).

215.    Nor did CVS Health have sufficient controls in place to ensure that the CVS Pharmacies and non CVS Health-owned network pharmacies dispensed generic versions of the SSG/DNS Drugs as required in those States with mandatory generic substitution laws.

216.    The CVS Health Executive Committee was made aware of the potential compliance risk the company faced by implementing the SSG/DNS Scheme, but determined that (comparatively) the risk was worth the substantial upside to the company, particularly since the company faced severe austerity financial measures related to the delay in completing the Aetna acquisition.

217.    Likewise, numerous senior executives within CVS Health senior management (including the Relator) complained that this was highly unethical, and pointed out that this was in clear violation of its Code of Conduct.  Moreover, they were afraid that CVS Health pharmacists in charge of Medicare Part D coverage determinations would call the CVS Health "Ethics Line" over fears that they could lose their licenses because they were being asked to deceive beneficiaries.

218.    Illustrating that any compliance concerns raised would have fallen on deaf ears, the SSG/DNS Scheme had the explicit blessing of Patrick Jeswald, SilverScript Compliance Officer from 2013 through 2018 and current CVS Health Chief Compliance Officer, Medicare. For example, when Suboxone Film was added to the SSG/DNS Scheme, on March 5, 2019 Bethany Crotts (Clinical Advisor, Medicare Part D) emailed Jeswald to confirm whether he had any concern regarding the implementation of a block which would prevent SilverScript beneficiaries from receiving the Suboxone Film generic.  Jeswald responded the same day:  "No concerns."

219.    Instead of "Doing the Right Thing," as had been promised in its Code of Conduct, CVS Health and its subsidiaries have conspired together to engage in a systematic scheme of

dishonest and unethical behavior (a) to violate its obligation under the FTC Consent Order that it would not, directly or indirectly, make deceptive claims about the price or cost of Medicare Part D prescription drugs; (b) to violate its obligation under the Federal antitrust laws not to share competitively sensitive information between its firewalled subsidiaries, which conduct was aimed at increasing the cost of the SSG/DNS Drugs, thereby harming elderly, ESRD and disabled SilverScript beneficiaries; (c) to mislead and deceive Medicare Part D beneficiaries; (d) to submit false PDE records and statements in support of Medicare Part D claims which it knew were untruthful, inaccurate and incomplete; (e) to refuse to dispense less costly generic drugs in those States requiring mandatory generic substitution; and (f) to submit PDE data that was inaccurate, incomplete and untruthful and thereby made false attestations about compliance with the law.

## B.    CVS Health Deceived SilverScript Beneficiaries

220.    CMS encourages Part D sponsors to submit formularies similar to those in widespread use in the market. CMS will check the formulary to ensure inclusion of a range of drugs in a broad distribution of therapeutic categories and classes, in order to satisfy the Medicare Modernization Act (MMA) requirement that a sponsor's categorization system does not substantially discourage enrollment by any group of beneficiaries.[138] CMS will consider the specific drugs, tiering and utilization management strategies employed in each formulary, and will identify outliers from common benefit management practices for further evaluation. Sponsors may be asked to provide written clinical justification for unusual benefit features that are identified as outliers.[139]

221.    A PDP Sponsor such as SilverScript cannot lie to, mislead, or keep critical

---

[138] Prescription Drug Benefit Manual Chapter 6, Section 30.2.

[139] *Id.*

information from its beneficiaries to induce them to select a SilverScript plan, nor engage in deception about the availability of less costly, identical authorized generics after the beneficiary has enrolled in the plan. This is especially true when doing so results in elderly, ESRD and disabled populations not being able to obtain their needed medication.

### 1. SilverScript Failed to Provide Information Regarding the SSG/DNS Scheme to Prospective Part D Beneficiaries

222.    So that beneficiaries can make informed choices in selecting a Part D plan, under 42 § 423.128(b)(2)(iii), CMS required SilverScript to provide accurate information regarding cost-sharing (such as copayments, deductibles, and coinsurance). Section 423.128(b)(2)(iv) also required SilverScript to provide any other conditions associated with receipt or use of benefits. And, section 423.48 required SilverScript to provide information to allow "current and potential Part D eligible individuals the information they need to make informed decisions among the available choices for Part D coverage."

223.    Those disclosures did not happen here. To the extent that elderly, ESRD or disabled beneficiaries would have investigated further, at no time would the SSG/DNS Scheme have been disclosed in the SilverScript enrollment materials. For example, nowhere does the SilverScript formulary ever explain to potential members that *some of the time*, instead of making less costly, identical authorized generics the formulary choice, SilverScript would instead require them to pay higher costs for the brand-name product. Instead, the formulary only discloses that SilverScript would from time to time substitute the lower-cost generic drug, not the other way around.[140] This is discriminatory and violates the obligation that Part D plans "must offer the Part D benefit

---

[140]    SilverScript Choice (PDP) 2020 Formulary (List of Covered Drugs), at i, https://www.silverscript.com/pdf/FORM_2020_CHOICE_EN.pdf

uniformly within the plan's service area including any segments."[141]

224.    Truthful, accurate information about the SilverScript formularies was necessary for beneficiaries to make "informed decisions" about their coverage and plan choice. Yet, for any beneficiary who needed one of the SSG/DNS Drugs, SilverScript did not inform them that their cost share would be higher than if the identical authorized generics were available or that the cash price would often be less costly than the on-formulary SSG/DNS Drugs. SilverScript also did not disclose that, as a result of its games, the SSG/DNS Scheme would force them into the Donut Hole and the Catastrophic Coverage stages faster, nor that the Government's costs would increase dramatically.

225.    A recent Drug Channels article demonstrates how PDPs' gaming of the pricing of brand-name drugs induces beneficiaries with the promise of lower premiums. In Adam J. Fein's January 22, 2020 Drug Channels article entitled "Why Part D Plans Prefer High List Price Drugs That Raise Costs for Seniors,"[142] Fein illustrates that, despite drug manufacturers offering authorized generic products with lower list prices, Medicare Part D plans were rejecting the therapeutically identical and lower-priced authorized generic versions of these drugs. That decision significantly affects seniors' out-of-pocket costs because "Part D plans are needlessly costing many of them thousands of dollars." This practice also results in the Government's Medicare spending being "unnecessarily higher."[143]

226.    Especially relevant here, Fein highlights the pricing for Gilead's two hepatitis C

---

[141] CMS, Reinterpretation of the Uniformity Requirement (April 27, 2018).

[142] Adam Fein, *Why Part D Plans Prefer High List Price Drugs That Raise Costs for Seniors*, Drug Channels (Jan. 22, 2020), https://www.drugchannels.net/2020/01/why-part-d-plans-prefer-high-list-price.html.

[143] *Id*.

drugs, Harvoni and Epclusa, as well as the pricing for their identical authorized generics.[144] The article explains that the less costly authorized generic drugs are not being included on Medicare Part D formularies. According to Fein, the result has a significant impact for beneficiaries' cost for these drugs since they are pushed into the catastrophic phase sooner where their additional costs may be substantial:

> Medicare beneficiaries, unlike those in most private insurance plans, can face unlimited out-of-pocket prescription drug costs if they reach the catastrophic coverage limit. Medicare covers 80% of the cost in the catastrophic phase, while plans pay 15% and the beneficiary pays 5% coinsurance.

> Progression through the Part D benefit tiers is based on the prescription price negotiated between the plan and the pharmacy. That negotiated price excludes rebates, so beneficiaries reach catastrophic coverage—and its unbounded 5% out-of-pocket expense—sooner when using products with higher list prices.

> Manufacturers are not permitted to provide copayment support to beneficiaries of federal healthcare programs, *so the burden of using a higher-price product falls entirely on the patient*.[145]

227.    Here is a chart Fein shares to illustrate the dramatically increased costs for beneficiaries:

---

[145] Fein article (emphasis added).



**Figure 3**

While out-of-pocket costs for some <u>hepatitis C</u> drugs have decreased since their introduction, Part D enrollees still pay thousands of dollars for these medications

Median out-of-pocket costs in 2019: ▓ BELOW catastrophic threshold ▮ ABOVE catastrophic threshold

| Drug | Below | Above | Total |
|---|---|---|---|
| Zepatier | $2,271 | $351 | $2,622 |
| Mavyret | $2,269 | $1,251 | $3,520 |
| Epclusa | $2,272 | $3,010 | $5,283 |
| Vosevi | $2,262 | $3,045 | $5,306 |
| Sovaldi | $2,265 | $3,368 | $5,633 |
| Harvoni | $2,275 | $4,063 | $6,338 |

NOTE: Analysis reflects coverage and costs in 25 stand-alone prescription drug plans (mostly national/near-national), based on a pharmacy located in zip code 21201 (Baltimore, MD).
SOURCE: KFF analysis of 2019 Medicare Plan Finder data.

**KFF**

228.    According to Fein's calculations, a Part D beneficiary's median out-of-pocket costs for brand-name Epclusa were $5,283 and $6,338 for brand-name Harvoni. By comparison, if the less costly and identical authorized generics had been dispensed instead, he estimates that the out-of-pocket costs would be about $3,300.[146]

229.    As it was required to do under the CVS Caremark Entities' deal with Gilead, SilverScript has systematically preferred the SSG/DNS Drugs like Harvoni and Epclusa with higher list prices than the identical authorized generics. Requiring them to use expensive drug products like Harvoni and Epclusa pushes more beneficiaries into the Catastrophic Coverage Stage, where the plan liability is low, but where Medicare and beneficiary liability could be substantial.

230.    Fein describes the scheme as "gaming" which they use to reduce premiums,

---

[146] *Id.*

enabling them to sign up more Part D enrollees on their plans: "Here's the twist: Plans can use the additional rebates earned from the high-list price products to reduce monthly premiums and *grab more Part D market share*. The weird math of Part D bidding and its benefit structure encourage this gaming."[147]

231.   Illustrating how pernicious the Scheme is, it allowed CVS Health to collect more rebates from the Drug Makers, allowing SilverScript to reduce premiums and actually enabling SilverScript to sign up even more LIS beneficiaries through automatic enrollment.

232.   There were an estimated 13 million Part D LIS enrollees in 2021. Beneficiaries who are LIS qualify for the additional assistance, and CMS automatically enrolls them into PDPs with premiums at or below the regional average (the LIS "Benchmark") if they do not choose a plan on their own.[148]

233.   To qualify as a Benchmark plan, the PDP premium must be at or below the regional benchmark premium, calculated based on an enrollment-weighted average of the monthly premiums between all PDPs offered in the region.   LIS beneficiaries are automatically and randomly assigned evenly between regional Benchmark plans.[149]

234.   Since its exit from the CMS sanctions on December 20, 2013, SilverScript has relied heavily on auto-enrolling LIS beneficiaries for its growth.   Much of its growth was fueled

---

[147] *Id.* (emphasis added).

[148] Kaiser Family Foundation, *An Overview of the Medicare Part D Prescription Drug Benefit* (Oct. 13, 2021), available at https://www.kff.org/medicare/fact-sheet/an-overview-of-the-medicare-part-d-prescription-drug-benefit/.

[149] Rajul Patel, Mark Alberg, Joseph Woelfel, Michelle Amaral, Paresh Varu, *Medicare Part D Roulette: Potential Implications of Random Assignment and Plan Restrictions*, 3 Medicare & Medicaid Research Review E1, E2 (2013).

by the SSG/DNS Scheme with the Drug Makers to block less costly generics on its formularies.

### 2. *SilverScript's Marketing Materials Were Materially Misleading and Deceptive*

235.    The accuracy, completeness and truthfulness of marketing materials used by Part D Sponsors, allowing beneficiaries to choose and enroll with a particular Part D Sponsor, is very important for both the Part D beneficiary and the Medicare Part D Program because Part D beneficiaries are encouraged to choose a plan based on representations which will directly affect the coverage Medicare Part D will provide.

236.    However, for the SSG/DNS Scheme to succeed, the deals the CVS Caremark Entities had entered into required SilverScript to engage in systematic lies and deceit, starting with its representations to potential beneficiaries evaluating what PDP to choose and continuing through the administration of the plan. Throughout its solicitation materials provided to prospective Part D beneficiaries, SilverScript uses a bait-and-switch scheme to emphasize it is "All about you," deceptively telling elderly, ESRD and disabled prospective members that it will *always* act *only* on behalf of beneficiaries and not in its own self-interest.  Indeed, its marketing materials to prospective enrollees show happy seniors hiking through the woods, telling them it has "one focus": "to deliver Medicare prescription drug coverage that works well *every day, in every way*"[150]:

---

[150] SilverScript 2020 Plan Decision Guide Your guide to choosing a Medicare Part D plan, at I (emphasis added), https://www.silverscript.com/pdf/2020-plan-and-enrollment-guide.pdf



237.    As part of the sales pitch, SilverScript touts its expertise with Medicare Part D as a reason beneficiaries should trust it to be honest:  "We specialize in Medicare Part D — so you don't have to."[151]

238.    The message was that beneficiaries could trust SilverScript.  One marketing piece states that SilverScript is "[a]ll about quality, reliability and trust" and that "[m]illions of Medicare beneficiaries choose SilverScript for the coverage, copays . . . and customer care."[152]

## All about quality, reliability and trust.
**Millions of Medicare beneficiaries choose SilverScript year after year for the coverage, copays, convenience and customer care.**

---

[151] *Id.* at 3.

[152] SilverScript 2019 Plan Decision Guide.

This trust in SilverScript was misplaced. In reality, once beneficiaries were enrolled, SilverScript would not only block access to the generics of the SSG/DNS Drugs, it would mislead them about their price or cost.

239.    The SilverScript "Brand Promise"[153] to every Part D beneficiary emphasizes "**confidence**," "**comfort**," and "**consistency**." Beneficiaries were told SilverScript provided them with "trust and **peace of mind** that they have chosen the right plan that **cares** for them."  Not only that, but the Brand Promise was that, "[w]ith SilverScript, every prescription is more than a mere transaction; each is a commitment to demonstrate our expertise and sole focus on delivering Part D coverage that helps keep participants on their path to better health."



**SilverScript Brand Promise**

SilverScript®

For Medicare Part D beneficiaries, we offer **confidence** over confusion and **comfort** that comes with **consistency**.  With SilverScript, every prescription is more than a mere transaction; each is a **commitment** to demonstrate our **expertise** and sole focus on **delivering** Part D coverage that helps keep participants on their path to better health.

We've been here since Medicare Part D began in 2006, and we focus 100 percent on delivering prescription drug coverage that works well in every way, every day.  We go the extra mile to educate, explain and **empathize** and provide Part D beneficiaries with trust and **peace of mind** that they have chosen the right plan that **cares** for them.

What the Brand Promise does not mention is that SilverScript "trust and peace of mind" only went so far.  Often, when it was in CVS Health's financial interest, rather than having as its "sole focus" keeping beneficiaries on "their path to better health" through access to less costly (and identical) generic drugs, CVS Health looked to its own profit instead.

---

[153] *See* SilverScript 2016 Plan Year Preview, http://kafl.com/wp-content/uploads/2015/11/2016cvssilverscriptsneakpeakallstates.pdf.

240.    It used the lure of low premium costs, telling prospective customers: "SilverScript plans are affordable and comprehensive."[154]

241.    One SilverScript online direct ad shows an actor portraying a flyfisherman and tells viewers it will help prospective elderly, ESRD and disabled members "save money":



242.    The SilverScript marketing materials have also told prospective enrollees that using a SilverScript plan will help them "cover the cost" of their expensive prescription drugs: "Prescription drugs can be expensive. Our plans can help you cover the cost."[155]  And in another marketing piece, it tells customers they should choose SilverScript because it will "protect your health savings" through "lower premiums" and "competitive costs."[156]

243.    These claims are materially inaccurate.  If it were being honest, what SilverScript should have said is that it "[h]elps you save money *only some of the time*."  Sadly, for the SSG/DNS Drugs, SilverScript did not help defrauded beneficiaries at all, instead forcing them to take much costlier brand-name drugs.  Rather than giving them the "peace of mind" about their Medicare Part

---

[154] *Id.* at 11.

[155] *Id.* at 6.

[156] Why Choose SilverScript (PDP)?, https://www.silverscript.com/learn/why-choose-silverscript

D plan that they were promised, for any elderly, ESRD or disabled beneficiaries seeking less costly versions of the SSG/DNS Drugs, its message was, as one 82-year-old woman living in Florida put it when she was told she could not access the less costly Asacol HD, "tough luck."

244.    Nowhere in the promises made in its glossy marketing materials does SilverScript disclose that for many beneficiaries its SSG/DNS formulary choices would actually drive their costs into the Donut Hole and Catastrophic Coverage Stages much sooner, nor that these decisions would dramatically increase both their cost, but also the Government's cost sharing.

245.    What SilverScript failed to disclose are the warped incentives baked into its formularies, which allowed it to offer lower premiums to grab more market share of Part D customers. The SSG/DNS Scheme thus has forced many beneficiaries to face potentially substantial out-of-pocket prescription drug costs as well as dramatically increasing the Government's costs.

246.    Its marketing materials fail to disclose that, for SilverScript elderly, ESRD and disabled members seeking access to lower the cost of extremely expensive drugs like Harvoni, Epclusa, their efforts were doomed from the start because CVS Health had already made the decision at the highest levels of the company that SilverScript would deny all formulary exceptions. Not only that, if they got their medications from a CVS Pharmacy, they would soon find that the less costly authorized generics were not even being stocked on their shelves.

247.    Beneficiaries' Medicare rights were denied *in every instance* when SilverScript automatically denied formulary exceptions for less costly, lifesaving drugs they needed. Likewise, the SilverScript (through its PBM the CVS Caremark Entities and the CVS Pharmacies) violated

the obligation to "offer the Part D benefit uniformly"[157] *in every instance* when beneficiaries were unable to receive the less costly generics because the CVS Pharmacies were not stocking these drugs. These beneficiaries were thereby deceived about the benefits offered under the SilverScript plan. By not disclosing this information, CVS Health and its subsidiaries violated the terms of the 2012 FTC Consent Order because beneficiaries were being provided with deceptive information about their SilverScript coverage options.

248.    These claims are in explicit violation of Medicare directives that Plan Sponsors "are prohibited from distributing communications that are materially inaccurate, misleading, or otherwise make representations or could confuse beneficiaries."[158] Plan Sponsors "may not" "[u]se unsubstantiated absolute or qualified superlatives . . . ."[159]

249.    Not only has SilverScript engaged in a bad faith bait-and-switch scheme to induce beneficiaries to select its plans, once they were enrolled, it has routinely lied to them about the cost and availability of the SSG/DNS Drugs in order to prevent them from getting less costly, identical alternatives – *i.e.,* before the PDE is ever submitted. In doing so, as alleged herein, SilverScript has thereafter (a) violated State mandatory substitution laws and/or (b) created false PDE claim records which included false DAW coding (*see* discussion below). These misrepresentations and lies to beneficiaries have violated numerous laws and regulations.

---

[157] CMS, Reinterpretation of the Uniformity Requirement (April 27, 2018).

[158] Medicare Communications and Marketing Guidelines (MCMG), section 30.7 (July 20, 2018), at 6.

[159] *Id.*

C.      **In Order to Carry Out Its Illicit SSG/DNS Scheme, CVS Health Violated Its 2007 Firewall Agreement and the Terms of the 2012 FTC Consent Order**

### 1. *CVS Health and Its Subsidiaries Breached the 2007 Firewall*

250.    As a part of its 2007 agreement with the FTC, the merged entity would maintain "stringent firewall protections between [its] CVS Pharmacy retail business and [its] CVS Caremark PBM business to prevent any anti-competitive activity."[160] For example, in its Code of Conduct, CVS Health claims that it "maintains firewalls between select businesses within the Company to separate and protect certain competitively sensitive information that each business possesses."[161] One of the main reasons for requiring a firewall between these subsidiaries is to prevent the very type of illegal activity being complained of herein.

251.    With regard to sharing of sensitive competitive information between SilverScript and the CVS Caremark Entities specifically, CVS Health in 2018 told one Insurance Department that its long-standing "firewall policy prevents SilverScript employees from accessing competitively sensitive information Caremark has collected from health plans that compete with

---

[160] *See* Press Release, *CVS Health Statement on PA Auditor General's Report on PBMs* (Dec. 11, 2018), available at https://cvshealth.com/newsroom/press-releases/cvs-health-statement-on-pa-auditor-generals-report-on-pbms; *see* Press Release, *CVS Health Statement on Ohio Auditor of the State's Report on Pharmacy Benefit Managers* (Aug. 16, 2018) ("CVS Health maintains stringent firewall protections between our CVS Pharmacy retail business and our CVS Caremark PBM business to prevent any anti-competitive activity by either side of our enterprise"), available at https://cvshealth.com/newsroom/press-releases/cvs-health-statement-on-ohio-auditor-of-the-states-report. Moreover, at least one insurance department has ordered CVS Health to maintain a strict firewall policy. *See* Order of the Insurance Commissioner of the Commonwealth of Pennsylvania, Order No. ID-RC-18-14 (CVS Health ordered to "develop, implement, monitor the operation of and enforce strict compliance with a firewall policy that is applicable to the Domestic Insurers.").

[161] CVS Health Code of Conduct (November 2019) ("Such information includes contract terms, pricing and other financial arrangements. These firewalls become important in contract negotiations, in which the businesses must compete on the same terms as their competitors."), available at https://cvshealth.com/sites/default/files/cvs-health-code-of-conduct.pdf

SilverScript in the Medicare Part D area. There are robust compliance protocols in place at CVS Health to prevent any improper exchanges of information across its business units."[162]

252.    On June 4, 2018, Melissa Schulman, CVS Health Senior Vice President, Government Relations, testified at a hearing before the New York Standing Committees on Insurance and Health, assuring that CVS Health maintains a "firewall around business sensitive information and so the decision of the folks who look at pharmacy purchasing would have had no [insight] into the business information as to what was happening with the reimbursement on the Caremark side."[163]  Schulman reassured the Committees that the firewall had been part of its promise to the FTC in 2007 at the time of the merger between CVS and Caremark, as well as part of its Code of Conduct:

> It's part of a commitment that we made to the FTC when CVS and Caremark came together. It is part of our code of conduct. It is part of our training. That's where that's what that's based in. There are also computer safeguards that information is not inappropriately shared when it comes to business sensitive information as well. There's additional training. There are essentially waiting periods so people can't be employed in one side and then be employed in the other without essentially a cleansing period. We have a number of procedures around this.[164]

253.    When questioned whether firewalls would ever prevent "all those components from

---

[162] CVS Health Form A, *Statement Regarding The Acquisition Of Control Of Or Merger With A Domestic Insurer Aetna Life Insurance Company, Aetna Insurance Company Of Connecticut, Aetna Health And Life Insurance Company, Aetna Health Inc. (A Connecticut Corporation) And Aetna Better Health Inc. (A Connecticut Corporation) Subsidiaries Of Aetna Inc*., Connecticut Insurance Department (Amended Aug. 13, 2018), available at https://www.cidverifylicense.ct.gov/portalApps/viewFile.aspx?F=435.

[163] *See also* Testimony of Melissa A. Schulman, CVS Health Senior Vice President, Government Relations before the New York State Assembly Standing Committees On Insurance and Health Public Hearing CVS Health's Acquisition of Aetna Inc. (June 4, 2018), at 106, available at https://nystateassembly.granicus.com/DocumentViewer.php?file=nystateassembly_169e83e0d600bff7e5d3d9e8ad6f1e98.pdf&view=1.

[164] *Id.* at 107.

working together to maximize the power and profit of CVS [Health]," Schulman swore that "[t]here are, there will be and there are protections around that."[165]

254.    Schulman's pledge was demonstrably false even then. The firewall protections allegedly in place had already failed to prevent CVS Health from conspiring across its three wholly owned and vertically integrated subsidiaries to engage in the illegal SSG/DNS Scheme with the Drug Makers to block competition from less costly generic drugs.  In fact, as alleged herein, the SSG/DNS Scheme was only made possible because the parent corporation CVS Health owned and controlled the Medicare PDP (SilverScript), the PBM that administers the pharmacy benefit on behalf of SilverScript as the Plan (CVS Caremark Entities), and the retail, mail order, and specialty pharmacies that dispense the SSG/DNS Drugs (CVS Pharmacies).

### 2.  CVS Health and Its Subsidiaries Violated the 2012 Consent Order

255.    CVS Health's use of its position in the market to mislead and deceive has been the focus of enforcement actions and government concern since the consolidation of the various CVS Health entities in 2007.  For example, the CVS Caremark Entities in 2008 entered into a $41 million settlement and Consent Decree with 28 state Attorneys General with regard to its deceptive drug substitution business practices.[166]

256.    Again in 2009, two years after the merger, the CVS Caremark Entities' conduct caught the attention of health plans, independent pharmacists, and consumer groups, along with five U.S. Senators and over a dozen members of the House of Representatives, who asked the FTC

---

[165] *Id.* at 108.

[166] *See, e.g.*, Washington State Office of Attorney General, *Attorney General McKenna Announces Caremark to Pay $41 Million to Resolve Multistate Consumer Protection Claims* (Feb. 14, 2008), https://www.atg.wa.gov/news/news-releases/attorney-general-mckenna-announces-caremark-pay-41-million-resolve-multistate.

to investigate the potential anti-competitive effects of the merged retail-PBM business model and evaluate the potential risks for consumers and health plans when such a large portion of the pharmaceutical supply chain was controlled by one company.[167] Among the concerns raised was that the combination of a PBM and a retail pharmacy posed an inherent conflict of interest which would harm consumers.

257. According to Change to Win, a partnership of six million union members:

As a PBM, CVS Caremark is expected to save health plans money by negotiating lower drug prices with manufacturers and by promoting lower-cost drugs to participants, while ensuring that plan participants have access to medicine in a broad pharmacy network. As a retailer, CVS Pharmacy has an incentive to drive plan participants into its stores so it can fill the maximum number of prescriptions, particularly those with high markups, and has little incentive to help save health plans money.[168]

258. The concerns raised led to a three-year FTC investigation into whether Caremark was gaming its position as owner of a PBM and retail pharmacy to increase the cost of drugs to its members.[169]

---

[167] Reed Abelson, Natasha Singer, *5 Groups Call for the Breakup of CVS Caremark: Pressure Grows to Unwind CVS Merger*, New York Times (April 24, 2011) ("CVS Caremark has been accused by consumer advocates of not fulfilling promises made at the time of the merger; executives said then they would erect a firewall between the CVS and Caremark businesses and would be agnostic about where consumers filled their prescriptions."); *Providence Business Journal. FTC competition unit to examine CVS* (June 24, 2009), http://www.pbn.com/detail/43167.html. Letters to the Federal Trade Commission calling for a review of the CVS Caremark merger came from more than 17 members of Congress, six health plans and purchasing coalitions, and three consumer groups.

[168] CVS Caremark: An Alarming Merger, Two Years Later – How the CVS-Caremark merger increases health plan costs, creates obstacles to oversight, and threatens patient privacy (Nov. 2009), liye.info-cvs-caremark-prescription-drug-discounts-pr_13fed139fc3c7b9073a110d8f2b83c3a (1).pdf.

[169] *Id.* at 3 ("Now, in addition to collecting the health plan's payment for an expensive brand-name drug, Caremark may be able to manipulate the reimbursement rate to CVS Pharmacy in order to collect a higher profit.")

259.    At the conclusion of its investigation, the FTC levied penalties against CVS for its conduct. On January 3, 2012, as part of closing its investigation, the FTC entered into a settlement and consent order with CVS, which admitted liability and agreed to pay $5 million to resolve allegations that it had lied about the pricing of drugs to induce beneficiaries to select Medicare Part D coverage from its subsidiary RxAmerica. As the FTC explained in its press release announcing the settlement:

> In January 2012, the FTC had charged that CVS Caremark misrepresented the prices of certain Medicare Part D prescription drugs – including drugs used to treat breast cancer symptoms and epilepsy – at CVS and Walgreens pharmacies. The claims caused many seniors and disabled consumers to pay significantly more for their drugs than they expected and pushed them into the "donut hole" – a term referring to the coverage gap where none of their drug costs are reimbursed – sooner than they anticipated or planned. The settlement barred the deceptive claims and required CVS Caremark to pay $5 million to reimburse affected Medicare Part D consumers for the price discrepancy.[170]

260.    In the January 2012 FTC Complaint against CVS, it alleged that CVS as a matter of company policy had misrepresented, both expressly and by implication, its Medicare Part D pricing to beneficiaries.[171]

261.    In the Agreement and Consent Order which issued on the same day, CVS agreed for a period of twenty (20) years[172] that it would not "misrepresent, in any manner, or assist others in misrepresenting, in any manner, directly or indirectly, expressly or by implication, the prices or costs associated with Medicare Part D prescription drug plans.":

---

[170]  Press Release, https://www.ftc.gov/news-events/press-releases/2012/09/ftc-return-money-victims-allegedly-deceptive-drug-price-claims.

[171] FTC Complaint, *In the Matter of CVS Caremark Corporation*, Dkt. No. C-4357, ¶¶ 7, 11-16, 17, 18.

[172] FTC Agreement Containing Consent Order, *In the Matter of CVS Caremark Corporation,* File No: 112 3210, at Section VIII, p. 8.

**IT IS ORDERED** that Respondent, directly or through any corporation, partnership, subsidiary, division, trade name, or other device, and those persons in active concert or participation with them who receive actual notice of this order by personal service or otherwise, in connection with the marketing, advertising, promotion, distribution, offer for sale, sale or administration of Medicare Part D prescription drugs and Medicare Part D prescription drug plans, in or affecting commerce, **shall not misrepresent, or assist others in misrepresenting, in any manner, expressly or by implication, the price or cost of Medicare Part D prescription drugs or other prices or costs associated with Medicare Part D prescription drug plans.**[173]

262.    At the time, in response to a question from the District of Columbia Attorney General about what would happen if CVS violated the terms of the Consent Order, the FTC explained that "to the extent that [CVS Health] and/or any of its subsidiaries . . . violates the terms of the Commission's final order, such as by misrepresenting the price or cost of Medicare Part D prescription drugs, it would be liable for civil monetary penalties of up to $16,000 per violation, pursuant to Section 5(l) of the FTC Act."[174]

263.    Yet, despite this clear prohibition and the potential liability the Company faced, CVS Health's Executive Committee has used its position across the vertically integrated enterprise to coordinate the SSG/DNS Scheme, once again misleading beneficiaries "expressly or by implication" about the prices or costs (in addition to access) of the SilverScript plan. And what has enabled CVS Health to mislead beneficiaries has been its improper and illegal sharing of sensitive competitive information between the CVS Health entities.

### 3. The SSG/DNS Scheme Was Only Possible Because of Anticompetitive Conduct by CVS Health and Its Subsidiaries

264.    The typical arms-length structure between vertical competitors would have normally provided a competitive check and balance against the corrupt behaviors in the SSG/DNS

---

[173] *Id.* at Section I, p. 3 (emphasis added).

[174] FTC Letter to the Honorable Irvin B. Nathan, Attorney General for the District of Columbia (May 3, 2012).

Scheme. For example, pharmacies would ordinarily be incentivized to dispense generic drugs, rather than brand-name drugs, because the reimbursement is greater for the pharmacies on the generics and, because the cost to the pharmacy customers is lower for generics, customer satisfaction is higher. But under the SSG/DNS Scheme, even though some components of the business, like the CVS Pharmacies, would lose money (by not stocking the more profitable authorized generic drugs) or face potential compliance scrutiny, the vast profits to be made by CVS Health through the CVS Caremark Entities' rebate deals outweighed those concerns.

265.    The SSG/DNS Scheme worked because the highest levels of CVS Health leadership had determined that it provided what they euphemistically called an "enterprise-wide benefit" despite some in senior management (including the Relator) complaining that it was "highly unethical."

266.    Generally, there would be compelling commercial incentives on the part of vertically-integrated firms like CVS Health to ensure the confidentiality of their customers' or suppliers' competitively-sensitive information. Losing the trust of, and potentially the commercial relationships with, its customers or suppliers of one business unit within an enterprise in order to gain competitive advantage for another unit would in most circumstances have been economic suicide for CVS Health. In this instance, in order to reduce the risk of customer pushback, beginning in 2019, CVS Health made the calculated business decision not to deploy its Scheme with its employer customers contracting with the CVS Caremark Entities (where it might face considerable member complaints) and instead would begin restricting the illegal SSG/DNS Scheme only to its SilverScript Medicare Part D business (because it viewed the Government as not actively monitoring its conduct).

267.    CVS Health management thus concluded the minimal risk of being caught by the

Government was worth the upside profits it would reap from its PDP Sponsor (SilverScript) coordinating with the CVS Pharmacies and PBM the CVS Caremark Entities to prevent beneficiaries from having access to less costly generic drugs.  Moreover, the profits the enterprise hoped to pocket would make up for any financial losses any subsidiary would suffer – even if its conduct was not only a money-loser, but potentially illegal.

268.    Meanwhile, in order to blunt any potential scrutiny, CVS Health has publicly insisted it designs "formularies that encourage the use of generics and biosimilars, and [created] new tools to help bring escalating drug prices under control."

269.    CVS Health Executive VP and Caremark President Derica Rice even maintained in a 2019 article posted on the CVS Health website that the company used its "proven" strategies to control the cost of expensive drugs like Harvoni even after Gilead had introduced authorized generic copies of these extremely expensive Hep C drugs. Rice proclaimed that the CVS Caremark Entities' deals with Gilead and other SSG Drug makers would help its customers because it had "been able to use our proven cost management strategies and negotiated with manufacturers to help ensure plan members had access to appropriate therapies while clients could focus on controlling plan costs."[175]

270.    These were lies meant to deflect attention from its illegal conduct.  What Rice failed to mention is that the "proven cost management strategies" CVS Health had used for Harvoni and the other SSG/DNS Drugs did not provide "access" to the less costly authorized generic versions for elderly, ESRD, and disabled SilverScript members.  Instead, covertly, the CVS Health

---

[175] Derica Rice, *Why the Time is Right for a New Pricing Model: As Market Trends Evolve, Payors Need an Adaptable Approach* (March 19, 2019), https://payorsolutions.cvshealth.com/insights/why-the-time-is-right-for-a-new-pricing-model.

leadership had taken advantage of its enterprise-wide control of the CVS Caremark Entities, SilverScript and the CVS pharmacies to garner huge profits for itself by making the more expensive brand-name Harvoni and the other SSG/DNS Drugs the only SilverScript formulary options, thus driving beneficiaries' costs much faster into the Donut Hole and Catastrophic Coverage Stages.

271.    Likewise, CVS Health management knew that in seventeen states its pharmacies must dispense the generic versions of drugs according to State mandatory generic substitution laws.  Yet, the CVS Health Executive Committee made the deliberate decision that the CVS Caremark Entities would require its CVS Pharmacies to dispense the brand-name drugs instead of the less costly authorized generics.  In doing so, the Executive Committee knew this would be at the expense of beneficiaries and Medicare, and would be in violation of State mandatory generic substitution laws.

272.    The Scheme would not have been possible had the CVS entities (the CVS Caremark Entities, SilverScript, and the CVS pharmacies) been truly operating at arm's length as they had promised repeatedly since the 2007 merger. If they had operated at arm's length, the CVS subsidiaries would have ensured that each entity's business objectives, financial goals, pricing, and compensation would not be connected with the performance of the firewalled organization.

273.    Through its breaches of the firewalls, CVS Health has facilitated coordinated collusive activities between its subsidiaries and the SSG/DNS Drug Makers, which harmed Part D beneficiary access to less costly generic drugs.

