# EXHIBIT 2



Janaury 22, 2024

**<u>VIA EMAIL</u>**
Bruce P. Merenstein, Esq.
Welsh & Recker, P.C.
306 Walnut Street
Philadelphia, Pennsylvania 19106
bmerenstein@welshrecker.com

     Re:   *United States of America ex rel. Ellsworth Associates, LLP v. CVS Health Corp., et al.*,
           Plaintiff-Relator's Discovery Dispute Letter No. 6

Dear Special Discovery Master Merenstein:

     Pursuant to the Stipulation and Order Governing Special Discovery Master Protocol, Plaintiff-Relator Ellsworth Associates, LLP ("Relator") respectfully presents the following discovery disputes for your immediate consideration. The Defendants[1] provided production volumes 7, 8, and 9 on the final day for document discovery, December 1, 2023. That document production consisted of approximately 31,000 documents and 274,393 pages of production, including claims data comprising approximately 11 million records. Plaintiff believes this production contains significant deficiencies. The parties met and conferred regarding deficiencies after the production on December 1, 2023, and have reached an impasse.

**I.     Defendants Should be Ordered to Search all Reasonably Available Data Sources that are Expected to House Relevant Custodial Documents**

     On December 5th and 7th (Ex. A), Plaintiff inquired about the status of CVS's production and specifically whether custodial sources other than just email were searched. Defendants said Plaintiff is not entitled to a list of custodial sources searched. Defendants also noted that they did not search custodial data sources other than email such as the hard drives of custodians' computers. This is despite Defendants determining that those non-email custodial sources do contain some relevant documents, but that those sources "were unlikely to house significant numbers of relevant documents."

---

[1] CVS Health Corporation f/k/a CVS Caremark Corporation ("CVS Health"), SilverScript Insurance Company, LLC ("SilverScript"), Caremark LLC f/k/a Caremark, Inc. ("Caremark LLC"), CVS Pharmacy Inc. ("CVS Pharmacy"), and CVS Caremark Part D Services LLC ("CVS Caremark Part D") are collectively referred to herein as "Defendants."

January 22, 2024
Page 2

Discovery of electronically stored information ("ESI") need not be provided when sources are "not reasonably accessible because of undue burden or cost." *See* F.R.C.P. 26(b)(2)(B). A party objecting to a request on "undue burden or cost grounds" is obligated to show that the ESI sought is "not reasonably accessible." *See* Rule 26(b)(2)(B). Furthermore, "[t]he responding party must also identify, by category or type, the sources containing potentially responsive information that it is neither searching nor producing. The identification should, to the extent possible, provide enough detail to enable the requesting party to evaluate the burdens and costs of providing the discovery and the likelihood of finding responsive information on the identified sources." Advisory Committee Notes to 2006 Amendment to F.R.C.P. 26(b)(2).

Defendants have violated Rule 26 because they have not searched reasonably accessible ESI, they have not shown why the unsearched sources are "not reasonably accessible," and because they refuse to provide information about what sources they are not searching. Defendants admit they have not searched custodial data sources such as local hard drives. *See* F.R.C.P. 26(b)(2)(B); *see also* F.R.C.P. 34 (not limiting ESI to emails, and instead puts ESI on equal footing with paper document sources kept in the usual course of business and explicitly mentions document categories in addition to emails.); Ex. B - Dkt. 74 (specifically noting that "[t]he term 'Document includes Hard-Copy Documents, Electronic Documents, and other ESI.").

Defendants do not properly justify their decision not to search these common custodial data sources. Defendants' obligation is not to produce documents only from sources that they unilaterally determine may house "significant" numbers of responsive documents. Even a single relevant document can be a critical document for the trier of fact.[2] Plaintiff here has met its burden of demonstrating that CVS' search strategy was unreasonable because CVS admits they expect to find responsive documents in non-email custodial sources, and still did not perform even the ESI-keyword searches on those and other sources. In fact, the keyword searches and the

---

[2] By way of example, if the Plaintiff were asked for all agreements she had with CVS, and she only searched her filing cabinet and then claimed she did not search her briefcase because she believed there would not be very many responsive documents there, that would not be a valid reason not to provide any documents contained in her briefcase. Furthermore, any argument that this analogy breaks down because the burden of searching non-email custodial sources is significantly larger than with a briefcase fails because the party resisting discovery on the grounds that it is overly burdensome "must show specifically how… each [request]… is burdensome or oppressive." *Josephs v. Harris Corp.*, 677 F.2d 985, 992 (3d Cir. 1982) citing *Roesberg v. Johns-Manville Corp.*, 85 F.R.D. 292, 296-97 (E.D.Pa. 1980). Defendants have failed to provide any declaration or affidavit to support an assertion of burden here. As part of the meet and confer correspondence, Defendants cited to *Winn-Dixie Stores, Inc. v. Eastern Mushroom Marketing Cooperative*, 2020 WL 3498161, *3 (E.D. Pa. Jun. 29, 2020), for the proposition that it is Plaintiff's obligation to show that Defendants' search strategy was unreasonable, is unavailing. First, in *Winn-Dixie* the Defendant used the agreed-upon search terms in both email systems "**and/or other documents on the [Defendants] servers,**" reviewed paper files, and they also contacted former salespeople and had them all search their files that might have had the requested documents and then affirmatively stated they found no responsive documents. *Id.* at *2. Consistent with *Winn-Dixie*, Plaintiff here is asking for the same -- a comprehensive search of data sources expected to house relevant documents.

January 22, 2024
Page 3

TAR process are intended to lessen the burden of Defendants' discovery when searching custodial data sources beyond email.[3]

The parties jointly stipulated that "[t]he parties shall conduct discovery in a cooperative manner… [T]his shall include cooperation and reasonable transparency in the search, collection, and production process (e.g., disclosing proposed custodians and search terms, ***disclosing technical details regarding computer systems containing relevant ESI***….." Ex. B - Dkt. 74 at p.1.

Despite this Order, Defendants have refused Plaintiff's reasonable request for information about the custodial search, citing merely to the portion of the ESI protocol that provides that "no provision herein alters any provision of the Federal rules of Civil Procedure, local rules, or applicable law." But the Federal Rules require the identification of "the sources containing potentially responsive information that [the responding party] is neither searching nor producing." Advisory Committee Notes to 2006 Amendment to Fed. R. Civ. P. 26(b)(2); *Star Direct Telecom, Inc. v. Glob. Crossing Bandwidth, Inc.*, 272 F.R.D. 350, 359 (W.D.N.Y. 2011). In fact, the rules go further to require that "[t]he identification should, to the extent possible, provide enough detail to enable the requesting party to evaluate the burdens and costs of providing the discovery and the likelihood of finding responsive information on the identified sources." *Id.* Defendants continue to refuse to provide the Plaintiff relevant responsive documents from accessible custodial data sources, such as local computer hard drives or provide sufficient transparency to determine if additional data sources were improperly omitted from their search methodology.

Plaintiff seeks an order compelling Defendants to search all reasonably accessible data sources and to provide transparency related to its search methodology, including the identification of searched data sources and existing data sources not searched.

## II. Defendants Should Be Ordered to Search and Provide Documents That Comprise Instant Message ("IM") Communications.

Plaintiff seeks an order compelling Defendants to search for and produce relevant instant message communications. Plaintiff's December 7, 2023 meet and confer email (Ex. A), evidences its request for the production of company instant messaging communications. Plaintiff identified specific occasions during her deposition where, while working for Defendants, she used their instant message system to communicate with other employees, including instances where she raised concerns about the impropriety of Defendants' activities that form the basis for her complaint. (Ex. C – Miller 9/19/23 Deposition at p. 28:11-18.)

Additionally, Ms. Miller produced and was questioned at her deposition about instant message communications she had while employed at CVS. See Ex. 6 to Miller deposition produced as ELLSWORTH 000002 (Ex. D). Additionally, Defendants' production contains documents discussing the "Do Not Substitute (DNS) Strategy" at the heart of the Plaintiff's

---

[3] Such as Custodian's local computer files, custodian's records, custodian's notes, custodian's physical documents, custodian's cloud-based storage/filing systems, custodian's non-email communications.

January 22, 2024
Page 4

claims that evidence discussion between company personnel over Instant Messaging Systems. *See* Ex. E - CVS-Ellsworth_00013674) ("Sorry I missed your IM yesterday evening. There is one highly utilized drug that will need to be launched into the strategy as soon as it becomes available as a generic." Similarly, at CVS-Ellswoth_00023321 (Ex. F), CVS personnel discussing "Brand Over Generic (BOG) Strategy" refers to Instant Message communications wherein they are discussing which drugs are to be part of the strategy.

Despite the ample evidence that IMs contain discoverable information, Defendants have stated that they are not searching IMs for the vast majority of custodians. To justify their choice, Defendants say that IMs are not retained in the normal course of business beyond 30 days. But CVS also admits that employees can (and do) manually save IMs. In fact, CVS has agreed to search manually saved IMs of only two custodians: Ms. Miller and Kristen Ferraco. Notably, the custodians CVS has agreed to search are limited to those that CVS is likely to use either for defensive discovery or an affirmative defense. Such gamesmanship should be rejected.

CVS should be ordered to search any IMs that are in their possession, custody or control which have been saved by any document custodian. While CVS claims that doing so is overly burdensome, they cannot justify their position. This is particularly so when they have agreed to search some, but not all the custodians' manually saved IMs. Furthermore, even if there can be no burden for custodians who did not manually save IMs, still in those instances CVS refuses to even look to determine if other custodians have IMs manually saved.

Plaintiff has adequately identified that CVS employees used internal Instant Message systems to communicate about relevant information that is otherwise absent from the document production because data sources that may contain such communications were systematically excluded from ESI searches. Defendants' claim that IM conversations are not regularly logged or maintained by CVS provides no support for them failing to search all available data sources using the agreed-upon keywords that might identify personally saved IM conversations or otherwise logged or archived IM conversations. And here again, Defendants have failed to evidence any burden that would make performing these searches overly burdensome or oppressive.

Plaintiff seeks an order compelling Defendants to search all available custodial and non-custodial sources likely to house such information for relevant instant message communications.

## III. Defendants Should Be Ordered to Remove "Confidential" Designations and Reproduce Improperly Redacted Documents.

On January 10, 2023, Plaintiff inquired about numerous documents that had been produced with questionable redactions. Ex. G. Included within the documents produced by the Defendants are numerous documents with in-line redactions that simply note "Confidential Redaction." There is no basis for the Defendants to redact information they unilaterally determine is confidential in an otherwise relevant document. Defendants indicated they redacted P&T committee member names under this "Confidential" moniker. Ex. G, Routh 1/16/24 email point 1. Defendants have not identified any statute, law, regulation, or case that provides an exception to production for this information. In fact, Ms. Routh also represented that "The P&T

January 22, 2024
Page 5

Committee is charged with reviewing all drugs on CVS Caremark approved drug lists and the approvals made are non-biased, quality driven, and evidence based. The clinical merit of the drug, not the cost, is the primary consideration of the P&T Committee." This factual assertion is subject to testing and examination. Plaintiff's ability to do so is hampered by these inappropriate redactions. For example, if the persons on the P&T Committee are categorically unqualified to perform such tasks that undermines the claim.  Likewise, if the persons on the P&T Committee are all in the marketing department or were actuaries, that calls into question the claim that clinical merit and not cost are the primary considerations of the Committee, and Plaintiff should not be forced to accept as uncontroverted fact the unverified word of Defense counsel on the issue.

Moreover, the parties have entered into a protective order which contemplated both "confidential" and "attorney-eyes-only" designation categories. The Defendants' production is replete with documents designated with these two categories. To also then redact information as "confidential" undermines the purpose of the Protective Order altogether. As an example, CVS-Ellsworth_00375299 (Ex. H) contains a large redaction box that completely obscures the email recipients in their entirety as well as the signature block in the email, thereby obscuring the email sender's name and position as well. The Protective Order in this case explicitly prohibits these "confidentiality" redactions:

> Unless otherwise agreed by the parties on a case-by-case basis, the parties will not use the designation of a documents' Confidential designation as a basis for applying redactions when producing discovery material.

Ex. I – Dkt. 73 - Protective Order, p. 5 at ¶ 9. Moreover, these redactions were omitted from the privilege log served by the Defendants that identifies both withheld documents and in-line redactions for facially appropriate purposes such as "Attorney Client Privileged" documents or information, further undermining the Plaintiff's ability to prosecute its case. Fed. R. Civ. Proc. 26(b)(5)(A).

Plaintiff seeks an order that all documents withheld or otherwise redacted based on the "Confidential" designation should be produced in full and/or unredacted.

## IV.    Defendants Should Be Ordered to Remove and/or Limit PHI Redactions and Reproduce Overly Redacted Documents.

Defendants' production includes documents that contain PHI redactions. Assuming redacting PHI is appropriate at all where the parties have entered into a Protective Order including HIPAA confidentiality provisions, CVS has even then vastly over-redacted based on the assertion of PHI. During the meet and confer process, Plaintiff has now learned that Defendants have used the "PHI Redaction" notation for information that is unquestionably not PHI at all.

January 22, 2024
Page 6

    By way of example, in CVS-Ellsworth_00379747 (Ex. J),[4] which is a spreadsheet where grievances reported by beneficiaries are tracked, Defendants redacted the beneficiary's name based on PHI grounds, but Defendants also then redacted wholesale columns of information titled "Description of Issue" and "Description of Resolution." First of all, once the identifying information such as the beneficiary's name is redacted, there is no reason to redact anything else because the identity of the patient is protected. Defendants represented in their meet and confer response that they redacted these columns using a "PHI redaction" indication to withhold information on relevance grounds. *See* Ex. G, Routh 1/16/24 email at point 2. Putting aside the deceptive nature of using a "PHI redaction" notation for relevance, Defendants have provided no basis to redact a portion of an otherwise relevant and responsive document on the grounds of relevance. As is often the case, narrative fields related to drugs which are not at issue here can provide context for language used, policies applied, and procedures followed in connection with the entries related to the drugs at issue.

    Plaintiff's claims implicate misstatements made in connection with drug prescription fills. If a beneficiary complains that a prescription was filled inappropriately or if misrepresentations or fraudulent statements are made during the prescription fill process, that is highly probative of the claims at issue here. Similarly, the Description of Resolution column likely contains highly probative information related to the manner and method of both responding to and resolving the potentially fraudulent transaction. *See Gen. Motors LLC v. Ashton*, No. CV2012659RBKEAP, 2023 WL 1765711, at *3-4 (D.N.J. Feb. 3, 2023) ("The majority of federal courts have held that 'unilateral redactions based on one party's subjective view of relevancy are improper'" because "unilateral redaction of responsive documents is inconsistent with Federal Rule of Civil Procedure 26's overarching purpose of permitting broad discovery.").[5] The *Ashton* Court was persuaded by the argument that such unilateral redactions "deprive both [the parties] and the factfinder of necessary context for the scattered excerpts that [the producing party] has deemed relevant" which then can "prejudice [the receiving party] in his ability to use these documents." *Id.* at *3.

    <u>Plaintiff seeks an order that all PHI Redactions should be limited to only actual PHI information and narrowly tailored to redact only true PHI (such as names and social security numbers from relevant documents).</u>

---

[4] We provided a truncated spreadsheet for ease of viewing the example, the full spreadsheet can be provided in native Excel format by request.

[5] Additionally, the *Ashton* Court notes that Rule 34 requires a party to "produce documents as they are kept in the usual course of business" and "because copies produced by a party must be identical to the original documents kept in the usual course of business, it follows that a party must provide unredacted documents as they exist in the party's possession." *Id.* (citation omitted.) This is especially noteworthy, because defendants here wield this rule as a shield by claiming their production was done based on how the documents are "kept in the usual course of business" to reject Plaintiff's demand that they identify categories of documents produced within their production by bates range. (See Ex. G, Routh 1/16/24 email at point 3.) Defendants should be prevented from using this rule as both a sword and a shield.

January 22, 2024
Page 7

## V.     Conclusion

Plaintiff respectfully requests a hearing to address these critical issues.

Respectfully submitted,

_____

Joe H. Tucker, Jr., Esquire
Scott E. Diamond, Esquire
Ten Penn Center
1801 Market Street, Suite 2500
Philadelphia, PA 19103
Telephone: (215) 875-0609
jtucker@tlgattorneys.com
sdiamond@tlgattorneys.com

W. Scott Simmer (pro hac vice)
William G. Powers (PA Bar No. 316876)
BARON & BUDD, P.C.
The Watergate
600 New Hampshire Ave. NW, 10th Floor
Washington, DC 20037
Telephone: (202) 333-4562
Facsimile: (202) 337-1039

Daniel Alberstone (pro hac vice)
Evan Zucker (pro hac vice)
Peter Klausner (pro hac vice)
Elizabeth Smiley (pro hac vice)
BARON & BUDD, P.C.
15910 Ventura Boulevard, Suite 1600
Encino, California 91436
Telephone: (818) 839-2333
Facsimile: (214) 520-1181

Counsel for Relator Ellsworth Associates, LLP

Exhibit A

**Evan M. Zucker**

---

| | |
|---|---|
| **From:** | Will Powers |
| **Sent:** | Friday, December 8, 2023 2:04 PM |
| **To:** | Routh, Jenn; Rodriguez, Annabel |
| **Cc:** | Scott Simmer; Brian Williams; Evan M. Zucker; Elizabeth Smiley; Peter Klausner; Diskant, Ted; Suominen, Katie; Dan Alberstone |
| **Subject:** | RE: Ellsworth/CVS- Production |

We disagree with your points in your email, especially because it stands to reason that if your process was so defensible you wouldn't have any issues telling us the custodial sources you searched. Doing so would help keep this dispute from getting to the special master but so be it.

I also note that I asked clarifying questions about the TAR metrics you provided. When can we expect a response to those? They are pretty simple.

**Will Powers**
Baron & Budd, PC | Shareholder
600 New Hampshire Ave. NW
The Watergate, 10th Floor
Washington, DC 20037

202.333.4562 main
202.333.4762 direct
202.394.2966 mobile

www.baronandbudd.com

Dallas | Austin | Baton Rouge | New Orleans | Los Angeles
San Diego | Chico | New York | Washington, D.C.

---

**From:** Routh, Jenn <Jrouth@mwe.com>
**Sent:** Friday, December 8, 2023 12:35 PM
**To:** Will Powers <wpowers@baronbudd.com>; Rodriguez, Annabel <Anrodriguez@mwe.com>
**Cc:** Scott Simmer <ssimmer@baronbudd.com>; Brian Williams <brwilliams@baronbudd.com>; Evan M. Zucker <ezucker@baronbudd.com>; Elizabeth Smiley <esmiley@baronbudd.com>; Peter Klausner <pklausner@baronbudd.com>; Diskant, Ted <Ediskant@mwe.com>; Suominen, Katie <Ksuominen@mwe.com>; Dan Alberstone <dalberstone@baronbudd.com>
**Subject:** RE: Ellsworth/CVS- Production

Will,

We agree that discovery is furthered by mutual cooperation and transparency.  But you have invoked that clause repeatedly throughout this litigation to demand a level of invasiveness into our collection and review that is inappropriate and that, with respect to TAR, for example, has already been rejected by Special Master Merenstein.  I should add that when we asked your clients custodial questions during their depositions about how they conducted reviews for you, you repeatedly interspersed privilege objections and we are similarly not waiving privilege as to any aspect of our dialogue with our clients or our review.