274.    CVS Health's unified control over the vertically integrated enterprise has thus ensured that the fraudulent scheme could be successful because it viewed the risk of being caught was worth the significant profits it would garner.  So, even though the fraudulent scheme violated

its promised firewalls and the FTC Consent Order, as well as State laws requiring pharmacies to substitute generic medications for the costlier brand-name versions, because CVS Health owned and therefore controlled the Caremark PBM, the SilverScript PDP, and the CVS Pharmacies, any potential discord between what it wanted (dispensing of more expensive brand-name SSG/DNS Drugs) and what the law required could be easily swept aside.

275.    Had the CVS Health entities been truly operating behind a firewall, they would have been unable to carry out the SSG/DNS Scheme.  Because it would have been administering the Medicare Part D benefit in the best interests of its beneficiaries (instead of the interests of its corporate parent CVS Health), PDP Sponsor SilverScript would have had operated a robust and effective compliance program which would have ensured that beneficiaries had access to a full and fair grievance and coverage determinations process, and were fully informed of less costly generic options that should have been available to them.

276.    Likewise, had the firewall restricted access to business sensitive information, SilverScript would have (a) required the CVS Pharmacies and non-CVS Health owned network pharmacies disclose to beneficiaries accurate differential prices available for less costly (often identical) generic drugs; (b)  required the CVS Pharmacies and non-CVS Health owned network pharmacies to substitute the less costly generic drugs as mandated by State generic substitution laws; (c) would have "submitted [PDE] data [that] is accurate, complete and truthful"; and (d) made truthful attestations about its compliance with the law.

277.    The harm alleged goes directly to the quality of healthcare the SilverScript beneficiaries have received.  CVS Health itself recognizes that, "when prescriptions are more affordable, patients are more likely to keep taking them – and that leads to healthier people and

communities."[176] Despite this recognition, and in violation of the promised firewalls between these entities, CVS Health and its wholly owned subsidiaries conspired to carry out the SSG/DNS Scheme and thus recklessly disregarded the adverse health impact it has had on Medicare Part D beneficiaries.

## VII.    CVS HEALTH FRAUDULENT SINGLE SOURCE GENERIC SCHEME

278.    The SSG/DNS Scheme was initially offered for SilverScript and other Medicare PDP Sponsors which contracted with the CVS Caremark Entities for PBM Services.[177] Beginning in 2019, however, out of concerns that other PDP Sponsors (which had far fewer LIS beneficiaries) would have far more members push back on the illegality of the conduct, CVS Health made the intentional decision to restrict the SSG/DNS Scheme only to its SilverScript standalone PDP where (because it had a high percentage of LIS members whose copayments would see little impact) it would encounter very few complaints.

279.    Until 2018, even though it had engaged in systematic misinformation and deception in its coverage determination process, CVS Health still routinely had approved all SilverScript SSG formulary exceptions, thus still allowing beneficiaries access to less costly generic drugs, even in situations where the beneficiary would be receiving the clinically equivalent authorized generic.

280.    Only in late 2018 with the CVS Caremark Entities' addition of Gilead's Harvoni and Epclusa to the SSG/DNS Scheme (as alleged below) did SilverScript begin its blanket denials of formulary exceptions for the SSG/DNS Drugs.  Likewise, in violation of its obligation that it

---

[176] Exhibit 2 (CVS-001427).

[177] Exhibit 3 (CVS-002069).

"must offer the Part D benefit uniformly,"[178] the CVS Caremark Entities' deals required that the CVS Pharmacies no longer stock the authorized generics of: (a) Gilead's Harvoni and Epclusa, and (b) GSK's Advair Diskus and Ventolin HFA.  Most alarming is that this has meant not only that the authorized generics were unavailable to SilverScript beneficiaries who fill scripts at the CVS Pharmacies, but also would not have been available to the 45 million Part D beneficiaries, many of whom would have filled their prescriptions at a CVS Pharmacy.  In 2019, some 34.55% of all prescriptions filled in the U.S. were filled at a CVS Pharmacy.

A.      **The SilverScript PDP**

281.    In total, SilverScript is one of the largest standalone Medicare Part D Program plans, having 5.994 million beneficiaries in 2019[179] and 6.134 million beneficiaries in 2018.[180] For 2019, SilverScript offered three plans: SilverScript Choice, SilverScript Plus, and SilverScript Allure.

282.    For the SilverScript plans, the drugs included on its formularies are categorized into five cost-sharing tiers. The formulary tiers indicate the level of cost-sharing for a covered drug. In general, the higher the tier (*e.g.*, Tier 5), the higher the beneficiary's out-of-pocket cost for the covered drug. The 5 tiers are: Cost-Sharing Tier 1: Preferred Generic; Cost-Sharing Tier 2: Generic; Cost-Sharing Tier 3: Preferred Brand; Cost-Sharing Tier 4: Non-Preferred Drug; Cost-Sharing Tier 5: Specialty Tier.

283.    The majority of the SilverScript beneficiaries are in the SilverScript Choice Plan, while approximately 180,000 beneficiaries are in the SilverScript Plus Plan, and approximately

---

[178] CMS, Reinterpretation of the Uniformity Requirement (April 27, 2018).

[179] CVS Health 2020 Annual Report, at 80.

[180] CVS Health 2019 Annual Report, at 71.

10,000 beneficiaries are in the Allure plan. About 40-50% of the Choice Plan are LIS beneficiaries receiving Extra Help from Medicare resulting in subsidized costs for prescriptions; very few beneficiaries in the Plus and Allure plans are subsidized. SilverScript has more LIS beneficiaries than any other Medicare Part D plan in the U.S.

284.    For those SilverScript LIS beneficiaries who receive Extra Help, all or some of the copayments and cost-sharing usually paid by beneficiaries is instead subsidized by Medicare.

285.    This fact made SilverScript particularly susceptible to abuse through the SSG/DNS Scheme. Because the LIS beneficiaries did not see large differences in their out-of-pocket expenses, CVS Health senior leadership overseeing the SSG/DNS Scheme concluded these beneficiaries were less likely to be price sensitive and therefore would be less concerned with the large copayment differences between the brand-name drugs and their generic versions.

286.    The costs for subsidizing low-income beneficiaries are significant.  The Federal Government pays approximately 18% of the drug cost of Medicare Part D for non-low income beneficiaries. The Federal Government subsidizes on average 65% of the drug cost of Medicare Part D for each beneficiary receiving the low income subsidy benefit.[181]

287.    Even though the Executive Committee members understood there would be significant impact on non-LIS beneficiaries whose Catastrophic Coverage Stage was not subsidized by Medicare, they concluded that the few complaints they would receive from non-LIS beneficiaries would not be enough to offset the significant profits that the CVS Caremark Entities would garner from the illegal scheme.

---

[181] 2012 Annual Report of the Boards of Trustees of the Federal Hospital Insurance and Federal Supplementary Medical Insurance Trust Funds, April 23, 2012, p. 167, available at www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-andReports/ReportsTrustFunds/Downloads/TR2012.pdf.

B.      **CVS Health's False Public Statements Concerning Its Preference for Less Costly Generic Drugs and that Its SSG/DNS Scheme Would Not Increase Beneficiary Costs**

288.    The SSG/DNS Scheme also required CVS Health to make what it knew were outright false public statements to conceal its illegal scheme. For example, CVS Health Vice President for Government and Public Affairs Melissa Schulman on March 5, 2019 publicly professed that CVS Health aimed to get the "right drug at the lowest possible cost for patients. . . ." and allow patients to "stay on the medications they need":

> At CVS Health, we believe the high price of prescription drugs is among the most pressing health care issues facing Americans today. We are committed to finding the **right drug at the lowest possible cost for patients** to ensure they are able to access and **stay on the medications they need.**

289.    Schulman also claimed that its PBM, Caremark, was "focused" on "help[ing] lower costs for clients and their plan members" and "negotiating for greater discounts from manufacturers on their behalf":

> As a PBM, CVS Caremark is focused on developing strategies that **help lower costs for clients and their plan members**, and negotiating for greater discounts from manufacturers on their behalf. In 2017 despite a nearly 10 percent increase by manufacturers on brand list prices, CVS Caremark kept drug price growth nearly flat (0.2 percent) and lowered member monthly out-of-pocket costs, which helped improved adherence.
>
> CVS Health is proud of our proven record of using innovative tools to hold down net costs. However, more can, and must, be done to provide prescription drug price relief and we support the Trump administration's focus on this important issue.[182]

290.    Even more troublesome, Schulman touted that CVS Health was in favor of eliminating pharmaceutical manufacturer efforts to block competition: "We actively support policies that would eliminate practices by drug manufacturers to block competition, which limit

---

[182] March 5, 2019 Statement of CVS Vice President for Government and Public Affairs,"*HHS Rebate Rule 101:  What Payors Need to Know*," available at https://payorsolutions.cvshealth.com/insights/hhs-rebate-rule-101.

our ability to secure more affordable medications for consumers and clients."[183]

291.    In reality, the CVS Health SSG/DNS Scheme became the centerpiece in enabling the Drug Makers' anticompetitive strategies to block competition, including through deals which facilitated product hopping, patent evergreening, sham patent infringement suits, sham Citizen's Petitions, authorized generics and other schemes.  The SSG/DNS Scheme of blocking generics became a key tool to impede generic competition in the marketplace, and was aimed at harming elderly, ESRD and disabled Medicare Part D beneficiaries.

292.    In a piece by Derica Rice (Executive Vice President, CVS Health, and President, Caremark) posted on the CVS Health website on March 19, 2019, discussing PBM pricing models, he mentions various examples of "Changing Market Trends" in drug pricing. According to Rice, "[a]fter years of double-digit list price inflations, as public outcry grew, manufacturers began to adopt new strategies either to maintain market share, or simply avoid having to drop drug list prices outright to a sustainable level."[184]

293.    One of the examples Rice provides is that the makers of Harvoni had introduced an authorized generic of the drug in 2018.  He then says that Caremark has "been able to use our **proven cost management strategies and negotiated with manufacturers to help ensure plan members had access to appropriate therapies while clients could focus on controlling plan costs**."[185]

---

[183] *Id.*

[184] Derica Rice, *Why the Time is Right for a New Pricing Model:  As Market Trends Evolve, Payors Need an Adaptable Approach* (March 19, 2019), available at https://payorsolutions.cvshealth.com/insights/why-the-time-is-right-for-a-new-pricing-model.

[185] *Id.* (emphasis added).

294.    This was a lie.  What Rice fails to mention is that the "proven cost management strategies" the CVS Caremark Entities used for Harvoni provided neither "access" to the less costly generic version of Harvoni, nor did it control plan costs. Instead, behind the scenes the CVS Caremark Entities had entered into a secret rebate agreement with Gilead to take advantage of its position to reap huge profits for itself by blocking the less costly authorized generics and making the more expensive brand-name Harvoni and Epclusa the only options.

295.    Three weeks later, on April 9, 2019 in testimony before the United States Senate Committee on Finance, Rice told members of the Senate that the CVS Caremark Entities' goal was simple: "to reduce costs and improve health outcomes. We do this by negotiating discounts with manufacturers, designing formularies that encourage the use of generics and biosimilars, and creating new tools to help bring escalating drug prices under control."[186]

296.    Likewise, in a bit of sleight of hand, Rice told the Committee in his written comments how important access to generic drugs was to ensuring patient adherence and healthy outcomes, saving lives:  "[W]e encourage the use of generics . . . because they are proven to improve adherence and outcomes, while also lowering costs. Our research shows that **use of generics actually improves outcomes and saves lives**, **largely because they are more affordable for patients and therefore increase patient adherence to their medicines**."[187]

297.    There were those on the Committee who challenged what Rice was saying.  During the hearing, Senator Wyden asked Rice why the CVS Caremark Entities were putting "artificial

---

[186] *Drug Pricing in America: A Prescription for Change, Part III: Hearing Before the S. Comm. on Finance*, 116th Congress (2019) (Written Testimony of Derica Rice), available at: https://www.finance.senate.gov/imo/media/doc/CVS%20Health%20SFC%2004%2009%2019%20Final.pdf.

[187] Derica Rice written comments to the Senate Finance Committee at 2 (emphasis added).

barriers between patients and less costly medicines" by not allowing access to identical authorized

generics, and asked whether it is "because you get a bigger rebate on a more expensive drug?"[188]:

> [Senator Wyden]  [You as a pharmacy benefit manager] consistently say— this is your message: you bring value and fight for the lowest price. So I am going to use a couple of examples to try to see how that works in the real world. . . .  [One drug maker] recently launched an identical version of [its brand-name] drug that cost 60 percent less than the original. Now here is a copy of a prior authorization form that CVS requires doctors to fill out if the doctor wants to prescribe a less costly version of this cholesterol drug. I am going to ask unanimous consent to enter this document into the record.
>
> . . . The CVS forms says, and I quote: "The two products are the exact same, and they are made in the same manufacturing facility." But they ask the doctor to answer detailed questions about the patient's medical history. **Mr. Rice, why is CVS—based on this form—putting arbitrary barriers between patients and less costly medicine? Is it because you get a bigger rebate on a more expensive drug?**

298.    In response, Rice dodged the question, instead testifying that what CVS "tend[s] to

do" is to look at the net savings to members "to keep out-of-pocket costs low, . . . And in that

particular scenario, the branded drug was still the lowest cost"[189]:

> Mr. RICE. Senator, I understand your question, and the short answer is, **absolutely not**. What you may find is that, in many cases, the highest list price drug, or the lowest list price drug in the particular example you cite, may not be the absolute lowest-cost drug. So what we tend to do is, we look at the drug's cost after all discounts have been taken into account, because that then is what allows members to keep out-of-pocket costs low as well as the plans to keep their premiums low for their members. **And in that particular scenario, the branded drug was still the lowest cost** for——

Not true.  It does not keep member out-of-pocket costs low at all.

299.    According to CVS, members "win" on net price.[190]

---

[188] *Id.* at 15 (emphasis added).

[189] *Id.* (emphasis added).

[190] *Id.* (emphasis added).

Senator WYDEN. You are making the argument the consumer somehow, **by your analysis, wins on net price. Is that the argument you are making?**

**Mr. RICE. Yes, Senator.**

300.    And, in response to similar questioning from Senator Menendez, who asked about how long it would take CVS to add an authorized generic to its formulary, and challenging the excuse of the authorized generic having "different national [drug] codes," Rice again dissembled, insisting again CVS would "absolutely" put the authorized generic as a "preferred drug" on its formulary when it resulted in the "lowest net cost for the patient as well as for the plan"[191]:

> Senator MENENDEZ. Finally, when a drug company does lower their list price, how long does it take for the patient at the pharmacy counter to see that savings, if ever? Let me give you an example. Last fall, you may have read in the news that the list price for one . . . . drug, went down by 60 percent. Despite the price decrease, putting the drug's price below the threshold for specialty tier status, I recently read that PBMs have kept the drug on a specialty tier, which means it is more expensive for Medicare beneficiaries.  [C]an you tell me in one or two sentences why a list price cut would not lead to lower prices for consumers? And if you are going to tell me it is the different national codes, then if you get guidance on how to handle this NDC issue, can we expect lower list prices leading to immediate tier changes? . . . .

> **Mr. RICE. Senator, when those lower list prices result in the lowest net cost for the patient as well as for the plan, then absolutely, that is the preferred drug on formulary.**

301.    As alleged herein, Rice's "lowest net cost" explanation was simply false.  There are numerous examples set out herein where the CVS Caremark Entities' clandestine deals with the Drug Makers to block less costly generics (many of them identical authorized generics) resulted in higher costs to the SilverScript beneficiary and to Medicare.

302.    Likewise, even though Rice touted the CVS Caremark Entities' efforts to improve patient adherence to their medications by increasing utilization of generic drugs, in fact as alleged

---

[191] *Id.* (emphasis added).

herein, there are tens of thousands of instances in which its SSG/DNS Scheme did exactly the opposite.  Rather than "simplifying prescription management for patients" and increasing adherence to generic medications so that patients would be able to afford their medications, the SSG/DNS Scheme in many instances has resulted in patients ceasing altogether their drug treatment due to the significant increases they faced in the cost of these drugs in addition to the barriers to access the needed drugs.

303.    When confronted directly with questions about the SSG/DNS Scheme, the CVS Caremark Entities have simply lied.  According to a story jointly written by ProPublica and the New York Times, the authors disclose that in December 2016 the CVS Caremark Entities had "sent a memo to pharmacies informing them that some of its Medicare prescription drug plans would cover only brand-name versions of 12 drugs. Some of the drugs, such as the antipsychotic medication Invega, have had generic competitors for over a year."[192] Access to needed medications is a primary and critical concern of CMS's for Medicare beneficiaries.

304.    The authors then tell the story of Lisa Hopkins, a 50-year-old disabled food and nutrition supervisor from Eagleville, Pennsylvania (located in this District), who had attempted to fill a prescription for Voltaren Gel, and was told by her pharmacist that her drug plan, SilverScript, denied her claim because it was for a generic.[193] "I said to the lady at the insurance company, 'That's really, really odd to me,'" Hopkins said. "She said, 'Yes. It's happening more and more

---

[192] Charles Ornstein, Katie Thomas, *Take the Generic Drug, Patients Are Told — Unless Insurers Say No*, ProPublica (Aug. 6, 2017), https://www.propublica.org/article/take-the-generic-drug-patients-are-told-unless-insurers-say-no; *see also* Charles Ornstein, Katie Thomas, *Take the Generic, Patients Are Told. Until They Are Not*, New York Times (Aug. 6, 2016), https://www.nytimes.com/2017/08/06/health/prescription-drugs-brand-name-generic.html.

[193] *Id.*

that the name brand is covered but the generic isn't.'"[194] Hopkins has osteoporosis and bulging spinal disks and has been on disability for almost a decade. She is covered through Medicare and receives extra help subsidy from the government for her medications, lowering her out-of-pocket costs. That means that when her drugs cost a lot, taxpayers pay the bill.[195] Even for subsidized beneficiaries, the cost share differential between a generic/multisource drug and a brand name drug can be substantial for them, usually in the range of $5-6 per prescription.

305.    When questioned by the ProPublica/Times reporters, a spokeswoman for Caremark, Christine Cramer (Senior Director, Public Relations), responded that consumers would never pay more in the rare instances in which the company favors a brand-name drug over a generic: "**This generally occurs when there is limited or no competition among generics**," she said.[196] This was an outright lie. Not only was the brand-name Voltaren Gel already more expensive than the less costly authorized generic, because the pharmacy was in Pennsylvania, a mandatory generic substitution State, CVS Health deprived Hopkins' right under State law to have the less costly generic prescription substituted.

306.    While CVS Health hypes in public statements the cost savings that generics offer, in actuality its SSG/DNS Scheme operates exactly counter to this. Instead of providing savings for members and Medicare, CVS Health has coordinated efforts of its vertically integrated subsidiaries to line its pocket with huge profits from the SSG/DNS Drugs.

---

[194] *Id.*

[195] *Id.*

[196] *Id.* (emphasis added).

C.    **CVS Health Has Touted the SSG Strategy to Its Customers While It Conceals Its Deception of Medicare Part D Beneficiaries**

307.    At least initially in 2014 when the SSG Strategy started, it worked legitimately as a program aimed at saving the PDPs and beneficiaries money by taking advantage of the fact that, when first released, the first ANDA and therefore single source generic drugs may not offer significantly lower pricing than the brand-name option due to the 180-day first applicant ANDA generic marketing exclusivity. So, with only a single generic competitor, the brand-name option could be an economically more viable option, particularly when coupled with manufacturer rebates. Only when multiple generic options are introduced does the competition between multiple options often lower prices significantly. This is consistent with the FTC's analysis of so-called "House Brand Strategies,"[197] and the FDA's analysis of the impact of generic competition.[198]

308.    When the SSG Strategy began, as part of making it more palatable to its customers, CVS Health had ensured that it would be cost neutral to beneficiaries and Medicare, meaning that it made sure preferring the higher-cost SSG/DNS Drugs would not increase costs to beneficiaries or to Medicare.

309.    However, by 2015, CVS Health management had decided not to share all of the savings generated through the SSG Strategy, and instead they would conceal the fact that many of the SSG/DNS Drugs would no longer be cost neutral for SilverScript beneficiaries. Thus began the illegitimate SSG/DNS Scheme alleged herein.

310.    The SSG Strategy, as initially envisioned in 2014, sought to exploit the economics

---

[197]    Pharmacy Benefit Managers: Ownership of Mail-Order Pharmacies, Federal Trade Commission, at 78-80 (Aug. 2005).

[198]    Report: *Generic Competition and Drug Prices: New Evidence Linking Greater Generic Competition and Lower Generic Drug Prices*, U.S. Food & Drug Administration (Dec. 2019), at 2-3.

to prefer brand-name options only when a single generic alternative existed. In numerous customer presentations throughout the United States, including to PDPs contracting with the CVS Caremark Entities, CVS Health touted that Single Source Generics were not always more cost effective than the brand-name drug:



311.    CVS Health told PDPs contracting with the CVS Caremark Entities throughout the United States, *that they could "maximize" savings using brand-name drugs*[200]:

---

[199] Exhibit 4 (CVS-002524).

[200] *Id.*

312. Likewise, CVS Health pitched to PDPs contracting with the CVS Caremark Entities throughout the United States that it had a "dedicated team" which engaged in "continuous surveillance and analysis of market events and pricing" to determine when to enter into a Single Source Generic agreement with a brand-name drug manufacturer. It reassured customers concerning the legality of the SSG program because CVS Health had the "operational infrastructure" in place to "ensure that all systems and processes align, including *applicable regulations*"[201]:

---

[201] *Id.* (emphasis added).

313. According to the sales pitch, by keeping the brand-name drug as the only formulary option and excluding the generic options, PDPs contracting with the CVS Caremark Entities would have available the brand-name drug at similar pricing as the generic. As one CVS Health presentation put it: "Members and clients generally save when plan designs encourage generic use. However, single source generics challenge this model."[202]

314. CVS Health even went so far as to claim that the SSG Strategy would benefit beneficiaries financially: "Once a generic is available, CVS will apply one of two strategies, *based on financial benefits to members*: Do not include the SSG on the formulary; maintain the brand-name drug in the existing tier OR Do not include the SSG on the formulary; down tier the brand-name and reduce the member copay. Note: the typical period of exclusivity for the first generic

---

[202] Exhibit 5 (CVS-002536).

manufacturer is 180 days."[203]

315.    What CVS Health did not tell its PDP customers contracting with Caremark was that, under the illegal SSG/DNS Scheme it initiated in June 2015, there would be no financial benefit to members.  Instead, the SSG/DNS Drugs would in fact often be much more expensive than the generic versions which were being blocked. The result was that for the SSG/DNS Drugs CVS Health was choosing the more (often much more) expensive brand-name drug.

316.    Even though PDPs contracting with the CVS Caremark Entities were unaware that, for some of the SSG/DNS Drugs, the brand-name drug would be more expensive than the generic to the Part D beneficiary, CVS Health's wholly owned standalone Part D plan SilverScript was very much aware of the price impact the Scheme would have on its Part D beneficiaries.

317.    Confidential Informant No. 1 ("CI-1"), a former CVS Medicare Part D actuary for SilverScript from 2017 until 2019, explained that beneficiaries and Medicare were often the losers, pointing in particular to the SSG drug Copaxone, a drug that cost $85,000 a year. CI-1 acknowledged that "there are winners and losers," admitting that SilverScript marketing claims that its "always" looks out for its beneficiaries were often inaccurate: "Marketing folks don't understand the details — there should be asterisks everywhere — maybe 70% of the time what they say is true, but they can't asterisk everything. Marketers don't get into the nitty-gritty."

318.    Initially, when the SSG Strategy began in 2014 up through 2018, SilverScript beneficiaries who requested formulary exceptions through the coverage determination process were universally approved. Even while it tried to keep beneficiaries in the dark about the other, less costly options, SilverScript did not block the beneficiaries from getting the non-formulary

---

[203] Exhibit 3 (CVS-002069) (emphasis added).

options as long as they were specifically requested and supported by the requisite information.

319.    This all changed when the CVS Caremark Entities entered into the agreements in late 2018 with Gilead for Harvoni and Epclusa whereby they agreed they would require SilverScript to deny all coverage determinations and appeals.  Not only had the CVS Caremark Entities agreed SilverScript would universally block all coverage determinations and appeals for the Gilead drugs, their agreements required as well that the CVS Pharmacies would not stock the Gilead drugs as well as the GSK drugs Advair Diskus and Ventolin HFA on their shelves.

320.    Publicly, CVS Health has championed the SSG Strategy as beneficial both to beneficiaries and Medicare. For example, CVS Health has told its customers that a drug will be "eligible for consideration in the SSG Strategy if including the drug will, on average and in the aggregate, result in *equal or lower cost to the plan and members*, versus use of the newly introduced SSG." (emphasis added).[204] Elsewhere, CVS Health has similarly touted potential savings in a presentation example: "Based on review of your membership, participation in the SSG strategy would yield a per prescription savings of $42.30 to $123.25."[205]

321.    Although the SSG Strategy was initially set up in 2014 to save monies for Medicare and for beneficiaries, since the inception of the illegal SSG/DNS Scheme in June 2015, for certain SSG/DNS drugs the only winner has been CVS Health. Medicare and the SilverScript beneficiaries have been the losers. The SSG/DNS Scheme was turned into a fraudulent scheme designed to block competition by keeping prices artificially high for certain SSG/DNS Drugs while CVS Health passed on the increased cost to elderly, ESRD and disabled SilverScript beneficiaries and to U.S. taxpayers.

---

[204] Exhibit 6 (CVS-002488).

[205] Exhibit 7 (CVS-002513).

### D.    The Drugs Included in the SSG/DNS Scheme

322.    Out of the some forty drugs that have been active in the SSG program up through 2019, the following brand-name drugs in the illicit SSG/DNS Scheme have caused significant increased costs to both Medicare and SilverScript beneficiaries alike:

1. Copaxone (Teva)

2. Exelon (Novartis)

3. Voltaren Gel (Endo)

4. Invega (Janssen)

5. Asacol HD (Allergan)

6. Xopenex HFA (Sunovion)

7. Renvela Packets (Sanofi)

8. Renvela Tablets (Sanofi)

9. Istalol (Bausch & Lomb)

10. Harvoni (Gilead)

11. Epclusa (Gilead)

12. Ventolin HFA (GSK)

13. Canasa Rectal Suppository (Allergan)

14. Advair Diskus (GSK)

15. Suboxone Sublingual Film (Indivior)

323.    These drugs account for significant claims dollars. In 2018 alone, SilverScript had 3,800,171 claims for these drugs, with total costs to SilverScript of some $1,574,283,814.75:

| Generic Name | Brand Name | Number of Claims | Total Cost |
|---|---|---|---|
| Glatiramer-Sofote | Copaxone Syn 40Mg/Ml-ML* | 25638 | $147,414,508.39 |

| | | | |
|---|---|---|---|
| Glatiramer-Sofote | Copaxone Syn 20Mg/Ml-ML* | 7803 | $53,870,483.11 |
| Rivastigmine | Exelon 4.6 MG/24 | 34338 | $23,957,768.11 |
| Rivastigmine | Exelon 9.5 MG/24 | 47227 | $32,644,966.40 |
| Rivastigmine | Exelon 13.3 MG/24 | 20671 | $14,759,200.84 |
| Diclofenac Sodium (Topical) | Voltaren Gel 1% | 764512 | $72,390,304.15 |
| Paliperidone-Sofoidone | Invega Tab 9Mg-9MG* | 22935 | $36,652,397.03 |
| Paliperidone-Sofoidone | Invega Tab 3Mg-3MG* | 22259 | $23,855,848.81 |
| Paliperidone-Sofoidone | Invega Tab 1.5Mg-5MG* | 4122 | $4,094,059.39 |
| Paliperidone-Sofoidone | Invega Tab 6Mg-6MG* | 37831 | $50,290,584.36 |
| Mesalamine-Sofoamine | Asacol HD Tab 800Mg-800MG* | 18314 | $21,079,720.09 |
| Levalbuterol Artrate | Xopenex INH HFA 200 | 85862 | $7,556,471.22 |
| Sevelamer-Sofoate | Renvela Pow 2.4Gm-4GM* | 6087 | $12,404,198.73 |
| Sevelamer-Sofoate | Renvela Pow 0.8Gm-8GM* | 4028 | $7,062,090.35 |
| Sevelamer-Sofoate | Renvela Tab 800Mg-800MG* | 188590 | $286,846,157.87 |
| Timolol-Sofo(ophth) | Istalol Sol 0.5% Op-OP* | 7140 | $2,421,727.25 |
| Ledipasvir-Sofobuvir | Harvoni Tab 90-400MG* | 5799 | $186,167,824.22 |
| Sofosbuvir-Sofotasvir | Epclusa Tab 400-100* | 4815 | $121,064,301.23 |
| Albuterol Sulfate | Ventolin INH HFA 200 | 1734708 | $109,387,787.39 |
| Albuterol Sulfate | Ventolin INH HFA 60 | 5947 | $152,366.24 |
| Mesalamine-Sofoamine | Canasa Sup 1000Mg-1000MG | 5390 | $6,294,657.70 |
| Fluticasone-salmeterol | Advair Diskus INH 250/50 | 385562 | $189,769,808.04 |
| Fluticasone-salmeterol | Advair Diskus INH 500/50 | 130831 | $85,347,888.82 |
| Fluticasone-salmeterol | Advair Diskus INH 100/50 | 78870 | $31,647,453.54 |
| Buprenorphine HCL-Sofol-naloxone HCL dehydrate | Suboxone Mis 12-3MG | 8 | $2,654.28 |
| Buprenorphine HCL-Sofol-naloxone HCL dehydrate | Suboxone Film Sl 8-2MG | 135416 | $43,611,284.47 |
| Buprenorphine HCL-Sofol-naloxone HCL dehydrate | Suboxone Film Sl 2-0.5 | 8086 | $1,339,153.90 |
| Buprenorphine HCL-Sofol-naloxone HCL dehydrate | Suboxone Film Sl 4-1MG | 7382 | $2,198,148.82 |
| | **TOTALS:** | **3,800,171** | **$1,574,283,814.75** |

**E.    The CVS Defendants Have Submitted Invalid PDE Records or Statements in Support of Claims for Unsubstituted Brand-Name Drugs in Violation of State Mandatory Generic Substitution Laws**

324.    The claim records for the SSG/DNS Drugs show two things clearly. First, CVS is

forcing CVS Pharmacies and non-CVS pharmacies alike to dispense brand-name drugs illegally

in States with laws requiring mandatory generic substitution.[206] Thus, without the required generic substitution, the prescription was not a valid prescription under State pharmacy law and cannot be reimbursed by Medicare. <u>Second</u>, even in states without mandatory generic substitution laws, the SilverScript claims records show that the DAW codes submitted on claims for the SSG/DNS Drugs were inaccurate when dispensing the brand-name drug instead of the generic. Causing claims to be submitted with inaccurate DAW codes constitutes the submission (or causing the submission) of false claims.

325.    Even though its contract with CMS required it to follow State mandatory generic substitution laws, SilverScript has failed to require the CVS Pharmacies and non-CVS owned network pharmacies to substitute generic drugs for much costlier brand-name SSG/DNS Drugs, and has submitted to CMS untruthful, inaccurate and incomplete PDE records and statements in support of those false claims for payment of the SSG/DNS Drugs. Furthermore, in order to ensure that only the brand-name SSG/DNS Drugs were being dispensed, CVS Health through the CVS Caremark Entities has blocked claims from non-CVS-owned network pharmacies in States where mandatory generic substitution is required.

326.    As a result, all such untruthful, inaccurate, and incomplete PDE records or statements so submitted to CMS were false and as a result violated the condition of payment that the SilverScript Plan reimburse only valid generic prescriptions (as required by State mandatory generic substitution laws), instead dispensing tens of thousands of high-cost invalid prescriptions for brand-name SSG/DNS Drugs.

327.    This deception across multiple CVS Health vertically integrated business units to

---

[206] Most of the time the DAW Code is "0" on those records. As such, CVS cannot explain away its failure to substitute because the pharmacy was out of stock of the generic or the prescriber indicated the brand was necessary as those conditions necessitate a different DAW Code.

implement the fraudulent scheme (and in violation of its promised firewall) can be seen in its sample answers to customers' questioning whether the SSG/DNS Scheme complies with State generic substitution laws. CVS Health recognized that many States require generic substitution and those laws could cause issues for success of the SSG/DNS Scheme. But, instead of complying with those laws, SilverScript claimed it was instead only a dispensing pharmacy issue.

328.    The CVS Health document entitled "Health Plan Client Strategy and FAQs" demonstrates its canned response to questions regarding State mandatory generic substitution laws[207]:

| Q5 | **Is this change permissible in states that mandate generic dispensing?** |
|---|---|
| A5 | The Medicare Part D rules allow a plan to retain a brand on the Medicare Part D formulary with a generic copay and to exclude the newly released generic. While state pharmacy substitution laws are a pharmacy issue – and not a plan issue – the generic substitution laws would not pose a barrier to this strategy because such laws generally are based on economic advantage to the member as a result of receiving the generic. |
| | **Note:**  A few of the states with generic substitution laws have more restrictive requirements. Nonetheless, the intent of these stricter pharmacy substitution laws is that consumers of prescription drug products may realize cost savings by buying less expensive, safe drug products. This is consistent with the SSG strategy, and therefore these laws should not be problematic. |

329.    This response is problematic at least for the following reasons:

- <u>First</u>, CVS Health's statement to its customers that the mandatory generic substitution issue is a not a PDP Sponsor issue, and instead a pharmacy issue is contrary to SilverScript's obligation to follow State law and to ensure that its pharmacy network and PBM did as well.

- <u>Second</u>, what cannot be lost is the fact that SilverScript, the CVS Caremark Entities, and the CVS Pharmacies all just happen to be wholly owned subsidiaries of CVS Health. What this obfuscation does do, though, is to ensure that the fraudulent behavior would be

---

[207] Exhibit 8 (CVS-001794) (emphasis added).

concealed behind a veneer that SilverScript somehow operates at arm's length from Caremark and the CVS Pharmacies. The reality remains that, and in spite of its firewall obligations, CVS Health needed the complicity of all three CVS Health subsidiaries for the SSG/DNS Scheme to succeed.

- <u>Third</u>, this response suggests that the intent of mandatory substitution laws to provide consumer access to less costly generic drugs is consistent with the goal of the SSG Strategy. What this does not explain is the hundreds of thousands of prescriptions where the CVS Caremark Entities network pharmacies (including numerous of its CVS Pharmacies) have filled more expensive brand-name SSG/DNS Drugs for SilverScript beneficiaries in States where mandatory substitution is required by law.  There is thus no "economic advantage" to the SilverScript beneficiaries from this Scheme.

330.    As explained *supra*, the CVS Caremark Entities' network pharmacies are required to dispense generic versions of brand-name drugs in seventeen mandatory generic substitution States. Such substitution is mandatory and required under both State law and Medicare laws and regulations that require the prescription to be valid under State law in order to be eligible for reimbursement.

331.    Not only has SilverScript certified that the PDE records submitted to document the claims for payment of the SSG/DNS Drugs were truthful, compliant with State mandatory generic substitution laws, and compliant with Medicare's requirements to follow such State laws, it also expressly certified that the data transmitted in the PDE was "accurate and complete" to its "best knowledge, information and belief."

332.    At all times material hereto, in all instances in which SilverScript submitted PDE claims with the default DAW Code 0 when dispensing a brand-name product even when there

were available generics, such information was clearly false. As the NCPDP guidelines make clear, a DAW Code 0 "is not appropriate" for brand drugs with an available generic, and "may result in a reject" of the PDE record.[208]

333.    Lest there was any doubt, in Call Letters and in regulations, CMS has made clear that authorized generics are to be considered "generic" drugs and not brand-name drugs.[209]

334.    The CVS Caremark Entities' own Administrative Manual also instructs pharmacists to "*Use the DAW 0 code when dispensing a generic drug*; that is, when no party (*i.e.*, neither Prescribing Provider, nor pharmacist, nor Participant) requests the branded version of a multi-source product."[210] (emphasis added). The CVS Caremark Entities' Manual thus does not allow use of DAW Code 0 for anything other than dispensing generic drugs.