1

I would also note that our ESI Protocol further provides that "no provision herein alters any provision of the Federal Rules of Civil Procedure, local rules, or applicable law." We have complied with the Federal Rules and shared more information with you about the thoroughness of our collection work than is required. We previously discussed with you the numerous categories of documents that we collected such as rebate agreements, claims data, DIR data, marketing materials, materials pertaining to CMS audits, formularies, call scripts, and the like. Moreover, as you know, you had perfect insight and significant input into the email custodians and search terms used to derive the million documents we reviewed just in email data. Finally, and as we assume you have done with your clients, in the process of meeting with ours we have asked and will continue to ask questions and will produce additional responsive materials should we discover them.

So with that said, we don't believe we have an obligation to go further and, in particular, to give you even further granular detail on our collection and review process. If there are documents that you expected to receive, which you have not, please identify them immediately and we will work with you promptly to resolve any deficiencies you perceive. It is, after all, your burden to demonstrate that our search was unreasonable. *See, e.g., Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Coop.*, 2020 WL 3498161, *3 (E.D. Pa. Jun. 29, 2020) ("The problem with Plaintiffs' argument is that it wrongly assumes the burden is on Defendants to provide enough information to prove their document search was reasonable. The burden, however, rests with Plaintiffs to show that Defendants' search was not reasonable. Plaintiffs cannot carry that burden by pointing to all the information they do not know about Defendants' methodology.").

Thanks,
Jenn

JENNIFER B. ROUTH
Partner
**McDermott Will & Emery LLP** The McDermott Building, 500 North Capitol Street, NW, Washington, DC 20001-1531
**Tel** +1 202 756 8165 **Mobile** +1 202 679 3260 **Email** jrouth@mwe.com
Biography | Website | vCard | Twitter | LinkedIn

---

**From:** Will Powers <wpowers@baronbudd.com>
**Sent:** Thursday, December 7, 2023 8:05 PM
**To:** Routh, Jenn <Jrouth@mwe.com>; Rodriguez, Annabel <Anrodriguez@mwe.com>
**Cc:** Scott Simmer <ssimmer@baronbudd.com>; brwilliams <brwilliams@baronbudd.com>; Evan M. Zucker <ezucker@baronbudd.com>; Elizabeth Smiley <esmiley@baronbudd.com>; Peter Klausner <pklausner@baronbudd.com>; Diskant, Ted <Ediskant@mwe.com>; Suominen, Katie <Ksuominen@mwe.com>; Dan Alberstone <dalberstone@baronbudd.com>
**Subject:** RE: Ellsworth/CVS- Production

[ External Email ]
Jenn,

The parties agreed in the ESI protocol that "the efficient and just resolution of this matter will be furthered by ***mutual cooperation and transparency*** in responding to the parties' request for documents…" (order at p. 1) The continued stonewalling of what sources was searched violates the most basic tenet of mutual cooperation and transparency called for in the Order. This idea is furthered at section IV.A. wherein the order says "[t]he parties shall conduct discovery in a cooperative manner… this shall include cooperation and reasonable transparency in the search, collection, and production process (e.g., disclosing proposed custodians and search terms, disclosing technical details regarding

computer systems containing relevant ESI… The parties shall disclose enough detail regarding their search, collection, and production methods such that the opposing party is able to fairly evaluate the methodologies and challenge them if necessary." By refusing to provide basic information about what sources of information you have or have not searched you have failed to meet these transparency obligations. This is especially troublesome now that you have confirmed you did not search some undefined number of sources because you apparently internally "determined were unlikely to house significant numbers of relevant documents." Again, the transparency requirements require you disclose the methodology they used to exclude data sources with potentially relevant documents sufficient for us to evaluate and challenge it, which you are refusing to do.

**Will Powers**
Baron & Budd, PC | Shareholder
600 New Hampshire Ave. NW
The Watergate, 10th Floor
Washington, DC 20037

202.333.4562 main
202.333.4762 direct
202.394.2966 mobile

www.baronandbudd.com

Dallas | Austin | Baton Rouge | New Orleans | Los Angeles
San Diego | Chico | New York | Washington, D.C.

---

**From:** Routh, Jenn <Jrouth@mwe.com>
**Sent:** Thursday, December 7, 2023 2:09 PM
**To:** Will Powers <wpowers@baronbudd.com>; Rodriguez, Annabel <Anrodriguez@mwe.com>
**Cc:** Scott Simmer <ssimmer@baronbudd.com>; Brian Williams <brwilliams@baronbudd.com>; Evan M. Zucker <ezucker@baronbudd.com>; Elizabeth Smiley <esmiley@baronbudd.com>; Peter Klausner <pklausner@baronbudd.com>; Diskant, Ted <Ediskant@mwe.com>; Suominen, Katie <Ksuominen@mwe.com>; Dan Alberstone <dalberstone@baronbudd.com>
**Subject:** RE: Ellsworth/CVS- Production

Will,

In response to your 81 document requests, we went through a months-long process of talking to custodians about where responsive documents might reside, pulling relevant non-email data, reviewing that data, and producing responsive documents to you.  If you have authority for the proposition that you are entitled to "a comprehensive list of all non-custodial sources from which production was made" we will review it, but to catalogue all the steps we took and all the data sources we pulled from over approximately seven months would be near impossible.  Your list below includes locations we determined were unlikely to house significant numbers of relevant documents (i.e., local hard drives) and it omits locations we determined warranted collection and review (i.e., relevant shared-drive directories).  Our obligation is to conduct a reasonable and diligent search, and we believe that we have more than satisfied our obligation under the circumstances.

Thanks,
Jenn

JENNIFER B. ROUTH
Partner
**McDermott Will & Emery LLP**  The McDermott Building, 500 North Capitol Street, NW, Washington, DC 20001-1531

**Tel** +1 202 756 8165     **Mobile** +1 202 679 3260     **Email** jrouth@mwe.com
Biography | Website | vCard | Twitter | LinkedIn

---

**From:** Will Powers <wpowers@baronbudd.com>
**Sent:** Thursday, December 7, 2023 12:16 PM
**To:** Routh, Jenn <Jrouth@mwe.com>; Rodriguez, Annabel <Anrodriguez@mwe.com>
**Cc:** Scott Simmer <ssimmer@baronbudd.com>; brwilliams <brwilliams@baronbudd.com>; Evan M. Zucker <ezucker@baronbudd.com>; Elizabeth Smiley <esmiley@baronbudd.com>; Peter Klausner <pklausner@baronbudd.com>; Diskant, Ted <Ediskant@mwe.com>; Suominen, Katie <Ksuominen@mwe.com>; Dan Alberstone <dalberstone@baronbudd.com>
**Subject:** RE: Ellsworth/CVS- Production

[ External Email ]

Jenn, you still are not answering my question in a straightforward way. You say that you searched beyond custodial emails, but what have you searched beyond the emails? Is what has been searched just the non-custodial data?

The critical question is what sources of information is CVS searching for the custodians in this case? You have made clear that you are searching emails. You have made clear that you are not searching any IMs that a custodian may have saved (with two exceptions). I laid out numerous sources of information in the email below (e.g. custodian's local computer files, custodian's records, custodian's notes, custodian's physical documents, custodian's cloud-based storage/filing systems, custodian's non-email communications) and we do not have a straight answer on whether CVS is searching those locations for responsive documents. Given the lack of a clear answer on what is a pretty straightforward question leads us to believe that you are not searching those sources.

**Will Powers**
Baron & Budd, PC | Shareholder
600 New Hampshire Ave. NW
The Watergate, 10th Floor
Washington, DC 20037

202.333.4562 main
202.333.4762 direct
202.394.2966 mobile

www.baronandbudd.com

Dallas | Austin | Baton Rouge | New Orleans | Los Angeles
San Diego | Chico | New York | Washington, D.C.

---

**From:** Routh, Jenn <Jrouth@mwe.com>
**Sent:** Thursday, December 7, 2023 12:04 PM
**To:** Will Powers <wpowers@baronbudd.com>; Rodriguez, Annabel <Anrodriguez@mwe.com>
**Cc:** Scott Simmer <ssimmer@baronbudd.com>; Brian Williams <brwilliams@baronbudd.com>; Evan M. Zucker <ezucker@baronbudd.com>; Elizabeth Smiley <esmiley@baronbudd.com>; Peter Klausner <pklausner@baronbudd.com>; Diskant, Ted <Ediskant@mwe.com>; Suominen, Katie <Ksuominen@mwe.com>; Dan Alberstone <dalberstone@baronbudd.com>
**Subject:** RE: Ellsworth/CVS- Production

Will,

You are aware that we searched for responsive documents in locations other than custodial emails because we have explicitly discussed the fact that we were doing so repeatedly in the past.

Given that, I cannot possibly think of a good faith basis for you to make such an assertion or put the same in a filing with the Court.

Thanks,
Jenn

JENNIFER B. ROUTH
Partner
**McDermott Will & Emery LLP**  The McDermott Building, 500 North Capitol Street, NW, Washington, DC 20001-1531
**Tel** +1 202 756 8165    **Mobile** +1 202 679 3260    **Email** jrouth@mwe.com
Biography | Website | vCard | Twitter | LinkedIn

---

**From:** Will Powers <wpowers@baronbudd.com>
**Sent:** Thursday, December 7, 2023 11:51 AM
**To:** Routh, Jenn <Jrouth@mwe.com>; Rodriguez, Annabel <Anrodriguez@mwe.com>
**Cc:** Scott Simmer <ssimmer@baronbudd.com>; brwilliams <brwilliams@baronbudd.com>; Evan M. Zucker <ezucker@baronbudd.com>; Elizabeth Smiley <esmiley@baronbudd.com>; Peter Klausner <pklausner@baronbudd.com>; Diskant, Ted <Ediskant@mwe.com>; Suominen, Katie <Ksuominen@mwe.com>; Dan Alberstone <dalberstone@baronbudd.com>
**Subject:** RE: Ellsworth/CVS- Production

**[ External Email ]**
Jenn, our question below about whether you have searched for responsive documents in locations other than custodial emails and non-custodial data sources is one that you should already know the answer to. Unless we hear from you we will assume you did not search beyond emails and non-custodial data and put that information in our motion to extend the case deadlines.

**Will Powers**
Baron & Budd, PC | Shareholder
600 New Hampshire Ave. NW
The Watergate, 10th Floor
Washington, DC 20037

202.333.4562 main
202.333.4762 direct
202.394.2966 mobile

www.baronandbudd.com

Dallas | Austin | Baton Rouge | New Orleans | Los Angeles
San Diego | Chico | New York | Washington, D.C.

---

**From:** Will Powers
**Sent:** Wednesday, December 6, 2023 8:15 PM
**To:** Routh, Jenn <Jrouth@mwe.com>; Rodriguez, Annabel <Anrodriguez@mwe.com>
**Cc:** Scott Simmer <ssimmer@baronbudd.com>; Brian Williams <brwilliams@baronbudd.com>; Evan M. Zucker <ezucker@baronbudd.com>; Elizabeth Smiley <esmiley@baronbudd.com>; Peter Klausner <pklausner@baronbudd.com>; Diskant, Ted <Ediskant@mwe.com>; Suominen, Katie <Ksuominen@mwe.com>; Dan Alberstone <dalberstone@baronbudd.com>
**Subject:** RE: Ellsworth/CVS- Production

Jenn,

I'm just looking for a straight answer on whether CVS considers its document production complete as of December 1 and I'm hearing equivocation. First, you note that CVS's production is "generally" complete.  With the exceptions you note, is CVS' production otherwise completely complete, yes or no?

You also note that "voluminous data" was produced that was not part of the email data. We understand from your December 2 letter that CVS-Ellsworth_00381850-51 contain data production.  Please identify any other data produced that was not part of the "email data."

But emails and non-custodial data (like the claims data, formulary exception data, etc.) are not the only sources that CVS should be searching and producing responsive documents from. For example, custodian's local computer files, custodian's records, custodian's notes, custodian's physical documents, custodian's cloud-based storage/filing systems, custodian's non-email communications, etc. are all part of a custodian's records that are expected to be produced. You have already stated that you are only searching the manually saved IMs of only two custodians (which we disagree with). Please confirm that custodial searches were not limited to just emails. Also, please provide us a comprehensive list of all non-custodial sources from which production was made.

Thank you for the TAR metrics. We have a couple clarifying questions about them which are outlined in red:

- **Metrics:**
  - Number of documents tagged responsive as the result of human review: 15,841
    - What does this number represent? It is our understanding that CVS started its review with linear human review before switching to TAR. Is this number of documents marked as responsive resulting from that linear human review? If yes, how many documents were reviewed in that linear review that resulted in the 15,841 being marked as responsive?
  - Size of the elusion set: 115,491
    - Is this the set that was marked as non-responsive by the TAR algorithm? If so, how many total documents were reviewed by the TAR algorithm (as opposed to the linear human review)?
  - Size of the elusion sample: 1,517
    - Is this is a sample of documents taken from the documents the TAR algorithm coded as not responsive to be manually reviewed? Please confirm.
  - Responsive rate of the elusion sample: 0.3296%
    - Is this % of documents that human coders marked as responsive from the elusion sample, i.e. the % of documents the human coders overruled the computer on in the sample set?
  - Estimated recall derived from the elusion: 97.65%
- How many documents were QC'd as low scoring and marked as responsive: 84
  - How many total documents were in the QC set reviewed?
- How many documents were QC'd as part of our targeted searches for high scoring and marked as not responsive: 26,513
  - You note that these documents were ID'd through "targeted searches" - how does this selection differ from the low scoring documents reviewed as part of QC process?
- How we generated random sampling populations and the total volume of that random sampling as part of our QC process: The Consilio team took a random sampling of the Responsive and Not Responsive documents that were reviewed by using the Sampling tool within Relativity to generate a fixed number of documents to QC.  The total volume of that random sampling is 3,213 documents.
  - Where does the "total volume" of 3,213 documents come from and what does it comprise? Is that a different QC sample set than the high and low-scoring

documents in the previous two bullet points (which would total over 26k documents)?

Thank you,

**Will Powers**
Baron & Budd, PC | Shareholder
600 New Hampshire Ave. NW
The Watergate, 10th Floor
Washington, DC 20037

202.333.4562 main
202.333.4762 direct
202.394.2966 mobile

www.baronandbudd.com

Dallas | Austin | Baton Rouge | New Orleans | Los Angeles
San Diego | Chico | New York | Washington, D.C.

---

**From:** Routh, Jenn <Jrouth@mwe.com>
**Sent:** Tuesday, December 5, 2023 9:17 PM
**To:** Will Powers <wpowers@baronbudd.com>; Rodriguez, Annabel <Anrodriguez@mwe.com>
**Cc:** Scott Simmer <ssimmer@baronbudd.com>; Brian Williams <brwilliams@baronbudd.com>; Evan M. Zucker <ezucker@baronbudd.com>; Elizabeth Smiley <esmiley@baronbudd.com>; Peter Klausner <pklausner@baronbudd.com>; Diskant, Ted <Ediskant@mwe.com>; Suominen, Katie <Ksuominen@mwe.com>; Dan Alberstone <dalberstone@baronbudd.com>
**Subject:** RE: Ellsworth/CVS- Production

Will,

CVS also produced voluminous data on Friday that was not part of email data.  CVS's production is generally complete with the exceptions I mentioned below.

The TAR metrics were not numbers I had at my fingertips, but I worked with the vendor to expedite getting those numbers per your request.
- **Metrics:**
  - Number of documents tagged responsive as the result of human review: 15,841
  - Size of the elusion set: 115,491
  - Size of the elusion sample: 1,517
  - Responsive rate of the elusion sample: 0.3296%
  - Estimated recall derived from the elusion: 97.65%
- How many documents were QC'd as low scoring and marked as responsive: 84
- How many documents were QC'd as part of our targeted searches for high scoring and marked as not responsive: 26,513
- How we generated random sampling populations and the total volume of that random sampling as part of our QC process: The Consilio team took a random sampling of the Responsive and Not Responsive documents that were reviewed by using the Sampling tool within Relativity to generate a fixed number of documents to QC.  The total volume of that random sampling is 3,213 documents.

Thanks,

*Jenn*

JENNIFER B. ROUTH
Partner
**McDermott Will & Emery LLP**  The McDermott Building, 500 North Capitol Street, NW, Washington, DC 20001-1531
**Tel** +1 202 756 8165   **Mobile** +1 202 679 3260   **Email** jrouth@mwe.com
**Biography | Website | vCard | Twitter | LinkedIn**

---

**From:** Will Powers <wpowers@baronbudd.com>
**Sent:** Tuesday, December 5, 2023 3:53 PM
**To:** Routh, Jenn <Jrouth@mwe.com>; Rodriguez, Annabel <Anrodriguez@mwe.com>
**Cc:** Scott Simmer <ssimmer@baronbudd.com>; brwilliams <brwilliams@baronbudd.com>; Evan M. Zucker <ezucker@baronbudd.com>; Elizabeth Smiley <esmiley@baronbudd.com>; Peter Klausner <pklausner@baronbudd.com>; Diskant, Ted <Ediskant@mwe.com>; Suominen, Katie <Ksuominen@mwe.com>; Dan Alberstone <dalberstone@baronbudd.com>
**Subject:** RE: Ellsworth/CVS- Production

**[ External Email ]**
Jenn,

Your email notes that CVS's production of "custodial email data" is complete. Please identify the status of CVS's production generally, including for non-custodial email data. Is the production of all documents/materials complete?

The TAR metrics are numbers you presumably have at your fingertips having just done your review. We see no reason to delay providing them today.

**Will Powers**
Baron & Budd, PC | Shareholder
600 New Hampshire Ave. NW
The Watergate, 10th Floor
Washington, DC 20037

202.333.4562 main
202.333.4762 direct
202.394.2966 mobile

www.baronandbudd.com

Dallas | Austin | Baton Rouge | New Orleans | Los Angeles
San Diego | Chico | New York | Washington, D.C.

---

**From:** Routh, Jenn <Jrouth@mwe.com>
**Sent:** Monday, December 4, 2023 6:53 PM
**To:** Will Powers <wpowers@baronbudd.com>; Rodriguez, Annabel <Anrodriguez@mwe.com>
**Cc:** Scott Simmer <ssimmer@baronbudd.com>; Brian Williams <brwilliams@baronbudd.com>; Evan M. Zucker <ezucker@baronbudd.com>; Elizabeth Smiley <esmiley@baronbudd.com>; Peter Klausner <pklausner@baronbudd.com>; Diskant, Ted <Ediskant@mwe.com>; Suominen, Katie <Ksuominen@mwe.com>; Dan Alberstone <dalberstone@baronbudd.com>
**Subject:** RE: Ellsworth/CVS- Production

Will,

CVS's production of custodial email data is complete with one exception: Defendants' privilege log is not yet complete.  If following the completion of the privilege log, there are any documents

that were initially coded privileged, which are later overturned or produced in redacted form, we will produce those documents promptly.

And of course, if there are any other documents that need to be produced consistent with Fed. R. Civ. P. 26(e), we will do so promptly.

We will endeavor to get you the TAR metrics data by tomorrow, but I am not aware of any deadline for us to do so.  Why do you need it by tomorrow?