335.    The CVS Health entities thus submitted numerous PDE claims that show violations of State mandatory generic substitution laws and with the default DAW Code 0, in violation of the requirement to submit "accurate, complete and truthful" PDE records.  For example:

- The 2019 record for a paid Copaxone claim attached hereto as Exhibit 9 indicates that the "Dispense As Written" field was submitted as "0 – NO DAW."[211] As the record makes

---

[208] *U.S. ex rel. Fox Rx, Inc. v. Omnicare, Inc.*, holds that the submission of DAW Code 0 in connection with the dispensing of a brand-name product when a generic should have been substituted pursuant to state law is not factually false because DAW Code 0 simply means that there was "No Product Selection Code Indicated." *See* 38 F.Supp.3d 398, 411 (S.D.N.Y. 2014). But the 2017 version of NCPDP updates the definition of DAW Code 0 to make that conclusion of the *Fox* court inapplicable because the new DAW Code 0 definition makes it clear that it is not to be used when dispensing brand drugs if a generic is available.

[209] *See* CMS Call Letter (April 3, 2017); 82 Fed. Reg. 56372 (Nov. 28, 2017).

[210] Exhibit 1 (CVS-002944).

[211] Exhibit 9 (CVS-001893).

clear, Copaxone (*i.e.,* the brand product), was dispensed and billed at a total plan cost allowed of $5,878.66, with a beneficiary copayment of $1,901.46, instead of the less costly generic despite the clear instruction that there was no Dispense as Written instruction indicated by the prescriber. Furthermore, the claim record shows that the brand Copaxone was dispensed at a pharmacy located in Florida, thus violating the obligation to dispense the less costly generic in a State requiring mandatory generic substitution (Florida).

- The 2019 record for a paid Renvela Tablets claim attached hereto as Exhibit 10 indicates that the "Dispense As Written" field was submitted as "0 – NO DAW."[212] As the record makes clear, Renvela Tablets (*i.e.,* the brand product), was dispensed and billed at a total plan cost allowed of $4,290.08, with a beneficiary copayment of $291.09, instead of the less costly generic despite the clear instruction that there was no Dispense as Written instruction indicated by the prescriber. Furthermore, the claim record shows that the brand Renvela Tablets was dispensed at the CaremarkPCS Pennsylvania Mail Pharmacy, 1 Great Valley Blvd. Wilkes-Barre, Pennsylvania, thus violating the obligation to dispense the less costly generic in a State requiring mandatory generic substitution (Pennsylvania).

- The 2019 record for a paid Suboxone Film claim attached hereto as Exhibit 11 indicates that the "Dispense As Written" field was submitted as "0 – NO DAW."[213] As the record makes clear, Suboxone Film (*i.e.,* the brand product), was dispensed and billed at a total plan cost of $240.10, with a beneficiary copayment of $91.91, instead of the less costly generic despite the clear instruction that there was no Dispense as Written instruction

---

[212] Exhibit 10 (CVS-001845).

[213] Exhibit 11 (CVS-002759).

indicated by the prescriber. Furthermore, the claim record shows that the brand Suboxone Film was dispensed at the CVS Pharmacy, 230 E. Ashland St, Cary Hill Plz, Brockton, Massachusetts, thus violating the obligation to dispense the less costly generic in a State requiring mandatory generic substitution (Massachusetts).

336.    Moreover, in all instances in which the SilverScript submitted PDE claims with a DAW 5 code ("Substitution allowed – brand drug dispensed as a generic"), such information was materially false and misleading because it was, in fact, not dispensing the SSG/DNS Drugs as "generic drugs" at all, but as the far more expensive brand-name drugs. In order to comply with State mandatory generic substitution laws, a DAW 5 code would only have been permissible in those instances in which it was dispensing the brand-name drug at the less costly, generic price.[214] That is exactly how it described the SSG Strategy in 2014 to its customers – *i.e.*,  a drug would be "eligible for consideration in the SSG Strategy if including the drug will, on average and in the aggregate, result in *equal or lower cost to the plan and members*, versus use of the newly introduced SSG."[215] Unfortunately, on average and in aggregate is not the intent of DAW 5.  DAW 5 is where a brand is priced as a generic meaning the actual cost for the beneficiary is generic

---

[214] *Moeckel v. Caremark, Inc.*, 622 F. Supp. 2d 663, 683 (M.D. Tenn. 2007) ("Thus, where a physician prescribes a drug and authorizes substitution, the standard across the retail and mail pharmacy industry (including Caremark's mail order pharmacies) is to utilize the DAW 5 code where the pharmacy uses, as a function of its business operations, the brand product as its generic for that drug, and it is then reimbursed at the generic rate. As the dispensing pharmacy, it can utilize any manufacturers' product to fill a prescription for the generic drug (one of whom might be the branded manufacturer of that drug). The DAW 5 code indicates to the payer that the pharmacy uses the branded item as its generic product."); *Teva Pharm. Indus. Ltd. v. SmithKline Beecham Corp.*, No. CIV.A.08CV3706DMC, 2009 WL 1687457, at *2 (D.N.J. June 16, 2009) ("If a pharmacy uses the DAW 5 code, it will be reimbursed the amount usually reimbursed for the generic, even though it actually dispensed a branded product.").

[215] Exhibit 6 (CVS-002488) (emphasis added).

pricing at the point-of-service. However, that is a far cry from using DAW 5 routinely to dispense much more expensive brand-name drugs that are, in fact, much costlier to Medicare and the member. In all instances in which SilverScript submitted PDE claims with the DAW Code 5 in States requiring mandatory substitution, such information therefore was false. It also means a drug dispensed with a DAW 5 that is not priced as a generic for the beneficiary does not meet the legitimate meaning of the DAW 5.

337. Likewise, at all times material hereto, in those instances in which the SilverScript submitted PDE claims with the DAW Code 9 (Plan requests brand), such information was false in States that require generic substitution. Even though the DAW Code 9 can be used to indicate situations in which the plan requests the brand instead of the generic, the DAW Code cannot supersede State law. Nor can the SilverScript deny a beneficiary his rights and due process under Medicare Part D to access needed Part D drugs. For example:

- The 2019 record for a paid Asacol HD claim attached hereto as Exhibit 12 indicates that the "Dispense As Written" field was submitted as "9 – PLAN REQ BRAND."[216] As the record makes clear, Asacol HD (*i.e.,* the brand product) was dispensed and billed at a total plan cost allowed of $190.01, with a beneficiary copayment of $96.25, instead of the less costly generic. Furthermore, the claim record shows that the brand Asacol HD was dispensed at a pharmacy located in Maryland, thus violating the obligation to dispense the less costly generic in a State requiring mandatory generic substitution (Maryland).

- The 2019 record for a paid Istalol 5ml claim attached hereto as Exhibit 13 indicates that

---

[216] Exhibit 12 (CVS-001698).

the "Dispense As Written" field was submitted as "9 – PLAN REQ BRAND."[217] As the record makes clear, Istalol (*i.e.,* the brand product) was dispensed and billed at a total plan cost allowed of $1042.70, with a beneficiary copayment of $129.00, instead of the less costly generic. Furthermore, the claim record shows that the brand Istalol was dispensed at a CVS Pharmacy located in Philadelphia, violating the obligation to dispense the less costly generic in a State requiring mandatory generic substitution (Pennsylvania).

338.    In submitting claims records supporting the dispensing of the brand-name SSG/DNS Drugs, CVS Health has routinely utilized untruthful, inaccurate and incomplete DAW Codes, such as DAW Code 0, DAW1, DAW 2, DAW Code 5, or DAW Code 9, because it has chosen not to substitute a generic for the SSG/DNS Drugs under circumstances required to do so by Medicare Part D through incorporation of State mandatory generic substitution laws. Thus, the CVS Health entities' certification its PDE information was "accurate, complete and truthful" was intentionally false and therefore fraudulent.

339.    CVS Health through SilverScript and the CVS Caremark Entities has thus submitted (or caused to be submitted) false PDE records or statements to CMS in violation of the mandatory generic substitution laws of the States of Florida, Hawaii, Kentucky, Maine, Maryland, Massachusetts, Minnesota, Nevada, New Jersey, New York, Pennsylvania, Puerto Rico, Rhode Island, Tennessee, Vermont, West Virginia, and Wisconsin.

340.    Likewise, even in states without mandatory generic substitution laws, the claims records show that the DAW codes submitted on claims for SSG/DNS Drugs were improper when dispensing the brand-name SSG Drug instead of the generic. Causing claims to be submitted with

---

[217] Exhibit 13 (CVS-001830).

improper DAW codes constitutes the submission (or causing the submission) of false PDE records or statements.

F.    **CVS Deceptively Failed to Disclose Accurate Differential Prices Available for Less Costly (Often Identical) Generic Drugs**

341.    CVS Health and its wholly owned subsidiaries violated the terms of its 2012 Consent Order with the FTC, the antitrust laws, and the False Claims Act by engaging in anticompetitive conduct to deceive SilverScript beneficiaries concerning accurate differential pricing of less costly generic drugs. Specifically, CVS Health conceived and directed a centrally-controlled scheme to conceal less costly differential prices in lieu of the SSG/DNS Drugs sold to SilverScript beneficiaries.

342.    CVS Health was only able to implement the SSG/DNS Scheme by utilizing its control of its PDP Sponsor SilverScript, its PBM the CVS Caremark Entities and the CVS Pharmacies to ensure that it would be able to block beneficiaries from receiving accurate information about and access to less costly medications.

343.    CVS Health chose to ignore its obligations under the FTC Consent Order, its obligations under its firewall, and the clear, literal instructions in CMS regulations, that it provide accurate information to elderly, ESRD and disabled beneficiaries of their choices so they might be able to choose to receive lower drug prices.

344.    The deception of SilverScript beneficiaries was not only cynical (particularly because it was aimed at vulnerable elderly, ESRD and disabled patients), this was particularly the case for the SSG/DNS Drugs for which there was a less costly generic.

345.    In those instances when the SSG drug had an authorized generic available as an alternative, the fraud was even more flagrant.  There can be no argument that the authorized generic drug is somehow in any way inferior to the brand-name drug.  The authorized generics being sold

are, in fact, *identical* to thirteen (13) of the fifteen (15) SSG brand-name drugs (Exelon, Voltaren Gel, Invega, Asacol HD, Xopenex HFA, Renvela Packets, Renvela Tablets, Istalol, Harvoni, Epclusa, Ventolin HFA, Advair Diskus, and Suboxone Sublingual Film), including the exact same active and inactive ingredients.   The only difference between brand-name version and the authorized generic is superficial – *i.e.*, the label, which references the different seller and different National Drug Code ("NDC") assigned to authorized generic.   The only difference CVS Health cared about was that the brand-name drug was much more expensive, allowing it to reap huge profits (while driving up the cost for taxpayers and elderly, ESRD and disabled SilverScript beneficiaries).

346.    Having a different NDC allows for significantly lower prices associated with the authorized generic. According to the February 2019 GoodRx.com pricing for these drugs, the price differences between the brand-name SSG/DNS Drugs and the identical authorized generics at CVS Pharmacies ranged between 227% (Xopenex HFA) to 4,206% (Istalol) more expensive:

| Brand | Brand Cash Price | Authorized Generic Cash Price | Percentage Difference |
|---|---|---|---|
| Exelon | $726.18 | $117.39 | 618% |
| Voltaren Gel | $61.84 | $19.95 | 309% |
| Invega | $1240.44 | $265.25 | 467% |
| Asacol HD | $893.48 | $243.65 | 366% |
| Xopenex HFA | $80.98 | $35.67 | 227% |
| Renvela Packets | $1,686.98 | $466.85 | 361% |
| Renvela Tablets | $540.35 | $146.45 | 368% |
| Istalol | $391.58 | $9.31 | 4,206% |
| Harvoni | $32,704.50 | $10,087.51 | 324% |
| Epclusa | $25,874.46 | $6,727.50 | 385% |
| Ventolin HFA | $67.79 | $28.99 | 233% |
| Advair Diskus | $436.81 | $123.49 | 354% |
| Suboxone Sublingual Film | $134.92 | $39.80 | 338% |

347.    SilverScript's failure to disclose accurate differential prices for these authorized

generic drugs is thus particularly troubling in this instance because these less costly alternatives are in fact the *exact same drugs as the brand-name versions*.

348.    Not only that, but illustrating that it had long ago forgone any honest interest in having SilverScript shift to the generic once there was more competition from other generic drug makers to drive prices lower, as of November 2020 its formularies nevertheless still retained a number of the drugs as part of the SSG/DNS Scheme despite these SSG/DNS Drugs having more than one generic competitor beyond the authorized generic:

- Copaxone (Mylan, Sandoz)

- Exelon (Sandoz, Alvogen, Amneal, Breckenridge, Mylan, Zydus)

- Voltaren Gel (Amneal, Akorn, Perrigo)

- Invega (Actavis, Amneal, Inventia, Mylan, Sun)

- Xopenex HFA (Teva, Aurobindo, Cipla, Impax, Mylan)

- Renvela Packets (Aurobindo, Dr. Reddys)

- Renvela Tablets (Amneal, Anxin, Aurobindo, Dr. Reddys, Impax, Invagen, TWI, Wilshire)

- Istalol (Akorn, Apotex, E Fougera, FDC, Hi Tech Pharmacal, Pacific, Sandoz, Valeant, Wockhardt)

- Canasa (Mylan, Sandoz, PSP, Inc., and Zydus)

- Advair Diskus (Prasco, Mylan)

- Suboxone (Alvogen, Dr. Reddys, Mylan)

349.    The availability of multiple generic competitors completely undermines CVS Health's stated explanation for the SSG/DNS Scheme – *i.e.*, a single generic competitor does not bring prices lower than the brand-name drug.

350.    The fact that many of the SSG/DNS Drugs remained a part of the SSG/DNS

Scheme despite the presence of multiple generic competitors demonstrates that this was merely a pretext used to enrich CVS Health (while enabling the Drug Makers' anticompetitive conduct) and not really a strategy to keep drug prices affordable for Medicare and elderly, ESRD and disabled SilverScript beneficiaries.

351.    The SSG/DNS Scheme relied on systematic deception of SilverScript beneficiaries, blocking access to the less costly generic.  This is exactly the point made in a 2021 JAMA Internal Medicine study which featured Medicare Part D coverage for Harvoni and Epclusa and two other drugs.  According to the study, there would be substantial savings if Part D beneficiaries had access to lower priced authorized generics of these drugs.  However, "[f]or patients to take advantage of these lower list prices, they must be aware that the authorized generic drug is available, be on a plan that provides coverage for the product, and find a pharmacy that has this product in stock. These requirements represent *substantial barriers to getting authorized generic drugs to patients*."[218]

352.    The "substantial barriers" to a competitive market erected by the deals between the CVS Caremark Entities and the Drug Makers include:

- SilverScript's systematic denial of beneficiary rights regarding pricing and costs of authorized generics;

- Significant additional costs for the more expensive brand-name drugs, often driving beneficiaries into the Catastrophic Coverage Stage of their Medicare Part D benefits, where these drugs were frequently unaffordable;

---

[218] Stacie B. Dusetzina, et al., *Patient and Payer Incentives to Use Patented Brand-Name Drugs vs Authorized Generic Drugs in Medicare Part D*, 181 JAMA Internal Medicine 1605, 1609 (Dec. 2021) (emphasis added).

- SilverScript's denial of all formulary exceptions for authorized generics forms of Harvoni and Epclusa; and

- By virtue of the CVS Pharmacies not stocking the authorized generics for Harvoni, Epclusa, Advair Diskus, and Ventolin HFA, it failed to offer uniform benefits to all Part D members.

353.    CVS Health's unlawful acts in violation of the FCA, as alleged herein, arise from its (a) violation of the FTC Consent Order that it would not, directly or indirectly, make deceptive claims about the price or cost of Medicare Part D prescription drugs, and is thereby liable for civil monetary penalties of up to $10,000 per violation, pursuant to Section 5(l) of the FTC Act[219]; (b) obligation under the Federal antitrust laws not to share competitively sensitive information between its firewalled subsidiaries, which conduct was aimed at harming elderly, ESRD and disabled SilverScript beneficiaries; (c) use of materially false PDE records and statements in support of false claims; (d) submission of (or causing the submission of) hundreds of thousands of false PDE records and statements in support of SSG/DNS Drug reimbursement claims for the purpose of unlawfully obtaining fraudulent reimbursement payments higher than those authorized by law; and (e) knowingly (and systematically) deceiving SilverScript beneficiaries, blocking access to equivalent, frequently identical and less costly generic drugs, often despite being required to do so by State law.

## VIII.    CVS HEALTH SYSTEMATICALLY DECEIVED SILVERSCRIPT BENEFICIARIES

354.    CVS Health has been explicit internally about its intentional preference for the brand-name medications in the SSG/DNS Scheme and has made clear that it takes a coordinated

---

[219] FTC Letter to the Honorable Irvin B. Nathan, Attorney General for the District of Columbia (May 3, 2012); *see* 15 U.S.C. § 45(l).

effort across its subsidiaries to implement the SSG strategy of maximizing rebates. As CVS Health writes: "Implementation of the Single Source Generic (SSG) Strategy includes several operational pieces to ensure exclusion of the generic product(s) and maximize the utilization of the rebated brand product."[220]

355.    A key part of the corrupt SSG/DNS Scheme has been the use of deceptive verbatim scripts developed by SilverScript for use in training its Customer Care Representatives ("CCRs") how to respond to beneficiary inquiries calling in to understand why they could not get access to the less costly generic.

356.    The elaborate coordination across the enterprise to execute the Scheme is illustrated by the detailed training call center representative received for how to answer beneficiary inquiries received.  Confidential Informant No. 2 ("CI-2"), a former superviser and Medicare Part D lead at CVS Health from 2014 to 2020, described CCR training as being "robust," almost two months of full-time classroom work. During the training program, SilverScript CCRs were expected to learn everything from phone manners to CMS rules. In addition, they learned the required disclaimers established under Medicare and how to answer plan member questions using CVS's "call flow."

357.    "It was almost like taking a college class, where we had a lecture, and we took notes, and then we're tested on it," CI-2 said.

358.    SilverScript CCRs were expected to master use of the SSG/DNS Drug scripts in responding to beneficiaries, were regularly evaluated by their managers to ensure they were doing so, and indeed would be fired if they were not.

359.    Instead of providing accurate information to encourage the use of less costly

---

[220] Exhibit 14 (CVS-002622).

generics, SilverScript CCRs were trained to follow these directives which systematically misled beneficiaries into believing there was no less costly generic option available.

360.    The SilverScript CCRs thus often became unwitting foot soldiers in the carefully coordinated deceptive activities to block access to less costly generics.  Not infrequently, because the SSG/DNS Scheme ran counter to how they had been trained generally in most instances to encourage the use of less costly generics, during these calls with beneficiaries the SilverScript CCRs themselves overtly express confusion and concern with what they were being directed to do.

361.    Here is a sampling of: (a) the false and deceptive SilverScript Customer Care responses SilverScript CCRs were trained to give for the SSG/DNS Drugs, and (b) instances where CCRs thereby deceived elderly, ESRD and disabled SilverScript beneficiaries, blocking access to less costly generics:

### A.    Copaxone

362.    Glatiramer acetate is an immunomodulator medication used to treat multiple sclerosis. Teva Pharmaceutical Industries, Ltd. manufactures glatiramer acetate under the brand-name Copaxone, which was first approved by the FDA in the daily 20 mg dose in 1996 and in the three times weekly 40 mg dose in 2014.

363.    Medicare Part D costs for MS drugs like Copaxone have risen dramatically in the last decade.  Between 2009 and 2019, rising prices for multiple sclerosis drugs including Copaxone caused Medicare spending for these medicines to increase more than 10 times, while Part D beneficiaries saw their out-of-pocket costs increase more than sevenfold. Specifically, Part D spending on multiple sclerosis drugs jumped from on average nearly $7,800 in 2006 to more than $79,400 in 2016. Meanwhile, out-of-pocket average patient spending rose from $372 to nearly $2,700 for patients with multiple sclerosis during that same period of time. And the annual cost of

treatment for those patients climbed from about $18,600 to almost $75,900, or 12.8% a year.[221]

364.    In the year ending August 31, 2018, Copaxone had U.S. brand sales of $527 million for the 20 mg/mL dose and $2.86 billion for the 40 mg/mL dose.

365.    After multiple generic manufacturers filed ANDAs challenging as invalid Teva's dosing schedule patents on the 40 mg dose of Copaxone, Teva initiated four patent infringement lawsuits beginning in 2014.  On January 30, 2017, a Delaware federal judge denied Teva's infringement claims, invalidating the Teva 40mg Copaxone patents for obviousness.[222] That decision was affirmed by the Federal Circuit on October 12, 2018.[223]

366.    The first generic glatiramer acetate (the 20 mg Glatopa, manufactured by Sandoz) came to market in June 2015, priced at $5000 a month, only an $800 a month discount to Teva's monthly price for Copaxone at the time, $5800.[224]  Mylan later in October 2017 introduced 20 mg and 40 mg generics, priced the same as Glatopa.  By 2018, Mylan had dropped its list price from $5,000 a month to $1,900 a month.[225]

---

[221] Ed Silverman, *Price hikes for multiple sclerosis drugs helped Medicare Part D out-of-pocket costs to skyrocket*, Stat+ (Aug. 26, 2019), available at https://www.statnews.com/pharmalot/2019/08/26/multiple-sclerosis-prices-medicare/.

[222] Kelcee Griffis, *Teva Vows Appeal After 4 Copaxone Patents Invalidated*, Law360 (Jan. 31, 2017), available at https://www.law360.com/articles/886765.

[223] Ryan Davis, *Fed. Circ. Rules Teva's Copaxone Patents Are Invalid*, Law360 (Oct. 12, 2018), available at https://www.law360.com/articles/1091792/fed-circ-rules-teva-s-copaxone-patents-are-invalid.

[224] Press Release, *Sandoz announces US launch of Glatopa™, the first generic competitor to Copaxone® 20mg* (June 19, 2015), https://www.us.sandoz.com/news/media-releases/sandoz-announces-us-launch-glatopatm-first-generic-competitor-copaxoner-20mg.

[225] Carly Helfand, *Mylan decimates the list price of its Copaxone copy. But why?*, Fierce Pharma (July 9, 2018), https://www.fiercepharma.com/pharma/mylan-decimated-list-price-its-copaxone-copy-but-why.

367.    In response to the entry of generic competitors to Copaxone 20 mg, the CVS Caremark Entities first entered into an agreement with Teva, requiring that SilverScript add Copaxone 20 mg to the SSG/DNS Scheme on June 22, 2015.  Later the CVS Caremark Entities entered into an agreement with Teva, requiring that SilverScript add Copaxone 40 mg injection to the SSG/DNS Scheme on December 1, 2017.

368.    The high cost associated with Copaxone has driven beneficiaries and Medicare into the Catastrophic Coverage stage where plan costs are lower (and may be offset altogether with manufacturer rebates), but beneficiary and Medicare liability could be substantial.[226]

369.    The Copaxone SSG/DNS Scheme was controversial at CVS Health. On multiple occasions, Confidential Informant No. 1 ("CI-1"), a former SilverScript Medicare Part D actuary from 2017 to 2019, raised concerns among CVS leadership about the high cost of the SSG Copaxone scheme on beneficiaries taking the drug.  CI-1's superiors told him that the increased Copaxone costs for Medicare and Part D beneficiaries "were not an issue" of concern because "on average 93% of [LIS] members didn't care" since their coinsurance amounts were subsidized by the Government.  According to CI-1, there was little concern from CVS Health management for non-LIS members who would be the "losers" in the SSG/DNS Scheme for Copaxone.

### 1.    The CVS Caremark Entities Product Hopping Deal with Teva for Copaxone

370.    CVS Health insists that it does not participate in product hopping schemes with drug makers.  In written testimony to the Senate Finance Committee,[227] CVS Health Executive

---

[226] *The Flawed Design of Medicare Part D: A Copaxone Case Study*, 46brooklyn (August 12, 2020), https://www.46brooklyn.com/research/2020/8/12/copaxone

[227] *Drug Pricing in America: A Prescription for Change, Part III: Hearing Before the S. Comm. on Finance*, 116th Congress (2019) (Written Testimony of Derica Rice), at 43, *available at*: https://www.finance.senate.gov/imo/media/doc/CVS%20Health%20SFC%2004%2009%2019% 20Final.pdf.

Vice President and Caremark President Derica Rice responded to questions about product hopping from Senator Ben Cardin, stating that CVS Health would not do a "product hopping" deal with a drug maker unless "the [new] product provides a genuine benefit to patients":

> Question [Senator Cardin]. Do you think the proposed rule anticipates a situation where a pharmaceutical company stops producing an older version of a drug when a new formulation is available, but the newer formulation is not covered by a Part D plan? Why or why not?
>
> Answer [Mr. Rice]. Brands will sometimes cease production of an older version of a product in the interest of promoting a new formulation and preventing uptake of impending generic competition for the old formulation. This is commonly referred to as "product hopping" and allows them to keep prices artificially high. In instances that you are describing, if the newer product provides **a genuine benefit to patients we would work to get such products on formulary**. **Otherwise we would use traditional utilization management tools to ensure patients have access to the appropriate drugs.**

371.    What Rice describes is the Copaxone scheme in which the CVS Caremark Entities not only became a willing participant, but a primary co-conspirator with Teva. His statement that CVS Health "would use traditional utilization management tools" is thus palpably false with regard to how it blocked generics of Copaxone.

372.    Indeed, a House Oversight Committee report investigating drug manufacturer Teva's Copaxone tells a quite different story than what Rice had insisted in his testimony to the Senate Finance Committee.  The House Report found evidence Teva had product hopped patients from the original version of Copaxone 20 mg to a newer increased dosage version of Copaxone 40 mg, creating a 2.5 year delay in generic competition and costing the U.S. health care system between $4.3 billion and $6.5 billion in excess expenditures.[228]

373.    Internal documents disclosed to the Oversight Committee reveal that Teva

---

[228] *Drug Pricing Investigation: Majority Staff Report*, Committee on Oversight and Reform (December 2021), at 108, 109-113.

developed the new dose to extend its monopoly pricing for Copaxone by shifting patients to the new dose—which still enjoyed market exclusivity—before the existing 20 mg/mL dose began facing generic competition. Teva had invested in research to support the less frequent 40 mg/mL dose of Copaxone, despite considerable internal opposition from Teva's own Innovative Research and Development team, which, according to one of Teva's scientists, was "strongly against" Teva's study into the less frequent dosing of Copaxone "since it has no scientific rationale/value."[229]

374.    The Oversight Committee Report details how Teva took steps to leverage PBMs like the CVS Caremark Entities into facilitating the product hop "by tying contractual rebates—the discounts provided to PBMs and payers—on Copaxone 20 mg/mL to adding Copaxone 40 mg/mL to their formularies."[230]  In anticipation of competing generic versions entering the market in October 2017, the Committee found that "Teva began planning a 'House Brand Strategy' to contract with—and pay rebates to—PBMs and specialty pharmacies to make Copaxone 40 mg/mL the only version of the drug covered or dispensed. Teva pursued this strategy following its product hop from Copaxone 20 mg/mL to 40 mg/mL."[231]

375.    The CVS Caremark Entities executed one such "House Brand" deal with Teva, selling access to its formularies in furtherance of the Teva product hopping scheme, blocking generic competitors from being covered on its drug formularies.[232]

---

[229] *Id.* at 174.

[230] *Id.* at 113.

[231] *Id.* at 121.

[232] *Id.* at xii, 108.

376.    In a series of emails in January 2018, Teva's Executive Vice President for North America, Brendan O'Grady, explained how Teva's House Brand agreement with the CVS Caremark Entities had successfully prevented generic competition to Copaxone. In one email, a fellow employee asked Mr. O'Grady whether Teva's position would be harmed by a health insurer decision to place Copaxone 40 mg/mL on more restrictive tiers on commercial and Medicare Part D formularies, in favor of generic alternatives. O'Grady responded that the insurer's decision had "almost zero impact on actual prescriptions." At the time, patients covered by the insurer accessed Copaxone through a specialty pharmacy (CVS Specialty Pharmacy) that was wholly owned by a PBM (Caremark) which had entered into a House Brand contract. O'Grady explained: "Because [the CVS Caremark Entities] is getting an additional rebate to fill all 'glatiramer' or Copaxone scripts with Copaxone ... if a doctor orders generic glatiramer or the pharmacy benefit [manager] mandates it be filled as a generic, it will come in a plain box with Copaxone inside. Win-win for all. . . ."[233]

377.    But, many SilverScript beneficiaries were left holding the bag on increased costs for Copaxone in the Catastrophic Coverage stage of their Part D benefit.  Many could not afford the additional cost, and were forced to skip their treatment.  The impact of blocking beneficiaries from getting access to the less costly generic glatiramer acetate instead of the costlier brand-name Copaxone has had a dramatic impact not just on the cost of the drug, but on many patients' care. The annual cost of Copaxone by 2019 was approximately $85,000.  A recent survey by the National Multiple Sclerosis Society found that 40% of MS patients who take a DMT drug (like Copaxone) skipped or delayed filling a prescription, took less than prescribed, or stopped taking

---

[233] *Id.* at 122-23.

their medication altogether due to the high cost.[234] Only 11% said they could afford the medication without financial assistance.[235]

378.    The SSG/DNS Scheme for an expensive, maintenance drug like Copaxone pushed beneficiaries into the Catastrophic Coverage stage faster, where the SilverScript financial liability is low, but where beneficiaries and Medicare are forced to pick up significant additional cost.  That is because a Medicare beneficiary's progression through the Part D benefit stages is based on the prescription drug list price at the point of sale, which excludes rebates, discounts, and other fees the CVS Caremark Entities receives. This creates the perverse situation where beneficiaries reach the Catastrophic Coverage Stage (where they face potentially substantial cost sharing) sooner when using a high-priced product like Copaxone.[236]

### 2. SilverScript Deception Blocked Access to the Less Costly Generic Copaxone (glatiramer acetate)

379.    SilverScript CCRs were provided training materials telling them to inform beneficiaries that making Copaxone the exclusive formulary option would help "lower out-of-pocket cost":

> <Copaxone> is a brand-name prescription drug used to treat multiple sclerosis. This prescription drug was recently launched in its generic form <(glatiramer acetate)>. Generic prescription drugs are typically the lowest-cost option when compared to brand-name prescription drugs. <Client> promotes the use of generic prescription

---

[234] Multiple Sclerosis Society, *Quantifying the Effect of the High Cost of DMTs Market Research Report August 2019*, available at
https://www.nationalmssociety.org/NationalMSSociety/media/MSNationalFiles/Advocacy/NMSS-Research-Report-Full-Access-to-MS-Medications.pdf.

[235] *Id.*

[236] Joshua Cohen, *More Accountability Needed In Medicare Part D Plan Formulary Decision-Making*, Forbes (March 12, 2020), available at
https://www.forbes.com/sites/joshuacohen/2020/03/12/more-accountability-needed-in-medicare-part-d-plan-formulary-decision-making/?sh=378c7060779a 1/5

> drugs to help plan beneficiaries save money. During the initial launch phase for the generic, there will be few manufacturers marketing the generic and the cost of the generic is expected to be relatively high. To help lower out-of-pocket cost, <Client> is passing along a manufacturer discount on the brand <Copaxone>. As a result, <Client> will continue to keep the brand version of <Copaxone> on the formulary and will NOT be adding the generic version until further notice.[237]

While this may have been accurate when Copaxone was added to the SSG/DNS Scheme in 2015, the CCR statement about lowering out-of-pocket costs was no longer correct by late 2018 when other generic forms of glatiramer acetate were available at a much lower in cost to the member and Medicare Part D than the brand Copaxone. Moreover, given the fact that by late 2018 there were two competing generics (Mylan, Sandoz), there was simply no longer any reasonable explanation why brand-name Copaxone remained the only SilverScript formulary option.

380. SilverScript CCRs were also instructed that they should tell beneficiaries that they have the option to request a formulary exception, but that it would be at the "highest cost share level":

> [t]he generic equivalent, <Glatiramer acetate>, will not be on the formulary during this time. Beneficiaries will have the option to request an exception if they wish to obtain <glatiramer acetate>. However, exception requests for non-formulary prescription drugs, if approved, are typically approved for coverage at the highest cost share level. Brand <Copaxone> is available at the current Specialty Tier copay/coinsurance, so if the request for the generic is granted, the beneficiary would pay the amount associated with the plan's exception tier. This may be a different cost than the brand. [238]

The CCR statement about exception requests was deceptive. For 2019, Copaxone was a Tier 5 drug with coinsurance of 33%. A formulary exception would have been approved for Tier 4 with a coinsurance of 40%. Thus, keeping the brand Copaxone as the only SilverScript formulary option

---

[237] Exhibit 15 (CVS-000377-87)

[238] *Id.*

would not have resulted in lower out-of-pocket costs. Moreover, the discussion about the copay for the generic of Copaxone, glatiramer acetate, was intended to discourage beneficiaries from asking for a formulary exception by using misleading terminology "highest cost share level." This was deceptive. Even with the higher non-formulary exception tier coinsurance that would apply to the generic, if approved, due to the dramatically lower price of glatiramer acetate (generic Copaxone) will always be less expensive for Medicare and the beneficiary.

381. If SilverScript CCRs were asked by beneficiaries "[w]ill <Copaxone> cost more than <glatiramer acetate> in any stage of the Medicare D benefit," they were told to respond: "This will vary based on what Plan you are in and which Medicare Part D coverage stage you currently are in (*e.g.*, Deductible, Initial Coverage Limit, Coverage Gap or Catastrophic)."[239]

382. For LIS beneficiaries inquiring about whether there would be higher costs at any stage, SilverScript CCRs were to say that "[i]n the Catastrophic stage of the benefit you will continue to receive <Copaxone> at no cost. If you have not yet reached the Catastrophic stage, you might have to pay your brand-name copayment for <Copaxone> until you reach the Catastrophic stage."[240] This was misleading because comparative costs are not provided to subsidy members, leaving them without information to determine actual cost differences. If SilverScript CCRs had been trained to give a truthful answer, they would have told LIS beneficiaries:

- The cost to LIS 1 beneficiaries in the initial coverage stage for CY2019 is $8.50 for the brand and $3.40 for the generic. The LIS beneficiary will pay $0 for both the brand and the generic glatiramer acetate in the Catastrophic Coverage stage.

---

[239] *Id.*

[240] *Id.*

- Medicare Part D will pay $2,461.55 for the brand ($2,470.05 - $8.50) and $1,528.60 for the generic glatiramer acetate ($1,532.00 - $3.40) in the ICL stage.

- Medicare Part D will pay $1.862.75 for the brand ($1,871.25 - $8.50) and $1,413.70 for the generic glatiramer acetate ($1,417.10 - $3.40) for the generic in the Coverage Gap (where applicable) stage.

- Medicare Part D will pay $374.25 for the brand and $191.50 for the generic glatiramer acetate in the Catastrophic Coverage stage (full amount of beneficiary's cost) in addition to 80% of the cost of either drug for the Medicare portion of the cost of the drugs in this stage.

383.    If beneficiaries asked SilverScript CCRs "[a]ren't generics less expensive," the canned response was: "When a generic version is first available, it is typically similar in price to the brand-name version. Eventually, we expect more generic prescription drug companies to start making and selling <glatiramer acetate>, which could bring down the price."[241]    The CCR statement about when generic glatiramer acetate prices will be lower than the brand was false and deceptive.  Here generic glatiramer acetate was, in fact, already by 2018 were much lower in price for all beneficiaries.  There was no need to wait for there to be additional generic manufacturers to bring the price down.