Thanks,
Jenn

JENNIFER B. ROUTH
Partner
**McDermott Will & Emery LLP**  The McDermott Building, 500 North Capitol Street, NW, Washington, DC 20001-1531
**Tel** +1 202 756 8165   **Mobile** +1 202 679 3260   **Email** jrouth@mwe.com
**Biography** | Website | vCard | Twitter | LinkedIn

---

**From:** Will Powers <wpowers@baronbudd.com>
**Sent:** Monday, December 4, 2023 12:52 PM
**To:** Rodriguez, Annabel <Anrodriguez@mwe.com>
**Cc:** Scott Simmer <ssimmer@baronbudd.com>; brwilliams <brwilliams@baronbudd.com>; Evan M. Zucker <ezucker@baronbudd.com>; Elizabeth Smiley <esmiley@baronbudd.com>; Peter Klausner <pklausner@baronbudd.com>; Diskant, Ted <Ediskant@mwe.com>; Suominen, Katie <Ksuominen@mwe.com>; Dan Alberstone <dalberstone@baronbudd.com>; Routh, Jenn <Jrouth@mwe.com>
**Subject:** RE: Ellsworth/CVS- Production

**[ External Email ]**
Counsel,

Does CVS consider its production complete at this time? If so, please confirm. If not, please let us know what outstanding information you expect to still produce and when we can expect it.

Also, please provide the agreed upon metrics regarding your TAR process used. We expect those metrics by tomorrow COB at the latest.

**Will Powers**
Baron & Budd, PC | Shareholder
600 New Hampshire Ave. NW
The Watergate, 10th Floor
Washington, DC 20037

202.333.4562 main
202.333.4762 direct
202.394.2966 mobile

www.baronandbudd.com

Dallas | Austin | Baton Rouge | New Orleans | Los Angeles
San Diego | Chico | New York | Washington, D.C.

---

**From:** Rodriguez, Annabel <Anrodriguez@mwe.com>
**Sent:** Friday, December 1, 2023 11:58 PM

**To:** Will Powers <wpowers@baronbudd.com>
**Cc:** Scott Simmer <ssimmer@baronbudd.com>; Brian Williams <brwilliams@baronbudd.com>; Evan M. Zucker <ezucker@baronbudd.com>; Elizabeth Smiley <esmiley@baronbudd.com>; Peter Klausner <pklausner@baronbudd.com>; Diskant, Ted <Ediskant@mwe.com>; Suominen, Katie <Ksuominen@mwe.com>; Dan Alberstone <dalberstone@baronbudd.com>; Routh, Jenn <Jrouth@mwe.com>
**Subject:** Ellsworth/CVS- Production

Counsel:

Please find attached our production letter. You can access the production using the following link:  CVS-ELLSWORTH-PROD007 ,

The links to access the production, as well as the production is password protected and I will send the password in a separate email.

Please let me know if you have any questions.


Thank you.

ANNABEL RODRIGUEZ
Associate
**McDermott Will & Emery LLP**  200 Clarendon Street, Floor 58, Boston, MA 02116-5021
**Tel** +1 617 535 4063    **Email** anrodriguez@mwe.com
**Biography** | Website | vCard | Twitter | LinkedIn


*********************************************************************************************************
This message is a PRIVATE communication. This message and all attachments are a private communication sent by a law firm and may be confidential or protected by privilege. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of the information contained in or attached to this message is strictly prohibited. Please notify the sender of the delivery error by replying to this message, and then delete it from your system. Our Privacy Policy explains how we may use your personal information or data and any personal information or data provided or made available to us. Thank you.
*********************************************************************************************************

Please visit http://www.mwe.com/ for more information about our Firm.

Exhibit B

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* ELLSWORTH ASSOCIATES, LLP,<br><br>            Plaintiff-Relator,<br><br>v.<br><br>CVS HEALTH CORPORATION, *et al.*,<br><br>            Defendants. | Case No.: 2:19-cv-02553-JMY |

## STIPULATION AND ORDER ON DISCOVERY OF ELECTRONICALLY STORED INFORMATION

Pursuant to Fed. R. Civ. P. 16 and Fed. R. Civ. P. 26(f), the Court adopts and enters as an Order the parties' Stipulation and Order on Discovery of Electronically Stored Information. The procedures and protocols outlined herein govern the production of electronically stored information ("ESI") and paper documents that are produced in an electronic format (the "ESI Protocol") on or after the date of this Order. All disclosures and productions made pursuant to the ESI Protocol are subject to the Stipulated Qualified Protective Order. The parties will confer, if needed, for production formats for particular materials that are not addressed herein.

### I.    General Provisions

A.    Counsel for Plaintiff-Relator Ellsworth Associates, LLP and Defendants CVS Health Corporation, SilverScript Insurance Company, LLC, CVS Caremark Corporation, and CVS Pharmacy, Inc. (collectively "Defendants") have met and conferred regarding discovery of electronically stored information and have reached agreement on certain of the issues discussed regarding such discovery. The parties agree that the efficient and just resolution of this matter will be furthered by mutual cooperation and transparency in responding to the parties' requests for

1

documents, and the parties intend to promote, to the fullest extent possible, the resolution of disputes regarding the discovery of ESI without Court intervention. The parties do not intend by entering this stipulation to waive any privilege, work product protections, or other protections or objections in responding to discovery.

B.      The Federal Rules of Civil Procedure will govern discovery, and no provision herein alters any provision of the Federal Rules of Civil Procedure, local rules, or applicable law. The terms of this Order shall be construed to ensure the cost-efficient and cost-effective exchange of information consistent with the Federal Rules of Civil Procedure, local rules, and applicable law.

C.      This Protocol does not address, limit, or determine the authenticity, admissibility, or relevance of any Document.

D.      Nothing in this Protocol shall be interpreted to limit a Producing Party's right to conduct a review of Documents, including metadata, for relevance, responsiveness, or segregation of privileged or protected information before production.

E.      Any practice or procedure set forth herein may be varied by agreement of the parties, and such variance first will be confirmed in writing, where such variance is deemed appropriate to facilitate the timely and economical exchange of electronic data or other covered discovery materials.

F.      Should any party subsequently determine in good faith that it cannot proceed as required by this Order or that the Order requires modification, the parties will meet and confer to resolve any dispute before seeking Court intervention.

## II.      Definitions

A.      "**Confidentiality Designation**" means the legend affixed to Documents for

Confidential or Confidential Protected Health Information as defined by, and subject to, the terms of the parties' Stipulated Qualified Protective Order.

B.     **"Document"** has the meaning contemplated in the Federal Rules of Civil Procedure and, includes, without limitation, all ESI. The term "Document" includes Hard-Copy Documents, Electronic Documents, and other ESI.

C.     **"Electronic Document or Data"** means Documents that are in electronic form at the time of collection.

D.     **"Electronically stored information"** or **"ESI,"** means electronically stored information, as that term is used in Federal Rule of Civil Procedure 34(a).

E.     **"Hard-Copy Document"** means a document that is stored in paper form at the time of collection.

F.     **"Hash Value"** is a number that uniquely identifies a file or specific data and that is calculated using a standard mathematical hashing algorithm whose input comprises characteristics of the respective file or data.

G.     **"Load File"** is an electronic file that can assist in loading an electronic production set into a receiving party's document review platform.  For example, as described more fully below, a Metadata Load File contains Metadata about the electronic production set, and an Image Load File contains information to facilitate loading document images into the document review platform. The Producing Party shall produce a load file for all documents with each particular production in accordance with specifications provided herein.

H.     **"Media"** means an object or device, real or virtualized, including but not limited to a disc, tape, computer or other device, on which data is or was stored.

I.      **"Metadata"** are information embedded in or associated with an electronic

document that are generated automatically by the operation of a computer or other information technology system when the document is created, modified, transmitted, deleted, or otherwise manipulated.

    J.      "**Native Format**" means the original format of ESI in which it was generated, used and/or normally kept by the producing party in the usual course of its business and in its regularly conducted activities. For example, the native format of an Excel workbook is a .xls or .xlsx file.

    K.      "**OCR**" is an abbreviation for "optical character recognition" and references a process by which text contained within an Electronic Document in a non-searchable imaged format is converted to a searchable text format.

    L.      "**Producing Party**" means the Party producing documents during discovery.

    M.      "**Receiving Party**" means the Party receiving documents during discovery.

    N.      "**Static Image(s)**" means a representation of ESI produced by converting a Native File into a standard image format capable of being viewed and printed on standard computer systems. A Static Image may also be created by scanning a Hard-Copy Document. A Tagged Image File Format (TIFF) image is an example of a Static Image.

## III.    Form of Production

The parties will produce Documents in "a reasonably usable form." Fed. R. Civ. P. 34(a)(1)(A). If a Party has previously processed or produced certain Documents in a form that is different than that provided for herein, the Party is not required to produce the Documents in accordance with this protocol, provided that the form utilized is also "reasonably usable." The requesting party reserves the right to object to whether the form utilized is "reasonably usable." Notwithstanding the foregoing, the parties agree that the following forms of production are "reasonably usable": documents produced as TIFF images with load files utilizing Concordance default delimiters, and files produced in native format pursuant to Section III.B with an

accompanying placeholder image / slip sheet bearing the Bates number and any confidentiality designation required by the Parties' protective order.

### A. Paper Documents/Hard Copy Scanned Images.

1. Hard-Copy Documents shall be scanned to single page Group IV TIFF format, 300 dpi quality or better with corresponding searchable OCR text. Image file names will be identical to the corresponding Bates numbered images, with a ".tif" file extension. The file name of each text file should correspond to the file name of the first image file of the document with which it is associated. The production will include a Metadata Load File and an Image Load file as described more fully below in Section III.C. For Hard-Copy Documents, the Parties need only populate the following metadata fields: "BEGDOC," "ENDDOC," "CUSTODIAN," "CONFIDENTIALITY," and "REDACTION" fields, as well as "BEGATTACH" and "ENDATTACH" fields where applicable. The parties agree that to the extent the Producing Party scanned hard copy documents prior to the entry of this Order, the Producing Party is not required to re-scan those hard copy documents.

2. To the extent practicable, paper documents and hard copy scanned images shall be produced in the manner in which those documents were kept in the ordinary course of business. In scanning Hard-Copy Documents, distinct documents should not be merged into a single record, and single documents should not be split into multiple records (i.e., paper documents should be logically unitized). For example, Hard-Copy Documents stored in a binder, folder, or similar container should be produced in the same order as they appear in the container. The front cover of the container should be produced immediately before the first document in the container. The back cover of the container should be produced immediately after the last document in the container. The Parties will undertake reasonable efforts to, or have their vendors, logically unitize documents

correctly, and will commit to address situations of improperly unitized documents.

3.      Where a paper document or hard copy scanned image has identification spines, "post-it" notes, or any other labels, the information on the label shall be scanned and produced to the extent practicable.  In scanning a paper document, if a document is more than one page, to the extent reasonable, the unitization of the document and any attachments or affixed notes should be maintained as it existed when collected by the producing party.  The parties will utilize reasonable best efforts to ensure that paper documents and/or hard copy scanned images in a single production are produced in consecutive Bates number order.

**B.      ESI**

1.      Except as otherwise provided herein, the parties shall produce ESI in TIFF format with a Metadata Load File, an Image Load File, and a corresponding text file.  Word processing files, including Microsoft Word files, will be produced as TIFF images in "last saved" or "last modified" format and with tracked changes and comments showing in the TIFF image and searchable in the extracted text, to the extent tracked changes and comments exist in the "last saved" or "last modified" format.  Presentation files, including PowerPoint, will also be produced as TIFF images in "last saved" or "last modified" format with any speaker notes and hidden slides showing and searchable in the extracted text, to the extent speaker notes and hidden slides exist in "last saved" or "last modified" format.  Audio files in non-standard formats should be produced in MP3 or Native Format.  Unless redacted, the following files shall be produced in Native Format with extracted text and applicable Load Files:  (a) electronic spreadsheets (e.g., Excel); (b) desktop databases (e.g., Access); and (c) audio/video multimedia files.  A producing party may also elect to produce electronic presentations (*e.g.*, PowerPoint) in Native Format with extracted text and applicable metadata fields set forth in Attachment A; these files may otherwise be produced in

TIFF format as provided for herein. The parties reserve the right to request unredacted electronic presentations (*e.g.*, PowerPoint) produced in TIFF format in Native Format as necessary. If a document that otherwise would be produced in Native Format requires redaction, such document may be produced in TIFF format in accordance with this Protocol and in compliance with Section III.B.2, and the Native File version need not be produced unless production in such format would render the file not "reasonably useable." Fed. R. Civ. P. 34(a)(1)(A). In such case, the parties will meet and confer regarding appropriate production and redaction methods and formats.

2.     All TIFF-formatted documents will be produced in as single page Group IV, 300 DPI, when reasonably practicable. Where color is reasonably necessary to comprehend the content of a document, or is used to convey information (e.g., color coding and highlighting versus merely decorative use), the document must be produced in color. Image file names will be identical to the corresponding Bates numbered images, with a ".tif" file extension. The requesting party retains the right to request a TIFF image in a higher resolution or larger page size if necessary to render the image legible or reasonably usable. All images of redacted documents that contain comments, deletions, revision marks (including the identity of the person making the deletion or revision and the date and time thereof), speaker notes, or other user-entered data that the source application can display to the user will be processed such that all data is visible in the image, to the extent it exists in "last saved" or "last modified" format. For instances in which only a portion of a document is redacted for privilege, the party claiming the privilege will redact only the privileged portions and produce the remaining portions. All privilege redactions must be properly logged in accordance with the Parties Stipulated Qualified Protective Order. The party may, at its option, also indicate the basis on the face of the redaction. The Producing Party's production of a text file or Metadata Load File containing information redacted from that Document shall not be deemed a waiver of

the privilege or other protection associated with that Document, and any metadata or text file containing the text of redacted portions of a redacted Document or other privileged or protected information shall be treated as protected information, consistent with the terms of clawback provisions of the parties' Stipulated Qualified Protective Order.

3. All images must be assigned a Bates number that shall always: (1) be unique across the entire document production, (2) maintain a constant length (zero/0-padded) across the entire production, (3) contain no special characters or spaces, and (4) be sequential within a given document. Bates numbers shall not obscure any portion of the original file. If Bates numbers are skipped in a production range and not otherwise identified in a privilege log, then the producing party will disclose the Bates numbers or ranges in a cover letter accompanying the production. A single text file (.TXT) will be provided for each document produced. The text file name will be the same as the Bates number of the first page of the respective document, with the extension ".txt" suffixed. Electronic text must be extracted directly from the Native File unless the document requires redaction, is originally an image file, is any other Native File that does not contain text to extract (e.g., non-searchable PDFs), or where text cannot practicably be extracted. In these instances, and in the case of imaged hard-copy documents, the TIFF image will be OCR'd to create a text file that shall be produced in lieu of extracted text. Extracted text shall be provided in UTF-8 format text and may include a Byte Order Mark. Extracted text shall include all available comments, revisions, tracked changes, speaker's notes, text from documents with comments or tracked changes, as well as hidden worksheets, slides, columns, and rows. Text extracted from emails shall include the following header information that would be visible if the email was viewed in the e-mail application: (1) the individuals to whom the communication was directed ("To"), (2) the author of the email communication ("From"), (3) who was copied and blind copied on such

email ("CC" and "BCC"), (4) the subject line of the email ("RE" or "Subject"), and (5) the date and time of the email. The full path of the text file must be provided in the Metadata Load File.

4. The parties will disclose the time zone used for field dates and times.

5. OLE embedded objects (embedded MS Office files, etc.) shall be extracted as separate files and treated as attachments to the parent document where practicable. Images embedded in emails shall not be produced as attachments unless they are responsive to a discovery request served upon the producing party, e.g., logos and junk files embedded in emails do not need to be produced as attachments.

6. Documents that contain languages other than English, in whole or in part, shall be produced in the original language(s).

7. OCR software should be set to the highest quality setting during processing. Settings such as "auto-skewing" and "auto-rotation" should be turned on during the OCR process. A Bates-stamped placeholder TIFF, bearing a legend indicating that the document was produced natively shall be provided for ESI produced in native format, unless the document is also produced in TIFF format. These placeholders will be Bates numbered in the same way as any other TIFF, and the Bates number of that single page shall be used as the BegBates and EndBates of the associated document, and the "PGCOUNT" field in the Metadata Load File for the placeholder shall contain "1."

8. The parties will meet and confer to address the production and production format of any responsive data contained in a database or other structured or aggregated data source under the possession, custody, or control of the parties. The parties anticipate that certain productions of structured data may require the parties to first exchange information about the pertinent database, including to discuss the efficient retrieval and production of data contained therein.

9.      Parent-child relationships (the association between an attachment and its parent document or between embedded documents and their parent) shall be preserved. A document and all other documents in its attachment range, emails with attachments, and files with extracted embedded OLE documents all constitute family groups.  If attachments and embedded files are combined with their parent documents "BegDoc" and "EndDoc" fields listing the unique beginning and ending number for each document and "BegAttach" and "EndAttach" fields listing the begin and end of the entire document family must be included.  If any member of a family group is produced, all members of that group must also be produced. However, if any member of a family is withheld in its entirety on the basis of privilege, the document should be replaced with a slip sheet bearing only BegDoc and EndDoc numbers and a notation that the document is withheld for privilege. The document must also be properly logged in accordance with the Parties Stipulated Qualified Protective Order

10.     A Producing Party will take reasonable steps to unencrypt any discoverable ESI that exists in encrypted form (e.g., password-protected) and that can be reasonably unencrypted. A Producing Party will not be required to guess passwords or otherwise produce documents that are not reasonably accessible.

11.     Absent a specific showing of need, the following categories of ESI are not discoverable in this case:  deleted, slack, fragmented, or unallocated data on media; random access memory (RAM) or other ephemeral data; and online access data such as temporary internet files, history, cache, cookies, etc. Federal Rule of Civil Procedure 37(e) governs the loss of electronically stored information that should have been preserved in the anticipation or conduct of litigation because a party failed to take reasonable steps to preserve it and it cannot be restored or replaced through additional discovery.   If a party demonstrates a specific need for information

encompassed by this section and to the extent such information exists, the parties shall meet and confer on whether such data should be produced, preserved on a forward-looking basis, and/or whether cost-shifting is appropriate. However, prior to a showing of a specific need and an agreement among the parties on the need or Court order accepting the need, there shall be no obligation to preserve such information.

12.      Common system and program files as defined by the NIST National Software Reference Library database need not be preserved, collected, processed, reviewed, or produced.

C.      **Load Files**. There will be two Load/Unitization files accompanying all productions. One will be the Image Load File and the other will be the Metadata Load File. The specifics of these files are set forth below. To the extent a Producing Party departs from the specifics of these files, it shall disclose such deviation to the receiving party. The parties will use consistent load file parameters throughout their respective productions.

1.      Image Load File

(a)      Every Document referenced in a production Image Load File shall have all corresponding images, text, and data logically grouped together in a directory structure with a common key to properly load the data.

(b)      Documents shall be produced in only one Image Load File throughout the productions, unless that document is noted as being a replacement document in the Replacement field of the corresponding Metadata Load File.