384.    If asked, "[c]an I get the generic," they were to tell beneficiaries:

At this time the generic version, called <glatiramer acetate>, is not on the formulary. You do have the option to request a formulary exception. However, brand <Copaxone> is available at the current Specialty Tier coinsurance/copay, so if the request for the generic is granted, you (the beneficiary) would pay the amount

---

[241] *Id.*

associated with the Part D plan's exception tier. This may be a different cost than the brand."[242]

This was deceptive. While this statement may have been true for some newly released generics, the generics for Copaxone were soon available at a lower cost option for all beneficiaries. Moreover, it was intended to discourage beneficiaries from asking for a formulary exception. A formulary exception for the generic would have been approved at the highest tier (Tier 4) with a coinsurance of 40%. However, even with the higher coinsurance, the generic glatiramer acetate was already much less expensive than the brand due to the dramatic difference in price.

385.    If they were asked how long would "<COPAXONE> remain on the formulary on the <Specialty Tier (Tier 5)>," the scripted response was: "We anticipate that <COPAXONE> will remain on the formulary on the <Specialty Tier (Tier 5)> in <2018 and 2019> until the price of the generic form of <COPAXONE> drops. We anticipate it will be a <minimum of six months>, however that is based on market conditions not within our control and could change."[243]

386.    This was misleading. As of February 2019, the GoodRx price of the generic glatiramer acetate was $1,567.18 compared to the brand Copaxone price of $7,170.91, already making the generic a lower cost option for both the beneficiary and Medicare.

387.    Thus, the decision to keep the brand Copaxone as the only option on the SilverScript formulary was not driven by market conditions, but by CVS Health's own profit motives. This was even more deceptive by 2020, well past the promised price drop related to "market conditions."[244] By then, there were two generics being sold competing against Copaxone

---

[242] *Id.*

[243] *Id.*

[244] *Id.*

(Mylan, Sandoz). However, even then the brand-name Copaxone remained the only choice on the SilverScript Choice and Plus formularies.[245] Likewise, it was a lie and deceptive to say that the market conditions were not "within our control" when it was the CVS Caremark Entities' agreement with Teva that was the cause for the delay in the formulary access to the less costly generic drug glatiramer acetate. The market conditions were thus completely within its control.

388.    If beneficiaries asked whether they could request a coverage determination for the less costly generic, they were to be told: "Yes, you as the beneficiary may request a coverage determination for <glatiramer acetate>. However, exception requests for non-formulary prescription drugs, if approved, are typically approved for coverage at the highest cost share level." This was misleading and intended to discourage beneficiaries from asking for a formulary exception. A formulary exception for the generic glatiramer acetate would have been approved at the highest tier (Tier 4) with a coinsurance of 40%. However, even with the higher coinsurance, the generic glatiramer acetate would have been less expensive than the brand Copaxone due to the dramatic difference in price.

### 3. Beneficiary No. 1

389.    Beneficiary No. 1's experience showcases how, despite beneficiary protests, SilverScript did not provide beneficiaries with information or options about how to reduce their Copaxone out-of-pocket cost (and also consequently costs to Medicare) by getting access to less costly generic drugs.

390.    In late January 2019, Beneficiary No. 1 (a 67-year-old woman from Nebraska) was

---

[245] *See* 2020 SilverScript Choice Comprehensive Formulary, available at https://www.silverscript.com/pdf/FORM_2020_CHOICE_EN.pdf; 2020 SilverScript Plus Comprehensive Formulary, available at https://www.silverscript.com/pdf/FORM_2020_PLUS_EN.pdf.

able to get her prescription for the generic version of Copaxone (glatiramer acetate) under a transition fill (hereinafter "Transition Fill"), a one-time, short-term fill of a prescription as a temporary stopgap to ensure beneficiaries get their medication even if it is not otherwise supposed to be available because it is not on formulary or is not pre-approved.[246]

391.    The claim record shows that the CVS Specialty Pharmacy filled her glatiramer acetate prescription and submitted the claims with a "0 – NO DAW" code.[247]

392.    According to the CVS Participating Pharmacy Manual, the CVS Specialty Pharmacy could only "*[u]se the DAW 0 code when dispensing a generic drug*; that is, when no party (*i.e.*, neither Prescribing Provider, nor pharmacist, nor Participant) requests the branded version of a multi-source product." (emphasis added).[248]

393.    Shortly thereafter, she received a letter from SilverScript dated January 28, 2019 stating that the Transition Fill of the generic was only a one-time fill because the drug was not covered on the formulary.[249]

394.    After receiving the letter from SilverScript, Beneficiary No. 1 contacted SilverScript Customer Care to figure out what she needed to do in order to keep getting the less costly medication. Over the course of two different calls, the SilverScript CCRs never gave Beneficiary No. 1 the option to request a coverage determination for the formulary exception. To the contrary, the solution SilverScript CCRs offered was for them to contact her doctor to have the doctor specify in the prescription that the brand-name Copaxone was required. So, instead of

---

[246] Exhibit 16 (CVS-001933).

[247] *Id.*

[248] Exhibit 1 (CVS-002944).

[249] Exhibit 17 (CVS-001934).

offering her a formulary exception, CVS Health forced the doctor to write a prescription for the brand-name Copaxone despite there being no clinical reason to use the brand-name over the generic.

395.    This is non-compliant with CMS rules and regulations, and was by definition a coverage determination request for the generic Copaxone.  What happened to Beneficiary No. 1 is exemplary of thousands of instances where SilverScript denied beneficiaries access to their rights under Medicare.

396.    Beneficiary No. 1's claims history demonstrates how denying the option of a formulary exception made her medication more expensive to both this senior and Medicare. Given the high price of Copaxone, merely three fills pushed her into the Catastrophic Coverage Stage. In the Catastrophic Coverage Stage, the cost difference between the brand-name Copaxone and the generic are stark:[250]

|  | Generic (Glatiramer Acetate) | Brand (Copaxone) |
|---|---|---|
| **Plan allowed drug cost** | $4,718.67 | $5,892.65 |
| **Member Co-pay** | $235.93 | $294.65 |
| **Plan Cost (SilverScript Cost)** | $707.80 | $883.89 |
| **Medicare Cost (Catastrophic Coverage Stage)** | $3,775.43 | $4,714.61 |
| **Total Medicare Cost** | $3,775.43 | $4,714.61 |

397.    Illustrating the contortions to which the SSG/DNS Scheme has required SilverScript to make, here, as evidenced by Beneficiary No. 1's use of the generic version of Copaxone and continued requests for it, there was no medically valid reason her physician would have required that she needed to receive the brand-name drug instead of the less costly generic that

---

[250] Exhibit 18 (CVS-001923).

had been requested. Not only had she specifically requested the generic, the generic glatiramer acetate she received was less costly and was therapeutically equivalent. Thus, a DAW 1 code in the PDE record in support of the SilverScript payment for Beneficiary No. 1 was untruthful, inaccurate and incomplete.

398. Furthermore, requiring her to use the brand-name Copaxone was invalid because the prescription was filled at a CVS pharmacy in Pennsylvania, a mandatory generic substitution State. SilverScript thus violated the State law requirement that the prescription be substituted with the less costly generic.

**B.    Invega**

399. Paliperidone is an atypical antipsychotic used to treat schizophrenia and schizoaffective disorder. Janssen Pharmaceuticals, Inc., a wholly-owned subsidiary of Johnson & Johnson, manufactures paliperidone under the brand-name Invega. Paliperidone is a "me, too" active metabolite version of its drug risperidone (Risperdal), which had lost patent protection years earlier.

400. As of the year ending June 30, 2015, Invega Extended-Release Tablets 1.5 mg, 3 mg, 6 mg and 9 mg, had U.S. sales of approximately $606.2 million.

401. On August 3, 2015, the FDA approved a generic version of Invega manufactured by Allergan, which announced it had launched sales of the generic tablets on September 25, 2015.[251] On September 28, 2015, Mylan announced the launch of its own generic versions of

---

[251] Da Hee Han, *First Generic Version of Invega Launched*, MPR (September 25, 2015), available at https://www.empr.com/home/news/generics-news/first-generic-version-of-invega-launched/

Invega tablets.[252]

402.    In response to the competing Allergan and Mylan generics, on September 24, 2015, a wholly owned subsidiary of Janssen, Patriot Pharmaceuticals, LLC (located in Horsham, Pennsylvania, within this District) announced it would begin selling the authorized generic version of Janssen's Invega (paliperidone), available as 1.5 mg, 3 mg, 6 mg, and 9 mg extended-release tablets.[253]

403.    The authorized generic for Invega was manufactured by Janssen and was identical to the brand-name drug.  The only difference was the assigned National Drug Code (NDC).

404.    Patriot's website describes authorized generics as "the innovator's prescription drug, approved under a New Drug Application (NDA) by the FDA, and are either marketed and distributed by an authorized generic distributor or have sales and supplies managed by an entity like Patriot with a generic product label."[254]

405.    In addition, Patriot's website says that there are no differences between the authorized generic and the brand product it is selling for Janssen: "Patients will have the same product experiences with Authorized Generics as they did with the brand-name products in areas

---

[252] *Mylan Launches Generic Invega® Tablets*, PR Newswire (Sep. 28, 2015), available at https://www.prnewswire.com/news-releases/mylan-launches-generic-invega-tablets-300149726.html

[253] OptumRx, "Invega (paliperidone) – First-Time Generic" available at https://professionals.optumrx.com/content/dam/optum3/professional-optumrx/vgnlive/HCP/Assets/RxNews/New%20Generics_Invega_2015-0925.pdf (last accessed June 6, 2019).

[254] Patriot Pharmaceuticals, "About Authorized Generics" https://www.patriotpharmaceuticals.com/patriotpharmaceuticals/faqs.html (last accessed on June 9, 2019).

such as taste, color, mouth feel, size and shape."[255]

406.    The CVS Caremark Entities shortly thereafter entered into an agreement with Janssen, requiring that SilverScript add Invega to the SSG/DNS Scheme on November 6, 2015.

### 1. SilverScript Deception Blocked Access to Generic Invega (paliperidone tablets)

407.    After Invega was added to the SSG/DNS Scheme, SilverScript CCRs were told to tell beneficiaries:

> During the initial launch phase for the generic, there will be few manufacturers marketing the generic and the cost of the generic is expected to be relatively high. To help keep out-of-pocket costs low, SilverScript is retaining brand INVEGA TABLET on its formulary on the Preferred Brand Tier (Tier 3). INVEGA TABLET is eligible for a manufacturer discount in the coverage gap.[256]

This was misleading.  Authorized generics are eligible for the Coverage Gap discount program since they are NDA "applicable" drugs.[257] The generic drug paliperidone tablet option(s) were lower cost to the member and Medicare than the brand for the SilverScript Allure Plan in the ICL stage and for all SilverScript plans in the Coverage Gap (where applicable) and Catastrophic Coverage Stage.  Moreover, given the fact that there were as of 2019 five competing generics (Actavis, Amneal, Inventia, Mylan, Sun), there was simply no longer any reasonable explanation why Invega remained the only SilverScript formulary option.

408.    SilverScript CCRs were also to tell beneficiaries:

> Retaining brand INVEGA TABLET on the Preferred Brand Tier (Tier 3) can help keep out-of-pocket costs low for SilverScript beneficiaries. . . . Beneficiaries will

---

[255] *Id.*

[256] Exhibit 19 (CVS-000324-33).

[257] CMS, *Medicare Coverage Gap Discount Program Beginning in 2011: Revised Part D Sponsor Guidance and Responses to Summary Public Comments on the Draft Guidance* (May 21, 2010), at 4.

have the option to request a formulary exception if they wish to obtain paliperidone tablet.

- However, exception requests for non-formulary prescription drugs, if approved, are typically approved for coverage at the highest non-specialty cost share level (Tier 4) in 2018 and 2019.

- Brand INVEGA TABLET is available at Preferred Brand Tier (Tier 3) copay in 2018 and 2019, so if the request for the generic is granted, the beneficiary would most likely pay a higher out-of-pocket cost as the medication will pay as a Tier 4 coinsurance. As the cost of the generic is expected to be higher, the coinsurance amount will also be higher for the generic.[258]

The statement about keeping out-of-pocket costs low was misleading. Invega was at the time a Tier 3 drug. A formulary exception would have been approved for Tier 4. This would result in a higher cost for the generic paliperidone tablet in the ICL stage only (Choice, Plus) and a lower cost for the generic (Allure). For the Coverage Gap and Catastrophic Coverage Stages, the generic paliperidone tablet would be less expensive in all plans.

409. If SilverScript CCRs were asked whether "INVEGA TABLET [will] cost more than paliperidone tablet in any phase of the Medicare Part D benefit," they were to tell non-LIS beneficiaries:

> No. The Coverage Gap Stage (also called the "donut hole") is where you will receive significant savings on brand INVEGA TABLET. The brand-name would have been less expensive than the generic version because of the manufacturer discount on brand-name prescription drugs. In 2018, your cost share in the Coverage Gap Stage is 35% on the price of brand INVEGA TABLET. If the generic were included at this time on the formulary, your cost share would be 44%. In 2019, your cost share in the Coverage Gap Stage is 25% on the price of brand INVEGA TABLET. If the generic were included at this time on the formulary, your cost share would be 37%.."[259]

---

[258] *Id.*

[259] *Id.*

This was false.  The reference to the higher generic cost share was misleading because, even with the higher copayment, the generic paliperidone tablet was already less costly.  If they were being truthful, SilverScript CCRs would say that, in all non-subsidy scenarios across all three plans, the cost of the generic paliperidone tablet would in almost all situations always be lower.

410.    If asked why beneficiaries cannot get the generic, SilverScript CCRs were trained to respond:

> When a generic version is first available, it is typically similar in price to the brand version. At this time the generic version, called paliperidone tablet, is not on the formulary. You do have the option to request a formulary exception. However, exception requests for non-formulary prescription drugs, if approved, are typically approved for coverage at the highest cost share level (excluding the Specialty Tier - Tier 4) in 2018 and 2019. Brand INVEGA TABLET is available at the Preferred Brand Tier (Tier 3) in 2018 and 2019, so even if an exception is granted to allow coverage of the generic, you might pay more out-of-pocket for the generic version paliperidone tablet than for brand INVEGA TABLET.  Eventually, we expect more generic prescription drug companies to start making and selling paliperidone tablet, and this should bring down the price.[260]

It was misleading to tell beneficiaries that the generic paliperidone tablet is not less costly than the brand-name Invega.  While this statement may have been true for some newly released generics, the generic paliperidone tablet was already much lower in price for some beneficiaries in the ICL stage and all beneficiaries in the Coverage Gap (where applicable) and Catastrophic Coverage Stages.  There was no need to wait for there to be multiple generic manufacturers for the price to come down since the generic was already less costly than the brand-name Invega.  Likewise, it was deceptive to discourage beneficiaries from asking for a formulary exception. Only in the ICL stage of the plan would the generic paliperidone tablet be more expensive than the brand in the Choice and Plus plans, but it would always be less expensive in the Allure plan.

---

[260] *Id.*

411.    If asked by beneficiaries how long Invega would be the exclusive formulary choice, SilverScript CCRs were to respond:  "We anticipate that INVEGA TABLET will remain on the formulary in Preferred Brand Tier (Tier 3) in 2018 and 2019 until the price of the generic form of INVEGA TABLET drops. We anticipate it will be a minimum of six months, however that is based on market conditions not within our control and could change."[261]

412.    This was misleading. By February 2019, the GoodRx price of the generic paliperidone tablet was $265.25 compared to the price of the brand Invega of $1,240.44, making the generic already a much lower cost option for both the beneficiary and Medicare in many scenarios.

413.    Thus, the decision to keep the brand Invega as the only choice on the SilverScript formulary was not driven by purported market conditions, but by CVS Health's own profit motives.  This was even more deceptive by 2020, well past the promised price drop related to "market conditions."[262] By then, there were six generic paliperidone tablet products being sold competing against Invega (Actavis, Amneal, Inventia, Mylan, Patriot and Sun).  However, even then the brand-name Invega remained the only option on the SilverScript Choice and Plus

---

[261] *Id.*

[262] *Id.*

formularies.[263]

414.    Likewise, it was a lie and deceptive to say that the market conditions were not "within our control" when it was the CVS Caremark Entities' agreement with Janssen that was the cause for the delay in the formulary access to the less costly generic drug paliperidone tablet. The market conditions were thus completely within its control.

415.    If SilverScript CCRs were asked by beneficiaries whether they could request a coverage determination for the less costly generic, they were to tell them:

> Yes, you as the beneficiary may request a coverage determination for paliperidone tablet. However, exception requests for non-formulary prescription drugs, if approved, are typically approved for coverage at a higher cost share level (excluding the specialty tier).  Brand INVEGA TABLET is available at the Preferred Brand Tier (Tier 3) copay in 2018 and 2019, so you might pay more out-of-pocket for the generic than for the brand at this time.[264]

This was misleading as to the Allure beneficiaries and was intended to discourage them from asking for a formulary exception.  Only in the ICL stage of the plan (where this exception would be used), the generic paliperidone tablet would be more expensive than the brand in the Choice and Plus plans, but less expensive in the Allure plan.

---

[263] *See* 2020 SilverScript Choice Comprehensive Formulary, available at https://www.silverscript.com/pdf/FORM_2020_CHOICE_EN.pdf; 2020 SilverScript Plus Comprehensive Formulary, available at https://www.silverscript.com/pdf/FORM_2020_PLUS_EN.pdf; Allure formulary, available at https://q1medicare.com/PartD-BrowseMedicare-2019PlanFormulary.php?letter=I&formulary=00019296&contractId=S5601&planId=154&segmentId=0&zipCountyCode=0&ccountyName=Statewide&stateReg=12TN&zip=&planType=P&mode=state&prAuth=&stepTh=&qtyLmt=&tier1=&tier2=&tier3=&tier4=&tier5=&tier6=&sort=drugNameasc.

[264] Exhibit 19 (CVS-000324).

## 2. Beneficiary No. 2

416.    When Beneficiary No. 2 (a 34-year-old man living in Missouri) sought to fill a prescription for the generic Invega (paliperidone tablets) on February 22, 2019, he was able to get his prescription under a Transition Fill at his pharmacy.[265]

417.    Shortly thereafter, he received a letter from SilverScript dated February 26, 2019, stating that the Transition Fill of the generic was only a one-time fill because the drug was not covered on the formulary, and was required to use the brand Invega thereafter.[266] The letter from SilverScript failed to notify Beneficiary No. 2 that there was an identical, less costly authorized generic for the brand Invega.

418.    After Beneficiary No. 2 filed a grievance on March 4, 2019, SilverScript failed to address his request for a coverage determination within that grievance for the generic paliperidone, presumably because it was not covered under the plan.  Despite the fact that SilverScript had for years granted all formulary exceptions whenever beneficiaries requested the less costly generic, there is no indication from the grievance notes that the representative offered him a formulary exception, which SilverScript was required to offer and which had been routinely granted up until late 2018.

419.    This is non-compliant with CMS rules and regulations, and was by definition a grievance and a coverage determination request for the generic Invega. What happened to Beneficiary No. 2 is exemplary of thousands of instances where SilverScript denied beneficiaries access to their rights under Medicare.

420.    While the decision to require Beneficiary No. 2 to use the brand Invega did not

---

[265] Exhibit 20 (CVS-002333).

[266] Exhibit 21 (CVS-002334).

increase his costs since his coinsurance was subsidized (his copayment was $3.40 for both the brand and the generic), it did drive up the costs for taxpayers considerably. The paid claim record for his paliperidone ER indicates the plan allowed drug cost for the generic paliperidone was $401.97 compared to the plan allowed cost for Invega of $607.83, a 151% increase.[267] These costs would only increase as Beneficiary No. 2 proceeded to the Catastrophic Coverage Stage of his benefit.

### C.    Asacol HD

421.    Mesalamine is used to treat inflammatory bowel disease, including ulcerative colitis and Crohn's disease. Allergan manufactures mesalamine delayed-release tablets under the brand-name Asacol HD.

422.    By 2014, Asacol HD's annual sales in the U.S. were $488 million.

423.    The CVS Caremark Entities entered into an agreement with Allergan, requiring that SilverScript add Asacol HD added to the SSG/DNS Scheme on September 23, 2016.

### 1.    *The Asacol HD SSG/DNS Deal Facilitated Allergan's "Pay-for-Delay" Tactics, Delaying Generic Competition*

424.    CVS Health has insisted that it opposes so-called "pay-for-delay" tactics from drug makers. For example, CVS Health Executive Vice President Jon Roberts posted an article on the company website on February 7, 2017, stating that the company "supports passing laws that end" pay-for-delay deals.[268]

425.    In a letter to then HHS Secretary Alex Azar dated July 16, 2018, CVS Health stated

---

[267] Exhibit 22 (CVS-002332).

[268] Jon Roberts, *Bending the Prescription Drug Cost Curve: How Policy Reform Can Help*, CVS Health website (Feb. 7, 2017), available at https://payorsolutions.cvshealth.com/insights/bending-prescription-drug-cost-curve.

that, "[b]y prohibiting pay-for-delay agreements, the Trump Administration can curb anti-competitive practices and help bring lower cost, clinically-equivalent generic medications to market more quickly."[269]

426.    Likewise, in testimony before the Senate Finance Committee on April 9, 2019, CVS Health Executive Vice President and Caremark President Derica Rice insisted that CVS Health supports "ending 'pay-for-delay,' a tactic that allows brand manufacturers to pay generic competitors to keep products off the market and extend market exclusivity."[270]

427.    What CVS Health has failed to admit was that, in fact, the SSG/DNS Scheme had for years actually aided and abetted pay-for-delay Drug Maker tactics.

428.    One example of this is Asacol HD.  In order to protect its Asacol franchise, Allergan had engaged in numerous schemes to delay generic competition, including a product hop from Asacol to Asacol HD; a so-called "hard switch" to Asacol HD (ceasing the sale of Asacol in April 2013); a reverse payment settlement with first generic maker Zydus (effectively bottlenecking all other generics), paying it not to compete with a generic form of Asacol HD; "ever-greening" sham patent infringement litigation against generic makers to obtain a 30-month Hatch Waxman stay; and the introduction of an authorized generic version of Asacol HD.

429.    In September of 2011, generic maker Zydus Pharmaceuticals had filed the first ANDA seeking FDA approval for generic Asacol HD. As the first generic filer, Zydus was

---

[269] Press Release, *CVS Health Responds to Request for Information on Trump Administration's Blueprint to Lower Drug Prices*, CVS Health website (July 16, 2018), available at https://www.cvshealth.com/news-and-insights/press-releases/cvs-health-responds-to-request-for-information-on-trump.

[270] *See Drug Pricing In America: A Prescription For Change, Part III*, Hearing Before the Committee on Finance, U.S. Senate, S. Hrg. 116-415 (April 9, 2019).

potentially entitled to 180 days of restricted competition from other generics (other than

"authorized generics" sold by the brand company itself). In November of 2011 Warner Chilcott

(later acquired by Allergan) filed a patent infringement suit in order to prevent Zydus from entering

the market.

430.    After two years of litigation, in late 2013 and early 2014 Warner Chilcott entered

into an unlawful non-competition agreement with Zydus. In the agreement, Warner Chilcott agreed

to pay Zydus tens of millions  of dollars annually in exchange for Zydus's agreement to quit its

challenge to Warner Chilcott's patent and assist in delaying the entry of a less costly generic

version of Asacol HD until at least November 15, 2015, but likely by or beyond July 1, 2016. As

part of the reverse payment agreement, Warner Chilcott promised (i) not to launch an authorized

generic version of Asacol HD to compete against Zydus's generic, and (ii) to deter other generic

manufacturers from entering the market before Zydus.

431.    According to a press release issued by Allergan in 2014, it had finalized the reverse

payment settlement agreement with Zydus related to Asacol HD:

> Under the terms of the agreement, Actavis will grant Zydus an exclusive license to
> market its generic Asacol® HD beginning on November 15, 2015, or earlier under
> certain circumstances, following receipt by Zydus of final approval from the U.S.
> Food and Drug Administration (FDA) on its Abbreviated New Drug Application
> (ANDA) for generic Asacol® HD. Alternatively, if Zydus does not
> gain FDA approval of its generic Asacol® HD by July 1, 2016, Zydus will be
> permitted to launch an authorized generic version of Actavis' product beginning
> on July 1, 2016.[271]

432.    As part of the settlement, Zydus agreed to turn over 75 percent of its authorized

---

[271] June 9, 2014 Press Release, "Actavis Finalizes Agreement Related to Asacol® HD Patent
Challenge Litigation," available at
https://www.allergan.com/news/news/thomson-reuters/actavis-finalizes-agreement-related-to-asacol-hd-p.

generic profits to Actavis (which changed its named to Allergan when it bought the company in 2015).[272]

433.    On August 1, 2016, Zydus Pharmaceuticals announced it would begin selling an authorized generic version of Allergan's Asacol HD (mesalamine) 800 mg delayed-release tablets, using Asacol HD tablets supplied by Allergan.[273]

434.    Even though publicly CVS Health has been an outspoken critic of drug maker pay-for-delay deals, privately its SSG/DNS deals actually did exactly the opposite, actually facilitating the Drug Maker's tactics.

435.    For Asacol HD, shortly after Zydus began marketing the authorized generic, the CVS Caremark Entities entered into an anticompetitive "rebate wall" agreement with Allergan,[274] requiring that SilverScript add Asacol HD added to the SSG/DNS Scheme on September 23, 2016, thus blocking elderly, ESRD and disabled SilverScript members' access to the less costly generic.

### 2. *SilverScript Deception Blocked Access to the Less Costly Generic Asacol HD (mesalamine-sofoamine)*

436.    After Asacol HD was added to the SSG/DNS Scheme, SilverScript CCRs were provided materials and training instructing them to inform beneficiaries that:

> [d]uring the initial launch phase for the generic, there will be few manufacturers marketing the generic and the cost of the generic is expected to be relatively high. To help keep out-of-pocket costs low, SilverScript is retaining brand ASACOL®

---

[272] Joe Nocera, *How Allergan Continues to Make Drug Prices Insane*, Bloomberg (Jan. 9, 2018), https://www.bloomberg.com/opinion/articles/2018-01-09/how-allergan-continues-to-make-drug-prices-insane.

[273] *Zydus to sell Asacol HD's generic in US market*, Business Standard (July 14, 2016), available at  https://www.business-standard.com/article/pti-stories/zydus-to-sell-asacol-hd-s-generic-in-us-market-116071401279_1.html.

[274] Joshua Cohen, *Rebate Walls Stifle Prescription Drug Competition*, Forbes (March 1, 2021), available at https://www.forbes.com/sites/joshuacohen/2021/03/01/rebate-walls-stifle-prescription-drug-competition/?sh=40443b866ae9.

HD DELAYED-RELEASE TABLETS on its formulary on Non-Preferred Drug Tier (Tier 4). SilverScript will continue to keep the brand version of ASACOL HD DELAYED-RELEASE TABLETS on the formulary and will NOT be adding the generic version until further notice.[275]

The CCR statement about keeping out-of-pocket low was false. The generic drug option(s) were lower cost to the member and Medicare Part D than the brand.

437. They were also to tell beneficiaries that:

Retaining brand ASACOL HD DELAYED-RELEASE TABLETS on Non-Preferred Drug Tier (Tier 4) can help keep out-of-pocket costs low for SilverScript beneficiaries. Note: The generic equivalent mesalamine delayed-release tablets is not on the formulary until further notice. Beneficiaries have the option to request an exception if they wish to obtain mesalamine delayed-release tablets. However, exception requests for non-formulary prescription drugs, if approved, are typically approved for coverage at the highest cost share level. Brand ASACOL HD DELAYED-RELEASE TABLETS is available at the Non-Preferred Drug Tier (Tier 4) copay/coinsurance, so if the request for the generic is granted, the beneficiary would pay the amount associated with the plan's exception tier. This may be a different cost than the brand.[276]

This, too, was false. Asacol HD was at the time a Tier 4 drug. A formulary exception would also have been approved for Tier 4. Keeping the brand as the only SilverScript formulary option would not have resulted in lower out-of-pocket costs. Moreover, the exception request language was intended to discourage beneficiaries from asking for a formulary exception by using misleading terminology "highest cost share level." A formulary exception would always result in a lower beneficiary and Medicare cost for the generic mesalamine delayed-release tablets.

438. If SilverScript CCRs were asked whether Asacol HD Delayed Release Tablets would cost more in any stage for LIS beneficiaries, they were to tell them:

In the Catastrophic Coverage Stage of the benefit, you will continue to receive ASACOL HD DELAYED-RELEASE TABLETS at no cost. If you have not yet

---

[275] Exhibit 23 (CVS-000272-82).

[276] *Id.*

> reached the Catastrophic Coverage Stage, you might have to pay your brand-name copayment for ASACOL HD DELAYED-RELEASE TABLETS until you reach the Catastrophic Coverage Stage. [277]

This was misleading because comparative costs are not provided to subsidy members, leaving them without information to determine actual cost differences.  If they had been truthful, SilverScript CCRs would have informed LIS beneficiaries:

- The cost to LIS 1 beneficiaries in the initial coverage stage for CY2019 is $8.50 for the brand and $3.40 for the generic mesalamine delayed-release tablets.  Beneficiaries will pay $0 for both the brand and the generic in the Catastrophic Coverage stage.

- Medicare Part D will pay $518.95 for the brand ($527.45 - $8.50) and $344.70 for the generic mesalamine delayed-release tablets ($348.10- $3.40) in the ICL stage.

- Medicare Part D will pay $321.16 for the brand ($329.66 - $8.50) and $318.60 ($322.00 - $3.40) for the generic mesalamine delayed-release tablets in the Coverage Gap (where applicable) stage.

- Medicare Part D will pay $65.93 for the brand and $43.51 for the generic mesalamine delayed-release tablets in the Catastrophic Coverage stage (full amount of beneficiary's cost) in addition to 80% of the cost of either drug for the Medicare portion of the cost of the drugs in this stage.

439.    If asked by beneficiaries "[w]hy is the brand-name ASACOL HD DELAYED-RELEASE TABLETS on the formulary when there is now a generic available," they were to respond:

> In this case, the price of the generic version of ASACOL HD DELAYED-RELEASE TABLETS will likely be similar to the price of the brand version for a minimum of six months, and perhaps longer. There are few manufacturers of the generic version of ASACOL HD DELAYED-RELEASE TABLETS to drive the

---

[277] *Id.*

> price down. Until there are competitors and the price of the generic version goes down, your plan will continue to cover brand-name ASACOL HD DELAYED-RELEASE TABLETS at the Non-Preferred Drug Tier (Tier 4) cost share in 2019.[278]

The CCR statement about how long it will take for the generic price to come down was false. The generic mesalamine 800 mg delayed-release tablets are already much lower in price for most beneficiaries. There was no need to wait for there to be multiple generic manufacturers to drive the price down.

440.    If they were asked why they could not get a generic mesalamine delayed-release tablets, they were trained to respond:

> When a generic version is first available, it is typically similar in price to the brand version. At this time the generic version, called mesalamine delayed-release tablets, is not on the formulary. You do have the option to request a formulary exception. However, exception requests for non-formulary prescription drugs, if approved, are typically approved for coverage at the highest cost share level.[279]

The CCR statement about generic pricing was misleading. While this statement may have been true for newly released generics, the generic mesalamine delayed-release tablets has been on the market for almost three years and is at a lower cost option for beneficiaries. And, it was deceptive. The exception request language was intended to discourage beneficiaries from asking for a formulary exception. A formulary exception for the generic mesalamine delayed-release tablets would have been approved at the highest tier (Tier 4) which is the same tier/cost share (40%) as the brand.

441.    If asked how long Asacol HD would be the only SilverScript formulary option, they were expected to tell beneficiaries:

---

[278] *Id.*

[279] *Id.*

> We anticipate that ASACOL HD DELAYED-RELEASE TABLETS will remain on the formulary on the Non-Preferred Drug Tier (Tier 4) in 2019 until the price of the generic form of ASACOL HD DELAYED-RELEASE TABLETS drops. We anticipate it will be a minimum of six months, however that is based on market conditions not within our control and could change.[280]

442.    The CCR template statement about generic pricing was misleading.  By February 2019, the GoodRx price of the generic mesalamine delayed-release tablets was $240.96 compared to the price of the brand Asacol HD of $885.91, already making the generic a lower cost option for both the beneficiary and Medicare Part D.

443.    Thus, the decision to keep brand-name Asacol HD as the only choice on the SilverScript formulary was not driven by market conditions at all.  Likewise, it was a lie and deceptive to say that the market conditions were not "within our control" when it was the CVS Caremark Entities' agreement with Allergan that was the cause for the delay in the formulary access to the less costly generic drug mesalamine delayed-release tablets. The market conditions were thus completely within its control.

444.    If beneficiaries asked whether they could submit a coverage determination, SilverScript CCRs were to respond: "Yes, you as the beneficiary may request a coverage determination for mesalamine delayed-release tablets. However, exception requests for non-formulary prescription drugs, if approved, are typically approved for coverage at the highest cost share level."[281] This was misleading and intended to discourage beneficiaries from asking for a formulary exception.  A formulary exception for the generic would have been approved at the highest tier (Tier 4) which is the same tier/cost share 40% as the brand-name Asacol HD.

---

[280] *Id.*

[281] *Id.*

### 3.  Beneficiary No. 3

445.    When Beneficiary No. 3 (an 82-year-old woman living in Florida) sought to fill a prescription for the generic Asacol HD (mesalamine-sofoamine) on November 8, 2018, she was able to get the prescription filled under a tiering exception at her pharmacy.[282]

446.    She later received a Notice of Approval letter from SilverScript telling her that her Asacol HD prescription had been approved under a tiering exception to receive Asacol HD at the copay level for a Tier 2 drug, $17.00.[283]  This tiering exception was approved from August 10, 2018 to November 8, 2019.  What the letter failed to tell her was that tiering exceptions only apply in the Initial Coverage Stage, and they do not allow for a lower price in the Coverage Gap (where applicable) or the Catastrophic Coverage Stage.

447.    On February 9, 2019, she again filled the Asacol HD prescription at her pharmacy, again with a member copay of $17.00.[284]

448.    A month later on March 12, 2019, she attempted to fill the Asacol HD prescription again, but this time the copay had increased to $345.73.  She thereafter filed a grievance seeking the low $17.00 copay, which was declined because the generic mesalamine was non-formulary. There is no indication from the grievance notes that the representative, Andrea Jarmon, discussed the less costly authorized generic or offered a Beneficiary No. 3 a formulary exception. [285]

449.    Beneficiary No. 3 was then transferred to the Care Exception Representative (CER) team to discuss why she could no longer get the $17.00 copay for Asacol HD.  After being putting

---

[282] Exhibit 24 (CVS-001712)

[283] *Id.*

[284] Exhibit 25 (CVS-001708).

[285] Exhibit 26 (CVS-001709).

on hold and being bounced from representative to representative, she was eventually told she was no longer eligible for the tiering exception, and should discuss other medications with her doctor in the meantime.

450.    During the call, Beneficiary No. 3 had explained that she was very frustrated, particularly because she would run out of her Asacol HD prescription the following day, telling the CER she would call her doctor to discuss alternatives and asking the CER Cartier: "SilverScript is telling me 'tough luck for my medicine beyond tomorrow,' right?"  CER Cartier confirmed on the call that her understanding was correct.[286]

451.    The advice CER Cartier gave Beneficiary No. 3 is consistent with his training, which specifically instructs the CER representatives they are not proactively to advise beneficiaries of alternatives that are not on the formulary. As he had been trained to do, at no time did he tell her about the less costly authorized generic or offer her a formulary exception.

452.    If a formulary exception had been offered for the authorized generic and processed as an expedited Coverage Determination, she would have been able to fill the generic with her current prescription (A/B rated authorized generic) instead of having to contact the doctor for a new prescription for one of the alternative medications.