(c)      If produced on media, the name of the Image Load File shall mirror the name of the delivery volume or the production date, and should have an .lfp, .opt or .dii extension (e.g., ABC001.lfp). If named by delivery volume, the volume names shall be consecutive (i.e., ABC001, ABC002, et seq.). If a .dii file is produced, the accompanying

Metadata Load File shall be separate from the .dii file and not contained within the .dii file. The Image Load File shall contain one row per TIFF image.

(d)     Every image in the delivery volume shall be referenced by Bates number in the Image Load File.

(e)     The image key shall be named the same as the Bates number of the page.  If produced on media, load files shall not span across media (e.g., CDs, DVDs, hard drives, etc.).  In other words, a separate volume shall be created for each piece of media delivered.

2.     Metadata Load File

(a)     The metadata load file shall use Concordance default delimiters, or if a party is using different delimiters then the delimiters will be disclosed.

(b)     Data for a document shall be produced in only one data load file throughout the productions, unless that document is noted as being a replacement document.

(c)     The first record shall contain the field names as columns in the order of the data set forth in Attachment A, *infra*.  Metadata fields that are not applicable to a document shall be filled with a NULL value or left blank along with fields that were not able to be obtained due to a processing error or corrupt file.

(d)     Date fields shall be produced in "mm/dd/yyyy hh:mm:ss AM" or "M/D/YYYY hh:mm:ss PM" format.

(e)     A carriage-return line-feed shall be used to indicate the start of the next record.

(f)     Load Files shall not span across media (e.g., CDs, DVDs, hard drives, etc.). In other words, a separate volume shall be created for each piece of media delivered.

(g)     The name of the Metadata Load File shall mirror the name of the delivery

volume or production date, and shall have a .dat, .csv or .txt extension (i.e., ABC001.dat).

(h)     The volume names shall be consecutive for each produced source (i.e., ABC001, ABC002, et seq.).

**D.     De-duplication**.  "Duplicate ESI" means, for a stand-alone document, that one document is the exact duplicate of another stand-alone document, or for an e-mail family, that one e-mail family is the exact duplicate of another e-mail family based on the stand-alone files' or the e-mail families' identical MD5 or SHA-1 Hash Values.  The producing party need only produce a single copy of responsive Duplicate ESI.  However, no document that is a member of an e-mail family or is the parent or an attachment of a produced document may individually be withheld from production as a duplicate, and no stand-alone document may be withheld as a duplicate based on the presence of that stand-alone document within an e-mail family.  If a producing party de-duplicates documents across its various productions, then the producing party shall provide the names of all original file locations of the duplicates of a particular document in the relevant load file.  A Producing Party employing a deduplication process certifies that its process is commercially acceptable.  The Producing Party agrees that the presence of a custodian's name contained in "all custodians" or "other custodians" in the metadata for a particular document is evidence that a duplicate of the document was located in that custodian's file.

**E.     E-mail Threading.**  The Parties may use industry standard "email thread suppression." As used in this protocol, email thread suppression means reducing duplicative production of email threads by producing only the most inclusive email containing the thread of emails, as well as all attachments within the thread. Duplicative emails suppressed under this paragraph need not be reflected on the Party's privilege log. If the most inclusive email in a thread is redacted in its entirety as privileged, but earlier emails in the thread are responsive and not

privileged, then the unredacted portion of the thread must be produced.

**F.      Proprietary Software.** To the extent that relevant ESI cannot be rendered or reviewed without the use of proprietary software that is not commercially available, the parties shall meet and confer to discuss and attempt to reach a mutually agreeable resolution.

**G.      Redactions.** No redactions for relevance or non-responsiveness may be made within a produced document or ESI item.[1]  For redacted items that were originally ESI, all applicable metadata fields will be provided and will include all non-redacted data. All privilege redactions must be properly logged in accordance with the Parties' Stipulated Qualified Protective Order.

**H.      Production Media.** The producing party will use the appropriate electronic media (CD, DVD, flash/thumb drive or hard drive) for its ESI production, and will cooperate in good faith to use media with the appropriate storage capacity to minimize associated overhead.  A party who receives a production on a hard drive must return the drive to the producing party after transferring the data.  Alternatively, a party may produce via a secure FTP or Sharefile link, provided that, after making such a production, the producing party honors timely and reasonable requests for a copy provided on physical media if the size of the production imposed an unreasonable burden on the receiving party to download the files.  The Producing Party must notify the Receiving Party's E-Discovery Liaison of any such production via FTP or Sharefile link. If a party produces a replacement production, the party will cross-reference the original production and identify the replacement as being a replacement.

**I.      Production Problems**.  If a receiving party believes that a document, as produced, does not comply with the production format requirements herein, the receiving party may notify

---

[1] The parties disagree on the propriety and appropriate procedure for applying PHI redactions. The finalization of this ESI Protocol is not intended to resolve that dispute.

the producing party of the alleged non-compliance, and as necessary, the parties will promptly meet and confer regarding a reasonable resolution of any such production-format issue. If the party identifying the issue can provide samples (*i.e.*, documents' Bates numbers) of an issue, it should do so.

## IV.    ESI Procedures

**A.    Cooperation.** The parties shall conduct discovery in a cooperative manner and shall meet and confer in good faith on issues as may arise during the course of discovery. This shall include cooperation and reasonable transparency in the search, collection, and production process (e.g., disclosing proposed custodians and search terms, disclosing technical details regarding computer systems containing relevant ESI, disclosing the use and parameters of any technology assisted review). The parties shall disclose enough detail regarding their search, collection, and production methods such that the opposing party is able to fairly evaluate the methodologies and challenge them if necessary. Following receipt of a proposed list of search terms and custodians, the parties will meet and confer promptly regarding the proposed list of search terms and custodians. If the parties reach an impasse on the set of search terms and custodians, the objecting party will have 7 days to file a motion with the Court. Any party can seek to modify any agreement or order on custodians or search terms as discovery progresses for good cause.

**B.    E-Discovery Liaison.** The Parties will identify to each other liaisons who are and will be knowledgeable about and responsible for discussing their respective ESI ("E-discovery Liaisons"). Each Party's designated E-discovery Liaison(s) will be, or will have access to those who are, familiar with their Party's respective electronic systems and capabilities and knowledgeable about the technical aspects of e-discovery, including the location, nature, accessibility, format, collection, search methodologies, and production of ESI in this matter. The

Parties will rely on the liaisons, as needed, to confer about ESI and to help resolve disputes without court intervention.

DATED:    June 2, 2023

*/s/W. Scott Simmer*
W. Scott Simmer (pro hac vice)
William G. Powers (PA Bar No. 316876)
Michael von Klemperer (pro hac vice)
Noah M. Rich (pro hac vice)
BARON & BUDD, P.C.
The Watergate
600 New Hampshire Ave. NW,
10th Floor
Washington, DC 20037
Telephone: (202) 333-4562
Facsimile: (202) 337-1039

Joe H. Tucker, Jr., Esquire
Scott E. Diamond, Esquire
Ten Penn Center
1801 Market Street, Suite 2500
Philadelphia, PA 19103
(215) 875-0609
jtucker@tlgattorneys.com
sdiamond@tlgattorneys.com

*Counsel for Relator Ellsworth Associates, LLP*

*/s/Jennifer B. Routh*
Russell Hayman (*pro hac vice*)
MCDERMOTT WILL & EMERY LLP
2049 Century Park East
Suite 3200
Los Angeles, CA 90067
(310) 277-4110
Edward B. Diskant (*pro hac vice*)
MCDERMOTT WILL & EMERY LLP
One Vanderbilt Avenue
New York, NY 10017
(212) 547-5400

Lesli C. Esposito (PA Bar No. 201906)
Jennifer B. Routh (*pro hac vice*)
Theodore E. Alexander (*pro hac vice*)
Crystal Fomba (*pro hac vice*)
MCDERMOTT WILL & EMERY LLP
500 North Capitol Street NW
Washington, DC 20001

(202) 756-8000

*Counsel for Defendants*
*CVS Health Corporation; CVS Pharmacy,*
*Inc.; SilverScript Insurance Company,*
*LLC; and CVS Caremark Corporation*

**IT IS SO ORDERED.**

Dated: June 2, 2023

_____/s/ John Milton Younge_____

UNITED STATES DISTRICT COURT JUDGE

**Attachment A**

Absent a showing of good cause, a Party is only required to produce the metadata provided in the following fields applicable for the given produced document type, and in any event only insofar as such metadata is readily available, responsive, and not subject to the attorney-client privilege, work-product doctrine, or any other applicable privilege.

| Field | Definition | Hard-Copy Scanned Image | E-Document/ E-mail |
|---|---|---|---|
| CUSTODIAN | Name of person or other data source (non-human) from where documents/files are produced. *Where redundant names occur, individuals should be distinguished by an initial which is kept constant throughout productions (e.g., Smith, John A. and Smith, John B.)* | Yes | Both |
| BEGDOC | Beginning Bates Number | Yes | Both |
| ENDDOC | End Bates Number | Yes | Both |
| PGCOUNT | Number of pages in the document | No | Both |
| FILESIZE | File Size | No | Both |
| APPLICAT | Commonly associated application for the specified file type | No | Both |
| FILENAME | File name at collection | No | E-Document |
| NATIVEFILELINK | For documents provided in native format | No | E-Document |

| TEXTPATH | File path for OCR or Extracted Text files | Yes | Both |
|---|---|---|---|
| MSGID | Email system identifier assigned by the host email system. This value is extracted from parent message during processing | No | E-mail |
| Folder | Folder location of the e-mail within the PST/OST | No | E-mail |
| FROM | Sender | No | E-mail |
| TO | Recipient | No | E-mail |
| CC | Additional Recipients | No | E-mail |
| BCC | Blind Additional Recipients | No | E-mail |
| SUBJECT | Subject line of e-mail | No | E-mail |
| ATTACHBATES | Bates number from the first page of each attachment | No | E-mail |
| BEGATTACH | Bates number of the first page of the parent e-mail | Yes | E-mail |
| ENDATTACH | Bates number of the last page of the last attachment | Yes | E-mail |
| ATTACHCOUNT | Number of attachments to an e-mail | No | E-mail |
| ATTACHNAMES | Names of each individual Attachment, separated by semi-colons | No | E-mail |

| DATESENT (mm/dd/yyyy hh:mm:ss AM) | Date Sent | No | E-mail |
|---|---|---|---|
| DATERCVD (mm/dd/yyyy hh:mm:ss AM) | Date Received | No | E-mail |
| File Description | System generated item description, e.g., Word, email, calendar item, contact, note, task | No | E-document |
| HASHVALUE | MD5 or SHA-1 hash value | No | Both |
| TITLE | Title from within the document | No | E-document |
| AUTHOR | Creator of a document | No | E-document |
| DATECRTD (mm/dd/yyyy hh:mm:ss AM) | Creation Date | No | E-document |
| FSDATECRTD | File system date created | No | E-document |
| LAST MODIFIED BY | Last user who modified a document | No | E-document |
| LASTMODD (mm/dd/yyyy hh:mm:ss AM) | Last Modified Date | No | E-document |
| FSLASTMODD | File system date modified | No | E-document |

| Importance | High Importance set for email | No | E-mail |
|---|---|---|---|
| Confidentiality | Confidentiality level of document in accordance with the Stipulated Qualified Protective Order | Yes | Both |
| Replacement | Insert the word "Replacement" if the image is a replacement for a previously produced image; otherwise blank | Yes | Yes |
| Redaction | Insert the word "Redacted" if the document contains any redaction; otherwise blank | Yes | Yes |
| The following fields should be included if de-duplication is used across custodian | | | |
| OtherCustodians | Custodians of unproduced duplicate documents. Multiple values separated by semi-colons. | No | Both |

Exhibit C

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

--------------------------------

UNITED STATES OF AMERICA ex rel.

ELLSWORTH ASSOCIATES, LLP,

       Plaintiff-Relator,   Case No.

V.                2:19-cv-02553-JMY

CVS HEALTH CORPORATION, et al.,

       Defendants.

--------------------------------


VIDEOTAPED DEPOSITION OF

ALEXANDRA MILLER


Tuesday, September 19, 2023

9:08 a.m. Eastern Time



Stenographically Reported by:

Denise Dobner Vickery RMR, CRR   Job No. 1029715

MAGNA LEGAL SERVICES

866.624.6221

www.MagnaLS.com



Page 28

1                Are you comfortable with me referring

2     to that as the "December 2018 telephone call"?

3          A.    I am.

4          Q.    And that -- and when I say the

5     "December 2018 telephone call," I'm talking about

6     the one where you and Ms. Ferraco and

7     Ms. Moyer-Carey and other members of your teams were

8     present.

9                Does that make sense?

10         A.    Correct.

11         Q.    Did you talk to Ms. Ferraco about your

12    concerns on the December 2018 telephone call?

13         A.    I talked to her through our instant

14    messaging system, not verbally on the phone.

15         Q.    And so you were having instant message

16    conversations with Ms. Ferraco while the telephone

17    call was taking place?

18         A.    That is correct.

19         Q.    Who initiated the instant message

20    conversation between you and Ms. Ferraco?

21         A.    I don't recall.

22         Q.    What did -- what was the substance of



Exhibit D

Δ π EXHIBIT 6

Deponent A. MILLER

Date 9/9/23 Rptr ♦ ✓

WWW.DEPOBOOK.COM

...R PROFESSIONAL CLINICAL, in a meeting

2 Participants

u dont go to nsm do you?

i don't - at least i try not to

only difference is the generic manufacturer and the brand manufacturer agreed the generic could come to market but not ...stitutatable....it is all about the lawyers ...ng their bonus!

...d on 2/6/2019 at 9:13 AM

ELLSWORTH_00002

Exhibit E

Message

---

**From:**        Shorette, Caitlin N [Caitlin.Shorette@CVSHealth.com]
**Sent:**         12/4/2018 8:06:20 PM
**To:**           Crotts, Bethany E [Bethany.Crotts@CVSHealth.com]
**Subject:**      FW: Do Not Substitute (DNS) Strategy
**Attachments:**  RISC Case Executive Review 2018 12 14 v1.pptx


FYI - please let me know if you have any feedback. Thanks!

**Caitlin Shorette, PharmD** | Manager, Medicare Part D Clinical Advancement
**c** 412-310-7438 | **w** 412-967-2300 ext. 75389
CVS Health | 620 Epsilon Dr. Pittsburgh, PA 15238
Caitlin.Shorette@CVSHealth.com

CONFIDENTIALITY NOTICE: This communication and any attachments may contain confidential and/or privileged information for the use of the designated recipients named above. If you are not the intended recipient, you are hereby notified that you have received this communication in error and that any review, disclosure, dissemination, distribution or copying of it or its contents is prohibited. If you have received this communication in error, please notify the sender immediately by telephone and destroy all copies of this communication and any attachments.

---

**From:** Beyer, Donna C.
**Sent:** Tuesday, December 04, 2018 2:49 PM
**To:** Shorette, Caitlin N
**Cc:** Cook, Christopher M.
**Subject:** RE: Do Not Substitute (DNS) Strategy

Hi Caitlin,

Quick follow up: The meeting has been rescheduled to 12/14, due to conflicts.

Could you please take a look at the attached slides included for DNS Strategy (specifically 5, 6 & 7) to ensure it captures the full scope of the problem and send your feedback.

Attempting to finalize the deck this week!

Thank you,
Donna
DONNA BEYER, PMP | CVS Caremark | SENIOR ADVISOR, CLIENT SERVICE CENTER | cell 480-773-0708 | 9501 E. SHEA BLVD MC117 SCOTTSDALE, AZ 85260 | donna.beyer@CVSCaremark.com
Engage with us: CVS Health | Twitter | LinkedIn | Facebook | YouTube

CONFIDENTIALITY NOTICE: This communication and any attachments may contain confidential and/or privileged information for the use of the designated recipients named above. If you are not the intended recipient, you are hereby notified that you have received this communication in error and that any review, disclosure, dissemination, distribution or copying of it or its contents is prohibited. If you have received this communication in error, please notify the sender immediately by email or telephone and destroy all copies of this communication and any attachments. Thank You.

---

**From:** Shorette, Caitlin N
**Sent:** Tuesday, November 20, 2018 11:59 AM
**To:** Beyer, Donna C. <Donna.Beyer@CVSHealth.com>
**Subject:** RE: Do Not Substitute (DNS) Strategy

Thank you! Have a happy Thanksgiving. ☺

**Caitlin Shorette, PharmD** | Manager, Medicare Part D Clinical Advancement
**c** 412-310-7438 | **w** 412-967-2300 ext. 75389
CVS Health | 620 Epsilon Dr. Pittsburgh, PA 15238
Caitlin.Shorette@CVSHealth.com

CVS-Ellsworth_00013672

CONFIDENTIALITY NOTICE: This communication and any attachments may contain confidential and/or privileged information for the use of the designated recipients named above. If you are not the intended recipient, you are hereby notified that you have received this communication in error and that any review, disclosure, dissemination, distribution or copying of it or its contents is prohibited. If you have received this communication in error, please notify the sender immediately by telephone and destroy all copies of this communication and any attachments.

**From:** Beyer, Donna C.
**Sent:** Tuesday, November 20, 2018 1:59 PM
**To:** Shorette, Caitlin N <Caitlin.Shorette@CVSHealth.com>
**Cc:** Cook, Christopher M. <Christopher.Cook@CVSHealth.com>
**Subject:** RE: Do Not Substitute (DNS) Strategy

Hi Caitlin,

A meeting has been scheduled with senior executives to review this on 12/03/18.
More to come, following the outcome of that meeting!

Thanks,
Donna

DONNA BEYER, PMP | CVS Caremark | SENIOR ADVISOR, CLIENT SERVICE CENTER | cell 480-773-0708 | 9501 E. SHEA BLVD MC117 SCOTTSDALE, AZ 85260 | donna.beyer@CVSCaremark.com
Engage with us: CVS Health | Twitter | LinkedIn | Facebook | YouTube
UPCOMING Time Off 11/21/18 - 11/23/18

CONFIDENTIALITY NOTICE: This communication and any attachments may contain confidential and/or privileged information for the use of the designated recipients named above. If you are not the intended recipient, you are hereby notified that you have received this communication in error and that any review, disclosure, dissemination, distribution or copying of it or its contents is prohibited. If you have received this communication in error, please notify the sender immediately by email or telephone and destroy all copies of this communication and any attachments. Thank You

**From:** Shorette, Caitlin N
**Sent:** Tuesday, November 20, 2018 11:40 AM
**To:** Beyer, Donna C. <Donna.Beyer@CVSHealth.com>
**Cc:** Cook, Christopher M. <Christopher.Cook@CVSHealth.com>
**Subject:** RE: Do Not Substitute (DNS) Strategy

Hi Donna,

We have not heard of any updated launch timeline on this drug, but I wanted to touch base with you to see if you need any additional information from us or if there has been any progress on determining an owner for this.

Thanks!

**Caitlin Shorette, PharmD** | Manager, Medicare Part D Clinical Advancement
**c** 412-310-7438 | **w** 412-967-2300 ext. 75389
**CVS Health** | 620 Epsilon Dr. Pittsburgh, PA 15238
Caitlin.Shorette@CVSHealth.com

CONFIDENTIALITY NOTICE: This communication and any attachments may contain confidential and/or privileged information for the use of the designated recipients named above. If you are not the intended recipient, you are hereby notified that you have received this communication in error and that any review, disclosure, dissemination, distribution or copying of it or its contents is prohibited. If you have received this communication in error, please notify the sender immediately by telephone and destroy all copies of this communication and any attachments.