453.    In the Coverage Gap Stage, members will pay 37% for mesalamine and 25% for Asacol HD, resulting in a slightly higher cost for the member:  member cost for the generic would be $463.23 while the member cost for the brand would be $426.51.  However, when the member hits the Catastrophic Coverage stage, mesalamine-sofoamine would be less expensive than Asacol HD for both the member (who will pay 5% for either the brand or the generic) and for Medicare which will pay the balance.  Given the cost of Asacol HD, Beneficiary No. 3 should progress to

---

[286] Exhibit 27 (CVS-002993).

the Catastrophic Coverage stage after a few fills where her cost would be $62.60, the SilverScript cost would be $187.79, and the Medicare cost would be $1001.59.

454.    Illustrating that only CVS Health is the winner here (because it pockets a significant share of the brand Asacol HD rebates), since Beneficiary No. 3 was not offered the less costly authorized generic, the brand Asacol HD would cost her $85.30, cost SilverScript $255.90, and cost Medicare $1364.84.

455.    Furthermore, because the prescription was filled in Florida, a mandatory generic substitution State, SilverScript violated the State law requirement that the prescription be substituted with a less costly generic.

### D.    Renvela Packets and Tablets

456.    Sevelamer carbonate is a phosphate binding drug used to treat hyperphosphatemia in patients with chronic kidney disease. Sanofi-Aventis U.S. LLC manufactures sevelamer carbonate under the brand-name Renvela.

457.    In April 2009, Genzyme Corporation (the manufacturer of Renvela, which was later acquired by Sanofi) filed suit against Impax Laboratories, alleging patent infringement for the filing of the its ANDA relating to Sevelamer Carbonate Tablets, 800 mg, generic to Renvela®.

458.    On July 2, 2010, Genzyme filed suit against Impax a second time, this time alleging patent infringement of its patents relating to Sevelaner Carbonate Powder, 2.4 g and 0.8 g packets.

459.    On September 4, 2012, Impax announced that it had settled the patent infringement litigation with Genzyme,[287] and would commence shipment of the authorized generic of Sanofi's

---

[287] *Impax Laboratories Announces Settlement of Litigation Relating to RENVELA® and RENAGEL®*, Fierce Pharma (Sept. 4, 2012), https://www.fiercepharma.com/pharma/impax-laboratories-announces-settlement-of-litigation-relating-to-renvela%C2%AE-and-renagel%C2%AE.

drug Renvela 400 mg and 800 mg tablets as well as the generic oral suspension version of Renvela packets beginning on September 16, 2014.[288]   Under the terms of the settlement, Impax would continue to pursue its pending ANDAs for generic Renvela with the FDA.

460.    Impax at the time stated the authorized generics to Renvela would be manufactured by a division of Sanofi: "[A]n **authorized generic drug is the exact same in all aspects as a brand-name drug**, except that it is marketed without the brand-name on its label. Choosing Winthrop US sevelamer carbonate ensures that you will get **the exact same drug product as branded Renvela**. Winthrop US's [a division of Sanofi Aventis] sevelamer carbonate uses the same manufacturing process as Renvela. It is identical to Renvela in shape, active ingredients, size, and inactive ingredients."[289]

461.    Likewise, Sanofi-Aventis' subsidiary Winthrop US includes a chart on its website[290] to show that the authorized generic "is identical" to the brand Renvela "in shape, active ingredients, size, and inactive ingredients":

---

[288]   PRNewswire, "Impax Launches Authorized Generic RENVELA®" available at https://www.prnewswire.com/news-releases/impax-launches-authorized-generic-renvela-255473571.html (last accessed June 6, 2019).

[289]   "Sevelamer carbonate—the authorized generic identical to Renvela®" available at http://www.renvela.com/authorized-generic (last accessed June 6, 2019) (emphasis added).

[290]   *See* https://www.renvela.com/authorized-generic.



462.    Despite the loss of Renvela exclusivity, in its 2016 Form 20-F, Sanofi-Aventis announced sales of Renvela actually had risen by 18.9%, "reflecting reduced competition from Impax which for a few months beginning April 2014 had the right to sell a limited number of authorized generics of Renvela."

463.    For the 12 months ended July 2017, the drug had U.S. sales of roughly $1.88 billion.

464.    On October 2, 2017, Dr. Reddy's announced launched Sevelamer Carbonate Tablets, 800 mg, a therapeutic equivalent generic version of Renvela tablets, approved by the FDA.[291]

465.    On October 23, 2017, Impax announced it had received final FDA approval on its ANDA for a generic version of Renvela tablets, 800 mg and would immediately initiate commercialization activities.[292]

---

[291] *Dr. Reddy's Laboratories announces the launch of sevelamer carbonate tablets in the U.S. market*, Pharmaceutical Processing World (Oct. 2, 2017), https://www.pharmaceuticalprocessingworld.com/dr-reddys-launches-generic-version-of-genzyme-corp-s-renvela-in-u-s/.

[292] Press Release, *Impax Announces FDA Approval and Launch of Generic Renvela® (Sevelamer Carbonate) Tablets, 800 mg* (Oct. 23, 2017), https://www.prnewswire.com/news-releases/impax-announces-fda-approval-and-launch-of-generic-renvela-sevelamer-carbonate-tablets-800-mg-300541365.html.

466.    Shortly before, the CVS Caremark Entities had entered into an agreement with Sanofi-Aventis, requiring that SilverScript add Renvela Packets to the SSG/DNS Scheme on August 1, 2017 and Renvela Tablets to the SSG/DNS Scheme on August 22, 2017.

### 1.  CVS Blocked Access to the Less Costly Generic Version of the Brand-Name Renvela Packets (sevelamer carbonate)

467.    After Renvela Packets were added to the SSG/DNS Scheme, SilverScript CCRs were trained to tell beneficiaries:

> Generic prescription drugs are typically the lowest-cost option when compared to branded prescription drugs. SilverScript promotes the use of generic prescription drugs to help plan beneficiaries save money. During the initial launch phase for the generic, there will be few manufacturers marketing the generic and the cost of the generic is expected to be relatively high.    To help keep out-of-pocket costs low, SilverScript is retaining brand RENVELA ORAL PACKETS on its formulary on Preferred Brand Tier (Tier 3). RENVELA is eligible for a manufacturer discount in the coverage gap.[293]

The is misleading.  Authorized generics are eligible for the Coverage Gap discount program since they are NDA "applicable" drugs.[294] The generic sevelamer carbonate option(s) were lower cost to the member and Medicare than the brand for LIS (subsidized) members across all "applicable" stages and for non-subsidized members in the SilverScript Allure Plan in the ICL stage and for all SilverScript plans in the Coverage Gap (where applicable) and Catastrophic Coverage Stage. Moreover, given the fact that in addition to Sanofi's authorized generic there were as of 2019 two competing generics (Aurobindo, Dr. Reddys), there was simply no longer any reasonable explanation why Renvela Packets remained the only SilverScript formulary option.

468.    SilverScript CCRs were also trained to tell beneficiaries:

---

[293] Exhibit 28 (CVS-000220-29).

[294] CMS, *Medicare Coverage Gap Discount Program Beginning in 2011: Revised Part D Sponsor Guidance and Responses to Summary Public Comments on the Draft Guidance* (May 21, 2010), at 4.

> Retaining brand RENVELA ORAL PACKETS on Preferred Brand Tier (Tier 3) can help keep out-of-pocket costs low for SilverScript beneficiaries. . . . Beneficiaries have the option to request an exception if they wish to obtain sevelamer carbonate oral packets. However, exception requests for non-formulary prescription drugs, if approved, are typically approved for coverage at the highest cost share level. Brand RENVELA ORAL PACKETS is available at the Preferred Brand Tier (Tier 3) copay/coinsurance, so if the request for the generic is granted, the beneficiary would pay the amount associated with the plan's exception tier. This may be a different cost than the brand.[295]

This was misleading. Renvela Oral Packets was at the time a Tier 3 drug. A formulary exception would have been approved for Tier 4. This would result in a higher cost for the generic in the ICL stage only (Choice, Plus) and a lower cost for the generic (Allure). For the Coverage Gap and Catastrophic Coverage Stages, the generic would be less expensive in all plans. Generic would be less expensive than the brand for LIS (subsidized) members in all stages. Moreover, given the fact that in addition to the authorized generic there were as of 2019 five competing generics (Actavis, Amneal, Inventia, Mylan, Sun), there was simply no longer any reasonable explanation why Renvela Packets remain the only SilverScript formulary option.

469.    If asked whether Renvela Oral Packets would cost more than the generic in any coverage stage of the Medicare Part D benefit, SilverScript CCRs were to tell LIS beneficiaries: "In the Catastrophic Coverage Stage of the benefit, you will continue to receive RENVELA ORAL PACKETS at no cost. If you have not yet reached the Catastrophic Coverage Stage, you might have to pay your brand-name copayment for RENVELA ORAL PACKETS until you reach the Catastrophic Coverage Stage."[296] This was misleading. Costs are not provided leaving subsidy beneficiaries without information to determine the actual impact. If they had provided truthful information to LIS beneficiaries, SilverScript CCRs would have told them:

---

[295] *Id.*

[296] *Id.*

- The cost to LIS 1 beneficiaries in initial coverage stage for CY2019 is $8.50 for the brand and $3.40 for the generic. Beneficiaries will pay $0 for both the brand and the generic sevelamer carbonate oral packets in the Catastrophic Coverage stage.

- Medicare will pay $26.50 for the brand ($35.00 - $8.50) and $158.19 for the generic sevelamer carbonate oral packets ($161.59 - $3.40) in the ICL stage.

- Medicare will pay $388.86 for the brand ($397.36 - $8.50) and $146.07 ($149.47 - $3.40) for the generic sevelamer carbonate oral packets in the Coverage Gap (where applicable).

- Medicare will pay $79.47 for the brand and $20.20 for the generic sevelamer carbonate oral packets in the Catastrophic Coverage stage (full amount of beneficiary's cost) in addition to 80% of the cost of either drug for the Medicare portion of the cost of the drugs in this stage.

470.    If asked why Renvela Oral Packets remain the exclusive formulary choice when there is a generic available, they were to tell beneficiaries:

> In this case, the price of the generic version of RENVELA ORAL PACKETS will likely be similar to the price of the brand version for a minimum of six months, and perhaps longer. There are few manufacturers of the generic version of RENVELA ORAL PACKETS to drive the price down. Until there are competitors and the price of the generic version goes down, your plan will continue to cover brand-name RENVELA at the Preferred Brand Tier (Tier 3) copay/coinsurance in 2018 and 2019.[297]

This was false. The generic sevelamer carbonate oral packets was, in fact, already much lower in price for many beneficiaries in the Coverage Gap (where applicable) and Catastrophic Coverage Stages. There was no need to wait for there to be multiple generic manufacturers to drive the price down.

---

[297] *Id.*

471.    If SilverScript CCRs were asked by beneficiaries why they could not get the generic

sevelamer carbonate oral packets, according to their training they were to respond:

> When a generic version is first available, it is typically similar in price to the brand
> version. At this time the generic version, called sevelamer carbonate oral packets,
> is not on the formulary. You do have the option to request a formulary exception.
> However, exception requests for non-formulary prescription drugs, if approved, are
> typically approved for coverage at the highest cost share level.[298]

The statement about generic pricing was misleading.  While this statement may have been true for

some newly released generics,  the generic sevelamer carbonate oral packets was already much

lower in price for some beneficiaries in the ICL stage and all beneficiaries in the Coverage Gap

(where applicable) and Catastrophic Coverage Stages.  There was no need to wait for there to be

multiple generic manufacturers for the price to be lower.  The statement about the formulary

exception was intended to discourage beneficiaries from asking for a formulary exception when

the generic would be less expensive for many subsidy members in the Choice plan and all members

in the Allure plan.

472.    If asked how long Renvela Packets would remain the only SilverScript formulary

option, they were to say:  "We anticipate that RENVELA ORAL PACKETS will remain on the

formulary on the Preferred Brand Tier (Tier 3) in 2018 and 2019 until the price of the generic form

of RENVELA drops. We anticipate it will be a minimum of six months, however that is based on

market conditions not within our control and could change."[299]

473.    This was misleading.  By February 2019, the GoodRx price of the generic was

$403.98 compared to the brand Renvela Oral Packets price of $1,589.42, already making the

---

[298] *Id.*

[299] *Id.*

generic a lower cost option for both the beneficiary and Medicare.

474.    Thus, the decision to keep the brand Renvela Oral Packets as the only choice on the SilverScript formulary was not driven by market conditions, but by CVS Health's own profit motives.  This was even more deceptive in 2020, well past the promised price drop related to "market conditions."[300] There were then two generics (beyond the authorized generic) being sold competing against Renvela Packets (Aurobindo, Dr. Reddys).  Even then the brand-name Renvela Packets remained the only choice on the SilverScript Choice and Plus formularies.[301] Likewise, it was a lie and deceptive to say that the market conditions were not "within our control" when it was the CVS Caremark Entities' agreement with Sanofi that was the cause for the delay in the formulary access to the less costly generic drug sevelamer carbonate oral packets. The market conditions were thus completely within its control.

475.    If asked whether beneficiaries could obtain a coverage determination for the generic sevelamer carbonate oral packets, SilverScript CCRs were to tell beneficiaries:  "Yes, you as the beneficiary may request a coverage determination for sevelamer carbonate oral packets. However, exception requests for non-formulary prescription drugs, if approved, are typically approved for coverage at the highest cost share level."[302] This was misleading and was intended to discourage beneficiaries from asking for a formulary exception.

---

[300] *Id*.

[301] *See* 2020 SilverScript Choice Comprehensive Formulary, available at https://www.silverscript.com/pdf/FORM_2020_CHOICE_EN.pdf; 2020 SilverScript Plus Comprehensive Formulary, available at https://www.silverscript.com/pdf/FORM_2020_PLUS_EN.pdf.

[302] *Id*.

### 2. SilverScript Deception Blocked Access to the Less Costly Generic for the Brand-Name Renvela Tablets

476.    After Renvela Tablets were added to the SSG/DNS Scheme, SilverScript CCRs were told to tell beneficiaries:

> Generic prescription drugs are typically the lowest-cost option when compared to branded prescription drugs. SilverScript promotes the use of generic prescription drugs to help plan beneficiaries save money. During the initial launch phase for the generic, there will be few manufacturers marketing the generic and the cost of the generic is expected to be relatively high. To help keep out-of-pocket costs low, SilverScript is retaining brand RENVELA TABLETS on its formulary on Preferred Brand Tier (Tier 3). RENVELA TABLETS is eligible for a manufacturer discount in the coverage gap.[303]

This is misleading.  Authorized generics are eligible for the Coverage Gap discount program since they are NDA "applicable" drugs.[304] The generic drug option(s) were lower cost to the member and Medicare in most scenarios in the Coverage Gap (where applicable) and the Catastrophic Coverage Stages.

477.    SilverScript CCRs were also trained to say:

> Retaining brand RENVELA TABLETS on Preferred Brand Tier (Tier 3) can help keep out-of-pocket costs low for SilverScript beneficiaries. Beneficiaries have the option to request an exception if they wish to obtain sevelamer carbonate tablets. However, exception requests for non-formulary prescription drugs, if approved, are typically approved for coverage at the highest cost share level.[305]

This was false.  Keeping the brand as the only option would not have resulted in lower out-of-pocket costs for most beneficiaries and Medicare in the Coverage Gap (where applicable) and

---

[303] Exhibit 29 (CVS-000241-51).

[304] CMS, *Medicare Coverage Gap Discount Program Beginning in 2011: Revised Part D Sponsor Guidance and Responses to Summary Public Comments on the Draft Guidance* (May 21, 2010), at 4.

[305] *Id.*

Catastrophic Coverage Stages. It also intentionally is meant to discourage beneficiaries from asking for a formulary exception by using the language "highest cost share level."

478.    If SilverScript CCRs were asked whether Renvela Tablets would cost more than the generic at any stage of the Medicare Part D benefit, they were to tell subsidy members:

> Maybe. In the Catastrophic Coverage Stage of the benefit, you will continue to receive RENVELA TABLETS at no cost.  If you have not yet reached the Catastrophic Coverage Stage, you might have to pay your brand-name copayment for RENVELA TABLETS until you reach the Catastrophic Coverage Stage.[306]

This was deceptive because cost comparisons are not provided, leaving beneficiaries without information to determine the actual impact.  If they had been directed to provide truthful information, SilverScript CCRs would have told LIS beneficiaries:  The cost to LIS 1/LIS 2 beneficiaries in the initial coverage stage for CY2019 is $8.50/$3.80 for the brand and $3.40/$1.25 for the generic.  Beneficiaries will pay $0 for both the brand and the generic in the Catastrophic Coverage stage.  In ICL for LIS 1 & 2 in 2019, the brand would have been less expensive for Medicare. In the Coverage Gap (where applicable) and Catastrophic coverage scenarios for LIS 1 & 2 in 2019, the generic would have been less expensive for the beneficiary and Medicare.

479.    When beneficiaries inquired about why Renvela Tablets were still the only SilverScript formulary option when there is a generic available, the response they were directed to provide was:

> In this case, the price of the generic version of RENVELA TABLETS will likely be similar to the price of the brand version for a minimum of six months, and perhaps longer. There are few manufacturers of the generic version of RENVELA TABLETS to drive the price down.  Until there are competitors and the price of the generic version goes down, your plan will continue to cover brand-name

---

[306] *Id.*

RENVELA TABLETS at the Preferred Brand Tier (Tier 3) copay/coinsurance in <2018 and 2019>.[307]

This was false. The generic sevelamer carbonate tablets was, in fact, already much lower in price for many beneficiaries in the Coverage Gap (where applicable) and Catastrophic Coverage Stages. There was no need to wait for there to be multiple generic manufacturers to drive the price down.

480.    When beneficiaries asked why they could not get the generic, SilverScript told them to say:

> When a generic version is first available, it is typically similar in price to the brand version. At this time the generic version, called sevelamer carbonate tablets, is not on the formulary. You do have the option to request a formulary exception. However, exception requests for non-formulary prescription drugs, if approved, are typically approved for coverage at the highest cost share level.[308]

This was misleading. While this statement may have been true for some newly released generics, the generic was already much lower in price for some beneficiaries in the ICL stage and most beneficiaries in the Coverage Gap (where applicable) and Catastrophic Coverage Stages. There was no need to wait for there to be multiple generic manufacturers. It was intended to discourage beneficiaries from asking for a formulary exception where the generic would be less expensive for many subsidy members in the Choice plan and all members in the Allure plan.

481.    If asked how long Renvela Tablets would be the only option on the SilverScript formulary, the response was deceptive: "We anticipate that RENVELA TABLETS will remain on the formulary on the Preferred Brand Tier (Tier 3) in 2018 and 2019 until the price of the generic form of RENVELA TABLETS drops. We anticipate it will be a minimum of six months,

---

[307] *Id.*

[308] *Id.*

however that is based on market conditions not within our control and could change."[309]

482.    This was misleading.  As of February 2019, the GoodRx price of the generic was $135.65 compared to the brand Renvela Tablets price of $540.35, already making the generic a lower cost option for both the beneficiary and Medicare Part D in the Coverage Gap (where applicable) and Catastrophic Coverage Stages.

483.    The decision to keep the brand Renvela Tablets as the only choice on the SilverScript formulary was not driven by market conditions, but by CVS Health's own profit motives.  This was even more deceptive by 2020, well past the promised price drop related to "market conditions." There were then eight generics being sold competing against Renvela Tablets (Amneal, Anxin, Aurobindo, Dr. Reddys, Impax, Invagen, TWI, Wilshire).  However, even then the brand-name Renvela Tablets remained the only choice on the SilverScript Choice and Plus formularies.[310] Likewise, it was a lie and deceptive to say that the market conditions were not "within our control" when it was the CVS Caremark Entities' agreement with Sanofi that was the cause for the delay in the formulary access to the less costly generic drug sevelamer carbonate tablets. The market conditions were thus completely within its control.

484.    If beneficiaries asked whether they could request a coverage determination for the less costly generic, the response was deceptive: "Yes, you as the beneficiary may request a coverage determination for sevelamer carbonate tablets. However, exception requests for non-formulary prescription drugs, if approved, are typically approved for coverage at the highest cost

---

[309] *Id*.

[310] *See* 2020 SilverScript Choice Comprehensive Formulary, available at https://www.silverscript.com/pdf/FORM_2020_CHOICE_EN.pdf; 2020 SilverScript Plus Comprehensive Formulary, available at https://www.silverscript.com/pdf/FORM_2020_PLUS_EN.pdf.

share level."[311]   The use of "highest cost share level" was intended to discourage beneficiaries from asking for a formulary exception which would help reduce the cost of the generic vs the brand in the Coverage Gap (where applicable) and Catastrophic Coverage Stages.

### 3. Beneficiary No. 4

485.    When Beneficiary No. 4 (a 66-year-old man living in Kentucky) sought to fill a prescription for the generic Renvela (sevelamer carbonate tablets) on September 20, 2018, he was able to get his prescription with a Transition Fill at his pharmacy.

486.    Shortly thereafter, he received a letter from SilverScript dated September 24, 2018, stating that the Transition Fill of the generic was only a one-time fill because the drug was not covered on the formulary, and he was required to use the brand Renvela 800 mg tablets thereafter.[312] SilverScript failed to notify Beneficiary No. 4 that there was an identical, less costly authorized generic for the brand Renvela.

487.    He later received a Notice of Approval letter from SilverScript dated October 2, 2018, telling him that his generic sevelamer carbonate tablet prescription had been approved under a tiering exception.  This tiering exception was approved from September 1, 2019 through October 2, 2019.[313]  SilverScript again failed to notify Beneficiary No. 4 that there was an identical, less costly authorized generic for the brand Renvela. The letter also failed to tell him that tiering exceptions only apply in the Initial Coverage Stage, and they do not allow for a lower price in the Coverage Gap (where applicable) Stage or the Catastrophic Coverage Stage.

488.    Beneficiary No. 4, thereafter filled the sevelamer carbonate prescription at the

---

[311] Exhibit 29 (CVS-000241).

[312] Exhibit 30 (CVS-002679).

[313] Exhibit 31 (CVS-002675).

pharmacy. The claim record shows that the pharmacy filled his sevelamer prescription and submitted the claims with a "0 – NO DAW" code.[314]

489.    When he later learned that the tiering exception would not apply when he was in the Donut Hole, he then filled the Renvela prescription.  The claim record shows that the CVS Pharmacy filled his prescription and submitted the claims with a "1 – PHYSICIAN DAW" code, meaning the physician requested the brand.[315]

490.    Here, as evidenced by Beneficiary No. 4's prior use of the generic sevelamer carbonate tablets, there is little reason to believe his physician had actually stated it was medically necessary for him to use the brand Renvela instead of the generic, but was required to choose the brand only because CVS Health did not include the generic on its formulary. Thus, a DAW 1 code in the PDE record in support of the SilverScript payment for Beneficiary No. 4 appears to be untruthful, inaccurate and incomplete.

491.    The decision to require Beneficiary No. 4 to use the brand drove up the costs for both the Government and Beneficiary No. 4.  At the time, the total plan cost of the generic was $170.70 while the total plan cost of Renvela was $989.54, a 579% increase in cost.  While the copayment for Beneficiary No. 4 was $119.80 for the generic sevelamer carbonate and for $35.00 for Renvela, the high cost of Renvela would drive him into the Catastrophic Coverage Stage sooner, where both the Beneficiary No. 4's copay and the Government's cost would be much greater than it would have been for the generic.

492.    Not only had SilverScript inexplicably reversed the tiering exception he had been offered, at no time was he offered the authorized generic, which would have been less costly for

---

[314] Exhibit 32 (CVS-002678).

[315] Exhibit 33 (CVS-002677).

Beneficiary No. 4 and the Government.

E.      Harvoni/Epclusa

493.    Ledipasvir/SofosBuvir is a fixed-dose combination of ledipasvir, a hepatitis C virus (HCV) NS5A inhibitor, and sofosbuvir, an HCV nucleotide analog NS5B polymerase inhibitor, and is indicated for the treatment of chronic hepatitis C virus (HCV) in adults with genotype 1, 4, 5, or 6 infection. Gilead Sciences, Inc. manufactures Ledipasvir/SofosBuvir under the brand-name Harvoni.

494.    Sofosbuvir/Velpatasvir is a fixed-dose combination of sofosbuvir, a hepatitis C virus (HCV) nucleotide analog NS5B polymerase inhibitor, and velpatasvir, an HCV NS5A inhibitor, and is indicated for the treatment of adult patients with chronic HCV genotype 1, 2, 3, 4, 5, or 6 infection. Gilead Sciences, Inc. manufactures Sofosbuvir/Velpatasvir under the brand-name Epclusa.

495.    Asegua Therapeutics was formed in 2018 by Gilead as a wholly owned subsidiary to provide "greater access to therapies."[316] On September 24, 2018, Gilead announced that Asegua would launch authorized generic versions of Harvoni and Epclusa.[317] On November 27, 2018, Asegua launched an authorized generic version of Epclusa and on January 1, 2019, Asegua launched an authorized generic versions of Harvoni.[318]

496.    At the time, Gilead claimed that "dynamic and complicated insurance contracts

---

[316] "Authorized Generic Hepatitis C Drugs & Treatment: Asegua Therapeutics," https://www.asegua.com.

[317] Id.

[318] Silverman, "Looking to bolster dwindling hepatitis C sales, Gilead plans to sell generic versions," Pharmalot, Sept. 24, 2018, available at https://www.statnews.com/pharmalot/2018/09/24/gilead-hepatitis-authorized-generics/.

were the reason it was forming a new business unit to offer versions of the drug at lower list prices."[319] According to the press release Gilead issued at the time: "Due to the complexity and structure of the U.S. healthcare system, however, these discounts provided by Gilead **may not always translate into lower costs for patients**. Further, **existing contracts, together with laws associated with government pricing policies, make it challenging to quickly lower a product's list price once it is on the market.**"[320] (emphasis added)

497.    The CVS Caremark Entities shortly thereafter entered into an agreement with Gilead, requiring that SilverScript add Epclusa to the SSG/DNS Scheme on November 27, 2018[321] and add Harvoni to the SSG/DNS Scheme on January 1, 2019.

498.    The fraudulent SSG/DNS Scheme's ethical low point came with the 2018 decision to apply it to Gilead's brand-name hepatitis C drugs Harvoni and Epclusa where CVS Health Executive Committee leadership had deemed the fact that some 84% of SilverScript beneficiaries were receiving the LIS subsidy meant the risk of detection by CMS was relatively low.

499.    The fact that a high percentage of SilverScript beneficiaries have their cost-sharing subsidized by Medicare (and who were therefore highly unlikely to complain about the SSG/DNS Scheme) has only emboldened CVS Health leadership to expand its efforts to block generic

---

[319] Spalding, "Gilead to Sell Less Costly Versions of Drug That Sparked Cost Debate," Bloomberg, Sept. 24, 2018, available at https://www.bloomberg.com/news/articles/2018-09-24/gilead-to-sell-less costly-versions-of-drug-that-sparked-cost-debate.

[320] Press Release, "Gilead Subsidiary to Launch Authorized Generics of Epclusa® (Sofosbuvir/Velpatasvir) and Harvoni® (Ledipasvir/SofosBuvir) for the Treatment of Chronic Hepatitis C," Sept. 24, 2018, available at https://www.gilead.com/news-and-press/press-room/press-releases/2018/9/gilead-subsidiary-to-launch-authorized-generics-of-epclusa-sofosbuvirvelpatasvir-and-harvoni-ledipasvirsofosbuvir-for-the-treatment-of-chronic.

[321] Id.

versions of medications and instead fill only the more expensive brand-name options.

500.    As part of its agreement with Gilead regarding Harvoni and Epclusa, the CVS Caremark Entities agreed to require SilverScript to adopt an explicit policy to go beyond just deceiving SilverScript beneficiaries about the cost of the authorized generic drugs. Instead, SilverScript was required to deny any and all formulary exceptions and appeals for the less costly authorized generic versions.  And, were that not enough, the CVS Caremark Entities agreement with Gilead required that the CVS Pharmacies would no longer stock the authorized generic versions of Harvoni and Epclusa on their shelves.  This has meant not only that the authorized generics for Harvoni and Epclusa were unavailable to SilverScript beneficiaries who fill scripts at the CVS Pharmacies, but also would not have been available to the 45 million Part D beneficiaries, many of whom would have filled their prescriptions at a CVS Pharmacy.

501.    The SSG/DNS Scheme blocking strategy is particularly insidious for very expensive drugs like the drugs Harvoni and Epclusa. For each of the three treatments patients received with these drugs, Harvoni costs around $32,127.27 per treatment and Epclusa costs around $25,184.05 per treatment. The authorized generic versions cost over 300% less per treatment: approximately $12,265.92 for ledipasvir-sofosbuvir (generic Harvoni) and $8,083.20 for sofosbuvir-velpatasvir (generic Epclusa).

502.    Despite public statements by CVS Health about favoring access to less costly generics, in reality it pursued its own bottom line over cost savings to Medicare and Part D beneficiaries, particularly for Harvoni and Epclusa which had together an average of 1604 SilverScript claims each month.

503.    The SSG Harvoni/Epclusa strategy was very controversial within the walls of the company.  Even though its Executive Committee had approved the scheme because the financial

benefit to the company was simply too tempting to pass up, some in CVS Health senior management (including the Relator) complained that it was "highly unethical." For example, CVS Health Vice President of Medicare Operations Emily Pefanis complained of this in multiple conversations with Amy Moyer-Carey, CVS Health Vice President Coverage Determinations. Even though Moyer-Carey was reportedly "sick over this," she was told by Mitch Betses (CVS Health Executive Vice President, Member Services), Todd Meek (President of SilverScript), and Patrick Jeswald (CVS Health Chief Compliance Officer, Medicare Part D) that they were to do this, nonetheless.

504.    The first year of the SSG Harvoni/Epclusa Scheme shows how CVS Health had no intention of actually passing through to the beneficiaries and Medicare any of the manufacturer rebates for those drugs. Medicare requires Prescription Drug Programs ("PDPs") such as SilverScript who wish to enter into contracts to offer prescription drug coverage to submit bids over the summer before the next plan year (*e.g.*, for plan year 2020 the bids are due in June 2019). The PDP applications include information about plan design, premium costs, and the value of rebates. Yet, the authorized generic versions of Harvoni and Epclusa were not announced until September of 2018, well after the SilverScript bid was submitted for the following year. This means that SilverScript could not have included in its information provided to CMS the value of any rebates from Gilead in its 2019 PDP design and costs.

### 1.    SilverScript Deception Blocked Access to the Less Costly Generic for the Brand-Name Epclusa

505.    At the time the Epclusa SSG/DNS Scheme was initiated, SilverScript CCRs were provided materials and training telling them that they should explain to beneficiaries that

> [r]etaining brand EPCLUSA TABLETS on Specialty Tier (Tier 5) can help keep out-of-pocket costs low for SilverScript beneficiaries. NOTE: The generic equivalent sofosbuvir/velpatasvir 400MG-100MG tablets is not on the formulary until further notice. Beneficiaries have the option to request an exception if they

wish to obtain sofosbuvir/velpatasvir 400MG-100MG tablets. However, exception requests for non-formulary prescription drugs, if approved, are typically approved for coverage at the highest cost share level. Brand EPCLUSA TABLETS is available at the Specialty Tier (Tier 5) copay/coinsurance, so if the request for the generic is granted, the beneficiary would pay the amount associated with the Part D plan's exception tier. This may be a different cost than the brand.[322]

The stated rationale for keeping "out-of-pocket costs low" was false and deceptive. Epclusa was at the time a Tier 5 drug with coinsurance of 33%. A formulary exception would have been approved for Tier 4 with a generic coinsurance of 40%. Even with the higher percentage copayment, the generic sofosbuvir/velpatasvir 400MG-100MG tablets is still less costly. Keeping the brand Epclusa as the only SilverScript formulary option would not have resulted in lower out-of-pocket costs. In addition, telling beneficiaries that a formulary exception may result in higher costs is meant to discourage them from asking for a formulary exception by using misleading terminology 'highest cost share level.' Moreover, it was deceptive to fail to tell them that, even if beneficiaries request formulary exceptions, CVS has put into place a "block" where these requests would be automatically denied. Likewise, even with the higher coinsurance for the generic exception, due to the dramatic difference in drug pricing the generic sofosbuvir/velpatasvir 400MG-100MG tablets will always be less expensive.

506.    If SilverScript CCRs were asked "[w]ill EPCLUSA TABLETS cost more than sofosbuvir/velpatasvir 400MG-100MG tablets in any stage of the Medicare D benefit," they were to say: "This will vary based on your Plan and which Medicare Part D coverage stage you currently are in (e.g., Deductible, Initial Coverage Limits, Coverage Gap or Catastrophic)."[323] For LIS beneficiaries, SilverScript CCRs were to say "Maybe. In the Catastrophic Coverage Stage of

---

[322] Exhibit 34 (CVS-000476-87).

[323] *Id.*

the benefit, you will continue to receive EPCLUSA TABLETS at no cost. If you have not yet reached the Catastrophic Coverage Stage, you might have to pay your brand-name copayment for EPCLUSA TABLETS until you reach the Catastrophic Coverage Stage."[324]  This was misleading. Costs are not provided to subsidy members, leaving them without information to determine the actual impact.  Had SilverScript CCRs been truthful, they would have been trained to tell LIS beneficiaries:

- The cost to LIS 1 beneficiaries in the initial coverage stage for CY2019 is $8.50 for the brand and $3.40 for the generic sofosbuvir/velpatasvir 400MG-100MG tablets. Beneficiaries will pay $0 for both the brand and the generic in the Catastrophic Coverage stage.

- Medicare Part D will pay $7,998.43 for the brand ($8,006.93 - $8.50) and $3,277.90 for the generic sofosbuvir/velpatasvir 400MG-100MG tablets ($3,281.30 - $3.40) in the ICL stage.

- Medicare Part D will pay $6,057.32 for the brand ($6,065.85 - $8.50) and $3,031.81 for the generic sofosbuvir/velpatasvir 400MG-100MG tablets ($3,035.21 - $3.40) for the generic in the Coverage Gap (where applicable).

- Medicare Part D will pay $1,213.17 for the brand and $410.16 for the generic sofosbuvir/velpatasvir 400MG-100MG tablets in the Catastrophic Coverage stage (full amount of beneficiary's cost) in addition to 80% of the cost of either drug for the Medicare portion of the cost of the drugs in this stage.

507.    If SilverScript CCRs were asked by beneficiaries "[w]hy is the brand-name EPCLUSA TABLETS on the formulary when there is now a generic available," they were trained

---

[324] *Id.*

to say:

> In this case, the price of the generic version of EPCLUSA TABLETS will likely be similar to the price of the brand version for a minimum of six months, and perhaps longer. There are few manufacturers of the generic version of EPCLUSA TABLETS to drive the price down. Until there are competitors and the price of the generic version goes down, your plan will continue to cover brand-name EPCLUSA TABLETS at the Specialty Tier (Tier 5) cost share in 2018 and 2019.[325]

The CCR statement about how long it will take for the generic price to come down was false. The generic sofosbuvir/velpatasvir 400MG-100MG tablets was, in fact, already much lower in price for most beneficiaries. There was no need to wait for there to be multiple generic manufacturers to drive the price down.