**From:** Beyer, Donna C.
**Sent:** Tuesday, October 30, 2018 11:10 AM
**To:** Shorette, Caitlin N <Caitlin.Shorette@CVSHealth.com>
**Cc:** Cook, Christopher M. <Christopher.Cook@CVSHealth.com>
**Subject:** RE: Do Not Substitute (DNS) Strategy

Thank you, Caitlin.

This is good to know, please keep us in the loop as soon as you have an idea of launch timeline.

CVS-Ellsworth_00013673

Thanks,
Donna
DONNA BEYER, PMP | CVS Caremark | SENIOR ADVISOR, CLIENT SERVICE CENTER | cell 480-773-0708 | 9501 E. SHEA BLVD MC117 SCOTTSDALE, AZ
85260 | donna.beyer@CVSCaremark.com
Engage with us: CVS Health | Twitter | LinkedIn | Facebook | YouTube

CONFIDENTIALITY NOTICE: This communication and any attachments may contain confidential and/or privileged information for the use of the designated
recipients named above. If you are not the intended recipient, you are hereby notified that you have received this communication in error and that any review,
disclosure, dissemination, distribution or copying of it or its contents is prohibited. If you have received this communication in error, please notify the sender
immediately by email or telephone and destroy all copies of this communication and any attachments. Thank You.

---

**From:** Shorette, Caitlin N
**Sent:** Tuesday, October 30, 2018 4:44 AM
**To:** Beyer, Donna C. <Donna.Beyer@CVSHealth.com>
**Cc:** Cook, Christopher M. <Christopher.Cook@CVSHealth.com>
**Subject:** RE: Do Not Substitute (DNS) Strategy

Hi Donna,

Sorry I missed your IM yesterday evening. There is one highly utilized drug that will need to be launched into the strategy as soon as it
becomes available as a generic. However, there is no launch date for the generic drug so we don't have a clear timeline on when this
could occur (it could be tomorrow or it could be a year from now). When the generic launches it will become an immediate need, but it is
not at this time. Hopefully that helps - feel free to reach out if you need additional information!

Thanks,

**Caitlin Shorette, PharmD** | Manager, Medicare Part D Clinical Advancement
**c** 412-310-7438 | **w** 412-967-2300 ext. 75389
**CVS Health** | 620 Epsilon Dr. Pittsburgh, PA 15238
Caitlin.Shorette@CVSHealth.com

CONFIDENTIALITY NOTICE: This communication and any attachments may contain confidential and/or privileged information for the use of the designated recipients named
above. If you are not the intended recipient, you are hereby notified that you have received this communication in error and that any review, disclosure, dissemination,
distribution or copying of it or its contents is prohibited. If you have received this communication in error, please notify the sender immediately by telephone and destroy all
copies of this communication and any attachments.

---

**From:** Beyer, Donna C.
**Sent:** Monday, October 29, 2018 6:34 PM
**To:** Shorette, Caitlin N <Caitlin.Shorette@CVSHealth.com>
**Cc:** Cook, Christopher M. <Christopher.Cook@CVSHealth.com>
**Subject:** RE: Do Not Substitute (DNS) Strategy

Hello Caitlin,

Could you please let me know if there is anything needed from CSC immediately regarding your email?
We'll be meeting to discuss DNS strategy shortly, but wanted to know if there's an urgent need now.

Thanks,
Donna Beyer
DONNA BEYER, PMP | CVS Caremark | SENIOR ADVISOR, CLIENT SERVICE CENTER | cell 480-773-0708 | 9501 E. SHEA BLVD MC117 SCOTTSDALE, AZ
85260 | donna.beyer@CVSCaremark.com
Engage with us: CVS Health | Twitter | LinkedIn | Facebook | YouTube

CONFIDENTIALITY NOTICE: This communication and any attachments may contain confidential and/or privileged information for the use of the designated
recipients named above. If you are not the intended recipient, you are hereby notified that you have received this communication in error and that any review,
disclosure, dissemination, distribution or copying of it or its contents is prohibited. If you have received this communication in error, please notify the sender
immediately by email or telephone and destroy all copies of this communication and any attachments. Thank You.

---

**From:** Cook, Christopher M.
**Sent:** Friday, October 26, 2018 12:49 PM

                                                                              CVS-Ellsworth_00013674

**To:** Freeman, Patricia (Client Resolution Center) <Patricia.Freeman@CVSHealth.com>; Richens, Eric K <Eric.Richens@CVSHealth.com>; Beyer, Donna C. <Donna.Beyer@CVSHealth.com>
**Subject:** RE: Do Not Substitute (DNS) Strategy


\+ Donna Beyer
-Donna Rosen

Christopher M. Cook | CVS Health | Reliability Director, Client Service Center | cell 919-401-6894


Christopher M. Cook | CVS Health | Reliability Director, Client Service Center | cell 919-401-6894

---

**From:** Shorette, Caitlin N
**Sent:** Friday, October 26, 2018 3:15 PM
**To:** Cook, Christopher M. <Christopher.Cook@CVSHealth.com>
**Cc:** Pefanis, Emily <Emily.Pefanis@CVSHealth.com>
**Subject:** Do Not Substitute (DNS) Strategy

Hi Chris,

Emily asked me provide you with an overview of the DNS strategy so we can begin the process to identify the appropriate owner. The strategy is used when a new generic drug becomes available and Trade has negotiated rebates on the brand name drug that would be negatively impacted if we covered the generic product. We only use DNS when Trade directs us to block the generic product for all template clients. We currently have two products active in this strategy. Historically, launches have been fairly infrequent (the last launch occurred in late 2017). We have another similar strategy called Single Source Generic (SSG), which is specific to two clients in 2019 (SilverScript and Clearstone). My team has historically supported both SSG and DNS launches for these two clients. However, there is no DNS owner for the remaining health plan clients.

I have provided a copy of our SSG work instructions to give you an idea of the steps needed to launch a drug - the steps for a DNS would be almost identical. The primary steps are:
1. Open a SFDC case to allow brand name drug to continue processing at mail order pharmacy.
2. Draft and coordinate approval/distribution of client communications and Care scripts.
3. Submit request to update RxClaim coding to "block" the generic drug and approve test results.
4. Complete and submit the MAC pricing grid.
5. Review existing overrides and complete updates as appropriate to align with DNS strategy.

If you have any questions or need additional information please let me know!

Thanks,

**Caitlin Shorette, PharmD** | Manager, Medicare Part D Clinical Advancement
**c** 412-310-7438 | **w** 412-967-2300 ext. 75389
**CVS Health** | 620 Epsilon Dr. Pittsburgh, PA 15238
Caitlin.Shorette@CVSHealth.com

CONFIDENTIALITY NOTICE: This communication and any attachments may contain confidential and/or privileged information for the use of the designated recipients named above. If you are not the intended recipient, you are hereby notified that you have received this communication in error and that any review, disclosure, dissemination, distribution or copying of it or its contents is prohibited. If you have received this communication in error, please notify the sender immediately by telephone and destroy all copies of this communication and any attachments.

CVS-Ellsworth_00013675

Exhibit F

Message

---

**From**: Aragones, Noel [Noel.Aragones@CVSHealth.com]
**Sent**: 12/7/2020 4:03:23 PM
**To**: Wilkerson, Laura [Laura.Wilkerson@CVSHealth.com]
**Subject**: RE: Review Requested: Brand Over Generic (BOG) Strategy Update – Medicare Part D Awareness Only

I probably misunderstood...I thought we are going to put a reference to the Max+ page that Catherine will send out based on the information you will provide and not included in the message.

Anyway, it's the same.

**From:** Wilkerson, Laura <Laura.Wilkerson@CVSHealth.com>
**Sent:** Monday, December 07, 2020 9:42 AM
**To:** Mall, Anne C. <Anne.Mall@CVSHealth.com>; Aragones, Noel <Noel.Aragones@CVSHealth.com>; Clouse, Catherine Y. <cyclouse@accordant.net>; Hummel, David P <David.Hummel@CVSHealth.com>
**Cc:** Davis, Cody <Cody.Davis@CVSHealth.com>; Freeman, Patricia (Client Resolution Center) <Patricia.Freeman@CVSHealth.com>; Pry, Dawn M. <Dawn.Pry@CVSHealth.com>
**Subject:** RE: Review Requested: Brand Over Generic (BOG) Strategy Update – Medicare Part D Awareness Only

Hi,

I just IM'd with Noel. Can we include the 2021 BOG drugs in the communication and provide information that Max+ should be referred to for the most current list. If all agree, I have provided edits below.

Laura

**From:** Mall, Anne C. <Anne.Mall@CVSHealth.com>
**Sent:** December 7, 2020 10:00 AM
**To:** Aragones, Noel <Noel.Aragones@CVSHealth.com>; Clouse, Catherine Y. <cyclouse@accordant.net>; Hummel, David P <David.Hummel@CVSHealth.com>
**Cc:** Davis, Cody <Cody.Davis@CVSHealth.com>; Wilkerson, Laura <Laura.Wilkerson@CVSHealth.com>; Freeman, Patricia (Client Resolution Center) <Patricia.Freeman@CVSHealth.com>; Pry, Dawn M. <Dawn.Pry@CVSHealth.com>
**Subject:** RE: Review Requested: Brand Over Generic (BOG) Strategy Update – Medicare Part D Awareness Only

Noel,

Fair point. However, if I am on an account how do I know which drugs are impacted. Maybe a link within the communication to a Max+ page with the current listing of drugs?

Thanks,

**Anne Mall** | Sr. Director, CVS/caremark
**c** 469.203.7582| **f** 480.860.3248 |
795 W. John Carpenter Frwy Ste 1200, Mail Code 500, Irving, TX 75039
ooo: 12/4, 12/21 & 12/24

CONFIDENTIALITY NOTICE: This communication and any attachments may contain confidential and/or privileged information for the use of the designated recipients named above. If you are not the intended recipient, you are hereby notified that you have received this communication in error and that any review, disclosure, dissemination, distribution or copying of it or its contents is prohibited. If you have received this communication in error, please notify the sender immediately by email or telephone and destroy all copies of this communication and any attachments.

CVS-Ellsworth_00023321

**From:** Aragones, Noel <Noel.Aragones@CVSHealth.com>
**Sent:** Monday, December 7, 2020 8:59 AM
**To:** Mall, Anne C. <Anne.Mall@CVSHealth.com>; Clouse, Catherine Y. <cyclouse@accordant.net>; Hummel, David P <David.Hummel@CVSHealth.com>
**Cc:** Davis, Cody <Cody.Davis@CVSHealth.com>; Wilkerson, Laura <Laura.Wilkerson@CVSHealth.com>; Freeman, Patricia (Client Resolution Center) <Patricia.Freeman@CVSHealth.com>; Pry, Dawn M. <Dawn.Pry@CVSHealth.com>
**Subject:** RE: Review Requested: Brand Over Generic (BOG) Strategy Update – Medicare Part D Awareness Only

Hi Anne,
I am ok to add it, but in real time, there are drugs being discussed to be included in the strategy as of this moment.

Timing wise, what if the drug gets included in the strategy and we already released the communication, will we have to re-communicate that a drug has been added?  Also, similar to our Template Formulary clients, we (CVS) control the addition/removal of drugs in the strategy anytime our Trade partners decide that we need to do.

So, from that standpoint, it may be a good thing not to specify drugs?


Thanks!
Noel

**From:** Mall, Anne C. <Anne.Mall@CVSHealth.com>
**Sent:** Monday, December 07, 2020 8:44 AM
**To:** Clouse, Catherine Y. <cyclouse@accordant.net>; Hummel, David P <David.Hummel@CVSHealth.com>
**Cc:** Davis, Cody <Cody.Davis@CVSHealth.com>; Wilkerson, Laura <Laura.Wilkerson@CVSHealth.com>; Freeman, Patricia (Client Resolution Center) <Patricia.Freeman@CVSHealth.com>; Aragones, Noel <Noel.Aragones@CVSHealth.com>; Pry, Dawn M. <Dawn.Pry@CVSHealth.com>
**Subject:** RE: Review Requested: Brand Over Generic (BOG) Strategy Update – Medicare Part D Awareness Only

Good Morning –

Is there a reason why we don't list the drugs impacted by the strategy? I am curious because I think the drugs should be stated to ensure alignment with the SAS teams.

Thanks,

**Anne Mall** | Sr. Director, CVS/caremark
**c** 469.203.7582| **f** 480.860.3248 |
795 W. John Carpenter Frwy Ste 1200, Mail Code 500, Irving, TX 75039
ooo: 12/4, 12/21 & 12/24

CONFIDENTIALITY NOTICE: This communication and any attachments may contain confidential and/or privileged information for the use of the designated recipients named above. If you are not the intended recipient, you are hereby notified that you have received this communication in error and that any review, disclosure, dissemination, distribution or copying of it or its contents is prohibited. If you have received this communication in error, please notify the sender immediately by email or telephone and destroy all copies of this communication and any attachments.

**From:** Clouse, Catherine Y. <cyclouse@accordant.net>
**Sent:** Friday, December 4, 2020 8:41 AM
**To:** Mall, Anne C. <Anne.Mall@CVSHealth.com>; Hummel, David P <David.Hummel@CVSHealth.com>
**Cc:** Davis, Cody <Cody.Davis@CVSHealth.com>; Wilkerson, Laura <Laura.Wilkerson@CVSHealth.com>; Freeman, Patricia (Client Resolution Center) <Patricia.Freeman@CVSHealth.com>; Aragones, Noel <Noel.Aragones@CVSHealth.com>; Pry, Dawn M. <Dawn.Pry@CVSHealth.com>
**Subject:** RE: Review Requested: Brand Over Generic (BOG) Strategy Update – Medicare Part D Awareness Only

CVS-Ellsworth_00023322

Final for approval:

**Brand Over Generic (BOG) Strategy Update – Medicare Part D Awareness Only**
*Medicare Part D account team awareness only that an enterprise solution will be deployed for January 1, 2021 for drugs in our BOG strategy to reimburse pharmacies at Average Wholesale Price.*

## Background

A BOG strategy is set-up across all template formularies where the generic drug is excluded, and the brand drug covered. Currently, the BOG formulary set-up addresses the desired outcome (brand pays/generic rejects), however, pharmacy reimbursement is being paid at the Maximum Allowable Cost (MAC) pricing for certain drugs instead of the expected Average Wholesale Price (AWP). The BOG enterprise solution for January 1, 2021 will address any risks of claims being paid at MAC instead of AWP.

In order to address pricing and have pharmacy reimbursement paid at AWP, an enterprise solution is being developed by product and benefits teams for these medications in the BOG strategy. The solution will also be applied to the drugs included in the Single Source Generic (SSG) strategy for **January 1, 2021.**

Below are the BOG GPI's as of 1/1/21. SSG drugs are implemented and managed separately for opt-in clients only. Please reference Max+ for future BOG drug updates.

| | |
|---|---|
| ADVAIR DISKUS | 44209902708020 |
| ADVAIR DISKUS | 44209902708030 |
| ADVAIR DISKUS | 44209902708040 |
| MITIGARE | 68000020000120 |
| SYMBICORT | 44209902413220 |
| SYMBICORT | 44209902413240 |

## Aetna Applicability

Aetna has their own strategy.

### Medicare Part D Account Team Awareness for Clients with Template Formularies

An enterprise solution will be deployed for January 1, 2021 for drugs in our BOG and SSG strategies to reimburse pharmacies at AWP.

### Medicare Part D Account Team Awareness for Clients with Custom Formularies

If you have a custom client that wants to align with the BOG strategy solution, please work with your benefits partners on coding guidelines before implementing.

## Questions

For brand strategy questions, contact Noel Aragones.
For benefits setup questions for custom clients, contact your Benefit Relationship Manager (BRM).

Thank you!

**From:** Clouse, Catherine Y. <cyclouse@accordant.net>
**Sent:** Thursday, December 03, 2020 10:10 AM

**To:** Mall, Anne C. <Anne.Mall@CVSHealth.com>; Hummel, David P <David.Hummel@CVSHealth.com>
**Cc:** Davis, Cody <Cody.Davis@CVSHealth.com>; Wilkerson, Laura <Laura.Wilkerson@CVSHealth.com>; Freeman, Patricia (Client Resolution Center) <Patricia.Freeman@CVSHealth.com>; Aragones, Noel <Noel.Aragones@CVSHealth.com>; Clouse, Catherine Y. <cyclouse@accordant.net>; Pry, Dawn M. <Dawn.Pry@CVSHealth.com>
**Subject:** Review Requested: Brand Over Generic (BOG) Strategy Update – Medicare Part D Awareness Only

**Brand Over Generic (BOG) Strategy Update – Medicare Part D Awareness Only**
*Medicare Part D account team awareness only that an enterprise solution will be deployed for January 1, 2021 for drugs in our BOG strategy to reimburse pharmacies at Average Wholesale Price.*

**Background**

A BOG strategy is set-up across all template formularies where the generic drug is excluded, and the brand drug covered. Currently, the BOG formulary set-up addresses the desired outcome (brand pays/generic rejects), however, pharmacy reimbursement is being paid at the Maximum Allowable Cost (MAC) pricing instead of the expected Average Wholesale Price (AWP). The BOG enterprise solution for January 1, 2021 will address any risks of claims being paid at MAC instead of AWP.

In order to address pricing and have pharmacy reimbursement paid at AWP, an enterprise solution is being developed by product and benefits teams for these medications in the BOG strategy. The solution will also be applied to the drugs included in the Single Source Generic (SSG) strategy for **January 1, 2021.**

**Aetna Applicability**

Aetna has their own strategy.

**Medicare Part D Account Team Awareness for Clients with Template Formularies**

An enterprise solution will be deployed for January 1, 2021 for drugs in our BOG and SSG strategies to reimburse pharmacies at AWP.

**Medicare Part D Account Team Awareness for Clients with Custom Formularies**

If you have a custom client that wants to align with the BOG strategy solution, please work with your benefits partners on coding guidelines before implementing.

**Questions**

For brand strategy questions, contact Noel Aragones.
For benefits setup questions for custom clients, contact your Benefit Relationship Manager (BRM).

Thank you!
Catherine

**Catherine Clouse, MHA** | Advisor, Sales and Marketing Operations, CVS Caremark
**Colleague Engagement Committee Co-Lead** | VIRTUAL CRG
**p** 863-255-4083
Lexington, Virginia



CONFIDENTIALITY NOTICE: This communication and any attachments may contain confidential and/or privileged information for the use of the designated recipients named above. If you are not the intended recipient, you are hereby notified that you have received this communication in error and that any review, disclosure, dissemination, distribution or

copying of it or its contents is prohibited. If you have received this communication in error, please notify the sender immediately by email or telephone and destroy all copies of this communication and any attachments.