508.    If SilverScript CCRs were asked "[w]hy can't I get the generic? Aren't generics less expensive," they were trained to respond:

> When a generic version is first available, it is typically similar in price to the brand version. At this time the generic version, called sofosbuvir/velpatasvir 400MG-100MG tablets, is not on the formulary. You do have the option to request a formulary exception. However, exception requests for non-formulary prescription drugs, if approved, are typically approved for coverage at the highest cost share level."[326]

The CCR statement about the generic typically being at a similar price to the brand was misleading. While this statement may have been true for some newly released generics, the generic sofosbuvir/velpatasvir 400MG-100MG tablets was already at a lower cost option for beneficiaries. Moreover, the statement about exception requests was intended to discourage beneficiaries from asking for a formulary exception. A formulary exception for the generic sofosbuvir/velpatasvir 400MG-100MG tablets would have been approved at the highest tier (Tier 4) with a coinsurance

---

[325] *Id.*

[326] *Id.*

of 40%. However, even with the higher coinsurance, the generic is much less expensive than the brand due to the dramatic difference in price. Adding insult to injury, in the case of Epclusa, CVS Health has taken the extra step to automatically deny any formulary exception requests, something CVS Health fails to mention here.

509.    If SilverScript CCRs were asked how long Epclusa Tablets would remain on the formulary on Specialty Tier (Tier 5), they expected to respond: "We anticipate that EPCLUSA TABLETS will remain on the formulary on the Specialty Tier (Tier 5) in 2018 and 2019 until the price of the generic form of EPCLUSA TABLETS drops. We anticipate it will be a minimum of six months, however that is based on market conditions not within our control and could change."[327]

510.    The CCR statement about generic pricing was misleading. By February 2019, the GoodRx price of the generic was $8,083.79 compared to the brand Epclusa price of $25,184.05, already making the generic a lower cost option for both the beneficiary and Medicare Part D.

511.    Thus, the decision to keep the brand Epclusa as the only choice on the SilverScript formulary was not driven by "market conditions," but by CVS Health's own profit motives. Likewise, it was a lie and deceptive to say that the market conditions were not "within our control" when it was the CVS Caremark Entities' agreement with Gilead that was the cause for the delay in the formulary access to the less costly generic drug sofosbuvir/velpatasvir 400MG-100MG tablets. The market conditions were thus completely within its control.

512.    If asked whether the beneficiary could request a coverage determination for the generic, they were to say: "Yes, you as the beneficiary may request a coverage determination for

---

[327] *Id.*

sofosbuvir/velpatasvir 400MG-100MG tablets. However, exception requests for non-formulary prescription drugs, if approved, are typically approved for coverage at the highest cost share level."[328] The exception request statement was misleading and intended to discourage beneficiaries from asking for a formulary exception.  A formulary exception for the generic would have been approved at the highest tier (Tier 4) with a coinsurance of 40%. However, even with the higher coinsurance, the generic is much less expensive than the brand-name Epclusa due to the dramatic difference in price.  It was also deceptive.  What beneficiaries were not to be told is that, in the case of Epclusa, CVS has taken the extra step to automatically deny any formulary exception requests.

### 2.    *SilverScript Deception Blocked Access to the Less Costly Generic for the Brand-Name Harvoni*

513.    SilverScript CCRs were to explain to beneficiaries, "[t]o help keep out-of-pocket costs low, SilverScript is retaining brand HARVONI® TABLETS on its formulary on Specialty Tier (Tier 5). HARVONI is eligible for a manufacturer discount in the coverage gap." [329] This is misleading.  Authorized generics are eligible for the Coverage Gap discount program since they are NDA "applicable" drugs.[330] Likewise, the rationale of keeping "out-of-pocket costs low" was false.  The generic drug option ledipasvir/sofosbuvir 90MG-400MG tablets was already much lower cost to the member and Medicare Part D than the brand-name Harvoni.

---

[328] *Id*.

[329] Exhibit 35 (CVS-000210-19).

[330] CMS, *Medicare Coverage Gap Discount Program Beginning in 2011: Revised Part D Sponsor Guidance and Responses to Summary Public Comments on the Draft Guidance* (May 21, 2010), at 4.

514.    SilverScript CCRs were also told that they should tell beneficiaries that "[r]etaining brand HARVONI TABLETS on Specialty Tier (Tier 5) can help keep out-of-pocket costs low for SilverScript beneficiaries."[331]  This, too, was false.  Keeping the brand Harvoni as the exclusive formulary choice would not have resulted in lower out-of-pocket costs.

515.    SilverScript CCRs were told to tell SilverScript beneficiaries that they "have the option to request an exception if they wish to obtain ledipasvir/sofosbuvir 90MG-400 MG tablets. However, exception requests for non-formulary prescription drugs, if approved, are typically approved for coverage at the highest cost share level."[332] This was deceptive and is meant to discourage beneficiaries from asking for a formulary exception by using misleading terminology "highest cost share level." Even if a beneficiary were to request a formulary exception, what beneficiaries were not to be told is that CVS had put into place a "block" where these requests would be automatically denied. Moreover, even with the higher percentage coinsurance for the generic exception, due to the dramatic difference in drug pricing the generic ledipasvir/sofosbuvir 90MG-400MG tablets will always be less expensive.

516.    If asked whether "HARVONI TABLETS [will] cost more than ledipasvir/sofosbuvir 90MG-400 MG tablets in any stage of the Medicare D benefit for non-LIS beneficiaries," SilverScript CCRs were to tell beneficiaries "[t]his will vary based on your Plan and which Medicare Part D coverage stage you currently are in (*e.g*., Deductible, Initial Coverage Limits, Coverage Gap or Catastrophic)."[333] This was deceptive and false.  SilverScript CCRs were

---

[331] Exhibit 35 (CVS-000210-19).

[332] *Id.*

[333] *Id.*

trained to not to provide generic subsidy members costs in comparison to the cost of the brand-name Harvoni, leaving beneficiaries without information to determine actual cost differences. If they were being truthful, here is what CCR's should have told LIS beneficiaries:

- The cost to LIS 1 beneficiaries in the initial coverage stage for CY2019 is $8.50 for the brand and $3.40 for the generic ledipasvir/sofosbuvir 90MG-400MG tablets.

- Beneficiaries will pay $0 for both the brand and the generic ledipasvir/sofosbuvir 90MG-400MG tablets in the Catastrophic Coverage stage.

- Medicare Part D will pay $10,661.89 for the brand ($10,670.39- $8.50) and $4,973.88 for the generic ledipasvir/sofosbuvir 90MG-400MG tablets ($4,977.28 - $3.40) in the ICL stage.

- Medicare Part D will pay $8,075.13 for the brand ($8,083.63 - $8.50) and $4,600.58 for the generic ledipasvir/sofosbuvir 90MG-400MG tablets ($4,603.98 - $3.40) in the Coverage Gap (where applicable).

- Medicare Part D will pay $1,616.73 for the brand and $622.16 for the generic ledipasvir/sofosbuvir 90MG-400MG tablets in the Catastrophic Coverage stage (full amount of beneficiary's cost) in addition to 80% of the cost of either drug for the Medicare portion of the cost of the drugs in this stage.

517.    If SilverScript CCRs were asked "[w]hy is the brand-name HARVONI TABLETS on the formulary when there is now a generic available," they were trained to say:

> In this case, the price of the generic version of HARVONI TABLETS will likely be similar to the price of the brand version for a minimum of six months, and perhaps longer. There are few manufacturers of the generic version of HARVONI TABLETS to drive the price down. Until there are competitors and the price of the

generic version goes down, your plan will continue to cover brand-name HARVONI TABLETS at the Specialty Tier (Tier 5) cost share in 2019.[334]

The CCR statement about how long it will take for the price of generic ledipasvir/sofosbuvir 90MG-400MG tablets to come down was false. The generic ledipasvir/sofosbuvir 90MG-400 MG tablets was, in fact, already much lower in price for most beneficiaries. There was no need to wait for there to be multiple generic manufacturers to drive the price down.

518. If SilverScript CCRs were asked by a beneficiary "[w]hy can't I get the generic? Aren't generics less expensive," they were directed to say:

> When a generic version is first available, it is typically similar in price to the brand version. At this time the generic version, called ledipasvir/sofosbuvir 90MG-400 MG tablets, is not on the formulary. You do have the option to request a formulary exception. However, exception requests for non-formulary prescription drugs, if approved, are typically approved for coverage at the highest cost share level. [335]

The CCR statement about generic pricing was misleading. While this statement may have been true for some newly released generics, the generic ledipasvir/sofosbuvir 90MG-400 MG tablets was a much lower cost option for all beneficiaries. It was also deceptive because it was intended to discourage beneficiaries from asking for a formulary exception by deceiving them. A formulary exception for the generic ledipasvir/sofosbuvir 90MG-400 MG tablets would have been approved at the highest tier (Tier 4) with a coinsurance of 40%. However, even with the higher coinsurance, the generic is much less expensive than the brand due to the dramatic difference in price.

519. If SilverScript CCRs were asked by beneficiaries "[h]ow long will HARVONI TABLETS remain on the formulary on the Specialty Tier (Tier 5)," they were trained to respond: "We anticipate that HARVONI TABLETS will remain on the formulary on the Specialty Tier

---

[334] *Id.*

[335] *Id.*

(Tier 5) in 2019 until the price of the generic form of HARVONI TABLETS drops. We anticipate it will be a minimum of six months, however that is based on market conditions not within our control and could change."[336]

520. The CCR statement about generic pricing was misleading. By February 2019, the GoodRx price of the generic ledipasvir/sofosbuvir 90MG-400 MG tablets was $12,117.14 compared to the brand Harvoni price of $32,127.27, already making the generic a lower cost option for both the beneficiary and Medicare Part D.

521. Thus, the decision to keep brand-name Harvoni as the only choice on the SilverScript formulary was not driven by market conditions, but CVS Health profit. Likewise, it was a lie and deceptive to say that the market conditions were not "within our control" when it was the CVS Caremark Entities' agreement with Gilead that was the cause for the delay in the formulary access to the less costly generic drug ledipasvir/sofosbuvir 90MG-400 MG tablets. The market conditions were thus completely within its control.

522. If SilverScript CCRs were asked by a beneficiary if they could request a coverage determination for the less costly generic, they were to respond: "Yes, you as the beneficiary may request a coverage determination for ledipasvir/sofosbuvir 90MG-400 MG tablets. However, exception requests for non-formulary prescription drugs, if approved, are typically approved for coverage at the highest cost share level."[337] This was misleading. It was intended to discourage beneficiaries from asking for a formulary exception. A formulary exception for the generic would have been approved at the highest tier (Tier 4) with a coinsurance of 40%. However, even with the

---

[336] *Id.*

[337] *Id.*

higher coinsurance, the generic is still much less expensive than the brand-name Harvoni due to the dramatic difference in price. This is also deceptive. What beneficiaries are not to be told is that, in the case of Harvoni, CVS has taken the extra step to automatically deny any formulary exception requests.

### 3. Beneficiary No. 5

523. When CVS Health realized how much more profit could be made if higher-priced drugs were *only* filled instead of less costly identical authorized generic versions, CVS Health went beyond just withholding of information about the right to seek a formulary exception and began making outright denials of all formulary exceptions and appeals for certain of the SSG/DNS Drugs, including Gilead's expensive drugs Harvoni and Epclusa.

524. The misleading and false information often had a chilling effect on beneficiaries filling their prescriptions for potentially life-saving drugs.

525. One such instance that Relator remembers distinctly involved a seriously ill member from Nebraska. A nurse caring for Beneficiary No. 5 called requesting the less costly generic version of Epclusa, sofosbuvir/velpatasvir 400MG-100MG tablets. The nurse made numerous calls on behalf of Beneficiary No. 5, doing everything she could to get the member the generic for completion of therapy because, as she indicated in the calls, the member would not be able to afford to continue therapy with the much more expensive brand drug Epclusa.

526. As Relator heard on recorded CCR calls, the nurse was continually lied to and blocked from getting the less costly, generic Epclusa despite the nurse's best efforts. On information and belief, because he never was given the option to request a coverage determination for the less costly sofosbuvir/velpatasvir 400MG-100MG tablets, Beneficiary No. 5 interrupted his Epclusa therapy because he could not afford it.

527. As part of its assessment of whether the Harvoni/Epclusa SSG fraudulent scheme

would be detected, the CVS Health Executive Committee considered that the risk would be low because of its forecast that, of the 1604 Harvoni/Epclusa SilverScript prescriptions it projected per month, some 84% of the impacted SilverScript beneficiaries were on LIS subsidy and thus any higher copayments resulting from the Scheme would be absorbed by Medicare.

528.    As such, because these LIS members would not be seeing the much higher copays at the point of sale, they were less likely to be concerned about the drastic differences in SSG Drug pricing being passed on to Medicare Part D.

529.    So, even if the difference in price between the generic and the brand-name drug would often be many thousands of dollars, for an LIS beneficiary the out-of-pocket cost would be essentially the same. With the out-of-pocket cost thus minimally affected, the Executive Committee determined the SSG/DNS Scheme was a "low risk" of detection because these SilverScript beneficiaries (the majority of whom are LIS members) had much less incentive to file complaints or grievances to get a less costly generic drug.

530.    CVS Health has thus required its subsidiary SilverScript resort not only to misleading, but in outright lying to beneficiaries and having its CVS Pharmacies intentionally not stocking the generic medications on their shelves. For CVS Health to coordinate with its subsidiaries to mislead, lie, and otherwise deceive beneficiaries violated its fundamental obligations under the FTC Consent Order that it would not, directly or indirectly, make deceptive claims about the price or cost of Medicare Part D prescription drugs as well as its obligation of good faith and fair dealing in all its dealings with Medicare and Part D beneficiaries. Nothing in the law countenances such conduct.

### 4.   *Beneficiary No. 6*

531.    Another way CVS Health accomplished its goal of preventing beneficiaries from getting the less costly generic was having its subsidiary SilverScript provide misleading

information about the true cost of the drugs, implying that the generic would be more expensive when it was not, thus intentionally deceiving beneficiaries about whether they should seek formulary exceptions.

532.    On February 4, 2019, Beneficiary No. 6 (a 67-year-old man from New Mexico) attempted to fill a prescription for sofosbuvir-velpatasvir (authorized generic for brand-name Epclusa) at his pharmacy. The allowed cost for the drug was $8,083.20 with a total cost to Medicare for the authorized generic fill estimated to be $734.09. But, the order was reversed and not filled, apparently because Beneficiary No. 6 was concerned about the cost of the drug.[338]

533.    On February 11, 2019, Beneficiary No. 6 attempted to fill a prescription for brand-name Epclusa. The allowed cost for the drug was $25,179.17 with a total cost to Medicare for the brand-name fill estimated to be $13,865.12. But, the order was reversed and not filled, again apparently because he was concerned about the cost of the drug.

534.    On the same day, Beneficiary No. 6 and his spouse placed a call to CVS Health Customer Care to ask what happened. Beneficiary No. 6 and his wife wanted to "get a price" for the drug so they could "know how much it's going to cost, if we can afford it."[339]

535.    On the call, the SilverScript CCRs gave incorrect information to prevent Beneficiary No. 6 from getting the authorized generic sofosbuvir-velpatasvir. Beneficiary No. 6 was incorrectly told that Epclusa was at the time a Tier 4 drug (it was at the time a Tier 5 drug).[340]

536.    Beneficiary No. 6 was eventually transferred to a different CCR to discuss

---

[338] Exhibit 36 (CVS-002294).

[339] Exhibit 37 (CVS-001608).

[340] *Id.*

alternatives. The representative did not inform Beneficiary No. 6 that there was a less costly authorized generic alternative to her Epclusa prescription.

537.    Beneficiary No. 6 was transferred yet again to another CCR. This time the representative misled Beneficiary No. 6 about the true cost of filling the brand-name versus the authorized generic by only giving the price for the first fill of the sofosbuvir-velpatasvir and the brand-name Epclusa. While the cost would be similar for the first fill (only approximately a $400 difference), the costs for subsequent fills would be very different given that the Beneficiary No. 6 would be pushed into the Catastrophic Coverage stage of the Part D benefit where he would be responsible for 5% of either drug. This was especially misleading because Beneficiary No. 6 called inquiring about an 84-day supply of the drug – a total of three 28-day fills.[341]

538.    The situation involving Beneficiary No. 6 demonstrates how not informing patients about less costly generic options to the SSG/DNS Drugs and their right to request a coverage determination for the formulary exceptions has resulted in many thousands of SilverScript beneficiaries being forced to choose the much more expensive brand-name drug instead of less costly, equivalent (identical) alternative (and therefore affordable) generic.

539.    It also underscores yet again how CVS Health violated its obligations in the FTC Consent Order that it would not, directly or indirectly, make deceptive claims about the price or cost of Medicare Part D prescription drugs as well as its obligation of good faith and fair dealing in all its dealings with Medicare and Part D beneficiaries.

### 5.  *Beneficiary No. 7*

540.    Beneficiary No. 7's story illustrates how CVS Health's subsidiary SilverScript began to outright deny all requests for less costly versions of brand-name medication, regardless

---

[341] *Id.*

of merit. It also highlights how the SSG/DNS Scheme is particularly egregious for LIS beneficiaries who are in need of high-priced, life-saving drugs. With high-priced drugs for LIS beneficiaries, Medicare is subsidizing most of the cost and the LIS beneficiaries often pay relatively small co-pay amounts making them less likely to complain about the higher-priced brand-name drugs. For those beneficiaries who do still try to get the authorized generic version, however, they are thwarted by CVS Health as a matter of company policy.

541.    Beneficiary No. 7 (a 66-year-old man from Arkansas) was a SilverScript beneficiary receiving the low-income subsidy. He got a prescription for Epclusa to treat his hepatitis C, and filled it with brand-name Epclusa on November 5, 2018 at his pharmacy. The total cost to Medicare for the brand-name medication was $20,872.59.  As an LIS beneficiary, his cost was subsidized by Medicare during both the initial coverage and coverage gap (where applicable) for a total of $5,364.29 in addition to covering the cost of the drug in the catastrophic coverage stage ($15,335.87). Beneficiary No. 7 paid a copay of $8.35.[342]

542.    Even though his copayment was relatively low in comparison with the overall cost of Harvoni, on January 10, 2019 Beneficiary No. 7 nevertheless requested a formulary exception to get Sofosbuvir-Velpatasvir (authorized generic Epclusa).  But, pursuant to the fraudulent scheme, the very same day SilverScript automatically denied the formulary exception request using language specifically developed for the Epclusa authorized generics.

543.    The formulary exception denial letter dated January 11, 2019 that was sent to Beneficiary No. 7 had been specifically modified from the SilverScript standard language to include the new blanket denial of formulary exceptions implemented for Epclusa authorized

---

[342] Exhibit 38 (CVS-002272).

generics. It included language denying a formulary exception to Beneficiary No. 7 unlike any language SilverScript had ever used for any SSG/DNS Drug before, stating it denied the exception for the generic version of Harvoni (ledipasvir/sofosbuvir) – *i.e.*, the fact that they are authorized generic to Harvoni. The newly modified "same effectiveness" language in the denial letter reads:

> Both the brand Harvoni and generic version of this drug, Ledipasvir/sofosbuvir, **would be expected to have the same effectiveness in treating your condition.** The brand drug on the formulary and its generic contain the **same active medications. They both contain the same inactive ingredients such as dyes, and would be expected to have the same risk of causing adverse effects (side effects).** Talk to your prescriber to see if any of the formulary alternative(s) would be right for you.[343]

544.    The letter was configured only as an attempt to meet CMS requirements so as not to draw attention in an audit. There are psychological factors to consider as well. All generics have the same active ingredient and all would have the same effectiveness. But, if the beneficiary does not initiate therapy because he cannot afford the drug, the denial would ignore altogether the "Social Determinants of Health" (also called "SDoH").[344]

545.    While SDoH can impact people from across the economic spectrum, low-income individuals are particularly likely to face challenges related to housing, food, and transportation. LIS beneficiaries are low-income by definition and would be key target populations for addressing social needs. There is strong evidence pointing to SDoH interventions as being cost effective, improving health outcomes.

---

[343] Exhibit 39 (CVS-002280). (emphasis added).

[344] *See* Josh Lee, Melissa Majerol, Jeff Burke, *Addressing the social determinants of health for Medicare and Medicaid enrollees Leading strategies for health plans*, Deloitte Insights; *Innovative Approaches to Addressing Social Determinants of Health for Medicare Advantage Beneficiaries*, Better Medicare Alliance (Aug. 2021); Tany Feke, *How Medicare Addresses Social Determinants of Health Economics, Education, Health Care, Location, and Social Supports*, verywell health (Oct. 25, 2020).

546.     CVS Health claims it supports use of SDoH.  As a public relations effort to conceal its conduct, CVS Health has announced initiatives targeting SDoH.[345]  Here is an advertisement showing a young, smiling boy who has a CVS bandage on this arm, alongside the CVS Health claim that it is "working to provide you with resources to live a healthier life"[346]:



547.     This was just lip service.  While CVS Health touts its support of SDoH initiatives, its SSG/DNS Scheme did exactly the opposite, making less costly authorized generic versions of wildly expensive drugs like Harvoni unavailable for thousands of SilverScript benefit who could not afford it.

548.     What the SilverScript letter failed to tell Beneficiary No. 7 was that the brand Harvoni and the generic are the identical drug.  Instead of telling Beneficiary No. 7 that they were in fact the same drug, the letter utilizes the clinical equivalency of the authorized generic

---

[345] *See, e.g.*, Paige Minemyer, *CVS announces new initiatives targeting the social determinants of health*, Fierce Healthcare (July 24, 2019), available at https://www.fiercehealthcare.com/payer/cvs-announces-new-initiatives-targeted-social-determinants-health.

[346] CVS Health, Social Determinants of Health, available at https://www.cvshealth.com/health-with-heart/building-healthy-communities/social-determinants-of-health.

ledipasvir/ sofosbuvir and brand-name Harvoni to obfuscate that there would be no legitimate reason to allow the formulary exception to obtain the less costly authorized generic version of the drug. The SilverScript letter to Beneficiary No. 7 concealed the real (and shadier) reason why the formulary exception would not be granted – the less costly price for Ledipasvir/sofosbuvir meant that CVS Health would not make as much money.

549.    Beneficiary No. 7 then on January 14, 2019 attempted to obtain the generic sofosbuvir-velpatasvir (authorized generic for brand-name Epclusa) at the Hot Springs, Arkansas Smith Drug. The total cost to Medicare for the generic would have been $6,871.15.  However, the claim was later reversed, indicating that the beneficiary never received the medication.[347]

550.    The reversed claim was recorded in the CVS Health claim system, though, so the costs of the authorized generic versus the fill Beneficiary No. 7 have received on November 5, 2018 for Epclusa can be compared.  The cost difference is dramatic:

|  | Generic (sofosbuvir-velpatasvir) | Brand (Epclusa) |
|---|---|---|
| **Plan allowed drug cost** | $8,083.20 | $25,253.93 |
| **Member Co-pay** | $0 | $8.35 |
| **Plan Cost (SilverScript Cost)** | $1,212.55 | $4,373.49 |
| **Medicare Cost (Initial Coverage + Coverage Gap Stage)** | $404.18 | $5,508.30 |
| **Medicare Cost (Catastrophic Coverage Stage)** | $6,466.97 | $15,364.29 |
| **Total Medicare Cost** | $6,871.15 | $20,872.59 |

551.    The SSG/DNS blocking strategy worked, however.  Still needing this lifesaving medication despite being denied access to the identical drug (albeit the authorized generic), Beneficiary No. 7 filled the brand-name Epclusa medication three times: on January 21, 2019 at a

---

[347] Exhibit 40 (CVS-002287).

cost to Medicare of $19,988.92; on February 18, 2019 at a cost to Medicare of $21,402.72; and in March at a cost to Medicare of $21,402.72. Every fill for the brand-name Epclusa came at a much greater cost to Medicare.[348]

552.    Not only that, but all the prescriptions for Beneficiary No. 7 were coded as "0 – NO DAW."  Caremark's Administrative Manual instructs pharmacists to "*Use the DAW 0 code when dispensing a generic drug*; that is, when no party (*i.e.*, neither Prescribing Provider, nor pharmacist, nor Participant) requests the branded version of a multi-source product." (emphasis added).[349]

553.    Caremark's Provider Manual also includes a Reject Code for using a DAW Code 0 when dispensing a brand drug with available generics: "DAW 0 cannot be submitted on a multi-source drug with available generics. 407-D7, 408-D8."[350]

554.    Thus, a DAW 0 code in the PDE record in support of the SilverScript payment for Beneficiary No. 7 was untruthful, inaccurate and incomplete.

### 6. *Beneficiary No. 8*

555.    Another SilverScript beneficiary's story illustrates how the CVS Health scheme ensured only brand-name medications were dispensed despite a beneficiary's considerable efforts to get less costly generics. SilverScript repeatedly blocked Beneficiary No. 8's efforts to fill her prescription for the less costly authorized generic (ledipasvir-sofosbuvir). Ultimately, Beneficiary No. 8 would give up because SilverScript forced her to fill the prescription with the more expensive

---

[348] Exhibit 41 (CVS-002273); Exhibit 42 (CVS-002274); Exhibit 43 (CVS-002275).

[349] Exhibit 1 (CVS-002944).

[350] *See* CVS, "Reject Codes: Provider Manual Appendix B," at p. 33 (June 1, 2019), https://www.caremark.com/portal/asset/CVSCaremarkPayerSheetRejectCodes.pdf

brand-name medication.

556. Starting in early February 2019, Beneficiary No. 8 (a 77-year-old woman living in New Jersey) made multiple attempts to fill ledipasvir-sofosbuvir at her pharmacy, but was rebuffed each time by SilverScript. The first instance SilverScript denied Beneficiary No. 8 access to the authorized generic version was in early February 2019 when WestRiver would not fill Beneficiary No. 8's prescription for the authorized generic ledipasvir-sofosbuvir despite her submitting multiple requests.[351]

557. Given that her attempts to fill the authorized generic were denied, Beneficiary No. 8 contacted SilverScript and got a prior authorization for the brand-name medication, Harvoni, on February 11, 2019.

558. Yet, despite getting a prescription for the brand-name drug, Beneficiary No. 8 did not give up on trying to get the less costly authorized generic option. On February 12, 2019, Beneficiary No. 8 requested a formulary exception in order to get the authorized generic.[352]

559. Normally, SilverScript approved such exceptions with appropriate information from the prescriber. Until the CVS Caremark Entities entered into the Gilead deal, SilverScript had always granted formulary exceptions allowing beneficiary access to less costly generics. In this case, however, the exception was denied using the new SilverScript blanket denial that the authorized generic was not covered, with the new excuse that the brand-name drug and the generic were clinically equivalent drugs (ledipasvir-sofosbuvir and Harvoni).[353]

---

[351] Exhibit 44 (CVS-002175).

[352] *Id*.

[353] Exhibit 45 (CVS-002210).

560.    Beneficiary No. 8's additional attempts to fill her prescription with the authorized generic version were again denied at the pharmacy.

561.    Nearly two weeks after initially trying to fill her first prescription (during which time she had delayed initiating her hepatitis C treatment), on February 19, 2019, Beneficiary No. 8 received a prior authorization for brand-name Epclusa, the brand-name version of sofosbuvir-velpatasvir, which is a similar drug as Harvoni and also would help cure Beneficiary No. 8's Hepatitis C. That same day, Beneficiary No. 8 finally relented and filled her prescription for the brand-name Epclusa at a total cost to Medicare of $19,952.86.[354]

562.    Beneficiary No. 8 later attempted to refill her prescription on March 19, 2019 at her pharmacy, and  requested the generic Epclusa, sofosbuvir-velpatasvir. This time, only because of a flaw in the claims logic (which was later eliminated), Beneficiary No. 8 was able to get the authorized generic version because of a Transition Fill. The authorized generic sofosbuvir-velpatasvir fill was at a cost of only $6,854.74.[355]

563.    Beneficiary No. 8's fills for the authorized generic and the brand-name Epclusa show just how large the price differences were:[356]

| | Generic (sofosbuvir-velpatasvir) | Brand (Epclusa) |
|---|---|---|
| **Plan allowed drug cost** | $8,064.00 | $25,119.76 |
| **Member Co-pay** | $0 | $3.80 |
| **Plan Cost (SilverScript Cost)** | $1,209.66 | $5,163.10 |
| **Medicare Cost (Initial Coverage + Coverage Gap Stage)** | $403.22 | $5,935.66 |

---

[354] Exhibit 46 (CVS-002181).

[355] Exhibit 47 (CVS-002230).

[356] Exhibits 46 & 47.

| | | |
|---|---|---|
| **Medicare Cost (Catastrophic Coverage Stage)** | $6,451.52 | $14,017.20 |
| **Total Medicare Cost** | $6,854.74 | $19,952.86 |

564.    After the fill for the authorized generic, Beneficiary No. 8 received a letter from SilverScript dated March 20, 2019 advising her that, although she had been able to receive a temporary one-time Transition Fill for sofosbuvir-velpatasvir, the generic drug is not covered on the formulary and would not be covered in the future.[357] The letter did not mention that the generic sofosbuvir-velpatasvir is identical to the much more expensive brand-name Epclusa.

565.    On April 15, 2019, Beneficiary No. 8 again attempted to fill her prescription for the generic sofosbuvir-velpatasvir, but it was denied again because there was no formulary exception approval. That same day, Beneficiary No. 8's request for a formulary exception for the authorized generic sofosbuvir-velpatasvir was also denied. Beneficiary No. 8 submitted a formulary exception redetermination the next day on April 16, 2019 and was denied yet again with language indicating that the same "effectiveness in treating your condition" would be expected.[358] This is new language that was crafted specifically for the CVS Caremark Entities deal with Gilead to block the authorized generics ledipasvir-sofosbuvir and sofosbuvir-velpatasvir.  Illustrating the scope of CVS Health's deception, no other SSG/DNS formulary exception approvals had ever before been held to the same standard by SilverScript.  In every other instance prior to this, SilverScript had granted the SSG/DNS formulary exception.

566.    On April 18, 2019, Beneficiary No. 8 tried one last time to get sofosbuvir-velpatasvir filled and was denied once more. However, after days of obfuscation by CVS Health

---

[357] Exhibit 48 (CVS-002235).

[358] Exhibit 49 (CVS-002224).

aimed at wearing down her determination to get the less costly drug, the same day she finally surrendered and got a prescription for brand-name Epclusa. The total cost for the fill of Epclusa is $21,351.80.[359]

567.    Beneficiary No. 8's experience demonstrates SilverScript's repeated blocking of the less costly authorized generic versions of both Epclusa and Harvoni. The blocking happened despite the numerous requests from the beneficiary to have the authorized generic covered through a formulary exception.  She was never told by SilverScript that the brand-name Harvoni and Epclusa were in fact identical to the less costly authorized generic.

568.    Beneficiary No. 8's story again clearly illustrates the substantial difference in cost covered by Medicare for the brand-name version of the drug ($19,952.86) and the authorized generic version ($6,854.74). Even if the manufacturer of Epclusa (Gilead) had paid substantial rebates on the list price, Medicare is still picking up a higher cost versus the authorized generic version for a beneficiary like Beneficiary No. 8 given the price of the drug and her LIS status. For the February fill, Medicare paid the higher LIS amount regardless of any rebates.

569.    The claim record shows that the pharmacy filled Beneficiary No. 8's Epclusa prescriptions and submitted the claim with DAW Code 0.[360]

570.    Caremark's Administrative Manual instructs pharmacists to "*Use the DAW 0 code when dispensing a generic drug*; that is, when no party (*i.e.*, neither Prescribing Provider, nor pharmacist, nor Participant) requests the branded version of a multi-source product." (emphasis

---

[359] Exhibit 50 (CVS-002180).

[360] *Id.*

added).[361]

571.    CVS's Provider Manual also includes a Reject Code for using a DAW Code 0 when dispensing a brand drug with available generics: "DAW 0 cannot be submitted on a multi-source drug with available generics. 407-D7, 408-D8."[362]

572.    Thus, a DAW 0 code in the PDE record in support of the SilverScript payment for Beneficiary No. 8 was untruthful, inaccurate and incomplete.

573.    In addition to rebuffing Beneficiary No. 8's numerous attempts to get the less costly authorized generic, Beneficiary No. 8's Epclusa prescription was filled in violation of New York State law requiring generic substitution, causing false claims to be submitted because the unsubstituted claims are invalid prescriptions under State law and thus not eligible for reimbursement by the SilverScript.

574.    This illustrates graphically that, by not allowing substitution of the less costly generic authorized version of the Beneficiary No. 8's prescription, CVS Health and its subsidiary SilverScript had violated the terms of the Consent Order that it would not, directly or indirectly, make deceptive claims about the price or cost of Medicare Part D prescription drugs.

### 7.  *Beneficiary No. 9*

575.    Beneficiary No. 9's story demonstrates how SilverScript's policy of denying all formulary exceptions for Epclusa drove beneficiaries into the Catastrophic Coverage stage after only one fill of the drug. Like the other beneficiaries who tried to obtain formulary exceptions in order to get less costly versions of Harvoni or Epclusa, Beneficiary No. 9's request was summarily denied.

---

[361] Exhibit 1  (CVS-002944).

[362] *See* CVS, "Reject Codes: Provider Manual Appendix B," at p. 33 (June 1, 2019), https://www.caremark.com/portal/asset/CVSCaremarkPayerSheetRejectCodes.pdf.

576.    On January 14, 2019, Beneficiary No. 9 (an 83-year-old woman from California) attempted to fill a prescription for sofosbuvir-velpatasvir (authorized generic for brand-name Epclusa), but the claim was rejected because Beneficiary No. 9 did not have a formulary exception.[363]

577.    The same day, Beneficiary No. 9 requested a formulary exception, but the request was denied the following day, using the new SilverScript blanket denial letter.[364]

578.    As a result of the formulary exception denial, Beneficiary No. 9 had no option but to fill her prescription for the brand-name drug, Epclusa, at her pharmacy.

579.    For fills of Epclusa in January and February, the cost for the brand-name Epclusa to Medicare was $20,459.82 and $21,351.80 respectively – over three times higher cost than it would have been for the authorized generic version.[365]

580.    According to Beneficiary No. 9's January 31, 2019 Explanation of Benefits,[366] together with the other medications she was receiving (Irbesartan tab 300 mg, Olapatadine SOL 0.2%, Xiidra drops 55, Fluticasone SPR 50 mcg, and Levocetirizi tab 5 mg), she was pushed into the Catastrophic Coverage stage after only one fill of Epclusa in January.  However, because her yearly income and resources were below certain limits, she was entitled to "Extra Help" as an LIS beneficiary, meaning that the high cost of Epclusa alone would end up making Medicare would subsidize all her drugs earlier than if the generic had been dispensed throughout the rest of 2019.

---

[363] Exhibit 51 (CVS-002262).

[364] Exhibit 52 (CVS-002264).

[365] Exhibit 53 (CVS-002242) and Exhibit 54 (CVS-002243).

[366] Exhibit 55 (CVS-002254).

### 8. Beneficiary No. 10

581.    The story of Beneficiary No. 10, a 63-year-old woman from Oregon, illustrates how beneficiaries have attempted to receive the less costly authorized generic version of Harvoni, only to be repeatedly turned down by SilverScript.

582.    Beneficiary No. 10 first filled a prescription for Harvoni on January 14, 2019 at her pharmacy. The plan allowed cost for Harvoni was $32,198.04, of which her LIS copay was $3.80 and the Medicare cost was between $29,000 and $30,000.

583.    On February 5, 2019, Beneficiary No. 10 successfully received a prescription for the generic ledipasvir-sofosbuvir due to a flaw in the Transition Fill logic (which was later eliminated).  The plan allowed cost was $12,265.92, the member copay was $0, and the total Medicare cost was $10,426.46.[367]

584.    Soon after the fill for the authorized generic, Beneficiary No. 10 received a letter from SilverScript dated February 7, 2019, advising her that, although she had been able to receive a temporary one-time Transition Fill for ledipasvir-sofosbuvir, the generic drug was not covered on the formulary and would not be covered in the future.[368] The letter did not mention that the ledipasvir-sofosbuvir is a less costly authorized generic to the brand-name Harvoni.  While the letter tells her that she has the right to request a coverage determination, including a formulary exception to receive the generic, it does not tell her that because of the clandestine deal the CVS Caremark Entities had struck with Gilead, the right to a formulary exception was illusory and it would be summarily denied by SilverScript.