Proprietary

Proprietary

CVS-Ellsworth_00023325

Exhibit G

**Evan M. Zucker**

---

| | |
|---|---|
| **From:** | Routh, Jenn <Jrouth@mwe.com> |
| **Sent:** | Tuesday, January 16, 2024 3:01 PM |
| **To:** | Evan M. Zucker; Diskant, Ted; Suominen, Katie; Rodriguez, Annabel; Levengood, Jennifer |
| **Cc:** | Scott Simmer; Dan Alberstone; Will Powers; sdiamond; Joe Tucker; Brian Williams; Elizabeth Smiley; Peter Klausner; Grace Wald |
| **Subject:** | RE: Ellsworth v. CVS - Document production meet and confer |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Evan,

I have responded to each of your points below.

1. Defendants redacted documents in only three instances: to conceal privileged material, to conceal PHI, and to conceal the identities of the members of the P&T Committee. With respect to the latter, CVS Caremark regards the identity of P&T Committee members as highly sensitive information that is not typically shared even ***within*** CVS Caremark. The P&T Committee is charged with reviewing all drugs on CVS Caremark approved drug lists and the approvals made are non-biased, quality driven, and evidence based. The clinical merit of the drug, not the cost, is the primary consideration of the P&T Committee. Because it is so important that the work of the P&T Committee not be improperly influenced, CVS Caremark never discloses the identities of Committee members.

   As a result of your inquiry about those particular redactions, and consistent with CVS Caremark's general practice to conceal the identities of the P&T Committee members even within the organization, we learned that there is an identical set of P&T Committee minutes, provided internally at CVS Caremark, which refer to the member by description rather than name (e.g., "Physician with Expertise in Immunodeficiency, M.D."). As such, those documents would not need to be redacted at all. If you would prefer to receive a set of those minutes in that format instead of the redacted format we previously provided them, please let me know and we'll be glad to produce those versions.

2. With respect PHI redactions on the grievance trackers you identified, we redacted "Description of Issue" and "Description of Resolution" columns *except* for grievances that dealt with the relevant drugs (as defined in our responses and objections to Relator's RFPs). With respect to redactions of Member IDs for responsive PHI, those fields were redacted in error, and we are working to correct those redactions and reproduce those to you promptly.

3. As you know, Federal Rule of Civil Procedure 34(b)(2)(E)(i) requires that parties "produce documents as they are kept in the usual course of business ***or*** must organize and label them to correspond to the categories in the request." We have produced documents as they are kept in the usual course of business. Accordingly, we decline your request to provide you with an index of our production.

4.  The files you noted as corrupted are also corrupted on our end and do not open natively.  They were produced because they were part of a responsive family.

Separately, in working with our vendor to address the issues you raised in this email, we learned that there were a limited number of additional documents that we intended to produce, which were inadvertently omitted from the production.  We are working with the vendor to address this promptly and hope to be able to produce those additional documents to you by the end of next week.

Thanks,
Jenn

JENNIFER B. ROUTH
Partner
**McDermott Will & Emery LLP**  The McDermott Building, 500 North Capitol Street, NW, Washington, DC 20001-1531
**Tel** +1 202 756 8165   **Mobile** +1 202 679 3260   **Email** jrouth@mwe.com
**Biography | Website | vCard | LinkedIn**

---

**From:** Evan M. Zucker <ezucker@baronbudd.com>
**Sent:** Tuesday, January 16, 2024 1:18 PM
**To:** Routh, Jenn <Jrouth@mwe.com>; Diskant, Ted <Ediskant@mwe.com>; Suominen, Katie <Ksuominen@mwe.com>; Rodriguez, Annabel <Anrodriguez@mwe.com>; Levengood, Jennifer <Jlevengood@mwe.com>
**Cc:** Scott Simmer <ssimmer@baronbudd.com>; Dan Alberstone <dalberstone@baronbudd.com>; Will Powers <wpowers@baronbudd.com>; sdiamond <sdiamond@tlgattorneys.com>; Joe Tucker <jtucker@tlgattorneys.com>; brwilliams <brwilliams@baronbudd.com>; Elizabeth Smiley <esmiley@baronbudd.com>; Peter Klausner <pklausner@baronbudd.com>; gwald <gwald@baronbudd.com>
**Subject:** RE: Ellsworth v. CVS - Document production meet and confer

**[ External Email ]**
Jenn,

In an effort to avoid prejudice from any further delay, we need a response, at a minimum indicating which if any of the issues I raised in my email you intend to cure in full by end of day today.

Thank you,

**Evan Zucker**
Baron & Budd, P.C. | Shareholder

818.839.2333 main
818.839.2324 direct

www.baronandbudd.com

Dallas | Baton Rouge | New Orleans | Los Angeles
San Diego | Chico | New York | Washington, D.C.

---

**From:** Routh, Jenn <Jrouth@mwe.com>
**Sent:** Friday, January 12, 2024 3:37 PM
**To:** Evan M. Zucker <ezucker@baronbudd.com>; Diskant, Ted <Ediskant@mwe.com>; Suominen, Katie <Ksuominen@mwe.com>; Rodriguez, Annabel <Anrodriguez@mwe.com>; Levengood, Jennifer

<Jlevengood@mwe.com>
**Cc:** Scott Simmer <ssimmer@baronbudd.com>; Dan Alberstone <dalberstone@baronbudd.com>; Will Powers
<wpowers@baronbudd.com>; sdiamond <sdiamond@tlgattorneys.com>; Joe Tucker <jtucker@tlgattorneys.com>; Brian
Williams <brwilliams@baronbudd.com>; Elizabeth Smiley <esmiley@baronbudd.com>; Peter Klausner
<pklausner@baronbudd.com>; Grace Wald <gwald@baronbudd.com>
**Subject:** RE: Ellsworth v. CVS - Document production meet and confer

Evan,

We are investigating the issues raised in your email and expect to have a more substantive
update by early next week.

Thanks and have a nice weekend,
Jenn

JENNIFER B. ROUTH
Partner
**McDermott Will & Emery LLP**  The McDermott Building, 500 North Capitol Street, NW, Washington, DC 20001-1531
**Tel** +1 202 756 8165   **Mobile** +1 202 679 3260   **Email** jrouth@mwe.com
**Biography | Website | vCard | LinkedIn**

---

**From:** Evan M. Zucker <ezucker@baronbudd.com>
**Sent:** Wednesday, January 10, 2024 5:19 PM
**To:** Routh, Jenn <Jrouth@mwe.com>; Diskant, Ted <Ediskant@mwe.com>; Suominen, Katie <Ksuominen@mwe.com>;
Rodriguez, Annabel <Anrodriguez@mwe.com>; Levengood, Jennifer <Jlevengood@mwe.com>
**Cc:** Scott Simmer <ssimmer@baronbudd.com>; Dan Alberstone <dalberstone@baronbudd.com>; Will Powers
<wpowers@baronbudd.com>; sdiamond <sdiamond@tlgattorneys.com>; Joe Tucker <jtucker@tlgattorneys.com>;
brwilliams <brwilliams@baronbudd.com>; Elizabeth Smiley <esmiley@baronbudd.com>; Peter Klausner
<pklausner@baronbudd.com>; gwald <gwald@baronbudd.com>
**Subject:** Ellsworth v. CVS - Document production meet and confer

**[ External Email ]**
Counsel,

Documents produced by Defendants have substantial deficiencies. By this email Plaintiff demands that Defendants cure
the deficiencies identified below. Please confirm whether you agree to cure these outstanding issues no later than by
Friday, January 12.

1. <u>Defendants improperly redacted documents based on confidentiality.</u>

Included within the documents produced are numerous documents with in-line redactions that note "Confidential
Redaction." These redactions are improper and Plaintiff demands that all such instances be reproduced with no
redaction. The Protective Order entered in this case explicitly prohibits these "confidentiality" redactions. ("Unless
otherwise agreed by the parties on a case-by-case basis, the parties will not use the designation of a documents'
Confidential designation as a basis for applying redactions when producing discovery material.") (Dkt. 73, p. 5 at ¶ 9.)  As
an example, CVS-Ellsworth_00375299 contains several such improper confidentiality redactions which obscure portions
of the document.

2. <u>Defendants improperly redacted non-PHI information.</u>

Included within the documents produced are numerous documents that contain purported PHI redactions. To be clear,
at this time, Plaintiff does not take issue with a PHI redaction of a beneficiary name, date of birth and address. However,

there are numerous documents where CVS has over-redacted on the grounds of PHI. As an example, in CVS-Ellsworth_00379747 (a spreadsheet of grievances), Defendants redacted the beneficiary's name based on PHI grounds, but Defendants also redacted the "Description of Issue" and "Description of Resolution" columns. To the extent these fields contained a beneficiary's name, that information should be individually redacted as opposed to the entire cell. Also included in the production are data sources in which the "Member ID" field is redacted. See as an example, CVS-Ellsworth_00127689 at column H. In Ms. Routh's 11/20 and 11/22 emails, Defendants, in connection with PHI redaction discussions, represented that member ID fields would not be redacted. Plaintiff demands that all PHI redactions be reviewed to be narrowly tailored to only patient personal identifying information and all Member ID fields (or analogous information) be reproduced without redaction.

3. <u>Plaintiff demands that defendants detail which documents, by bates range, were produced by document category (i.e., ESI keyword search production, claims data, DIR data, data dictionaries, board meeting records, organizational charts, rebate agreement, financial records, etc.)</u>

Defendants have represented that included in the document production are documents and data in addition to ESI keyword search results. Plaintiff seeks an index of that production. To the extent various categories of documents were searched for outside of the ESI custodial search process, please identify those productions by bates range. For example, Plaintiff sought the production of rebate agreements and has located some rebate agreements in the production as attached to email communications. To the extent rebate agreements or any other document categories were identified and produced from a non-custodial source, Plaintiff seeks identification of those documents by bates range.

4. <u>Please re-produce corrupted documents.</u>

To date, we have identified two documents in the production that appear to be corrupted and don't open natively. Please review and reproduce working versions of CVS-Ellsworth_00045834 and CVS-Ellsworth_00051306.

Thank you,

**Evan Zucker**
Baron & Budd, P.C. | Shareholder

818.839.2333 main
818.839.2324 direct

www.baronandbudd.com

Dallas | Baton Rouge | New Orleans | Los Angeles
San Diego | Chico | New York | Washington, D.C.

*************************************************************************************************************
This message is a PRIVATE communication. This message and all attachments are a private communication sent by a law firm and may be confidential or protected by privilege. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of the information contained in or attached to this message is strictly prohibited. Please notify the sender of the delivery error by replying to this message, and then delete it from your system. Our Privacy Policy explains how we may use your personal information or data and any personal information or data provided or made available to us. Thank you.
*************************************************************************************************************

Please visit http://www.mwe.com/ for more information about our Firm.

Exhibit H

Message

| | |
|---|---|
| **Sent:** | 7/21/2020 9:44:54 AM |
| **To:** | |

**Confidential Redaction**

**CC:**
**BCC:**

**Subject:** May 27, 2020 CVS Caremark National Pharmacy & Therapeutics Committee Meeting
**Attachments:** May 27 2020 Meeting Agenda.pdf; VOTE NTM BLOCK AGENTS_05272020.pdf; UM Criteria Review - PT Subgroup April 16 2020.pdf; Spritam Med D PA Criteria 04-2020.pdf; VOTE CAREMARK 2021 EGWP MED D DELETIONS.pdf; NOTIFY AETNA COMMERCIAL_05272020.pdf; NOTIFY CAREMARK COMMERCIAL_05272020.pdf; NOTIFY CAREMARK MEDICAL 05272020.pdf; NOTIFY CAREMARK HEALTH EXCHANGES 05.27.2020.pdf; NOTIFY AETNA MED D 2020_05272020.pdf; NOTIFY CAREMARK MED D 2020_05272020.pdf; NOTIFY CAREMARK MED D 2021_05272020.pdf; NOTIFY EGWP METALS 2020_05272020.pdf; NOTIFY 2020 MED D EXTENSION LIST_05272020.pdf; NOTIFY 2021 MED D EXTENSION LIST_05272020.pdf; New Drug Review Status Tracking Document_05272020.pdf; PT Specialty Pharmaceutical Designations 1Q 2020.pdf; Supplemental Approvals 05.27.2020.pdf

**Importance:** High

## CONFIDENTIAL
*The complete meeting materials are available via Diligent.*

Good afternoon

**The meeting will take place via Conference Call and WebEx on Wednesday, May 27, 2020 from 9:00 AM to 11:00 AM, CT.**

### Call: 1-800-300-4206
### Meeting Number (access code): 746-583-151
### Meeting password (if requested): *May272020
### *Please refer to your meeting notice for the on-link to the WebEx.*

We look forward to speaking with everyone in a couple of weeks.  Attached to this e-mail, you will find the following items:

- **May 27, 2020 Meeting Agenda**

- **Consensus Decision Packet Information for your review and approval:**
  1. **Vote Required:**
     - New to Market Block Agents
     - Utilization Management Subgroup Meeting Minutes – April 16, 2020
     - Spritam Medicare Part D Utilization Management Criteria
     - CVS Caremark 2021 Employer Group Waiver Plan Medicare Part D Drug List Changes
  2. **Notifications:**
     - Commercial Drug List Changes
       1. Aetna Commercial Drug List Changes
       2. CVS Commercial & Managed Medicaid Drug List Changes
       3. CVS Caremark Medical Benefit Drug List Changes
     - CVS Health Exchanges Drug List Changes
       1. 2020/2021 Health Exchanges Drug List Changes
     - Medicare Part D Drug List Changes:
       1. Aetna 2020 Medicare Part D Drug List Changes
       2. CVS 2020 Medicare Part D Drug List Changes
       3. CVS 2021 Medicare Part D Drug List Changes
       4. CVS 2020 Medicare Part D Employer Group Waiver Plan (EGWP) Drug List Changes
       5. 2020 Medicare Part D Extension Drug List Changes
       6. 2021 Medicare Part D Extension Drug List Changes
     - New Drug Review Status
     - Specialty Pharmacy Designations
     - Supplemental New Indications

**The complete meeting materials are available via Diligent.   If you have difficulty with your access to Diligent, the  24/7Concierge Support: 866-262-7326**

Please contact me with any questions or concerns.  We look forward to speaking with you.  I can be reached at (847) 687-6324 or by email at **Confidential Redaction**

Regards,

**Confidential Redaction**



CONFIDENTIALITY NOTICE: This communication and any attachments may contain confidential and/or privileged information for the use of the designated recipients named above. If you are not the intended recipient, you are hereby notified that you have received this communication in error and that any review, disclosure, dissemination, distribution or copying of it or its contents is prohibited. If you have received this communication in error, please notify the sender immediately by email or telephone and destroy all copies of this communication and any attachments.

Exhibit I

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| UNITED STATES OF AMERICA *ex rel*. ELLSWORTH ASSOCIATES, LLP,<br><br>                    Plaintiff-Relator,<br><br>      v.<br><br>CVS HEALTH CORPORATION, *et al*.,<br><br>                    Defendants. | Case No.: 2:19-cv-02553-JMY |

**STIPULATED QUALIFIED PROTECTIVE ORDER GOVERNING EXCHANGE
OF CONFIDENTIAL MATERIAL AND PROTECTED HEALTH INFORMATION**

Pursuant to Rule 26(c) of the Federal Rules of Civil Procedure, the Court enters the following Qualified Protective Order ("Order") limiting the disclosure of discovered information and limiting the use of such information as hereinafter provided.  IT IS HEREBY STIPULATED AND ORDERED THAT:

1.      This joint stipulated Qualified Protective Order ("Protective Order" or "Order") shall govern the handling and use of all documents produced and testimony given in this action. This Order shall also govern the filing of documents, testimony, and all other materials disclosing or containing Confidential Information or Confidential-Attorneys' Eyes Only Information as defined herein.  This Order shall apply to the parties in this action, to all attorneys of record in this action and their agents, and to others who obtain or are given access to Confidential Information pursuant to this Order. This Order is a Qualified Protective Order pursuant to 45 C.F.R. § 164.512(e).

2.      The Court retains the right to allow disclosure of any subject covered by this stipulation or to modify this stipulation at any time in the interest of justice.

3.      The Court finds good cause to enter this Order because the case will inevitably involve the production of confidential, sensitive, secret, and private information in addition to Protected Health Information ("PHI") and proprietary information, disclosure of which will be critical to the issues at the core of the case.  For example, in the Second Amended Complaint, Plaintiff-Relator referenced and provided examples of Prescription Drug Event ("PDE") records that Defendants submit to CMS as part of their regular business practices.  Such records contain self-identifying PHI about each beneficiary.

4.      For purposes of this Order, the following terms are defined as follows:

a.      "Person" refers to all natural persons, corporations, unincorporated associations, partnerships, limited liability companies, joint ventures, or other artificial persons of any kind no matter how identified or how organized, and their directors, officers, employees and agents.

b.      "Documents" are defined under Fed. R. Civ. P. 34(a).

c.      "Testimony" includes all depositions, affidavits, declarations, and discovery responses.

d.      "Confidential" or "Confidential Information" in this Order means any information of any type, kind or character that a designating party designates as "Confidential," whether it be a document, information in a document, or information disclosed during a deposition, in an interrogatory answer, or otherwise that the party or its counsel in good faith represents as containing proprietary, trade secret, commercially valuable, competitively sensitive, and/or private information the confidentiality of which the asserting party has an obligation, legal duty, or right to protect.  All such

Confidential documents or testimony in this action are subject to the terms of this Protective Order.

    e.    "Confidential-Attorneys' Eyes Only" or "Confidential-Attorneys' Eyes Only Information" in this Order means information of any type, kind, or character that a designating party designates as "Confidential," which also creates a substantial risk of competitive injury to the designating party or the designating party's affiliates and/or business partners that would not be reasonably avoided if the information were designated only "Confidential." This designation should be used sparingly and only in compelling circumstances.

    f.    "Protected Health Information" encompasses information within the scope and definition set forth in 45 C.F.R. § 160.103 that is provided to the Parties by a covered entity as defined by 45 C.F.R. § 160.103 ("Covered Entities") or by a business associate of a Covered Entity as defined by 45 C.F.R. § 160.103 ("Business Associate") in the course of this litigation, as well as information covered by the privacy laws of any state or other federal law as applicable.

    5.    Each Party or Non-Party that designates information or items for protection under this Order must take care to limit any such designation to specific material that qualifies under the appropriate standards. The Designating Party must designate for protection only those parts of material, documents, items, or communications that qualify—so that other portions of the material, documents, items, or communications for which protection is not warranted are not swept

unjustifiably within the ambit of this Order.  Mass indiscriminate, bulk, or routinized designations are prohibited.

6.      Any party may designate as "Confidential" any document or testimony, but only information that the Designating Party in good faith believes: (a) contains non-public, proprietary or commercially sensitive information; (b) requires the protections provided in this Stipulation and Order to prevent unreasonable annoyance, expense, disadvantage or prejudice to any person or entity; (c) contains personally identifying information of any individual, including but not limited to social security numbers and financial account numbers; (d) contains any other information of a personal or intimate nature regarding any individual; (e) contains information for which applicable agreements, regulations, or laws restrict public disclosure; or (e) the material contains any other category of information hereinafter given confidential status by the Court, may be designated as Confidential.

7.      Any party may designate as "Confidential-Attorneys' Eyes Only" any document or testimony, but only information that the Designating Party in good faith believes the information creates a substantial risk of competitive injury to the designating party or the designating party's affiliates and/or business partners that would not be reasonably avoided if the information were designated only "Confidential."