585.    The result for Beneficiary No. 10 was that the SilverScript deception had denied

---

[367] Exhibit 56 (CVS-002166).

[368] Exhibit 57 (CVS-002169).

her request to receive the less costly (and identical) generic, increasing not only her copayment, but the Medicare cost by over $20,000 per prescription.

### 9. *Beneficiary No. 11*

586.    The story of Beneficiary No. 11 illustrates how CVS Health's gamesmanship resulted in a patient being repeatedly blocked from receiving access to necessary care.  Ultimately, it appears that Beneficiary No. 11 may never have completed treatment for his Hepatitis C, an illness that can cause serious health problems, including liver damage, cirrhosis (scarring of the liver), liver cancer, and even death.

587.    On March 6, 2019 and again on March 11, 2019, Beneficiary No. 11 (a 38-year-old male from Maryland) attempted to fill a prescription for generic Harvoni (ledipasvir-sofosbuvir), at his pharmacy.  The prescription was reversed (*i.e.*, never completed) three times by CVS Health, suggesting that Beneficiary No. 11 was looking for lower cost options than Harvoni.

588.    On March 14, 2019, Beneficiary No. 11 called SilverScript, complaining that he "cannot afford" the more expensive brand-name Harvoni prescription, and requested a price reduction.  SilverScript at first treated his request as a grievance and transferred his call to Coverage Exception Review ("CER") for a tiering exception to receive the less costly generic, but the exception was denied according to the new SilverScript standard for blocking all such requests for Harvoni and Epclusa.  As he had been trained, at no time did the CER representative advise Beneficiary No. 11 there were alternatives that are not on the formulary, including the less costly authorized generic ledipasvir-sofosbuvir.[369]

589.    Later that same day, Beneficiary No. 11 called again seeking the less costly generic. Initially, the call was treated as a grievance, but this time he was transferred to Coverage

---

[369] Exhibit 58 (CVS-002887).

Determinations & Appeals, where his request for a formulary exception to receive the less costly generic was denied. Consistent with CCR training, the representative failed to tell him that, even though he was seeking access to the identical formulation of the drug, no matter the merits of the formulary exception request for the generic ledipasvir-sofosbuvir, it would be summarily denied.

590.    Thereafter, on that same day, Beneficiary No. 11 filled the prescription for Harvoni at his pharmacy with a member copay (subsidy level 1) of $8.50, SilverScript cost of $4,556.84, and total Medicare cost of $27,633.20.

591.    The claim record shows that his pharmacy filled Beneficiary No. 11's Harvoni prescription and submitted the claim with DAW Code 0.[370]

592.    Caremark's Administrative Manual instructs pharmacists to "*Use the DAW 0 code when dispensing a generic drug*; that is, when no party (*i.e.*, neither Prescribing Provider, nor pharmacist, nor Participant) requests the branded version of a multi-source product." (emphasis added).[371]

593.    CVS's Provider Manual also includes a Reject Code for using a DAW Code 0 when dispensing a brand drug with available generics: "DAW 0 cannot be submitted on a multi-source drug with available generics. 407-D7, 408-D8."[372]

594.    Thus, a DAW 0 code in the PDE record in support of the SilverScript payment for Beneficiary No. 11 was untruthful, inaccurate and incomplete.

595.    On March 26, 2019, April 4, 2019, and April 5, 2019, Beneficiary No. 11 again attempted to fill Harvoni prescriptions at his pharmacy four different times, but none of the four

---

[370] Exhibit 59 (CVS-002892).

[371] Exhibit 1  (CVS-002944).

[372] *See* CVS, "Reject Codes: Provider Manual Appendix B," at p. 33 (June 1, 2019), https://www.caremark.com/portal/asset/CVSCaremarkPayerSheetRejectCodes.pdf.

claims was processed, suggesting he was still looking for lower cost options than Harvoni.

596.    Most concerning is that, based on the claims record, there is no evidence that Beneficiary No. 11 ever received his second and third fills for either Harvoni or ledipasvir-sofosbuvir.  Beneficiary No. 11 had made numerous attempts to receive the less costly generic, doing everything he possibly could to get the less costly generic for completion of his therapy, apparently because he could not afford Harvoni.  Despite his best efforts, Beneficiary No. 11 was continually lied to and blocked from getting the less costly generic Harvoni.

597.    On information and belief, because he never was given the option to request a coverage determination for the less costly (and identical) ledipasvir-sofosbuvir, Beneficiary No. 11 interrupted his Harvoni therapy because he could not afford it.

598.    Furthermore, because the prescription was filled in Maryland, a mandatory generic substitution State, SilverScript violated the State law requirement that the prescription be substituted with a less costly generic.

### 10. CVS Health Repeatedly Rejected Beneficiaries' Attempts to Fill Generic Harvoni and Epclusa

599.    Following the implementation of the SSG/DNS Scheme for Harvoni and Epclusa, CVS Health has routinely rejected thousands of beneficiary attempts to obtain access to less costly authorized generic of these drugs.  Attached hereto as Exhibit 60 is a representative sampling of 148 denied SilverScript claims for the authorized generic Harvoni and Epclusa prescriptions for just the month of January 2019, shortly after the SSG/DNS Schemes began.  The list includes 51 claims which were denied where the prescriptions for these drugs would have been filled in a mandatory substitution State.

600.    Each of these beneficiaries was sent SilverScript's letter including the blanket denial of formulary exceptions implemented for Harvoni and Epclusa authorized generics. It

included the new language denying a formulary exception unlike any language CVS Health had ever used before, stating it denied the exceptions for ledipasvir/sofosbuvir (authorized generic for brand-name Harvoni) or sofosbuvir/velpastasvir (authorized generic for brand-name Epclusa) based on their clinical equivalence – *i.e.*, the fact that they are authorized generics to Harvoni and Epclusa.

601.    Never before had CVS Health used as an excuse with any other SSG/DNS Drug that the drugs were clinically equivalent as a basis to deny a formulary exception requested by any beneficiary requesting the less costly generic to a SSG/DNS brand-name drug.

602.    For years, even when the preferred drug was in its SSG/DNS Program, SilverScript had universally allowed all formulary exceptions to dispense the less costly generic.  For the first time, the rebate deal that CVS Caremark Entities had inked with Gilead required that SilverScript would deny all formulary exceptions for generic versions of Harvoni and Epclusa.

603.    The formulary exception letter sent to beneficiaries rejecting their requests for the less costly (and identical) generic ledipasvir/sofosbuvir or sofosbuvir/velpastasvir is an explicit violation of the Consent Order that it would not, directly or indirectly, make deceptive claims about the price or cost of Medicare Part D prescription drugs.

604.    The letter tells beneficiaries that they had the right to ask for an appeal of the denial of the formulary exception.  What the letter from SilverScript failed to mention was that the result of any appeal was already predetermined – *i.e.*, the CVS Caremark Entities had already agreed with Gilead that SilverScript would deny all appeals.

605.    What is even more sinister is that, while the language included in the SilverScript denial letters for Epclusa and Harvoni formulary exceptions appears to track the Medicare guidance on formulary exceptions, the guidance language it was modeled after appears to have

been intended for the opposite situation – *i.e.*, a patient was requesting a formulary exception for a more expensive brand drug instead of a less costly on-formulary generic.

606.    Illustrating how perverse its new-found insistence that clinical equivalence would become a sufficient reason to deny all formulary exceptions for Harvoni and Epclusa, for years SilverScript has used DAW 1 (physician requests brand) as a justification to switch from the identical authorized generic to the brand-name SSG Drug, even requiring physicians to request the brand in those instances when there was no medical reason for dispensing the brand instead of the identical generic.

607.    However, under the NCPDP standards, DAW Code 1 may only be "used when the prescriber indicates, in a manner specified by prevailing law, *that the product is Medically Necessary to be Dispensed As Written*." (emphasis added)[373]  Even though there was no medical necessity requiring use of the brand instead of the generic, there are tens of thousands of examples where SilverScript required the beneficiary seeking access to an authorized generic to switch to the preferred brand, coding the claim as DAW 1.  The only reason for coding these "clinically equivalent" prescriptions as DAW 1 was the fact that the SSG/DNS Scheme was blocking the generic.

608.    With the Harvoni and Epclusa denial letters, however, SilverScript has engaged in the pretense of using an ethically questionable, technical loophole to keep patients and Medicare paying for the more expensive brand-name drugs instead of using the less costly authorized

---

[373] CMS recognizes that "excessive use" of DAW Code 1 on multi-source products may raise "red flags from an audit perspective." *See* Centers for Medicare and Medicaid Services, *Pharmacy Self-Auditing: Control Practices to Improve Medicaid Program Integrity and Quality Patient Care; Booklet 4: Billing Practices*, December 2015, available at: https://www.cms.gov/Medicare-Medicaid-Coordination/Fraud-Prevention/Medicaid-Integrity-Education/Downloads/pharmacy-selfaudit-booklet4-billing-practice.pdf.

generics. This is not only wholly contrary to the intent of the formulary exception criteria and the purpose of the Medicare guidance language, it is completely at odds with its own position about the "Social Determinants of Health" and its commitment to making less costly drugs available to ensure patient adherence and healthy outcomes.

609.    The result of this charade not only deceived beneficiaries, it has resulted in significant increased profits to CVS Health while dumping huge additional costs for Harvoni and Epclusa onto taxpayers and Part D beneficiaries, thereby violating the FTC Consent Order that it would not, directly or indirectly, make deceptive claims about the price or cost of Medicare Part D prescription drugs.

610.    HHS and CMS have expressly addressed the very concerns at issue in this case in its November 30, 2020 final rulemaking (the "Rebate Rule"), stating that "rebates also may create a perverse incentive that rewards manufacturers for increasing their list price, while subjecting consumers to higher out-of-pocket costs. Since beneficiary out-of-pocket costs are often calculated based on the list price of the drug (*i.e.*, before rebates are paid), beneficiaries pay higher cost-sharing than they would if discounts were reflected at the point of sale. Furthermore, high list prices may result in more beneficiaries more quickly reaching the catastrophic phase, where the Federal government bears 80 percent of the drug costs and the Part D plans only cover 15 percent of the drug costs."[374]

611.    In response to industry comments about the impact rebates have on increasing on Medicare Part D beneficiary costs, the HHS/CMS Rebate Rule cited the Gilead press release that the company would be introducing authorized generics of Harvoni and Epclusa because it could

---

[374] *See* Final Rule, *Removal of Safe Harbor Protection for Rebates Involving Prescription Pharmaceuticals*, 85 Fed. Reg. 76666, 76667 (Nov. 30, 2020).

not "quickly" lower list prices for the brand-name drugs once already locked into a PBM rebate agreement.[375] These are the same Gilead authorized generics that SilverScript was blocking in favor of the more expensive brand-name Harvoni and Epclusa.

612.    The increased costs for Harvoni and Epclusa in relation to their authorized generics are also the subject of a soon-to-be-issued 2022 HHS OIG report, *How Part D Plans' Preference for Higher Cost Hepatitis C Drugs Affects Medicare Beneficiaries*.[376] The report summary states that Medicare Part D spent $2.5 billion on hepatitis C drugs in 2019, some 93% of which was spent on three drugs, Harvoni, Epclusa and Mavyret. According to the summary, "[i]n early 2019, Gilead—the manufacturer of Harvoni and Epclusa—launched authorized generic versions of both drugs with the expressed goal of reducing patients' out-of-pocket costs. The retail price of authorized generic versions is $24,000, which is significantly less than the prices of Harvoni and Epclusa . . . ."[377] According to CMS, "[t]hese lower list prices *should in turn lead to lower out-of-pocket costs, as authorized generics are as effective as branded versions but sell for only a fraction of the cost*. However, a preliminary analysis indicates that Medicare utilization has not shifted from brandname versions of Harvoni and Epclusa to their significantly less costly, authorized generic versions. . . ."[378]

---

[375] *Id.* at 76686, n.34 (citing *A perspective from our CEO: Gilead Subsidiary to Launch Authorized Generics to Treat HCV*, Gilead Pharmaceuticals (Sept. 24, 2018), https://www.gilead.com/ news-and-press/company-statements/authorized-generics-for-hcv.

[376] *See* HHS OIG, *How Part D Plans' Preference for Higher Cost Hepatitis C Drugs Affects Medicare Beneficiaries*, OIE-BL-21-00200, https://oig.hhs.gov/reports-and-publications/workplan/summary/wp-summary-0000579.asp.

[377] *Id.*

[378] *Id.* (emphasis added).

F.       Ventolin HFA

613.    Albuterol sulfate inhalation aerosol is a short acting beta agonist or so-called "rescue inhaler" approved for the treatment or prevention of bronchospasm in patients aged 4 years and older with reversible obstructive airway disease and for the prevention of exercise-induced bronchospasm in patients aged 4 years and older.

614.    Bronchospasms are the tightening and narrowing of the airways in the lungs causing difficulty in breathing. Asthma attacks can lead to death, but can be avoided with proper treatment and care.  Access to affordable albuterol inhalers is a critical pharmacologic therapy used to treat asthma symptoms and to ease breathing by opening airways during an asthma attack.

615.    GSK manufactures albuterol sulfate inhalation aerosol under the brand-name Ventolin HFA.

### 1.   *CVS Health Entered into SSG/DNS Deal to Facilitate Evergreening of GSK's Ventolin HFA Product*

616.    Ventolin was first approved by the FDA in 1981, with a generic form approved in 1995.  At the time it was approved, Ventolin used chlorofluorocarbons (CFCs) as a propellant. CFCs were banned by the FDA for use as a propellant in 2008 as ozone-depleting substances.[379] GSK thereafter switched to the propellant hydrofluoroalkane (HFA).  The FDA 2008 change all but eliminated generic competition for albuterol inhalers like Ventolin HFA, substantially increasing out-of-pocket costs for the drug, resulting in huge profits for GSK.[380]

---

[379] *Making the Switch: Prepare your patients for the phase-out of CFC-propelled albuterol inhalers*, FDA (Dec. 4, 2015), https://www.fda.gov/drugs/resources-you-drugs/making-switch-prepare-your-patients-phase-out-cfc-propelled-albuterol-inhalers.

[380] Anupam Jena, Oliver Ho, Dana Goldman, *The Impact of the US Food and Drug Administration Chlorofluorocarbon Ban on Out-of-pocket Costs and Use of Albuterol Inhalers Among Individuals With Asthma*, 175 JAMA Intern Med. 1171-1179 (July 2015), https://jamanetwork.com/journals/jamainternalmedicine/fullarticle/2293081.

617.    GSK engaged in patent "evergreening" with Ventolin HFA, obtaining 15 secondary patents on the product delivery mechanism, artificially recycling and repurposing its Ventolin product with a new delivery mechanism to extent the product's patent cliff.[381]  GSK's primary patent on Ventolin HFA eventually expired on February 24, 2019.

618.    As part of its efforts to extend its exclusivity, on January 15, 2019, GSK announced that Prasco would begin selling an authorized generic version of its Ventolin HFA (albuterol) inhalation aerosol.  The authorized generic would be manufactured by GSK and sold by Prasco.[382] The only difference would be that there would be a different name on the label.

619.    Prasco's authorized generic for Ventolin HFA had a wholesale acquisition cost (WAC) of $36.00, representing a ~35% reduction in WAC cost compared to Ventolin HFA.

620.    Prasco promotes itself as a leading manufacturer of authorized generics. It states that:

> An Authorized Generic (AG) is the brand prescription product sold in private label packaging at generic prices. The AG is identical to the brand in every way; meaning that unlike standard generics, it contains the exact same active and inactive ingredients as the brand. And with the same shape, color, size, smell, taste and mouth feel, the AG provides a patient with the same overall experience as the brand product.

621.    Publicly, CVS Health claims it is opposed to evergreening.  On April 10, 2019, in written comments to questions from Representative Jeff Duncan (R-SC) before the House

---

[381] Reed Beall, Jason Nickerson, Warren Kaplan, Amir Attaran, *Is Patent "Evergreening" Restricting Access to Medicine/Device Combination Products?*, 11 PLOS One (Feb. 24, 2016), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4766186/; Robin Feldman, *May your drug price be evergreen,* 5 Journal of Law and the Biosciences 590 (Dec. 7, 2018), https://academic.oup.com/jlb/article/5/3/590/5232981.

[382] OptumRx, *Ventolin® HFA (albuterol) – First-time generic*, available at https://professionals.optumrx.com/content/dam/optum3/professional-optumrx/news/rxnews/new-generics/newgenerics_ventolinhfa_2019-0117.pdf.

Oversight Committee, Thomas Moriarty, Executive VP, Chief Policy and External Affairs Officer, and General Counsel, had testified that: "[CVS Health] believes that patent evergreening is a problem generally in the pharmaceutical industry. For that reason we have recently endorsed a bill introduced by Senators Cornyn and Blumenthal, the Affordable Prescriptions for Patients Act, which would give FTC the authority to review pharmaceutical patenting practices."[383]

622.    Executive VP Rice made similar comments before the Senate Finance Committee the day before, telling the Committee that Congress should prevent "evergreening," which "would prevent brand manufacturers from artificially maintaining monopolies and lower costs long term."[384]

623.    Even though CVS Health claims it supports ending evergreening,[385] arguing it had PBM "tools to lower drug prices," privately it has entered into anticompetitive agreements with SSG/DNS Drug Makers which in actuality have enabled these practices to continue, blocking access to less costly generics in favor of more expensive brand-name drugs.

624.    Ventolin HFA is one such example.  Two months before Moriarty and Rice had testified to Congress that CVS Health opposed evergreening, the CVS Caremark Entities had entered into an agreement with GSK, requiring SilverScript add Ventolin HFA to the SSG/DNS Scheme effective February 7, 2019.  Not only were prescription claims for the generic albuterol to

---

[383] Written comments of Thomas Moriarty, *Priced Out of Lifesaving Drugs: Getting Answers on the Rising Cost of Insulin*, Committee on Energy and Commerce Subcommittee on Oversight (April 10, 2019).

[384] Written comments of Derica Rice, Drug Pricing In America: A Prescription For Change, Part Iii, Committee On Finance United States Senate, S. Hrg. 116-415 (April 9, 2019).

[385] *Lowering drug prices for consumers and clients*, CVS Health, https://www.cvshealth.com/about-cvs-health/public-policy/lower-drug-prices-for-consumers-and-clients; *Making Medications More Affordable*, CVS Health website.

be blocked by SilverScript, the Executive Committee decided on February 18, 2019 that the CVS Pharmacies would stop stocking the generic as well. This has meant not only that the authorized generic of Ventolin HFA was unavailable to SilverScript beneficiaries who filled scripts at the CVS Pharmacies, but also would not have been available to the 45 million Part D beneficiaries, many of whom would have filled their prescriptions at a CVS Pharmacy.

625. These blocking measures were highly controversial among the CVS Health leadership, with Relator and numerous others complaining that this could create serious access issues for patients needing the less costly generic version of the rescue inhaler Ventolin HFA. There were concerns that blocking the generic would result in "[h]igher cost share for clients and members if they fill brand Ventolin" which would drive "questions/issues from clients."[386] If the "impact occurs on a weekend, members will be forced to go to another pharmacy or will be without a rescue inhaler until Dr can be reached" to write a new prescription.[387]

626. Not only that, but there were concerns that the collusion between SilverScript, the CVS Caremark Entities, and the CVS Pharmacies to block the generic Ventolin HFA could be an explicit violation of the firewall obligations with the FTC. For example, there were concerns that this would "cause noise" not just from SilverScript members, but from the rest of CVS Health's Part D business managed by the CVS Caremark Entities because not only was the generic Ventolin HFA not being stocked in CVS mail and retail pharmacies,[388] there were concerns with "associated

---

[386] Exhibit 65 (CVS-000020).

[387] *Id.*

[388] *Id.re* (CVS-000015).

sensitivity with CMS"[389] and the "increased calls to Customer Care."[390]

627.    However, because of the richness of the rebate for the brand, CVS Health senior leadership on the Executive Committee decided it would not stock the Ventolin HFA generic in its pharmacies – essentially blocking the ability for many beneficiaries in the plan to have access to the less costly generic versions of this critical drug.

## 2. *SilverScript Deception Blocked Access to the Less Costly Generic Ventolin HFA (albuterol sulfate HFA)*

628.    After Ventolin HFA was added to the SSG/DNS Scheme effective February 7, 2019, SilverScript CCRs were directed to tell beneficiaries:

> Generic prescription drugs are typically the lowest-cost option when compared to branded prescription drugs. SilverScript promotes the use of generic prescription drugs to help plan beneficiaries save money. During the initial launch phase for the generic, there will be few manufacturers marketing the generic and the cost of the generic is expected to be relatively high.   To help keep out-of-pocket costs low, SilverScript is retaining brand VENTOLIN® HFA on its formulary on Preferred Brand Tier (Tier 3). VENTOLIN is eligible for a manufacturer discount in the coverage gap.[391]

This is misleading.  Authorized generics are eligible for the Coverage Gap discount program since they are NDA "applicable" drugs.[392] The statement about keeping out-of-pocket costs low is a lie. The generic drug option(s) are already lower cost to the member and Medicare than the brand Ventolin HFA in many cases.

629.    SilverScript CCRs were also trained to say:

---

[389] *Id.* at CVS-000016.

[390] *Id.* at CVS-000018.
[391] Exhibit 61 (CVS-000294).

[392] CMS, *Medicare Coverage Gap Discount Program Beginning in 2011: Revised Part D Sponsor Guidance and Responses to Summary Public Comments on the Draft Guidance* (May 21, 2010), at 4.

Retaining brand VENTOLIN HFA on Preferred Brand Tier (Tier 3) can help keep out-of-pocket costs low for SilverScript beneficiaries.  Beneficiaries have the option to request an exception if they wish to obtain albuterol sulfate inhalation aerosol. However, exception requests for non-formulary prescription drugs, if approved, are typically approved for coverage at the highest cost share level.  Brand VENTOLIN HFA is available at the Preferred Brand Tier (Tier 3) copay/coinsurance, so if the request for the generic is granted, the beneficiary would pay the amount associated with the plan's exception tier. This may be a different cost than the brand.[393]

The statement about keeping out-of-pocket costs low was false.  Keeping the brand would not have resulted in lower out-of-pocket costs for beneficiaries and Medicare Part D.  The exception request statement intentionally is meant to discourage beneficiaries from asking for a formulary exception by using the language "highest cost share level."

630.    When beneficiaries asked whether Ventolin HFA would cost more than albuterol sulfate inhalation aerosol in any stage of the Medicare D benefit, they were to tell subsidy members:  "Maybe. In the Catastrophic Coverage Stage of the benefit, you will continue to receive VENTOLIN HFA at no cost. If you have not yet reached the Catastrophic Coverage Stage, you might have to pay your brand-name copayment for VENTOLIN HFA until you reach the Catastrophic Coverage Stage."[394]   This was misleading because comparative costs are not provided, leaving beneficiaries without information to determine the actual impact.  A truthful response would have been:

- The cost to LIS 1/LIS 2 beneficiaries in the initial coverage stage for CY2019 is $8.50/$3.80 for the brand and $3.40/$1.25 for the generic albuterol sulfate inhalation aerosol.

---

[393] Exhibit 61 (CVS-000293-302).

[394] *Id.*

- Beneficiaries will pay $0 for both the brand and the generic albuterol sulfate inhalation aerosol in the Catastrophic Coverage stage.

- In all scenarios for LIS 1 & 2 in 2019, the generic albuterol sulfate inhalation aerosol would have been less expensive for the beneficiary and Medicare.

631.    When beneficiaries asked why brand-name VENTOLIN HFA is the only choice on the SilverScript formulary when there is now a generic albuterol sulfate inhalation aerosol available, SilverScript CCRs were to respond:

> In this case, the price of the generic version of VENTOLIN HFA will likely be similar to the price of the brand version for a minimum of six months, and perhaps longer. There are few manufacturers of the generic version of VENTOLIN HFA to drive the price down.  Until there are competitors and the price of the generic version goes down, your plan will continue to cover brand-name VENTOLIN HFA at the Preferred Brand Tier (Tier 3) cost share in 2019.[395]

This is a lie.  The generic albuterol sulfate inhalation aerosol was, in fact, already lower in price for most beneficiaries.  There was no need to wait for there to be multiple generic manufacturers to drive the price down.

632.    When beneficiaries asked why they cannot get the generic albuterol sulfate inhalation aerosol, the response they were to give was:  "When a generic version is first available, it is typically similar in price to the brand version. At this time the generic version, called albuterol sulfate inhalation aerosol, is not on the formulary. You do have the option to request a formulary exception.  However, exception requests for non-formulary prescription drugs, if approved, are typically approved for coverage at the highest cost share level."[396]  This was false.  Keeping the brand as the only formulary choice would not have resulted in lower out-of-pocket costs for most

---

[395] *Id.*

[396] *Id.*

beneficiaries in all stages and Medicare (payor) in the ICL and Catastrophic Coverage Stages and some scenarios for the Catastrophic Coverage Stage. Moreover, beneficiaries were discouraged from asking for a formulary exception by using the language "highest cost share level."

633.    When they were asked how long the brand-name Ventolin HFA would remain the only SilverScript formulary option, they were to tell beneficiaries: "We anticipate that VENTOLIN HFA will remain on the formulary on the Preferred Brand Tier (Tier 3) in 2019 until the price of the generic form of VENTOLIN HFA drops. We anticipate it will be a minimum of six months, however that is based on market conditions not within our control and could change."[397]

634.    This was deceptive. By February 2019, the GoodRx price of the generic was $52.13 compared to the brand Ventolin HFA price of $63.29, already making the generic a lower cost option for both the beneficiary and Medicare. The decision to keep the brand Ventolin HFA as the only choice on the SilverScript formulary was not driven by market conditions, but CVS Health's own profit motives. Likewise, it was a lie and deceptive to say that the market conditions were not "within our control" when it was the CVS Caremark Entities' agreement with GSK that was the cause for the delay in the formulary access to the less costly generic drug albuterol sulfate inhalation aerosol. The market conditions were thus completely within its control.

635.    When beneficiaries asked whether they could request a coverage determination to receive the less costly generic, SilverScript CCRs were expected to say: "Yes, you as the beneficiary may request a coverage determination for albuterol sulfate inhalation aerosol. However, exception requests for non-formulary prescription drugs, if approved, are typically

---

[397] *Id.*

approved for coverage at the highest cost share level."[398]  This was misleading and intended to discourage beneficiaries from asking for a formulary exception.  A formulary exception for the generic albuterol sulfate inhalation aerosol would have been approved at the highest tier (Tier 4) which is the same tier/cost share 40% as the brand.

### 3. Beneficiary No. 12

636.    On February 9, 2019 (two days after the Ventolin HFA scheme started), Beneficiary No. 12 (a 74-year-old woman from Michigan) filled a prescription for the generic albuterol HFA at her pharmacy.  Her copay was $18.89 and plan cost was $28.34.  The claim record shows that her pharmacy filled Beneficiary No. 12's prescription and submitted the claim with DAW Code 0.[399]

637.    Shortly thereafter, she received a letter from SilverScript dated February 12, 2019, stating that the Transition Fill of the generic was only a one-time fill because the drug was not covered on the formulary.[400]

638.    When she later filled the Ventolin HFA prescription, the claim record shows that her pharmacy filled her Ventolin HFA prescription and submitted the claims with a "2 – PATIENT" code, indicating that the patient had requested the brand.  [401]

639.    Here, as evidenced by Beneficiary No. 12's prior use of the generic, there is little reason to believe she had actually requested the brand Ventolin HFA, but was required to choose the brand because CVS Health did not include the generic on its formulary. Thus, a DAW 2 code

---

[398] *Id*.

[399] Exhibit 62 (CVS-002814).

[400] Exhibit 63 (CVS-002809).

[401] Exhibit 64 (CVS-002813).

in the PDE record in support of the SilverScript payment for Beneficiary No. 12 was untruthful, inaccurate and incomplete.

640.    Furthermore, because her Ventolin HFA prescription was filled at a pharmacy located in Michigan, where state law requires that the pharmacy must dispense the generic when the patient requests it (MCL 333.17755), CVS Health violated the State law requirement that the prescription be substituted with a less costly generic.

### 4. *CVS Health Rejected Thousands of Beneficiaries from Receiving Access to the Less Costly Generic Ventolin HFA (albuterol sulfate inhalation aerosol)*

641.    Following the implementation of the SSG/DNS Scheme for Ventolin HFA, CVS Health has routinely rejected thousands of beneficiary attempts to obtain access to the less costly generic.

642.    Attached hereto as Exhibit 65 is a representative sampling of 502 patients who sought access to the less costly generic albuterol sulfate inhalation aerosol through a Transition Fill between February 7, 2019 and February 13, 2019, the first week of the SSG/DNS Scheme, only to have their subsequent claims blocked in favor of the much more expensive brand-name Ventolin HFA. The list includes 165 patients where the prescription would have been filled in a mandatory substitution State.

643.    Each of these beneficiaries was sent CVS Health's Transition Fill letter, stating that the Transition Fill of the generic was only a one-time fill because the drug was not covered on the formulary, and was required to use the brand Ventolin HFA thereafter.

644.    The result of this charade not only deceived beneficiaries, it resulted in significant increased profits to CVS Health while dumping huge additional costs onto taxpayers and Part D beneficiaries, thereby violating the FTC Consent Order that it would not, directly or indirectly, make deceptive claims about the price or cost of Medicare Part D prescription drugs.

G.      **Canasa Rectal Suppository**

645.    Mesalamine rectal suppository or is used to treat inflammatory bowel disease, including ulcerative colitis and Crohn's disease. Allergan manufactures mesalamine rectal suppositories under the brand-name Canasa rectal suppositories 1000 mg.

646.    Canasa is manufactured by Aptalis Pharma, a wholly owned subsidiary of Allergan, now owed by AbbVie.

647.    On November 11, 2015, Aptalis entered into a pay-for-delay settlement agreement resolving patent infringement litigation with Mylan. Under the terms of the settlement agreement, Mylan would be able to launch its generic version of Canasa on December 15, 2018, or earlier under certain circumstances. Aptalis also entered into settlement agreements with Sandoz, PSP, Inc., and Zydus, allowing them to begin marketing generic versions of Canasa in June 2019.

648.    Mylan began selling a generic of Canasa on December 17, 2018. Numerous other generics came on the market shortly thereafter.

649.    The CVS Caremark Entities shortly thereafter entered into an agreement with Allergan, requiring that SilverScript add Canasa to the SSG/DNS Scheme on February 22, 2019, blocking access not only to the authorized generic, but to all other generics on that market.

### 1. *SilverScript Blocked Access to the Less Costly Generic Canasa (mesalamine-sofoamine)*

650.    SilverScript CCRs were provided materials and training telling them to explain the situation to beneficiaries as follows:

> During the initial launch phase for the generic, there will be few manufacturers marketing the generic and the cost of the generic is expected to be relatively high. To help keep out-of-pocket costs low, SilverScript is retaining brand CANASA® RECTAL SUPPOSITORY on its formulary on Non-Preferred Drug Tier (Tier 4). CANASA is eligible for a manufacturer discount in the coverage gap. SilverScript

will continue to keep the brand version of CANASA RECTAL SUPPOSITORY on the formulary and will NOT be adding the generic version until further notice.[402]

The CCR statement about cost of the generic mesalamine rectal suppository was false. The generic drug option(s) were lower cost to the member and Medicare Part D than the brand Canasa.

651. SilverScript CCRs were also to tell members that:

> Retaining brand CANASA RECTAL SUPPOSITORY on Non-Preferred Drug Tier (Tier 4) can help keep out-of-pocket costs low for SilverScript beneficiaries. NOTE: The generic equivalent mesalamine rectal suppository is NOT on the formulary until further notice.
>
> - Beneficiaries have the option to request an exception if they wish to obtain mesalamine rectal suppository.
>
> - However, exception requests for non-formulary prescription drugs, if approved, are typically approved for coverage at the highest cost share level.
>
> - Brand CANASA RECTAL SUPPOSITORY is available at the Non-Preferred Drug Tier (Tier 4) copay/coinsurance, so if the request for the generic is granted, the beneficiary would pay the amount associated with the plan's exception tier. This may be a different cost than the brand.[403]

The statement in the CCR script about keeping out-of-pocket costs low was false. Canasa was at the time a Tier 4 drug. A formulary exception would also have been approved for Tier 4. Keeping the brand-name drug as the only SilverScript formulary option would not have resulted in lower out-of-pocket costs. In addition, telling beneficiaries that a formulary exception would be at the "highest cost share level" was intended to discourage them from asking for the exception. This was deceptive. A formulary exception would also have been available with the Tier 4 coinsurance, almost always resulting in a lower cost for the generic.

---

[402] Exhibit 66 CVS-000562-572).

[403] *Id.*

652.    If SilverScript CCRs were asked whether the Canasa Rectal Suppository would ever cost more at any stage for LIS beneficiaries, they were to respond:

> Maybe. In the Catastrophic Coverage Stage of the benefit, you will continue to receive CANASA RECTAL SUPPOSITORY at no cost. If you have not yet reached the Catastrophic Coverage Stage, you might have to pay your brand-name copayment for CANASA RECTAL SUPPOSITORY until you reach the Catastrophic Coverage Stage.[404]

This was misleading because comparative costs are not provided to subsidy members, leaving them without information to determine actual cost differences.   If they had been truthful, SilverScript CCRs would have told LIS beneficiaries:

- The cost to LIS 1 beneficiaries in the initial coverage stage for CY2019 is $8.50 for the brand and $3.40 for the generic mesalamine rectal suppository.  Beneficiaries will pay $0 for both the brand and the generic in the Catastrophic Coverage stage.

- Medicare Part D will pay $418.22 for the brand ($426.72 - $8.50) and $312.87 for the generic mesalamine rectal suppository ($316.27 - $3.40) in the ICL stage.

- Medicare Part D will pay $258.20 for the brand ($266.70 - $8.50) and $289.25 for the generic ($292.55 - $3.40) for the generic mesalamine rectal suppository in the Coverage Gap (where applicable).

- Medicare Part D will pay $53.34 for the brand and $39.53 for the generic mesalamine rectal suppository in the Catastrophic Coverage stage (full amount of beneficiary's cost) in addition to 80% of the cost of either drug for the Medicare portion of the cost of the drugs in this stage.

653.    If they were asked why the brand Canasa Rectal Suppository is only choice on the SilverScript formulary when there is a generic mesalamine rectal suppository available,

---

[404] *Id.*

SilverScript CCRs were to respond:

> In this case, the price of the generic version of CANASA RECTAL SUPPOSITORY will likely be similar to the price of the brand version for a minimum of six months, and perhaps longer. There are few manufacturers of the generic version of CANASA RECTAL SUPPOSITORY to drive the price down. Until there are competitors and the price of the generic version goes down, your plan will continue to cover brand-name CANASA RECTAL SUPPOSITORY at the Non-Preferred Drug Tier (Tier 4) cost share in 2019. [405]

The CCR statement about how long it will take for the generic mesalamine rectal suppository price to come down was false. The generic mesalamine was already much lower in price for most beneficiaries. There was no need to wait for there to be multiple generic manufacturers to drive the price down.

654.    If asked why they could not get a generic, SilverScript CCRs were directed to say:

> At this time the generic version, called mesalamine rectal suppository, is not on the formulary. You do have the option to request a formulary exception. However, exception requests for non-formulary prescription drugs, if approved, are typically approved for coverage at the highest cost share level. [406]

This was misleading. While this statement may have been true for some newly released generics, the generic for Canasa had been on the market for almost three years and was available at a lower cost option for beneficiaries. The CCR statement about the exception requests is a lie intended to discourage beneficiaries from asking for a formulary exception. A formulary exception for the generic mesalamine rectal suppository would have been approved at the highest tier (Tier 4) which is the same tier/cost share 34% as the brand.