8.      Any party who produces Protected Health Information in this case shall designate such discovery material "Confidential" in accordance with the provisions of this Protective Order. Pursuant to 45 C.F.R. § 164.512(e)(1), all Covered Entities and their Business Associates (as defined in 45 C.F.R. § 160.103), or entities in receipt of information from such entities, are hereby authorized to disclose Protected Health Information pertaining to this case and for such purposes as designated herein. Further, all parties that are entities subject to state privacy law requirements,

or entities in receipt of information from such entities, are hereby authorized to disclose Protected Health Information pertaining to this case to those persons and for such purposes as designed herein. Such Protected Health Information is necessary for the conduct of proceedings before the Court and failure to make the disclosure would be contrary to the public interest or to the detriment to one or more parties to the case.

9.      Unless otherwise agreed by the parties on a case-by-case basis, the parties will not use the designation of a documents' Confidential designation as a basis for applying redactions when producing discovery material.

10.     The parties to this action and their counsel shall not use documents and testimony designated "Confidential" or "Confidential-Attorneys' Eyes Only" except for the sole purpose of prosecuting or defending this case. The parties are prohibited from using or disclosing any information produced in discovery for any purpose other than the litigation or proceeding for which such information was requested.

11.     The parties shall not disclose, make available, or communicate documents and testimony designated Confidential or summaries containing Confidential Information , to any other person except that counsel may disclose such information or documents to:

    a.      each named Party and its employees, officers and directors, provided that such persons are assisting the Party with this litigation;

    b.      legal, paralegal, and/or clerical personnel directly employed by, associated with, or retained by a Party in connection with this case;

    c.      expert witnesses and consultants retained by a Party for this case, provided that such persons complete the certification contained in Exhibit A, Acknowledgment and Agreement to Be Bound;

    d.        any actual or potential witness, including former employees, officers, and agents of a Party, provided there is a reasonable basis to believe that the witness will give relevant testimony regarding the Confidential material;

    e.        any person who appears to have authored or previously received the material, who is referenced in the material, or whose conduct is purported to be identified in the material;

    f.        any persons recording, taking, or transcribing testimony or argument at any deposition, hearing, trial, or appeal in this action;

    g.        vendor agents retained by the parties or counsel for the parties, including outside photocopying, data processing, trial preparation services, or graphic production services, provided that the vendor completes the certification contained in Exhibit A, Acknowledgment and Agreement to Be Bound; and

    h.        the Court or any arbitrator, special master, or mediator acting in this Proceeding, and any members of their staffs to whom it is necessary to disclose the information.

12.     Access to documents and testimony designated Confidential-Attorneys' Eyes Only, or summaries containing Confidential-Attorneys' Eyes Only Information shall be limited to employees of the designating party during their depositions; the persons designated in Paragraph 10(b) (outside and in-house counsel); Paragraph 10(c) (outside experts and consultants, subject to the terms in Paragraph 10(c)); Paragraph 10(e) (witnesses, subject to the terms in Paragraph 10(e)); Paragraph 10(f) (court reporters); Paragraph 10(g) (litigation consultants and vendors, subject to the terms in Paragraph 10(g)); and Paragraph 10(h) (the Court). Unless they fall into one of the preceding categories, persons designated in Paragraph 10(a) are strictly prohibited from viewing

any information designated Confidential-Attorneys' Eyes Only. The protections afforded to Confidential-Attorneys' Eyes Only Information are not intended to unreasonably impede the deposition process. To the extent a party taking a deposition plans to use a document designated Confidential-Attorneys' Eyes Only during the deposition of an individual who does not fall within the foregoing exceptions, the parties shall meet and confer and if unable to resolve any dispute, may submit the matter to the Court for resolution. Parties may leave depositions open and resume them once the Court resolves the dispute.

13.     With respect to a document including transcript of testimony, the designation of confidentiality shall be made by placing or affixing a stamp or marking on the upper, lower, or side margin of the document (in such a manner as will not interfere with the legibility thereof) providing notice that the document is Confidential and identifying the designating party (e.g. "CONFIDENTIAL-CVS"). The designating party may also designate any document as Confidential or Confidential-Attorneys' Eyes Only within thirty (30) days after the disclosure of such document by notifying all parties in writing of the Confidential nature of the document(s) and providing appropriately marked versions of the document(s) consistent with the ESI protocol. Any non-disclosing party may also designate any document as Confidential or Confidential-Attorneys' Eyes Only within sixty (60) days after the disclosure of such document by notifying all parties in writing of the Confidential nature of the document(s). All parties recognize that native format documents cannot be so marked, and thus, to the extent native format documents are produced, the designating party or non-party should either (1) affix the words "CONFIDENTIAL" or "CONFIDENTIAL-ATTORNEYS' EYES ONLY" to the slip sheet produced with the native file or (2) add "CONFIDENTIAL" or "CONFIDENTIAL-ATTORNEYS' EYES ONLY" in the native file name.

14.    <u>Privilege Logs</u>.  Within 30 days of a Producing Party's production that substantially completes production for a particular custodian or non-custodial source, a Producing Party shall produce a privilege log consistent with the requirements set forth below.  Stated another way, privilege logs shall be produced on a rolling basis so as not to delay production of privilege logs.

   a.    Privilege logs should be produced in Excel format that allows for text searching, sorting and organization of data, and shall be produced either (a) in a cumulative manner, so that each subsequent privilege log includes all privilege claims from prior logs; or (b) in installments using a consistent format such that they can be merged into a cumulative Excel spreadsheet by the Receiving Party.

   b.    The Producing Party shall make a good faith effort to identify, in the privilege log or accompanying correspondence, the primary production volume(s) to which the privilege log relates.

   c.    The Producing Party shall identify which individuals are attorneys, paralegals or other legal staff carrying out a legal function for an attorney.

   d.    Each log entry should comply with Federal Rule of Civil Procedure 26(b)(5) and include:

      i.    a unique identifying number (separate from any Bates numbering), along with a separate column identifying the Bates number(s) of a document claimed to be privileged if produced in a redacted form;

      ii.    a description of the nature of the document, communication, or tangible thing (over which a privilege is asserted) in a manner that,

without revealing information itself privileged or protected, will enable Receiving Parties to assess the claim;

iii. the date of the document or communication to the extent it is reasonably ascertainable;

iv. the authors and recipients of the document or communication, based on the From (or Author), To, CC, and BCC fields from electronically-generated metadata associated with the document, to the extent applicable and reasonably available. For email chains, the parties will provide information gathered from the metadata for the most recent email in the chain. For email chains where only the most recent email is listed on the privilege log, the log entry will identify the email as an email chain, and whether an email in the chain contains an attachment. Further, if the attorney(s) giving rise to the privilege claim is/are not within the metadata of the most recent email, the Designating Party will include the name(s) of any such attorney(s) within the description;

v. the subject of the document, based on the Subject field (or other similar category) from electronically-generated metadata associated with the document, to the extent applicable and reasonably available, understanding that the Designating Party may eliminate some or all of this information to the extent that it has a good faith belief that it would reveal information which is itself privileged; and

vi.     the name of or other identifying information as to the produced source file in which the document subject to a privilege claim was found, (and listing of the primary custodian constitutes sufficient identifying information).

e.      No communications between the Parties and their outside counsel regarding this lawsuit, including any communications during the pre-filing investigation of this lawsuit, must be logged. This provision does not waive any claims of privilege on such communications.

15.     An inadvertent failure to designate a document as Confidential Information or Confidential-Attorneys' Eyes Only Information does not, standing alone, waive the right to so designate the document; provided, however, that a failure to serve a timely notice of designation of deposition testimony as required by this Order, even if inadvertent, waives any protection for deposition testimony.  If a party designates a document as Confidential Information or Confidential-Attorneys' Eyes Only Information after it was initially produced, the receiving party, on notification of the designation, must make a reasonable effort to assure that the document is treated in accordance with the provisions of this Order.  No party shall be found to have violated this Order for failing to maintain the confidentiality of material during a time when that material has not been designated Confidential Information, even where the failure to so designate was inadvertent and where the materials is subsequently designated Confidential Information.

16.     If at any time, a party objects to the designation of a document or testimony as Confidential or Confidential-Attorneys' Eyes Only, it shall so notify counsel for the designating party in writing.  The designating party will within 7 days respond in writing to any notification by either (i) modifying or withdrawing all or part of the designation as Confidential or

Confidential-Attorneys' Eyes Only, or (ii) if declining to redesignate any part of the Confidential or Confidential-Attorneys' Eyes Only designation, setting forth the reason(s) supporting the designation as Confidential or Confidential-Attorneys' Eyes Only. If, after conferring about the dispute, the objecting party and the designating party are not able to resolve the dispute, the designating party has 14 days from receipt of the written objection to move the court for any order regarding the designation.

17. The party asserting confidentiality bears the burden of establishing that the document or testimony is Confidential or Confidential-Attorneys' Eyes Only. Until the issue is finally determined by the Court, the document or testimony shall be afforded the confidential treatment initially assigned to it. If the Court determines that a designating party has made the Confidential or Confidential-Attorneys' Eyes Only designation without substantial justification, it shall award as a sanction the reasonable fees accrued by the non-designating party in getting the designation removed.

18. The Parties shall comply with their ethical and legal obligations concerning the actual or apparent inadvertent production of privileged or protected information consistent with Rule 26(b)(5)(B) of the Federal Rules of Civil Procedure and Federal Rule of Evidence 502(d). Disclosure of information subject to the attorney-client privilege or work-product doctrine or any other applicable privilege or immunity ("Privileged Material") shall not be deemed a waiver in whole or in part of the privilege or work-product protection or other applicable immunity, either as to the specific information disclosed or as to the same or related subject matter in the instant litigation or any other federal or state proceeding. If a Party has produced Discovery Material that it subsequently claims is Privileged Material, the receiving party (the "Party Receiving Privileged Material"), upon written or oral request, shall within five (5) business days return it, including

all copies, and promptly destroy any notes concerning it. The Party Receiving Privileged Material may not refuse to return the material. Upon receipt of the returned materials, the Producing Party shall within five (5) business days provide a written good faith explanation of the basis for the privilege claim or claim of immunity. If the Party Receiving Privileged Material wants to challenge the claim of inadvertent or unintentional production or the claim of privilege or immunity from disclosure, it must first return the material, then confer and provide written notice to the Producing Party identifying with particularity the reasons for the challenge. If the parties cannot resolve the dispute within a reasonable time, the Party Receiving Privileged Material may move the Court for an appropriate order. The disputed material shall be treated as privileged until a ruling on such motion or other resolution of the dispute.

19.     Upon identification of any Discovery Material that, on its face, appears to be covered by any applicable privilege or immunity from disclosure, the recipient of such Discovery Material shall provide prompt notice of the production of that material to the Producing Party, to afford the Producing Party the opportunity to designate the material as Privileged Material within five (5) business days. Upon such designation by the Producing Party, the Party Receiving Privileged Material must return all copies of the Privileged Material and destroy any notes concerning it.

20.     With respect to written discovery, such as answers and responses to requests for admission and interrogatories, the designation of confidentiality shall be made in the written response. The cover sheet of the discovery answers and responses and each page containing Confidential Information or Confidential Protected Health Information shall be identified by marking as provided above.

21.    With respect to deposition testimony, all such testimony automatically shall be deemed Confidential until thirty (30) days after copies of the deposition transcript are served upon the parties after which they will no longer be deemed Confidential absent a writing consistent with this Protective Order. Notice of such Confidential designation will be effective upon receipt by counsel for the other party. Notwithstanding the foregoing: (a) nothing herein shall prevent a party from designating testimony given during a deposition as Confidential at or before the time the testimony is given. Notice of such Confidential designation shall be deemed effective immediately, and must be made within 30 days of the transcription of the deposition; (b) if all or part of a deposition transcript is designated Confidential pursuant to this Order, the cover sheet and each page containing Confidential Information of the original and all copies of the transcript shall be marked in accordance with above by counsel in possession of such transcript.

22.    If any party chooses to file with the Court a Confidential document or testimony (including any redacted version of such), or a document or testimony containing Confidential-Attorneys' Eyes Only, the filing party shall file a sealing motion or stipulation that complies with Local Rule 5.1.5 and all other applicable rules and procedures for submitting materials under seal. The designating party has the burden of demonstrating a compelling reason for sealing the document or testimony and shall make that demonstration in the motion (if the designating party is the filing party). If the designating party is not the filing party, it shall timely respond by either withdrawing the Confidential or Confidential-Attorneys' Eyes Only designation or demonstrating a compelling reason for sealing the document or testimony.

23.    A Designating Party may withdraw its Confidential designation or may consent to the disclosure or use of such information beyond the terms of the Protective Order, without prejudice to any designation by any other party or nonparty, by so notifying all parties to this action

in writing or on the record of a deposition or court proceeding. However, information previously designated Confidential will continue to be considered "Confidential" subject to this Protective Order for seven (7) days following such notice of withdrawal being provided to all parties to this Action.

24.     All Persons (excluding clerical personnel or copy services employed or retained by counsel in connection with this case, any person who authored or previously received the Confidential material, any court reporter employed in this case, the Court and any arbitrator, special master, or mediator acting in this Proceeding) who are provided with Confidential Information or documents or Confidential-Attorneys' Eyes Only shall be advised of this Order and shall be instructed of their obligation to abide by the same.

25.     A third-party producing discovery in the case (e.g., documents in response to a subpoena, information compelled at a deposition, etc.) may avail himself or herself of the protections of this Order. A third-party wishing to do so shall designate any documents he or she produces using the same procedures applicable to the parties in the case. Likewise, a third party wishing to designate portions of his or her deposition testimony as Confidential Information shall follow the procedures in this Order concerning depositions.

26.     Nothing herein shall be construed to affect in any way the admissibility of any document, testimony, or other evidence. At trial or hearings, the parties agree that the Court may take such measures as the Court deems appropriate to protect the claimed Confidential document or information or Confidential-Attorneys' Eyes Only Information sought to be admitted or referenced.

27.     Within 60 days of termination of this action, all documents, deposition and hearing testimony designated as Confidential by the Court or by this Order, and all copies thereof

(including but not limited to any summaries, exhibits, computer records or other documents reflecting the contents of Confidential Information) in the custody of parties to whom counsel have disclosed such documents, shall either be made available by the custodial parties for pick up by the producing party or shall be destroyed. If destroyed, the destroying parties shall certify in writing to counsel for the party that produced or provided such documents stating that all such documents, copies, summaries, and exhibits have been destroyed. For purposes of this agreement, "termination" of this action shall occur upon (i) full settlement of all claims between all parties; or (ii) a final judgment (including final resolution of any appeal). Notwithstanding the foregoing provisions in this paragraph, counsel for the parties to this Proceeding shall be entitled (but not obligated to retain copies of all documents and transcripts containing Confidential Information (including but not limited to any summaries, exhibits, computer records or other documents reflecting the contents of Confidential Information) in their files, subject to the continuing terms of this Protective Order.

28.     Within 60 days of termination of this action, the Parties, their counsel, and any person or entity in possession of Protected Health Information received pursuant to this Order shall destroy or return to the Covered Entity or Business Associate such Protected Health Information (including all copies).

29.     Any party may apply to the Court, on reasonable notice to all counsel of record, for relief from or modification of any provision of this Order.

DATED:     June 2, 2023

*/s/W. Scott Simmer*
W. Scott Simmer (pro hac vice)
William G. Powers (PA Bar No. 316876)
Michael von Klemperer (pro hac vice)
Noah M. Rich (pro hac vice)
BARON & BUDD, P.C.
The Watergate
600 New Hampshire Ave. NW,
10th Floor
Washington, DC 20037
Telephone: (202) 333-4562
Facsimile: (202) 337-1039

Joe H. Tucker, Jr., Esquire
Scott E. Diamond, Esquire
Ten Penn Center
1801 Market Street, Suite 2500
Philadelphia, PA 19103
(215) 875-0609
jtucker@tlgattorneys.com
sdiamond@tlgattorneys.com

*Counsel for Relator Ellsworth Associates, LLP*

*/s/Jennifer B. Routh*
Russell Hayman (*pro hac vice*)
MCDERMOTT WILL & EMERY LLP
2049 Century Park East
Suite 3200
Los Angeles, CA 90067
(310) 277-4110
Edward B. Diskant (*pro hac vice*)
MCDERMOTT WILL & EMERY LLP
One Vanderbilt Avenue
New York, NY 10017
(212) 547-5400

Lesli C. Esposito (PA Bar No. 201906)
Jennifer B. Routh (*pro hac vice*)
Theodore E. Alexander (*pro hac vice*)
Crystal Fomba (*pro hac vice*)
MCDERMOTT WILL & EMERY LLP
500 North Capitol Street NW
Washington, DC 20001

(202) 756-8000

*Counsel for Defendants*
*CVS Health Corporation; CVS Pharmacy,*
*Inc.; SilverScript Insurance Company,*
*LLC; and CVS Caremark Corporation*

**IT IS SO ORDERED.**

Dated: <u>June 2, 2023</u>

<u>     /s/ John Milton Younge          </u>
UNITED STATES DISTRICT COURT JUDGE

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel*. ELLSWORTH ASSOCIATES, LLP,<br><br>               Plaintiff-Relator,<br><br>    v.<br><br>CVS HEALTH CORPORATION, *et al*.,<br><br>              Defendants. | Case No.: 2:19-cv-02553-JMY |

**EXHIBIT A:
ACKNOWLEDGMENT AND AGREEMENT
TO BE BOUND BY QUALIFIED PROTECTIVE ORDER**

I declare under penalty of perjury that I have read in its entirety and understand the Qualified Protective Order issued by the United States District Court for the Eastern District of Pennsylvania on _____ in the above-captioned matter (the "Order").

I agree to comply with and to be bound by all the terms of the Order. I promise that I will not disclose in any manner any information or item that is subject to the Order to any person or entity except in strict compliance with the provisions of the Order. I understand and acknowledge that failure to so comply could expose me to sanctions and punishment.

I further agree to submit to the jurisdiction of the United States District Court for the Eastern District of Pennsylvania for the purpose of enforcing the terms of the Order, even if such enforcement proceedings occur after termination of this litigation.