655.    If asked how long the brand Canasa would be the only SilverScript formulary option, they were expected to respond:

---

[405] *Id.*.

[406] *Id.*

> We anticipate that CANASA RECTAL SUPPOSITORY will remain on the formulary on the Non-Preferred Drug Tier (Tier 4) in 2019 until the price of the generic form of CANASA RECTAL SUPPOSITORY drops. We anticipate it will be a minimum of six months, however that is based on market conditions not within our control and could change. [407]

656.    The CCR statement about generic pricing was misleading.  By February 2019, the GoodRx price of the generic was $332.75 compared to the brand Canasa price of $1,213.43, already making the generic a lower cost option for both the beneficiary and Medicare Part D.

657.    The decision to keep the brand Canasa Rectal Suppository as the only choice on the SilverScript formulary was not driven by market conditions, but by CVS Health's own profit motives.  Likewise, it was a lie and deceptive to say that the market conditions were not "within our control" when it was the CVS Caremark Entities' agreement with Allergan that was the cause for the delay in the formulary access to the less costly generic drug mesalamine rectal suppository. The market conditions were thus completely within its control. Moreover, given the fact that there were as of 2019 seven competing generics (Amneal, Amring, Annora, Mylan, Pharmaceutical Sourcing Partners, Sandoz, Zydus), there was simply no reasonable explanation (other than greed) why Canasa remained the only SilverScript formulary option.

658.    If beneficiaries asked whether they could submit a coverage determination for the generic, they were to respond:  "Yes, you as the beneficiary may request a coverage determination for mesalamine rectal suppository. However, exception requests for non-formulary prescription drugs, if approved, are typically approved for coverage at the highest cost share level."  This was deceptive and intended to discourage beneficiaries from asking for a formulary exception.  A formulary exception for the generic would have been approved at the highest tier (Tier 4) which is the same tier/cost share 40% as the brand.

---

[407] *Id.*

### 2.   *Beneficiary No. 13*

659.    Even for those who were explicitly looking for less costly options, CVS Health concealed information about a beneficiary's right to request the generic version and has flatly misinformed them that there are no other options.

660.    For example, Beneficiary No. 13 (a 65-year-old woman) was a cost-conscious senior from the beginning looking for less costly options. When Beneficiary No. 13 first called to submit her prescription for Canasa to the pharmacy, she was told that Canasa would cost her $1,711 out of pocket. In response, Beneficiary No. 13 exclaimed "God, that's terrible, I mean, I'm on Medicare and stuff." Beneficiary No. 13 flatly said that she "can't afford a thousand dollars."[408]

661.    Even after being transferred yet again, Beneficiary No. 13 was not told about her option to apply for a coverage determination for the formulary exception. Instead of telling her that a formulary exception might be available, the SilverScript CCRs discussed Beneficiary No. 13's options to apply for Medicare subsidy (Extra Help) or to look for a manufacturer discount (even though the manufacturer discounts were of no use because they cannot be used with Medicare).[409]

662.    Throughout the calls, all of the SilverScript CCRs should have been able to see that there was an alternative and should have known that Beneficiary No. 13 had the right to request a coverage determination for the formulary exception for any drugs that are not covered by the PDP.

663.    These were clearly requests for a formulary exception.  However, it would appear SilverScript did not want them filed so it could conceal the SSG/DNS Scheme.

664.    Eventually, CVS Health's efforts prevailed and Beneficiary No. 13 gave up trying

---

[408] Exhibit 67 CVS-001526.

[409] *Id.*

to get less costly options. As Beneficiary No. 13 said: "I mean, 'I'm gonna have to pay it. One way or the ... If I'm gonna continue on the Canasa, I'm gonna have to pay it…. Right now, it's over $1700 for a 3-month supply, which people can't afford that!"[410]

665.    A large part of her motivation for giving in to the higher price was that her doctor told her she may develop cancer without the drug. As Beneficiary No. 13 explained to the SilverScript CCRs: "I know I have to take [Canasa] because she [her doctor] said it could develop into cancer if I didn't take it." Even this did not deter CVS Health.[411]

666.    Throughout, Beneficiary No. 13 repeatedly told the representatives that her doctor had let her know that Canasa (a drug she had been taking for 10 to 15 years) was her only alternative, mentioning that her prescription had run out three weeks before. She repeatedly told the representatives she could not afford her copay, and would have to consider skipping doses instead of using it daily as required.

667.    This is non-compliant with CMS rules and regulations, and was by definition a coverage determination request for the generic Canasa.  What happened to Beneficiary No. 13 is exemplary of thousands of instances where SilverScript denied beneficiaries access to their rights under Medicare.

668.    Beneficiary No. 13's story shows the impact of CVS Health's scheme to make sure that its beneficiaries only had access to the brand-name version of the SSG/DNS Drugs. Even though Beneficiary No. 13 was an elderly beneficiary who battled through multiple phone transfers between different SilverScript CCRs (all of whom she told she could not afford the medication

---

[410] Exhibit 68 (CVS-001553).

[411] Exhibit 69 (CVS-001568).

that she needed to prevent developing cancer), the CCR response was the same. No one at CVS Health gave her any less costly options which should have been readily available.

669.    In addition to failing to provide Beneficiary No. 13 information about availability and cost of lower-priced generic options, her Canasa prescription was filled in a violation of State law requiring generic substitution. The claim record shows that the CVS Caremark Entities Prescription Service WBP, was located in Pennsylvania, a mandatory substitution State, filled Beneficiary No. 13's Canasa prescription and submitted the claim with DAW Code 0.[412]

670.    While Code 0 is the "default," NCPDP makes clear that, for "a multi-source branded product with available generic(s), *DAW 0 is not appropriate, and may result in a reject*." (emphasis added)

671.    The CVS Caremark Entities' own "Caremark Participating Pharmacy Administrative Manual" includes guidance on DAW Codes as well. As the manual says, "CAREMARK supports the NCPDP standard (Dispense As Written) DAW codes. To ensure accurate reimbursement, always include the correct (DAW) code when you submit a claim."[413]

672.    By not substituting the less costly generic version of the prescription, CVS caused false claims to be submitted in two ways: (1) the unsubstituted claims are invalid prescriptions under Pennsylvania state mandatory substitution law and thus not eligible for reimbursement by the SilverScript PDP, and (2) using DAW Code 0 in this instance makes the PDE record and statement in support of the SilverScript payment untruthful, inaccurate and incomplete.

---

[412] Exhibit 70 (CVS-001788).

[413] Exhibit 1 (CVS-002944).

### 3.  Beneficiary No. 14

673.    On March 20, 2019, Beneficiary No. 14 (a 62-year-old male paraplegic) called Customer Care to ask about the high cost of Canasa Suppositories. Beneficiary No. 14 explained to the CCR that the high cost of the medication had prevented him from filling his prescription previously ("And so, at first, I just didn't get it filled because I couldn't afford it."). Despite his cost concerns, Beneficiary No. 14 indicated that he needed the medication because other forms of the medication (*i.e.*, an enema) would not work for him as a wheelchair-bound paraplegic and has "a lot of medical things."[414]

674.    On the call, Beneficiary No. 14 said that he wanted to know why his previous efforts to fill his prescription for mesalamine rectal suppository (the generic version of Canasa) were rejected. The CCR merely said that there is a note in the system to dispense the brand-name Canasa instead of the generic mesalamine rectal suppository. This was even though the claim detail screen in the Customer Care system specifically instructed the SilverScript CCRs to "DISCUSS GNRC SAVINGS OPPORTUNITY W/MBR."[415]

675.    These conflicting instructions in the CCR script show how the systems used at CVS Health were often not in alignment given the multiple business units involved. In some areas of its CVS Health claims system, the representatives could see that less costly generics were available, but in other areas they were seeing that the brand-name SSG Drug should be dispensed and/or the generic is not covered. The sheer confusion of this environment acted as a barrier to beneficiaries getting clear options and information about overall cost impact.

676.    Instead of working to help Beneficiary No. 14 get the appropriate medication at a

---

[414] Exhibit 71 (CVS-001578).

[415] Exhibit 72 (CVS-001800).

price he could afford, the CCR only offered asking for tiering exception to try to get the brand-name Canasa at a less costly price. But, Canasa is not eligible for a tiering exception so this request was ultimately denied.[416]  When Beneficiary No. 14 contacted CVS Health yet again, he was told that the generic mesalamine was not covered under his SilverScript plan.

677.    Again, despite numerous opportunities, Beneficiary No. 14 was never told about the option to request a coverage determination to get a formulary exception. This deception ensured that only the brand-name medication would get filled at an plan cost of $644.32 and patient copay of $527.16.

678.    This is non-compliant with CMS rules and regulations, and was by definition a coverage determination request for the generic Canasa.  What happened to Beneficiary No. 14 is exemplary of thousands of instances where SilverScript denied beneficiaries access to their rights under Medicare.

### H.    Advair Diskus

679.    Fluticasone-salmeterol inhalation powder is used to control and prevent symptoms (wheezing and shortness of breath) caused by asthma or ongoing lung disease (chronic obstructive pulmonary disease-COPD, which includes chronic bronchitis and emphysema).  It contains 2 medications: fluticasone and salmeterol. GSK manufactures fluticasone-salmeterol inhalation powder under the brand-name Advair Diskus.

680.    Asthma impacts more than 20 million adults and 6 million children in the United States.[417] Since its arrival on the market in 2001, by 2018 Advair Diskus had surpassed $100 billion

---

[416] Exhibit 71 (CVS-001578).

[417] Centers for Disease Control and Prevention, https://www.cdc.gov/asthma/most_recent_national_asthma_data.htm.

in sales for GSK.[418] Though the medication's patent had expired in 2010, the company protected its blockbuster drug by obtaining patents on the diskus delivery system.[419]

681.    Keeping Advair Diskus as the only SilverScript formulary option for SilverScript beneficiaries has had a direct impact on patient care. The price of Advair Diskus — often more than $300 a month — has meant that many patients often cannot afford the drug. When patients have been forced to skip doses because they cannot afford the cost of Advair Diskus, that means more emergency room visits, use of powerful "rescue" medications and hospitalizations, said Christopher Fanta, a lung specialist at Harvard-affiliated Brigham & Women's Hospital in Boston.[420]

682.    On January 30, 2019, the FDA approved Mylan's first generic version of Advair Diskus.[421]  Mylan launched its generic on February 12, 2019.[422]

---

[418] James Paton, *Glaxo's Advair Is the $100 Billion Asthma Drug That Won't Die*, Bloomberg (May 4, 2018), https://www.bloomberg.com/news/articles/2018-05-04/glaxo-s-advair-is-the-100-billion-asthma-drug-that-won-t-die.

[419] Ben Hirschler, *In fight for GSK's Advair, generic firms step carefully on price,* Reuters (June 3, 2016), https://www.reuters.com/article/us-gsk-advair/in-fight-for-gsks-advair-generic-firms-step-carefully-on-price-idUSKCN0YP1E0.

[420] James Paton, *Glaxo's Advair Is the $100 Billion Asthma Drug That Won't Die*, Bloomberg (May 4, 2018), https://www.bloomberg.com/news/articles/2018-05-04/glaxo-s-advair-is-the-100-billion-asthma-drug-that-won-t-die.

[421] *See* Press Release, *FDA approves first generic Advair Diskus* (Jan. 30, 2019), https://www.fda.gov/news-events/press-announcements/fda-approves-first-generic-advair-diskus**.**

[422] Press Release, *Mylan Launches Wixela™ Inhub™ (fluticasone propionate and salmeterol inhalation powder, USP), the First Generic of ADVAIR DISKUS® (fluticasone propionate and salmeterol inhalation powder), at a List Price 70% Less than the Brand* (Feb. 12, 2019), https://investor.mylan.com/news-releases/news-release-details/mylan-launches-wixelatm-inhubtm-fluticasone-propionate-and.

683.    On February 8, 2019, GSK announced that Prasco had launched an authorized generic version of its Advair Diskus.[423] As part of the launch, Prasco stressed the identical nature of the authorized generic product: ""The Prasco authorized generic, fluticasone propionate and salmeterol Inhalation Powder will provide patients with the same quality and experience as the brand product. A unique and exciting part of this launch is that the DISKUS inhaler itself will also be identical. . . . We are grateful to expand our relationship with a leader in the industry like GSK.""[424]

684.    At the time, Mylan's competing generic was priced on GoodRx at $135.74 compared to $421.27 for the brand, 70% less than Advair Diskus and 67% less than GSK's authorized generic product.[425]

685.    The CVS Caremark Entities shortly thereafter entered into an agreement with GSK, requiring that SilverScript add Advair Diskus to the SSG/DNS Scheme on February 27, 2019.

### 1. *SilverScript Deception Blocked Access to the Less Costly Generic Advair Diskus (fluticasone propionate and salmeterol inhalation powder)*

686.    When Advair Diskus was added to the SSG/DNS Scheme, SilverScript CCRs were trained to tell beneficiaries that keeping the brand-name as the only SilverScript formulary option would keep out-of-pocket costs low:

> Generic prescription drugs are typically the lowest-cost option when compared to branded prescription drugs. SilverScript promotes the use of generic prescription drugs to help plan beneficiaries save money. During the initial launch phase for the

---

[423] Prasco Laboratories, available at https://prasco.com/news/2019/prasco-launches-the-authorized-generic-of-advair-diskus-(fluticasone-propionate-and-salmeterol-inhalation-powder).html.

[424] *Id*.

[425] Kristen Coppock, *Generic Version of Advair Diskus Launched at Discounted List Price*, Pharmacy Times (Feb. 13, 2019), https://www.pharmacytimes.com/view/generic-version-of-advair-diskus-launched-at-discounted-list-price.

generic, there will be few manufacturers marketing the generic and the cost of the generic is expected to be relatively high. To help keep out-of-pocket costs low, SilverScript is retaining brand ADVAIR DISKUS® INHALATION AEROSOL POWDER BREATH ACTIVATED on its formulary on Preferred Brand Tier (Tier 3). ADVAIR DISKUS is eligible for a manufacturer discount in the coverage gap.[426]

This is misleading.  Authorized generics are eligible for the Coverage Gap discount program since they are NDA "applicable" drugs.[427] The generic drug option(s) were lower cost to the member and Medicare in the Coverage Gap (where applicable) and Catastrophic Coverage Stages.

687.    SilverScript CCRs were also told to say:

Retaining brand ADVAIR DISKUS on Preferred Brand Tier (Tier 3) can help keep out-of-pocket costs low for SilverScript beneficiaries. . . . Beneficiaries have the option to request an exception if they wish to obtain fluticasone-salmeterol aerosol powder breath activated. However, exception requests for non-formulary prescription drugs, if approved, are typically approved for coverage at the highest cost share level. Brand ADVAIR DISKUS is available at the Preferred Brand Tier (Tier 3) copay/coinsurance, so if the request for the generic is granted, the beneficiary would pay the amount associated with the plan's exception tier. This may be a different cost than the brand.[428]

688.    When beneficiaries inquire whether ADVAIR DISKUS will cost more than fluticasone-salmeterol aerosol powder breath activated in any stage of the Medicare D benefit, they were expected to provide the scripted misleading answer to LIS members:  "Maybe.  In the Catastrophic Coverage Stage of the benefit, you will continue to receive ADVAIR DISKUS at no cost. If you have not yet reached the Catastrophic Coverage Stage, you might have to pay your brand-name copayment for ADVAIR DISKUS until you reach the Catastrophic Coverage

---

[426] Exhibit 73 CVS-000515.

[427] CMS, *Medicare Coverage Gap Discount Program Beginning in 2011: Revised Part D Sponsor Guidance and Responses to Summary Public Comments on the Draft Guidance* (May 21, 2010), at 4.

[428] *Id.*

Stage."[429]  Because costs are not provided, beneficiaries are left without information to determine

the actual impact.  If SilverScript CCRs had provided a truthful response, they would have told

LIS beneficiaries:

- The cost to LIS1/LICS2 beneficiaries in the initial coverage stage for CY2019 is $8.50/$3.80 for the brand and $3.40/$1.25 for the generic mesalamine rectal suppository.

- Beneficiaries will pay $0 for both the brand and the generic in the Catastrophic Coverage stage.

- In ICL for LIS 1 & 2 in 2019, the brand would have been less expensive for Medicare Part D.

- In Coverage Gap and Catastrophic coverage scenarios for LIS 1 & 2 in 2019, the generic mesalamine rectal suppository would have been less expensive for the beneficiary and Medicare.

689.    When SilverScript CCRs were asked why brand-name Advair Diskus is still the

only SilverScript formulary option when there is a generic available, they were trained to provide

a false answer:

> In this case, the price of the generic version of ADVAIR DISKUS will likely be similar to the price of the brand version for a minimum of six months, and perhaps longer. There are few manufacturers of the generic version of ADVAIR DISKUS to drive the price down. Until there are competitors and the price of the generic version goes down, your plan will continue to cover brand-name ADVAIR DISKUS at the Preferred Brand Tier (Tier 3) cost share in 2019.[430]

Mylan's generic fluticasone-salmeterol aerosol powder breath activated was, in fact, already much

lower in price for beneficiaries in the Coverage Gap (where applicable) and Catastrophic Coverage

---

[429] *Id.*

[430] *Id.*

Stages. There was no need to wait for there to be multiple generic manufacturers to drive the price down.

690. In response to inquiries about why beneficiaries could not get the generic, their canned response was misleading: "When a generic version is first available, it is typically similar in price to the brand version. At this time the generic version, called fluticasone-salmeterol aerosol powder breath activated, is not on the formulary. You do have the option to request a formulary exception. However, exception requests for non-formulary prescription drugs, if approved, are typically approved for coverage at the highest cost share level."[431] Mylan's generic fluticasone-salmeterol aerosol powder breath activated was already much lower in price for some beneficiaries in the ICL stage and all beneficiaries in the Coverage Gap (where applicable) and Catastrophic Coverage Stages. There was no need to wait for there to be multiple generic manufacturers. This response was also intended to discourage beneficiaries from asking for a formulary exception where the generic would be less expensive for many subsidy members in the Choice plan and all members in the Allure plan.

691. If the question was how long Advair Diskus would remain the only option on the SilverScript formulary, SilverScript CCRs were to say that "[w]e anticipate that ADVAIR DISKUS will remain on the formulary on the Preferred Brand Tier (Tier 3) in 2019 until the price of the generic form of ADVAIR DISKUS drops. We anticipate it will be a minimum of six months, however that is based on market conditions not within our control and could change."[432]

692. This was misleading. As of February 2019, the GoodRx price of Mylan's generic

---

[431] *Id.*

[432] *Id.*

was $135.74 compared to the price of the brand Advair Diskus of $421.27, already making the generic a lower cost option for both the beneficiary and Medicare in the Coverage Gap (where applicable) and Catastrophic Coverage Stages.

693.    The decision to keep the brand Advair Diskus as the only choice on the SilverScript formulary was not driven by market conditions, but by CVS Health's own profit motives. As of February 12, 2019, there were two generics being sold competing against Advair Diskus (Prasco, Mylan). Even then the brand-name Advair Diskus remained the only choice on the SilverScript Choice and Plus formularies.[433] Likewise, it was a lie and deceptive to say that the market conditions were not "within our control" when it was the CVS Caremark Entities' agreement with GSK that was the cause for the delay in the formulary access to the less costly generic drug fluticasone-salmeterol aerosol powder breath activated. The market conditions were thus completely within its control.

694.    When members asked whether they could request a coverage determination to receive the less costly generic, SilverScript CCRs were expected to respond: "Yes, you as the beneficiary may request a coverage determination for fluticasone-salmeterol aerosol powder breath activated. However, exception requests for non-formulary prescription drugs, if approved, are typically approved for coverage at the highest cost share level."[434] This was misleading and intended to discourage beneficiaries from asking for a formulary exception which would help reduce the cost of the generic vs the brand in the Coverage Gap (where applicable) and

---

[433] *See* 2020 SilverScript Choice Comprehensive Formulary, available at https://www.silverscript.com/pdf/FORM_2020_CHOICE_EN.pdf; 2020 SilverScript Plus Comprehensive Formulary, available at https://www.silverscript.com/pdf/FORM_2020_PLUS_EN.pdf.

[434] Exhibit 73 (CVS-000512-23).

Catastrophic Coverage Stages.

### 2. Beneficiary No. 15

695.    Beneficiary No. 15 is an example of a senior determined to get the less costly Mylan generic Wixela because cost of the brand Advair Diskus would push her into the Part D Donut Hole. She was blocked by SilverScript at every turn.  She was first told by the CCR she might be able to get a formulary exception for the generic (which turned out not to be true), then told that the Wixela might be more expensive for her (in fact, Wixela was 70% less costly than the brand), and finally told that the reason it was being blocked might be because it was unsafe (untrue).

696.    On February 27, 2019, Beneficiary No. 15 (a 78-year-old retired nurse from Massachusetts) had contacted SilverScript Customer Care and spoken with CCR Kandace Thomas. Beneficiary No. 15 had earlier that day attempted get the generic Advair Diskus at her pharmacy, but was told it was not covered on her formulary.  During the call she asked the CCR specifically why SilverScript would not give her access to the generic manufactured by Mylan, Wixela, because she wanted to reduce her costs to avoid going into the Donut Hole on her Medicare Part D plan.  She objected to CVS Health blocking the generic because "that is wrong."  In response, CCR Thomas told her she might be able to get a formulary exception because the generic is not covered[435]:

| Beneficiary No. 15: | Okay. I went to get my Advair Diskus, and **I know that there's a generic available and it seems like SilverScript is not covering the generic and because it's not on the formulary and that is wrong**. And I would like the Wixela. |
|---|---|
| Kandace Thomas: | Okay. So you would prefer the generic? |
| Beneficiary No. 15 : | Yes. **The pharmacy is supposed to offer me the generic versus the preferred brand and the SilverScript should not have anything to do with my preference with, especially when there's a generic available**. . . .   And |

---

[435] Exhibit 74 (CVS-003007).

<table>
<tr><td></td><td>another thing **is the cost probably will be less costly and I won't go in the Donut Hole maybe**.</td></tr>
<tr><td>Kandace Thomas:</td><td>Okay. Well, in this case, let's see. This brand, yeah so the generic is not on the formulary. And so I'm looking at it now and I do see here that the generic is not on the formulary. So in this case, the brand is preferred. In some cases they prefer the generics, but in this case, the brand is preferred. So are you wanting to see about trying to get the generic?</td></tr>
<tr><td>Beneficiary No. 15:</td><td>Yes. Yes.</td></tr>
<tr><td>Kandace Thomas:</td><td>Okay. So let's see. Okay. All right. So that would require, **so what'll have to happen is called a formulary exception since this one is not on the formulary. We'll have to start the process to try and get this particular one on the formulary in your case**. Okay. So that means I have to get our Care Exception Review Team on the line. They'll speak with you, and then they'll get our Coverage Determination Team. And they'll let you know the steps from there. Okay?</td></tr>
</table>

697.    CCR Thomas then discussed offline Beneficiary No. 15's request with Keonna Harmon on the Coverage Exceptions Review team, who explained that the generic was not available because "anytime they say dispense brand, it's something going on with that medication"[436]:

<table>
<tr><td>Kandace Thomas:</td><td>She was trying to get her WIXELA INHUB filled, but she was told at the pharmacy that she had to use the brand-name, which [is] ADVAIR DISKUS. She's really upset about that. She wants to use the generic. She's wanting to get an exception on that one.</td></tr>
<tr><td>Keonna Harmon:</td><td>**She cannot use that medication. She has to use the brand. That's why it's saying dispense her the brand.**</td></tr>
<tr><td>Kandace Thomas:</td><td>She was saying it's wrong, and you can't tell me what to buy. She absolutely cannot get an exception on that WIXELA?</td></tr>
<tr><td>Keonna Harmon:</td><td>No. That one, that medication, **anytime they say dispense brand, it's something going on with that medication**.</td></tr>
</table>

---

[436] Exhibit 75 (CVS-003011).

698.    CCR Thomas then went back on the line with Beneficiary No. 15 to tell her that her formulary exception request for Mylan generic would be denied, repeating CER Harmon's statement that "there's something going on with the generic"[437]:

Kandace Thomas:    Yes. So I got the Care Exception Review Team on the line. And when I explained to them what was going on, you were wanting to get the Wixela covered, **she had let me know that in cases where the note says dispense brand, you have to get the brand**. She said **there's no way you can get a formulary exception on that**, because it's specifically saying. She said normally when they say that, that means **there's something going on with the generic**. So they prefer the brand.

699.    To deflect the caller's concerns, CCR Thomas next explained to Beneficiary No. 15 that the generic would be more expensive than the brand Advair Diskus. However, Beneficiary No. 15 challenged that the cost of the generic was a plausible reason for blocking it, telling CCR Thomas that she has a friend who is getting the generic Wixela at a less costly price, commenting SilverScript "just doesn't want to change because it's to their benefit… I'm not feeling that they're thinking of the consumer and it's hard for me to believe that the generic is pricier than the Advair. It shouldn't be that way."[438]:

Kandace Thomas:    And actually now that I'm doing it, that Wixela is way more expensive than the Advair. The Wixela is almost $200.

Beneficiary No. 15 :    $200 for whom?

Kandace Thomas:    For the Wixela, the generic.

Beneficiary No. 15 :    I pay $38 for Advair myself through SilverScript.

Kandace Thomas:    Right.

Beneficiary No. 15 :    The plan paid $359.48.

---

[437] Exhibit 74 (CVS-003007).
[438] *Id.*

Kandace Thomas:    Yes ma'am.

Beneficiary No. 15 :    What are you telling me?

Kandace Thomas:    What I'm telling you is that the Wixela, if you were to get that one... you can't get an exception on it. But the only good thing with that is that if you were to pay for the Wixela, you're going to be paying $128 for it. The brand is actually less costly.

Beneficiary No. 15 :    I know somebody that gets it and they don't pay that.

Kandace Thomas:    Well, they. . . .

Beneficiary No. 15 :    Well, **it sounds like SilverScript just doesn't want to change because it's to their benefit. . . . I'm not feeling that they're thinking of the consumer and it's hard for me to believe that the generic is pricier than the Advair.** . . .  **It shouldn't be that way**. . . . **Well, maybe according to SilverScript, because they want it to be.**

700.    Remarkably, CCR Thomas then ventured that there's "something going on" with the generic – *i.e.,* "where we don't want to give it to you" – which could be because it "may affect you," suggesting CVS was blocking the generic because of safety concerns[439]:

Kandace Thomas:    So if there's **something going on where we don't want to give it to you, where it may affect you, then we're not going to. We don't want you to receive anything that's not** . . . .

701.    This interchange illustrates the lengths to which CVS Health was willing to go in deceiving beneficiaries seeking access to less costly medications.

702.    Because her request for a coverage determination for the 70% less costly generic Wixela had been rejected, Beneficiary No. 15 then relented and filled the Advair Diskus

---

[439] *Id.*

prescription at her local pharmacy with a $38.00 copayment and $359.48 plan cost.[440]

703.    Not only that, because the prescription was filled at a pharmacy in Massachusetts, a mandatory generic substitution State, SilverScript violated the State law requirement that the prescription be substituted with a less costly generic.

### 3. SilverScript Deception Blocked Access to Thousands of Beneficiaries Seeking Access to Generic Advair Discus

704.    Following the implementation of the SSG/DNS Scheme for Advair Diskus, CVS Health has routinely rejected thousands of beneficiary attempts to obtain access to the less costly generic.

705.    Attached hereto as Exhibit 77 is a representative sampling of 73 rejected SilverScript claims for generic Advair Diskus prescriptions for just one day, January 27, 2019, the day CVS Health initiated the SSG/DNS Scheme for this drug.

706.    Each of these beneficiaries was sent SilverScript's letter denying formulary exceptions implemented for the Advair Diskus generic.  Not one of these letters informed the recipients that the non-formulary generic Wixela was 70% less costly than the brand drug.

707.    The formulary exception letter sent to beneficiaries rejecting their requests for the less costly generic tells them that they had the right to ask for an appeal of the denial of the formulary exception.  What the letter failed to tell them was that the result of any appeal was already doomed to fail – i.e., the CVS Caremark Entities had already agreed with GSK that SilverScript would summarily deny all appeals.

---

[440] Exhibit 76 (CVS-001664).

**4. CVS Health Senior Management Deception About Its "Proven Cost Management Strategies" To Block Beneficiary Access to the Less Costly Generic Advair Diskus**

708.    Shortly before he testified before the Senate Finance Committee, on March 19, 2019, CVS Health Executive Vice President and Caremark President Derica Rice issued a briefing[441] discussing "new trends" in the pharmacy benefit market that require "ongoing innovation, and evolution of, cost management strategies."  Rice specifically mentioned the "increasing use of authorized generics" by manufacturers, stating that "[s]ome manufacturers have chosen to launch an alternative version of the brand product at a lower cost under a different National Drug Code (NDC), which enables them to continue marketing the brand at a higher price."[442]

709.    In a bit of sleight of hand, Rice touted that the CVS Caremark Entities were using their "proven cost management strategies and [has] negotiated with manufacturers to help ensure members had access to appropriate therapies while clients could focus on controlling plan costs." Among the examples he mentioned where the CVS Caremark Entities had used their "formulary tools" to blunt the impact of drug maker gamesmanship was Advair Diskus.  According to Rice, one opportunity for cost savings "came in the form of two new generics for Advair Diskus launching in February — an authorized generic by the maker of the brand drug and another one by a different manufacturer."[443]

710.    But, there were no "cost savings" in the offing for SilverScript beneficiaries.  What

---

[441] Derica Rice, *Why the Time is Right for a New Pricing Model: As Market Trends Evolve, Payors Need an Adaptable Approach* (March 19, 2019), https://payorsolutions.cvshealth.com/insights/why-the-time-is-right-for-a-new-pricing-model.

[442] *Id.*

[443] *Id.*

Rice failed to mention was that three weeks earlier the CVS Caremark Entities had entered into an SSG/DNS deal with GSK, requiring that SilverScript block access to the 70% less costly generic Wixela, forcing beneficiaries instead to use only the much more expensive "appropriate" therapy, Advair Diskus. The result was sadly predictable, impeding access to the less costly generic and driving up costs for Medicare and Part D patients alike.

711.    The result of this travesty not only deceived beneficiaries, it resulted in significant increased profits to CVS Health, while dumping huge additional costs onto taxpayers and SilverScript beneficiaries, thereby violating the FTC Consent Order that it would not, directly or indirectly, make deceptive claims about the price or cost of Medicare Part D prescription drugs.

## X.   COUNTS

### COUNT I
### (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1); 31 U.S.C. § 3729(a)(1)(A))

712.    Relator incorporates herein by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

713.    CVS Health, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to the United States of America false or fraudulent claims for payment or approval, in violation of 31 U.S.C. § 3729(a)(1) and 31 U.S.C. § 3729(a)(1)(A).

714.    As a result of CVS Health's actions, as set forth above, the United States of America has been, and may continue to be, severely damaged.

## COUNT II
### (Violation of False Claims Act, 31 U.S.C. § 3729(a)(2); 31 U.S.C. § 3729(a)(1)(B))

715.    Relator incorporates herein by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

716.    CVS Health, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to the payment of false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(2); 31 U.S.C. § 3729(a)(1)(B).

717.    CVS Health's false and fraudulent statements, including with respect to the safety and efficacy, superiority, and medical necessity and appropriateness of its drugs, to the public, to patients, to the Health Care Providers, were material to the Health Care Providers' decisions to prescribe these drugs and the United States' decisions to pay claims for these drugs and related services.

718.    The United States, unaware of the falsity of the claims and/or statements made by CVS Health, and in reliance on the accuracy of these claims and/or statements, paid and may continue to be paying or reimbursing for the Drugs prescribed to patients enrolled in Federal Programs.

719.    As a result of CVS Health's actions, as set forth above, the United States of America has been, and may continue to be, severely damaged.

## COUNT III
### (Violation of False Claims Act, 31 U.S.C. § 3729(a)(3); 31 U.S.C. § 3729(a)(1)(C))

720.    Relator incorporates herein by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

721.    As alleged above, CVS Health and the SSG/DNS Scheme Drug Makers knowingly conspired, and may still be conspiring, to commit acts in violation of 31 U.S.C. §§ 3729(a)(1) & (a)(2); 31 U.S.C. §§ 3729(a)(1)(A) & (a)(1)(B). CVS Health and the SSG/DNS Scheme Drug Makers committed overt acts in furtherance of the conspiracy as alleged above.

722.    As a result of CVS Health's and the SSG/DNS Scheme drug makers' actions, as set forth above, the United States of America has been, and may continue to be, severely damaged.

## COUNT IV[444]
## (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(G))

723.    Relator incorporates herein by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

724.    As alleged above, CVS Health knowingly made, used, and/or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the Government, and/or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government pursuant to § 3729(a)(1)(G).

725.    As a result of CVS Health's actions as set forth above, the United States of America has been, and may continue to be, severely damaged.

## PRAYER FOR RELIEF

**WHEREFORE,** Relator prays for judgment against CVS Health as follows:

A.    That CVS Health be ordered to cease and desist from submitting or causing to be submitted any more false claims, or further violating 31 U.S.C. §§ 3729 *et seq.*;

B.    That judgment be entered in Relator's favor and against CVS Health in the amount

---

[444] Relator acknowledges that Count IV has been dismissed (ECF Nos. 49-50) but repleads this Count to preserve all issues for appeal. *See U.S. ex rel. Atkinson v. PA. Shipbuilding Co.*, 473 F.3d 506, 515-17 (3d Cir. 2007).

of each and every false or fraudulent claim, multiplied as provided for in 31 U.S.C. § 3729(a), plus a civil penalty of not less than eleven thousand one hundred eighty-one ($11,181) or more than twenty-two thousand three hundred sixty-three dollars ($22,363) per claim as provided by 31 U.S.C. § 3729(a)(1), to the extent such multiplied penalties shall fairly compensate the United States of America for losses resulting from the various schemes undertaken by CVS Health, together with penalties for specific claims to be identified at trial after full discovery;

C.    That Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d).

D.    That CVS Health be ordered to disgorge all sums by which they have been enriched unjustly by their wrongful conduct;

E.    That judgment be granted for Relator against CVS Health for all costs, including, but not limited to, court costs, expert fees and all attorneys' fees and costs incurred by Relator in the prosecution of this suit;

F.    That Relator be granted such other and further relief as the Court deems just and proper;

G.    That the Court issue an order enjoining CVS Health from continuing to engage in the fraudulent conduct alleged herein; and

H.    That this Court award such further relief as it deems just and proper.

## JURY TRIAL DEMAND

Relator demands a trial by jury of all issues so triable.

Dated:  August 7, 2023                         <u>/s/ W. Scott Simmer</u>

W. Scott Simmer (*pro hac vice*)
William G. Powers (PA Bar No. 316876)
Michael von Klemperer (*pro hac vice*)
BARON & BUDD, P.C.
The Watergate
600 New Hampshire Ave. NW,
10th Floor
Washington, DC 20037
Telephone: (202) 333-4562
Facsimile: (202) 337-1039

Joe H. Tucker, Jr., Esquire
Scott E. Diamond, Esquire
Ten Penn Center
1801 Market Street, Suite 2500
Philadelphia, PA 19103
(215) 875-0609
jtucker@tlgattorneys.com
sdiamond@tlgattorneys.com

*Counsel for Relator Ellsworth Associates, LLP*

239

**CERTIFICATE OF SERVICE**

I certify that on August 7, 2023 this document was filed electronically, that it is available for viewing and downloading from the ECF system, and that all counsel of record will be served by the ECF system.

*/s/ W. Scott Simmer*