Dated: _____

City and State where sworn and signed: _____

Printed Name: _____

Signature: _____

DM_US 195820875-2.086317.0081

Exhibit J



**Audit:** SSC Grievance January 2020
**Prepared by:** Bhavna Pursnani
**Prepared Date:** 3/6/2020

**Control:**
Assess whether

**Test Plan:**
Selected samples will be tested end-to-end to assess compliance with CMS standards and chapter 42 of the CFR, including, but not limited to, the following:
a. Proper identification as a grievance (GV01)
b. Appropriate handling of complaints that

**Population:**
All grievances generated through MedHok  for the period 01/01/2020-01/31/2020 provided by the Grievance team: 47,751 grievances

**Sample Selection Methodology:**
Judgmentally select 30 samples from the population above

**Sample Size:**
30

## Member Information

| Samples | New Grievance/First Call Resolution | UID # | GRV | Beneficiary Name | Enrollment Effective Date | Member CID | Contract ID | Plan ID | Date Grievance/Complaint was received | How was the Grievance / Complaint received (oral/written) | Category of the Grievance / Complaint must include one correct category: Coverage Determination and Redetermination Process, Customer Service, Enrollment/Disenrollment, Grievances related to "CMS Issues", Marketing, Other, Pharmacay Access, Plan Benefit and Quality of Care | Description of Issue | Completion Date | Description of Resolution |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | FCR | C057166 | GR2000215578 | PHI Redaction | 2020/01/01 | G9C717847 | 55601 | 816 | 2020/01/02 | Oral | Redetermination Process | PHI Redaction | 2020/01/02 | PHI Redaction |
| 2 | FCR | C090586 | GR2001382771 | PHI Redaction | 2017/06/01 | G7C102582 | 55601 | 811 | 2020/01/13 | Oral | Redetermination Process | PHI Redaction | 2020/01/13 | PHI Redaction |
| 3 | NEW | U001558 | GR1935633397 | PHI Redaction | 2019/02/01 | G9C043341 | 55601 | 012 | 2019/12/20 | Written | Customer Service | PHI Redaction | 2020/01/06 | PHI Redaction |
| 4 | NEW | Z271921 | GR1936015727 | PHI Redaction | 2020/01/01 | G9Z035672 | 55601 | 044 | 2019/12/26 | Oral | Customer Service | PHI Redaction | 2020/01/24 | PHI Redaction |
| 5 | Z271300 | GR2000327489 | PHI Redaction | 2020/01/01 | G4C822708 | 55601 | 028 | 2020/01/03 | Oral | Customer Service | PHI Redaction | 2020/01/03 | PHI Redaction |
| 6 | FCR | C100999 | GR2000611020 | PHI Redaction | 2020/01/01 | G9C778754 | 55601 | 820 | 2020/01/06 | Oral | Customer Service | | 2020/01/06 | |
| 7 | FCR | Z284012 | GR2001427316 | PHI Redaction | 2020/01/01 | G9C764328 | 55601 | 820 | 2020/01/14 | Oral | Enrollment/Disenrollment | PHI Redaction | 2020/01/14 | PHI Redaction |
| 8 | FCR | C023885 | GR2003149752 | PHI Redaction | 2018/04/01 | G7D179390 | 55601 | 805 | 2020/01/31 | Oral | Enrollment/Disenrollment | PHI Redaction | 2020/01/31 | PHI Redaction |
| 9 | FCR | U020220 | GR2000425305 | PHI Redaction | 2018/04/01 | G2C499959 | 55601 | 801 | 2020/01/04 | Oral | Grievances related to "CMS Issues" | PHI Redaction | 2020/01/04 | PHI Redaction |
| 10 | FCR | Z270017 | GR2003049960 | PHI Redaction | 2018/04/01 | G4D046525 | 55601 | 022 | 2020/01/30 | Oral | Marketing Grievances | | 2020/01/30 | |
| 11 | FCR | Z280376 | GR2000960085 | PHI Redaction | 2014/01/01 | G023490320 | 55601 | 055 | 2020/01/09 | Oral | Other | PHI Redaction | 2020/01/09 | PHI Redaction |
| 12 | FCR | Z275632 | GR2002031407 | PHI Redaction | 2018/12/01 | G5C537383 | 55601 | 019 | 2020/01/20 | Oral | Other | PHI Redaction | 2020/01/20 | PHI Redaction |
| 13 | FCR | Z280793 | GR2001352913 | PHI Redaction | 2018/04/01 | A4C200017 | 55601 | 064 | 2020/01/13 | Oral | Other | PHI Redaction | 2020/01/13 | |
| 14 | FCR | Z270380 | GR2002298499 | PHI Redaction | 2017/03/01 | G7C023190 | 55601 | 034 | 2020/01/22 | Oral | Other | PHI Redaction | 2020/01/22 | PHI Redaction |
| 15 | FCR | Z268899 | GR2002990930 | PHI Redaction | 2018/04/01 | G9C847973 | 55601 | 018 | 2020/01/29 | Oral | Other | | 2020/01/29 | |
| 16 | NEW | Z073147 | GR2003853030 | PHI Redaction | 2020/01/01 | G6Z169822 | 55601 | 022 | 2020/01/07 | Written | Pharmacy Access | PHI Redaction | 2020/01/13 | PHI Redaction |
| 17 | NEW | C024232 | GR2002990999 | PHI Redaction | 2018/04/01 | G7C301947 | 55601 | 060 | 2020/01/22 | Oral | Pharmacy Access | PHI Redaction | 2020/01/31 | PHI Redaction |
| 18 | FCR | U02R23V | GR2000772441 | PHI Redaction | 2020/01/01 | G6C679383 | 55601 | 801 | 2020/01/16 | Oral | Pharmacy Access | PHI Redaction | 2020/01/16 | PHI Redaction |
| 19 | UD1YLHD | GR2001563452 | PHI Redaction | 2020/01/01 | G2C496422 | 55601 | 801 | 2020/01/15 | Oral | Pharmacy Access | PHI Redaction | 2020/01/15 | PHI Redaction |
| 20 | FCR | C102191 | GR2001676376 | PHI Redaction | 2020/01/01 | G5C659702 | 55601 | 805 | 2020/01/16 | Oral | Pharmacy Access | PHI Redaction | 2020/01/16 | PHI Redaction |
| 21 | NEW | U028314 | GR2003933932 | PHI Redaction | 2020/01/01 | G9C733335 | 55601 | 004 | 2020/01/20 | Written | Plan Benefit | PHI Redaction | 2020/01/30 | PHI Redaction |
| 22 | FCR | U052794 | GR2002245162 | PHI Redaction | 2019/11/01 | G7C520641 | 55601 | 805 | 2020/01/21 | Oral | Plan Benefit | Member called in disappointed due to not being understood on previous call.  Also not her ALBUTEROL SULFATE-VIAL-NEB- 2.5MG/3MLnot being covered when taking 2.5MG/3MLnot being covered | 2020/01/22 | due to not being understood on previous call.  Also not her ALBUTEROL SULFATE-VIAL-NEB- 2.5MG/3MLnot being covered |
| 23 | FCR | Z280479 | GR2002226279 | PHI Redaction | 2018/04/01 | G6C761478 | 55601 | 018 | 2020/01/22 | Oral | Plan Benefit | PHI Redaction | 2020/01/22 | |
| 24 | FCR | Z229413 | GR2002363345 | PHI Redaction | 2020/01/01 | 2912550357 | 55601 | 026 | 2020/01/23 | Oral | Plan Benefit | REASON: Ejay V w/customer care transferring mbr expressed dissatisfaction that she has been transferred multiple times and disconnected multiple times - | 2020/01/25 | REASON: Ejay V w/customer care transferring mbr expressed dissatisfaction that she has been transferred multiple times and |
| 25 | FCR | Z268895 | GR2003582827 | PHI Redaction | 2018/04/01 | G024971001 | 55601 | 006 | 2020/01/25 | Oral | Plan Benefit | PHI Redaction | 2020/01/25 | PHI Redaction |
| 26 | FCR | C070346 | GR2002770566 | PHI Redaction | 2020/01/01 | G2Z565455 | 55601 | 002 | 2020/01/27 | Oral | Plan Benefit | PHI Redaction | 2020/01/27 | PHI Redaction |
| 27 | NEW | Z277709 | GR1934467774 | PHI Redaction | 2020/01/01 | G7C229728 | 55601 | 028 | 2019/12/10 | Oral | Quality of Care | PHI Redaction | 2020/01/07 | PHI Redaction |
| 28 | NEW | Z280349 | GR1935798210 | PHI Redaction | 2017/10/01 | G5D105841 | 55601 | 006 | 2019/12/23 | Written | Quality of Care | PHI Redaction | 2020/01/08 | PHI Redaction |
| 29 | NEW | U001558 | GR2001512874 | PHI Redaction | 2018/09/01 | G8C432747 | 55601 | 801 | 2020/01/03 | Oral | Quality of Care | PHI Redaction | 2020/01/08 | PHI Redaction |
| 30 | NEW | UP33KGN | GR2002670072 | PHI Redaction | 2017/01/01 | G2D183232 | 55601 | 801 | 2020/01/26 | Written | Quality of Care | PHI Redaction | 2020/01/31 | PHI Redaction |

**Tickmark Legend:**
Y - Attribute is satisfied
N - Attribute is not satisfied
N/A - Attribute is not applicable

**Conclusion:**
1 Grievance does not appear to be processed in accordance with CMS guid

| Testing | | | | | | | Results | |
|---|---|---|---|---|---|---|---|---|
| GV01 Previous Grievance, CTM Received and Documented Y/N/NA | GV02 Complaint Categorization (Grievance vs. Coverage Determination) Was request properly identified as a... | GV02 Received Date and Completion Date on the Universe agree with the dates in MedHOK /PeopleSafe? [Y/N] | GV03 Category Appropriate? Y/N] | GV04 Timely Notification Was request processed timely and was enrollee appropriately notified within the required timeframe? | GV05 Method of Grievance Response Appropriate [Y/N] | GV06 Internal Resolution and member notification is complete, accurate, easily understandable and appropriately... | CM Preliminary Result | Potential Condition |
| Y | Y | Y | Y | Y | Y | | Pass | |
| NA | Y | Y | Y | Y | Y | Y | | |
| NA | Y | NA | Y | Y | Y | Y | Pass Spelling/Grammar- Paragraph 3, 1st sentence, term 'SilverScript Choice Place' should be 'SilverScript Choice Plan'. | |
| NA | Y | NA | Y | Y | Y | Y | Pass | |
| NA | Y | NA | Y | Y | Y | Y | Pass w/Observation- Incorrect category of Grievances related to Customer Service. Member was upset because out of the two medications requested, only one medication was mailed to him. Correct category is Pharmacy- Mail Order . | |
| NA | Y | NA | Y | N | Y | Y | Pass | |
| NA | Y | NA | Y | Y | Y | Y | Pass | |
| NA | Y | NA | Y | Y | Y | Y | Pass w/Observation- Case is not a grievance. Member was not upset on the call and wanted to hold off on getting her prescription refilled. | |
| NA | N | NA | Y | Y | Y | Y | Pass w/Observation- Member's address is updated to the new address of 5313 SE Miles Grant Road, Apt K104, Stuart, FL 34997 in RxClaim and Peoplesafe However the member tab in MedHOk is showing the new address compared to the grievance tab that is showing the old address of 8909 Legacy Ct Apt 103 Bldg 15, Kissimmee, FL 34747 . Please update to the correct address in MedHOK. Pass w/Observation- Incorrect category of Grievances related to Customer Service. Member was upset about being transferred offshore and was unable to understand the CCR's language for getting his address changed. Correct category is Customer Service. | |
| NA | Y | NA | Y | Y | Y | Y | Pass w/Observation- Inaccurate Description/Resolution notes on the universe. Member on the call had no issues with the functionality of Caremark.com and rather was upset about not receiving his medication on time. Correct category should be Pharmacy- Mail Order. | |
| NA | Y | NA | Y | Y | Y | Y | FAIL: Based on the CCR phone call the Category is misclassified as Other . Category should be Quality of Care/ Mail Order delay. PeopleSafe call notes indicate member called on 1/3/20 to order the medication Prescription was on auto-refill and required the member's ship consent, however the caseworker did not release the order correctly which caused a delay in the member receiving her medication. Member received her medication on 1/15/2020. Member's call is a Quality of Care issue and should be processed in MedHOK to provide BFCC-QIO rights in the letter mailed to the member. IA noted there was no grievance opened in MedHOK for this member for a quality of care. - What is the root cause of this deficiency? | Quality of Care: Required Written Resolution not Sent to Member |
| NA | Y | NA | Y | N | Y | Y | Pass w/Observation- The initial issue was called into Care on 1/28/20, caseworker filed the case in MedHOk a day later on 1/29/20. | |
| NA | Y | Y | N | Y | Y | Y | Pass | |
| NA | Y | NA | Y | Y | Y | Y | Pass | |
| NA | Y | NA | Y | Y | Y | Y | Pass | |
| NA | Y | NA | Y | Y | Y | Y | Pass | |
| NA | Y | Y | Y | Y | Y | Y | Pass | |
| NA | Y | Y | Y | Y | Y | Y | Pass w/Observation- The initial issue was called into Care on 1/21/20, caseworker filed the case in MedHOk a day later on 1/22/20. The grievance caseworker updated the date reported to 1/21/20 but because this was logged as FCR the completion date did not change. Grievance team will be coaching the caseworker. | |
| NA | Y | NA | Y | Y | Y | Y | Pass w/Observation- Incorrect category of Grievances related to Plan Benefits. Member was upset about his medication not being covered on the formulary. Caseworker transferred the beneficiary to the CCR | |
| NA | Y | Y | Y | N | Y | Y | FAIL: Based on the call and CCR notes in PeopleSafe, member complained about being transferred multiple times and disconnected by Care reps who were rude, and one caseworker was unable to locate the member's ID#. However a separate grievance was not opened by the caseworker in MedHOK. Caseworker should have opened a separate grievance for Customer Service- Long hold time. | Grievance Not Filed by Customer Care |
| NA | Y | NA | Y | Y | Y | Y | Pass | |
| Y | Y | NA | Y | Y | Y | Y | Pass | |
| Y | Y | NA | Y | Y | Y | Y | Pass | |
| NA | Y | NA | Y | Y | Y | Y | Pass | |

| Grievance Business Area Comments (Agree- State Corrective Action to prevent future reoccurrence Disagree - provide rationale or evidence) | Customer Care Business Area Comments (Agree- State Corrective Action to prevent future reoccurrence Disagree - provide rationale or evidence) | CM Final Result | Final Condition |
|---|---|---|---|
| | | Pass | |
| | | Pass | |
| The Grievance Team agrees with this observation. | No response from Care | Pass Spelling/Grammar- Paragraph 3, 1st sentence, term 'SilverScript Choice Place' should be 'SilverScript Choice Plan'. | |
| | | Pass | |
| The Grievance Team agrees with this observation regarding the category. | Coaching ID 31 02/28 - Advised agent that based upon the WI she should have filed the grievance under the Pharmacy - Mail Order category.  Reviewed the Med D – Grievances in MedHok (TSRC-PROD-007931) work instruction with focus on the Grievance Categories and Definitions section. Agent was receptive advised that might helped. Agent was also advised that this WI must be used on every call to assist in ensuring accurate information is being provided to our members, which produces a good member experience.  Agent is aware that by not using WI it could lead to CA. | Pass w/Observation- Incorrect category of Grievances related to Customer Service. Member was upset because out of the two medications requested, only one medication was mailed to him. Correct category is Pharmacy- Mail Order. | |
| | | Pass | |
| Per the description of issue, the beneficiary was 'upset'. If IA reviewed the call and noted no dissatisfaction, then agree with observation. | Care disagrees with the observation. Per the call review, the member expressed dissatisfaction with the cost of her Xanax being more than her fill last year. | Pass- After reviewing comments from the Grievance team and listening to the call, CM has changed the results to a "Pass". | |
| | MedHOK updated to reflect the correct address. Coaching ID 26 02/25 - Agent has been coached. Reviewed the Med D – Grievances in Medhok (TSRC-PROD-007931) work instruction with focus on the Grievance Categories and Definitions section | Pass w/Observation- Member's  address is  updated to the new  address of 5313 SE Miles Grant Road, Apt K104, Stuart, FL 34997 in ReClaim and PeopleSafe However the member tab in MedHOk is showing the new address compared to the grievance tab that is showing the old address of 8909 Legacy Ct Apt 103 Bldg 15, Kissimmee, FL 34747. Pass w/Observation- Incorrect category of Grievances related to Customer Service. Member was upset about being transferred offshore and was unable to understand the CCR's language for getting his address changed. Correct category is Customer Service. | |
| The Grievance Team agrees with this observation. We believe this grievance was filed under the incorrect bene account because the bene does not use caremark.com to order his medications. | Coaching ID 27 02/26 - Agent Termed | Pass w/Observation- Inaccurate Description/Resolution notes on the universe. Member on the call had no issues with the functionality of Caremark.com and rather was upset about not receiving his medication on time. Correct category should be Pharmacy- Mail Order. | |
| The Grievance Team agrees with this fail.  The order was placed on consent hold on 12/22/2019.  There were multiple emails sent to obtain consent and a letter was mailed when there was no response from the bene.  The bene did call Care on 1/3/20 to order the medication; however, the CCR failed to release the order.  Due to the CCR error and delay in the bene receiving her medication, this grievance should be considered a quality of care category. | Coaching ID 28 02/26 - Agent was coached for the missed Quality of Care grievance.  Reviewed Med D – Grievances in MedHOK (TSRC-PROD-007931) with focus on the Grievance Categories and Definitions and the Determining Quality of Care and/or Access to Care sections.  Confirmed agent was not using the correct work instruction during the call. Advised agent to ask for the help if having a hard time on what category to choose. Moving forward the agent committed to use the proper work instructions. | FAIL: Based on the CCR phone call the Category is misclassified as Other.  Category should be Quality of Care/ Mail Order delay. PeopleSafe call notes indicate member called on 1/3/20 to order the medication.Prescription was on auto-refill and required the member's ship consent, however the caseworker did not release the order correctly which caused a delay in the member receiving her medication. Member received her medication on  1/15/2020. Member's call is a Quality of Care issue and should be processed in MedHOK to provide BFCC-QIO rights in the letter mailed to the member. IA noted there was no grievance opened in MedHOK for this member for a quality of care. | Quality of Care: Required Written Resolution not Sent to Member |
| | | Pass | |
| The Grievance Team agrees with this fail.  The order was placed on consent hold on 12/22/2019.  The Grievance Team agrees with this observation regarding the incorrect date reported; call into Care occurred on 1/28/20 and these is no call logged on 1/29/20. | Coaching ID 29 02/27 - Agent was coached for filing a grievance incorrectly. Reviewed the Med D – Grievances in MedHOK (TSRC-PROD-007931) work instruction and the MED D - Guide to Identifying and Filing Grievances (TSRC-PROD-012764) job aid. | Pass w/Observation- The initial issue was called into Care on 1/28/20, caseworker filed the case in MedHOK a day later on 1/29/20. | |
| | | Pass | |
| | | Pass | |
| | | Pass | |
| | | Pass | |
| The Grievance Team agrees with this observation. The Caseworker was coached for updating the date reported as necessary without converting the case to standard. | No response from Care | Pass w/Observation- The initial issue was called into Care on 1/21/20, caseworker filed the case in MedHOK a day later on 1/22/20. The grievance caseworker updated the date reported to 1/21/20 but because this was logged as FCR the completion date did not change. Grievance team will be coaching the caseworker. | |
| The Grievance Team agrees with this observation.  The bene was dissatisfied with the transaction IA convey is done correctly per the CA. | Pending IA response to grievance dispute | Pass w/Observation- After reviewing comments from the Grievance team and listening to the call, CM has changed the results to a "Pass". | |
| The Grievance Team does not agree that a separate grievance should have been filed.  The only issue is a customer service issue; the category should have been Customer Service | Care disagrees with this failure. A separate grievance should not have been filed as there was only a Customer Service issue identified. | Pass w/Observation-  Incorrect category of Grievances related to Plan Benefits -After listening to the call and  reviewing comments from the Grievance team, CM has overturned from a Fail to a Pass w/Observation. The category should be Customer Service and not Benefits. | |
| | | Pass | |
| | | Pass | |
| | | Pass | |
| | | Pass | |
| | | Pass | |