# EXHIBIT 16 to ECF No. 219

# EXPERT REPORT OF MICHELE DAVIDSON

U.S. ex rel. Ellsworth Associates, LLP v.
CVS Health Corporation, et al
No. 2:19-cv-02553

Submitted By:

Michele V. Davidson, R.Ph.
MVDavidson Consulting, LLC

# Table of Contents


Background & Experience Summary........................................1

Assignment Scope........................................2

Materials Considered........................................3

Definitions........................................4

Summary of Opinions........................................6

History of NCPDP Standards Development........................................6

The Telecommunication Standard........................................9

History of the Telecommunication Standard........................................9

408-D8 Dispense as Written (DAW) Product Selection Code Data Field........................................11

History of NCPDP DAW Codes........................................12

Impact of DAW Codes on Claim Billing........................................15

Determining Appropriate DAW Code Submission on a Pharmacy Claim........................................17

Determining Therapeutic Equivalency........................................19

State Generic Substitution Laws........................................22

Opinions........................................23

Opinion 1: CVS submitted claims for SilverScript Insurance Part D beneficiaries to CMS that utilized incorrect DAW codes for the Relevant Drugs within the Generic Blocking Strategies in violation of the NCPDP Telecommunication Standard, Version D.0. ........................................23

Opinion 2: The selection of DAW Code affects the financial reimbursement of prescription claims and can have lasting effects on a beneficiary's overall cost. ........................................31

Opinion 3: The CVS prescription and claim adjudication systems were designed such that it impeded proper DAW code submissions by pharmacists........................................32

Opinion 4: The employees of CVS that oversaw and enacted the Generic Blocking Strategies for the Relevant Drugs were unqualified for the roles they held and did not act within the standards of the field of claims adjudication and management for a Part D plan sponsor........................................34

Opinion 5: The records produced by CVS do not show that CVS Caremark or SilverScript Insurance Company were performing audits on the improper use of DAW Codes submitted related to SilverScript Beneficiaries........................................36

Appendix A - Curriculum Vitae........................................38

Appendix B - Summary of FDA's Orange Book Therapeutic Equivalence Codes........................................42

Appendix C- History of NCPDP DAW Codes .......... 43
Appendix D - LIST OF MATERIALS CONSIDERED .......... 45

## *Background & Experience Summary*

1. I am currently the President of MVD Consulting, LLC, a consulting firm offering various advisory services to the healthcare industry, including operational planning and expertise, as well as expert witness testimony regarding pharmacy national information technology standards.
2. I became a member of the National Council of Prescription Drug Programs (NCPDP) in July 2001 when I was working for Eckerd Drugs. I have continued to be an active member of this organization from 2001 until the present. I served on the Board of Trustees for 12 years and held various leadership positions on the Board including Secretary and Board Chair as well as Chair of numerous Committees, including Standardization, within the organization. I was the 2015 recipient of The Individual Member Excellence Award (TIME Award) presented annually to a member for unselfish devotion toward meeting the goals and objectives of NCPDP.
3. Throughout my over 20 years of involvement in NCPDP I have participated and led numerous task groups and served as co-chair of Workgroup 11 – Electronic Prescribing and Related Transactions for 7 years and Workgroup 9 – Government Programs for 2 years. Through this involvement I have been active in the development and maintenance of the SCRIPT Standard, which is the standard named by the Office of the National Coordinator (ONC) and Centers for Medicare and Medicaid Services (CMS) for e-prescribing transactions in the Medicare Modernization Act (MMA).
4. In addition to my NCPDP experience, I have had a long career in the pharmacy industry. I am a registered pharmacist in the state of Florida and worked as a retail pharmacist at Eckerd Drugs for 17 years before moving to the corporate office in 1997. Since 1997 I have held various executive positions within Eckerd Drugs, Brooks Corporation, the National Association of Chain Drug Stores (NACDS) and the Walgreen Company. I have focused on compliance with Medicaid and Medicare programs, pharmacy audits, pharmacy systems development and implementation (which includes e-prescribing as well as claims adjudication), Health IT strategic planning as well as Federal policy regarding pharmacy technical standards. My vast experience within the pharmacy industry enables me to provide insight into claims adjudication, audit policies and procedures, as well as e-prescribing services and pricing.

a. At Walgreens I was responsible for ensuring that the company was properly informed and engaged on trends and developments with pharmacy technical standards (e.g., reimbursement, billing, coding, etc.), while proactively coordinating with other members of the government relations team and key business units to facilitate their engagement and input as well as ensure compliance will all applicable standards (e.g., HIPAA, NCPDP).
b. My role at NACDS shifted more to that of a liaison with payers and processors on behalf of the chain pharmacy industry to ensure correct implementation of HIPAA pharmacy billing, payment and reconciliation standards. Additionally, I was responsible for ensuring that over 170 chain pharmacy members were aware of the latest pharmacy technology standards for claims adjudication as well as e-prescribing.
c. At Eckerd and Brooks Pharmacy I was responsible for claims adjudication, editing and audit processes as well as implementation of Medicare Part D in January 2006.

5. A more detailed description of my experience can be found in Appendix A.

## *Assignment Scope*

6. I have been retained by Baron & Budd, P.C. on behalf of the Relator:
    a. To assist the jury in understanding the NCPDP Telecommunication billing standard and how a pharmacy or pharmacy chain utilizes the various codes within the Standard (such as Dispense as Written of DAW codes) in the process of pharmacy claims adjudication, and
    b. To provide expert opinions on NCPDP and the claims billing Standard (referred to as the "Telecommunication Standard") and related publications, such as the Telecommunication Standard Implementation Guide Version D.0, Version D Editorial Document, July 2007 Data Dictionary and July 2007 and higher External Code List (ECL). All of which are applicable to the Telecommunication Standard, Version D.0.

c. To provide expert opinions on any purported DAW audit reviews done in relation to SilverScript beneficiary claims at issue in this case.

7. I am being compensated for my time at a rate of $400 per hour, plus travel expenses. My compensation is not contingent on the nature of my findings, opinions, or the outcome of any proceedings.

8. In forming my opinions and creating this report, I have relied upon my experience in senior management roles in healthcare organizations over the past 20 plus years including my leadership roles and involvement at NCPDP as well as extensive pharmacy experience.

9. I have previously testified (2006- 2012) before the National Committee on Vital and Health Statistics (NCVHS) in regard to implementation of the National Provider Identifier (NPI), Implementation of both NCPDP Telecommunication Standard, Version 5.1 and Version D.0 and the Implementation of the Health Plan Identifier (HPID). Most recently, I have been deposed as an expert witness for the plaintiff regarding Surescripts Antitrust Litigation in October 2024. The case is still ongoing.

10. My review of materials continues. I reserve the right to amend and/or supplement this report based on any new and/or additional facts and information that may be brought to my attention. My conclusions reflect normal industry practice, information from discovery, my experience and my analysis. If called to testify, I may also use summaries and demonstratives to aid in my testimony, which I will prepare and disclose per the Court's scheduling orders.

## *Materials Considered*

11. In forming my opinions and creating this report, I have relied upon my experience in senior or executive management roles in healthcare organizations over the past twenty plus years, including my leadership roles at the NCPDP, as well as my review of pleadings and discovery materials supplied to me by Baron and Budd. A list of the materials I reviewed and considered is provided in Appendix B.

## *Definitions*

12. In creating this report, I used the following definitions:

  a. **CVS Health ("CVS"):** This is the parent company that is comprised of several different entities including, but not limited to, a number of business units. For purposes of this report, "CVS" includes all business units related to this case such as Mail Pharmacy Operations, Retail Pharmacy Operations, Pharmacy Benefit Manager Services, Specialty Pharmacy Operations, SilverScript Insurance Company, etc.[1]

  b. **CVS Caremark:** CVS Caremark is the Pharmacy Benefit Manager, or PBM who manages prescription plans for over 89 million patients. For purposes of this report, this includes all pharmacy benefit manager service (include what is internally referred to as Pharmacy Services business unit) operations.[2]

  c. **CVS Mail Pharmacy:** CVS Mail Pharmacy is the mail order pharmacy operations for CVS Health. According to NCPDP, Mail order pharmacy services is "Compounding or dispensing prescriptions or other medications in accordance with federal and state law, using common carriers to deliver the medications to patient or their caregivers. Consultation to patients and caregivers (sometimes independent of the dispensing process) through telephone or email contact and provide other professional services associated with pharmaceutical care appropriate to the setting."[3] For the purposes of this report, this includes all mail-order pharmacy business unit operations under the CVS Health umbrella.[4]

  d. **CVS Retail Pharmacy:** These pharmacies encompass the retail pharmacy business unit operations,[5] with over 9,000 locations, under various subsidiaries throughout the United States. According to the Caremark Provider Manual,[6] a retail pharmacy is defined as a duly

[1] Brian Salvas Personal Deposition (03-27-25), at 19-23, 27-28; Brian Salvas 30(b)(6) Deposition, Exhibit 3
[2] Brian Salvas Personal Deposition (03-27-25), at 22-23.
[3] NCPDP External Codes List, July 2007 page 72 Definitions of Pharmacy Service Type
[4] Brian Salvas Personal Deposition (03-27-25), at 22.
[5] Brian Salvas Personal Deposition (03-27-25), at 21-22.
[6] CVS-Ellsworth_00095342 page 8 definition of retail pharmacy

licensed and established community pharmacy that dispenses and sells non-specialty prescription drugs to Eligible Persons through in-person hand delivery at point-of-sale.

e. **CVS Specialty Pharmacy:** These pharmacies are responsible for filling specialty medications. A specialty medication is used to treat complex and chronic conditions like rheumatoid arthritis, multiple sclerosis, human immunodeficiency virus (HIV), psoriasis, rare genetic disorders, infertility and cancer. A specialty medication is sometimes taken as a pill but is most often injected or infused. It tends to be high cost and those who take specialty medications may need extra monitoring or support. [7] It tends to be high cost and those who take specialty medications may need extra monitoring or support. For purposes of this report, this includes all specialty pharmacy business unit operations under the CVS Health umbrella.[8]

f. **SilverScript Insurance ("SilverScript"):** SilverScript Insurance Company is one of the largest providers in the United States that offers Medicare Part D coverage. SilverScript's Medicare Part D plans are in all 50 states. SilverScript is within the CVS Health family of companies.

g. **Generic Blocking Strategies:** These are the strategies utilized in the creation of the SilverScript Insurance formularies that preferred brand drugs over the equivalent generic drugs. The names of the strategies differed, but included the Single Source Generic Strategy, the Brand Over Generic Strategy, the Authorized Generic Strategy, and the Hepatitis C Authorized Generic Strategy.

h. **Relevant Drugs**: Copaxone, Exelon, Voltaren Gel, Invega, Asacol HD, Xopenex HFA, Renvela Packets, Renvela Tablets, Istalol, Harvoni, Epclusa, Ventolin HFA, Canasa Rectal Suppository, Advair Diskus, and Suboxone Sublingual Film.[9]

---

[7] https://www.cvsspecialty.com/faq.html#acc_uuidbd5c7a99-3d32-49d4-9cea-331c104dda17
[8] Brian Salvas Personal Deposition (03-27-25), at 22.
[9] Third Amended Complaint ("TAC") at ¶5.

## *Summary of Opinions*

**Opinion 1: CVS submitted claims for SilverScript Insurance Part D beneficiaries to CMS that utilized incorrect DAW codes for the Relevant Drugs within the Generic Blocking Strategies in violation of the NCPDP Telecommunication Standard, Version D.0.**

**Opinion 2: The selection of DAW Code affects the financial reimbursement of prescription claims and can have lasting effects on a beneficiary's overall cost.**

**Opinion 3: The CVS Retail Pharmacy prescription adjudication system was designed such that it impeded proper DAW code submissions by pharmacists.**

**Opinion 4: The employees of CVS that oversaw and enacted the Generic Blocking Strategies for the Relevant Drugs were unqualified for the roles they held and did not act within the standards of the field of claims adjudication and management for a Part D plan sponsor.**

**Opinion 5: The records produced by CVS do not show that CVS Caremark or SilverScript Insurance Company were performing audits on the improper use of DAW Codes submitted related to SilverScript Beneficiaries.**

## *History of NCPDP Standards Development*

13. NCPDP is a Standards Development Organization (SDO) accredited by the American National Standards Institute (ANSI). NCPDP began developing standards in 1976 and developed the first NCPDP standard, the Universal Claim Form (UCF) in 1980. The UCF form was created to standardize the

numerous Medicaid and third-party payer (TPP) paper claim forms utilized by pharmacies and entities who processed pharmacy benefit claims.[10]

14. NCPDP develops national standards for the electronic exchange of healthcare information NCPDP brings together members from across the pharmacy service sector of the healthcare industry: pharmacies, Pharmacy Benefit Managers (PBMS), Third Party Plans (TPPs), pharmaceutical manufacturers related information processors, systems vendors and other interested parties. These members bring forth business issues that can be solved through the development of new, or modification of existing, NCPDP standards.
15. NCPDP standards have transformed the pharmacy industry, saving billions of dollars in health system costs while increasing patient safety and quality of care. Many of these standards are named in federal legislation, including Health Insurance Portability and Accountability Act (HIPAA), MMA, Health Information Technology for Economic and Clinical Health (HITECH) and Meaningful Use (MU).
16. NCPDP has more than 75 task groups and 11 work groups that work to resolve business issues and develop solutions.[11] Work groups create multiple task groups to divide and conquer the work that needs to be accomplished. Task group deliverables, which may be standards, reference documents or white papers, are brought through the work groups using a consensus-based process. Specifically, Work Group 1(Telecommunication) was created to develop and maintain standards and guidelines to accommodate the collection, transmission and processing of information that may be exchanged electronically or in written formats. The information exchanged may be used for, but is not strictly limited to, such purposes as administering and certifying eligibility, establishing prior authorization for products and services, pharmacy claim billing, payment determination, denial of compensation with explanations, drug use review, determination of benefits and the exchange of adjudicated data between business associates. Additionally, Work Group 9 (Government Programs) was created to work in conjunction with Work Group 1 Telecommunication and other work groups, as necessary, to guide and advise federal and state pharmacy programs and their agents on NCPDP standards. WG9 also supports data processing initiatives, and provides design alternatives for standards, which support government requirements.

[10] https://ncpdp.org/History-and-Impact.aspx
[11] https://standards.ncpdp.org/Our-Process.aspx

17. Work groups meet quarterly and include elements of education, committee interactions, work group and task group activity, networking events, leadership development, new member orientation and exhibit opportunities[12]. Work groups are the place where all the standards for electronic transmission of pharmacy data are created and modified. NCPDP meetings provide a venue for members and other industry stakeholders to work together to create solutions for healthcare.

18. Following a work group vote of approval on standards, ballots are sent twice a year (after May and November work groups) to obtain public comment and approval by a Consensus Voting Group[13]. Then approval by the Standardization Committee and Board of Trustees ensures that procedures are followed. White papers recommending the best practices are approved by NCPDP's Standardization Committee.

19. The NCPDP membership consists of approximately 1600 members. Members fall into three general classifications of "categories" which are comparable in member numbers[14]. They are:

    a. **Producers and Providers**. This classification includes drug or device manufacturers, wholesalers, physicians and pharmacies, and anyone involved in the provision of patient care or medication dispensing.

    b. **Payers and Processors**. This classification includes insurance companies, benefits administrators, government payers, third party claims processors, and PBMs.

    c. **Vendor and General Interest**. This classification includes hardware and software developers, database management companies, clearinghouses/intermediaries and those having a general interest in the work of NCPDP.

20. While NCPDP's primary purpose is to develop and maintain standards that deliver increased efficiency to the pharmacy services sector of the healthcare industry, NCPDP also promotes and monitors the use of these standards among its members and other interest or affected parties.

---

[12] https://standards.ncpdp.org/Work-Groups.aspx
[13] https://standards.ncpdp.org/Standards-Data-Maintenance.aspx
[14] https://ncpdp.org/Membership-diversity.aspx

21. NCPDP has developed and currently maintains the Telecommunication Standard for the electronic exchange of information for pharmacy-related eligibility benefit inquiry and response transactions and for pharmacy claims transactions. Pharmacies, TPPs, processors, PBMs, and other trading partners create electronic claims transactions using the NCPDP's Telecommunication Standard Implementation Guide, the NCPDP Data Dictionary[15], and the NCPDP External Code List[16]. The electronic claims transactions allow trading partners to electronically transmit information between one another. These claims transactions contain a variety of data fields or elements that are defined in the NCPDP Data Dictionary.

**History of the Telecommunication Standard[17]**

22. In the 1980s, industry began to adopt technology like that of credit card clearinghouses. The first electronic claims were transacted in 1984, via magnetic tape and diskette using a format unique to each carrier or administrator. By 1988, direct electronic submission and adjudication of claims in an on-line, real-time environment became a reality, still using processor-specific formats. It wasn't until 1988 that a "standardized" format for claims transmission was developed. The NCPDP Telecommunication Standard Version 1.0 expedited the verification of a customer's prescription insurance coverage and to more efficiently submit and process prescription drug claims and was first published September 1, 1988.

---

[15] The Data Dictionary is an NCPDP publication that provides a comprehensive listing of all data fields or elements used in various NCPDP standards. The publication provides the data element format and length, a description of the meaning of the data element and examples and comments to assist analysts, system developers and programmers utilizing the standard in better understanding the standards' data elements. As of January 2016, the Data Dictionary is available via a web-enabled look-up tool.

[16] The NCPDP External Code List (ECL) is a list of codes and values with descriptions for NCPDP data elements. All data elements appear in the NCPDP Data Dictionary. However, values for data elements are not included in the NCPDP Data Dictionary and, instead, appear in the External Code List, a separate publication. As of January 2016, the External Code List is available via a web-enabled look-up tool.

[17] https://www.ncpdp.org/NCPDP/media/pdf/WhitePaper/RxforImprovingHealthcare_ExecSummary.pdf

23. Pharmacies would transmit claims and the associated data to the claims TPP/PBM via direct electronic communication (such as a dial-up connection, leased line, or other means). The TPP/PBM processed the claim instantaneously, or in "real-time," and provided an electronic response back to the pharmacy in seconds. If there was an error with the claim, the pharmacy could correct the error and resubmit the claim.

24. Over the years there have been over fifty-two (52) versions of the Telecommunication Standard published. However, only three versions have been in general use since Version 1.0 was created in 1988. Adoption of the Telecommunication Standard was not widespread until 1992 when Version 3.2 was published. During this timeframe, contracts between trading partners (e.g., pharmacies and TPPs/PBMs) would contain "payer sheets," which are attachments that identified which version of the Standard would be used in their transactions and which data fields from the Telecommunication Standard would be transmitted. Because the timing of adoption of the Telecommunication Standard and its updated versions varied from member to member, a TPP/PBM frequently had to support multiple versions of the Telecommunication Standard at the same time to accommodate participating pharmacy system limitations.

25. The NCPDP Telecommunications Standard was incorporated into federal regulations promulgated by the Department of Health and Human Services pursuant to the Health Insurance Portability and Accountability Act of 1996 (HIPAA).[18] Version D.0 (2012-present)[19] has been in effect during the time period covered by this case. On April 22, 2020, the National Committee on Vital and Health Statistics (NCVHS) recommended to HHS that HHS adopt the updated NCPDP version F6 to replace Version D.0 of the NCPDP Telecommunication Standard.[20]

26. Each Telecommunication Standard introduced since HIPAA's adoption includes a specific Data Dictionary that is incorporated by reference and available on the NCPDP web site. Although use of the Telecommunication Standard by pharmacies, PBMs, and TPPs for electronic transactions is

---

[18] 42 U.S.C.§ 1320d-2; 45 C.F.R. § 162.1102
HIPAA required HHS to establish national standards for electronic transactions to improve the efficiency and effectiveness of the nation's health care system. Any provider who accepts payment from any health plan or other insurance company must comply with HIPAA if they conduct the adopted transactions electronically. For retail pharmacy transactions, HHS adopted two standards from NCPDP

- Pharmacy and supplier transactions – NCPDP Version D.0
- Medicaid subrogation – NCPDP Version 3.0

[19] 45 CFR § 162.1101(a); 45 C.F.R. § 160.103.
[20] NCVHS Letter to Sec. Alex Azar, U.S. Dept. of Health & Humana Services (Apr. 22, 2020).

mandated by HIPAA, not every data field or section of the Standard is required to be filled in a Claim Billing transaction. Some data fields are "optional" or "required" only under specific conditions or situations, such as when required by trading partner agreement (i.e., the contract between the pharmacy and PBM, or between the pharmacy and the TPP).

27. The Telecommunication Implementation Guide integrates the technical specifications and provides information on the transaction, guidance for usage and examples. Besides the Telecommunication Implementation Guide, there are numerous other documents that are used by the industry to ensure proper implementation of these standards:

    a. **The NCPDP Data Dictionary** provides a definition of each data element and appropriate values. The NCPDP Data Dictionary identifies and defines the information that is specified in the NCPDP Standard Formats. Each data element that is presented in a transaction data set is identified in the NCPDP Data Dictionary. Each version of the Telecommunication Standard is associated with a single version of the Data Dictionary.

    b. **The NCPDP External Code List (ECL)** defines the valid values for the data elements. Since July 2007, the ECL has been a separate document from the Data Dictionary. It is updated quarterly and implemented yearly so that new values can be implemented in a timely manner.

    c. **The Editorial Document** contains clarifications, corrections, examples, and questions/answers that were obtained after the publication of the NCPDP Telecommunication Standard Implementation Guide. It must be used as a reference between official publications of the implementation guide. This document may be updated as often as quarterly and new versions should be downloaded when published. It is available from the public and members only sections of the NCPDP website.

### 408-D8 Dispense as Written (DAW) Product Selection Code Data Field

28. One of the many data fields used in the Telecommunication Standard is the "DAW Code" field. The DAW Code is defined as the Code indicating whether or not the prescriber's instructions regarding generic substitution were followed[21]. This is a mandatory field and is found in the Request Claim Segment and is populated by the pharmacy.

---

[21] According to the 2007 Data Dictionary

**History of NCPDP DAW Codes**

29. The DAW code values have remained largely unchanged since first being implemented in the Telecommunication Standard Version 1.0, published in 1988 and only contained values 0-5. As indicated below:

| | | |
|---|---|---|
| 408 | DISPENSE AS WRITTEN (DAW) | CODE INDICATING WHETHER OR NOT THE PRESCRIBER'S INSTRUCTIONS REGARDING SUBSTITUTION WERE FOLLOWED OR EXPLAINING WHY A GENERIC DRUG WAS NOT DISPENSED.<br><br>0=NO DAW<br><br>1=PHYSICIAN DAW<br><br>2=PATIENT DAW<br><br>3=PHARMACIST DAW<br><br>4=NO GENERIC AVAILABLE<br>5 =OTHER |

30. A second version of the Telecommunication Standard Version 1.0 was later published in 1993 and added the values of 6 and 9. The values of 7 and 8 were added prior to the October 1999 NCPDP Telecommunication Version 3.2.

31. For NCPDP Telecommunication Standard Version D.0, Dispense As Written/Product Selection Code (408-D8) value "9" (Other – Reserved and not in use) was modified to (Substitution Allowed By Prescriber but Plan Requests Brand - Patient's Plan Requested Brand Product To Be Dispensed - This value is used when the prescriber has indicated, in a manner specified by prevailing law, that generic substitution is permitted, but the plan's formulary requests the brand product. This situation can occur when the prescriber writes the prescription using either the brand or generic name and the product is available from multiple sources). This change was necessary because pharmacy providers had been instructed to use DAW 1 on multi-source Brand claims in which the Plan was mandating the branded product. Use of DAW 1 in this instance is in violation of the NCPDP data dictionary definition. Pharmacy providers must validate that the prescriber has signed and authorized brand medically

necessary on the prescription form, before DAW 1 can be used. When the prescriber has not provided this documentation, the pharmacy provider cannot submit DAW 1 on a claim. Providers were also requested to submit either DAW 0 or DAW 5, which are also in violation of the current definitions and present significant financial risks. This change in definition was requested to define the use of DAW 9 as Plan Requested Brand, facilitating consistency within the industry and appropriate reimbursement[22].

32. Additionally, the values of 0 and 1 were also modified[23] at that time from:

> **"0"** (No Product Selection Indicated - This is the field default value that is appropriately used for prescriptions where product selection is not an issue. Examples include prescriptions written for single source brand products and prescriptions written using the generic name and a generic product is dispensed.)
>
> And
>
> **"1"** (Substitution Not Allowed by Prescriber-This value is used when the prescriber indicates, in a manner specified by prevailing law, that the product is to be Dispensed)

33. Subsequently, the DAW Code values were further modified in 2022 to take into account biologics. I have not included those new definitions in this report since these modifications to the standard occurred after the timeline of this case and were implemented on October 15, 2023.

34. The values for this field were moved from the Data Dictionary to the ECL in July 2007 which is the version associated with Telecommunication Version D.0. According to the July 2007 ECL, the acceptable values that can be submitted in this field are defined as follows:

| Value | Description |
|---|---|
| 0 | No Product Selection Indicated<br>*This is the field default value that is appropriately used for prescriptions for single source brand, co-branded/co-licensed, or generic products. For a multi-source branded product with available generic(s), DAW 0 is not appropriate, and may result in a reject.* |
| 1 | Substitution Not Allowed by Prescriber |

[22] NCPDP DERF 000770 submitted to NCPDP June 13, 2006.
[23] NCPDP 2007 Data Dictionary modifications, page 191.

| | |
|---|---|
| | *This value is used when the prescriber indicates, in a manner specified by prevailing law, that the product is Medically Necessary to be Dispensed As Written. DAW 1 is based on prescriber instruction and not product classification.* |
| 2 | Substitution Allowed - Pharmacist Selected Product Dispensed<br>*This value is used when the prescriber has indicated, in a manner specified by prevailing law, that generic substitution is permitted and the pharmacist determines that the brand product should be dispensed. This can occur when the prescriber writes the prescription using either the brand or generic name and the product is available from multiple sources.* |
| 3 | Substitution Allowed - Pharmacist Selected Product Dispensed<br>*This value is used when the prescriber has indicated, in a manner specified by prevailing law, that generic substitution is permitted and the pharmacist determines that the brand product should be dispensed. This can occur when the prescriber writes the prescription using either the brand or generic name and the product is available from multiple sources.* |
| 4 | Substitution Allowed - Generic Drug Not in Stock<br>*This value is used when the prescriber has indicated, in a manner specified by prevailing law, that generic substitution is permitted and the brand product is dispensed since a currently marketed generic is not stocked in the pharmacy. This situation exists due to the buying habits of the pharmacist, not because of the unavailability of the generic product in the marketplace.* |
| 5 | Substitution Allowed - Brand Drug Dispensed as a Generic<br>*This value is used when the prescriber has indicated, in a manner specified by prevailing law, that generic substitution is permitted and the pharmacist is utilizing the brand product as the generic entity.* |
| 6 | Override<br>*This value is used by various claims processors in very specific instances as defined by that claims' processor and/or its client(s).* |
| 7 | Substitution Not Allowed - Brand Drug Mandated by Law<br>*This value is used when the prescriber has indicated, in a manner specified by prevailing law, that generic substitution is permitted but prevailing law or regulation prohibits the substitution of a brand product even though generic versions of the product may be available in the marketplace.* |
| 8 | Substitution Allowed - Generic Drug Not Available in Marketplace<br>*This value is used when the prescriber has indicated, in a manner specified by prevailing law, that generic substitution is permitted and the brand product is dispensed since the generic is not currently manufactured, distributed, or is temporarily unavailable.* |

| | |
|---|---|
| 9 | Substitution Allowed By Prescriber but Plan Requests Brand - Patient's Plan Requested Brand Product To Be Dispensed<br>*This value is used when the prescriber has indicated, in a manner specified by prevailing law, that generic substitution is permitted, but the plan's formulary requests the brand product. This situation can occur when the prescriber writes the prescription using either the brand or generic name and the product is available from multiple sources.* |

35. It should be noted that while the Implementation Guide defines the fields needed for implementation of the NCPDP Telecommunication Version D.0, it does not define the values used in the fields. The ECL supplies the values and their definitions. Proper implementation of NCPDP Telecommunication Version D.0 requires ALL the following:

- The Telecommunication Guide, Version D.0
- 2007 ECL plus annual ECLs
- D.0 Editorial Document

## *Impact of DAW Codes on Claim Billing*

36. Based on NCPDP DAW Code definitions, appropriate rules must apply to ensure proper claims editing and pharmacy reimbursement.[24] The following DAW code values are a selection from the complete list, found in Article IX (above), and require the pharmacy to dispense the brand product rather than the pharmacy electing to dispense the brand.

DAW Code 1 – Substitution Not Allowed by Prescriber

DAW Code 2 – Substitution Allowed-Patient Requested Product Dispensed

DAW Code 7 - Substitution Not Allowed-Brand Drug Mandated by Law

[24] The Proper Use of the NCPDP Telecommunication Standard Version D.0 as it applies to the Implementation of Medicaid Reimbursement Methodologies Based on Actual Acquisition Cost (AAC) Plus a Professional Dispensing Fee, Version 1.2 Published July 2017.

DAW Code 8 - Substitution Allowed-Generic Drug Not Available in Marketplace

DAW Code 9 - Substitution Allowed By Prescriber but Plan Requests Brand

Improper reimbursement or misuse of the code values above cause pharmacies and processor/PBMs the greatest difficulty when substituting branded drugs for generics. According to NCPDP, if the processor/PBM *accepts* DAW Codes listed above (1,2,7,8 and 9), they must reimburse the pharmacy according to the Ingredient Cost and Professional Dispensing Fee for the Preferred Product dispensed.

37. As previously stated, DAW codes directly impact reimbursement of pharmacy claims. The following table came from CVS Caremark[25] and further demonstrates the effect that DAW codes have on pharmacy reimbursement.

| DAW Code | Code Value | Rate of reimbursement for MONY code = O |
|---|---|---|
| 0 | No product selection indicated | Generic (MAC) Rate |
| 1 | Substitution Not Allowed by Prescriber | Brand (AWP) Rate |
| 2 | Substitution Allowed – Patient requested brand be dispensed | Brand (AWP) Rate |
| 3 | Substitution Allowed – Pharmacist selected product dispensed | Generic (MAC) Rate |
| 4 | Substitution Allowed – Generic drug not in stock | Generic (MAC) Rate |
| 5 | Substitution Allowed – Brand drug dispensed as generic | Generic (MAC) Rate |
| 6 | Override | Generic (MAC) Rate |
| 7 | Substitution Not Allowed – Brand Drug mandated by law | Brand (AWP) Rate |
| 8 | Substitution Allowed – Generic drug not available in market | Brand (AWP) Rate |
| 9 | Other | Generic (MAC) Rate |

*Table 1*

[25] Fredell Vol II Deposition, Exhibit 33 CVS-Ellsworth_00597382, at -385

The CVS Caremark document that this table was taken from incorrectly indicates that DAW 9 is "Other" even though it was modified by NCPDP to "Plan requests brand product to be dispensed" in July 2007 and was required to be changed with implementation of the NCPDP Telecommunication Standard, Version D.0 on January 1, 2012. It should be also noted that DAW 9 Reimbursement indicated above is incorrect and not in compliance with the NCPDP Standard.

38. In addition to improper reimbursement, incorrect DAW codes submitted on a pharmacy claim may result in a higher copay for the patient (e.g. DAW 2), claim rejections or third-party audits (DAW 1)[26].

*Determining Appropriate DAW Code Submission on a Pharmacy Claim*

39. The pharmacy should consider the following when determining the appropriate DAW code to indicate on a claim:
    a. Is there a generic equivalent for this product available? If so, the pharmacy should dispense the generic product with a DAW Code of 0 on the claim, unless:
        i. The prescriber indicates that only the brand should be dispensed. This is normally indicated by the words "brand medically necessary" or do not substitute in accordance with state law. If the brand preference has been indicated by the prescriber on the prescription, the pharmacy should indicate DAW code of 1 on the claim.
        ii. The patient determines that they do not want a generic. Then the pharmacy should indicate DAW code of 2 on the claim.
        iii. The pharmacy uses the Brand name product as the generic. The pharmacy should indicate DAW code of 5 on the claim.
        iv. The generic product is not available in the marketplace. In this instance, the pharmacy should indicate the DAW code of 6 on the claim.

[26] https://net-rx.com/daw-codes/

v. The plan does not cover the generic, only the brand. In this instance, the pharmacy should indicate DAW of 9 on the claims.

40. Pharmacy systems are coded to maintain compliance with the HIPAA-named NCPDP Telecommunication Standard and cannot alter the DAW code logic to support other situations. Manual exception override processes also create significant barriers to pharmacy workflow processes and negate training and policies that ensure standardization and compliance with the Telecommunication Standard.[27]

## *Medicare Part D*

41. Medicare is a federal health insurance program in the United States for people aged 65 or older and younger people with disabilities, including those with end stage renal disease and amyotrophic lateral sclerosis (ALS or Lou Gehrig's disease). It was begun in 1965 under the Social Security Administration (SSA) and is now administered by the Centers for Medicare and Medicaid Services (CMS).

42. Medicare Part D (Part D), also called the Medicare prescription drug benefit, is an optional United States federal-government program to help Medicare beneficiaries pay for self-administered prescription drugs [28]. Part D was enacted as part of the Medicare Modernization Act [29] of 2003 and went into effect on January 1, 2006. Under the program, drug benefits are provided by private insurance plans that receive premiums from both enrollees and the government.

43. Part D enrollees cover a portion of their own drug expenses by paying cost-sharing. The amount of cost-sharing an enrollee pays depends on the retail cost of the filled drug, the rules of their plan, and whether they are eligible for additional Federal income-based subsidies. Prior to 2010, enrollees

[27] The Proper Use of the NCPDP Telecommunication Standard Version D.0 as it applies to the Implementation of Medicaid Reimbursement Methodologies Based on Actual Acquisition Cost (AAC) Plus a Professional Dispensing Fee, Version 1.2 Published July 2017

[28] Kirchhoff, Suzanne M. (November 14, 2023). Medicare Part D Prescription Drug Benefit (PDF). Washington, DC: Congressional Research Service. Retrieved April 5, 2024.

[29] https://www.congress.gov/108/plaws/publ173/PLAW-108publ173.pdf

were required to pay 100% of their retail drug costs during the coverage gap phase, commonly referred to as the "doughnut hole." Subsequent legislation, including the Affordable Card Act (ACA)[30], "closed" the doughnut hole from the perspective of beneficiaries, largely through the creation of a manufacturer discount program.

---

*Determining Therapeutic Equivalency*

---

44. The publication, *Approved Drug Products With Therapeutic Equivalence Evaluations* (the List, commonly known as the Orange Book), identifies drug products approved on the basis of safety and effectiveness by the Food and Drug Administration (FDA) under the Federal Food, Drug, and Cosmetic Act (the FD&C Act)[31]. It was first published in October 1980. The main criterion for the inclusion of any product is that the product is the subject of an application with an approval that has not been withdrawn for safety or effectiveness reasons. The inclusion of products in the Orange Book is independent of any current regulatory action being taken administratively or judicially against a drug product. In addition, the Orange Book contains therapeutic equivalence evaluations for approved multisource prescription drug products.
45. The FDA classifies as therapeutically equivalent those drug products that meet the following general criteria:
    a. They are approved as safe and effective.
    b. They are pharmaceutical equivalents in that they
        i. Contain identical amounts of the identical active drug ingredient in the identical dosage form and route of administration, and
        ii. Meet compendial or other applicable standards of strength, quality, purity, and identity;
    c. They are bioequivalent in that

---

[30] https://www.healthcare.gov/where-can-i-read-the-affordable-care-act/
[31] https://www.fda.gov/drugs/development-approval-process-drugs/orange-book-preface

i. They do not present a known or potential bioequivalence problem, and they meet an acceptable in vitro standard, or

ii. If they do present such a known or potential problem, they are shown to meet an appropriate bioequivalence standard;

d. They are adequately labeled; and

e. They are manufactured in compliance with Current Good Manufacturing Practice regulations. The concept of therapeutic equivalence applies only to drug products containing the identical active ingredient(s) and does not encompass a comparison of different therapeutic agents used for the same condition (e.g., meperidine hydrochloride vs. morphine sulfate for the treatment of pain). Any drug product in the Orange Book repackaged and/or distributed by other than the applicant is considered to be therapeutically equivalent to the applicant's drug product even if the applicant's drug product is single source or coded as non-equivalent (e.g., **BN**). Distributors or repackagers of an applicant's drug product are not identified in the Orange Book.

46. Therapeutic equivalence evaluation codes are used by the pharmacy industry to determine which products are therapeutically equivalent. This information is communicated to pharmacies, PBMs and prescribers through drug files provided by the various drug databases or compendium.[32]

f. There are broadly two types of therapeutic equivalent codes A-rated and B-rated drugs or codes. A full list of the FDA equivalency codes can be found in Appendix B.

i. **"A" codes:** A-rated drugs are those, which the FDA considers to be therapeutically equivalent and, therefore, substitutable where permitted by the prescriber. Various codes and their interpretations are described in table 1. The second letter (A, B, C, D, E, N, O, P, R, S, T or X) provides information about the dosage form, and in some cases, about the results of the FDA's evaluation of actual or potential bioequivalence problems.

---

[32] Drug Databases are commercially available products that include FDA approved drugs and biologics and includes pricing and equivalency information. First Databank (FDB), Gold Standard and Medi-Span (Wolters Klower) are three of the main products used in the pharmacy industry to provide such information.

ii. **AA:** ingredients and dosage forms presenting neither actual nor potential bioequivalence problems (e.g., oral solutions).

iii. **AB:** actual or potential bioequivalence problems have been resolved through adequate in vivo and/or in vitro testing. Often some therapeutic codes are followed by a number, such as AB1, AB2, AB3 etc. This is particularly when there are two or more drug products, containing the same ingredient, with the same strength and dosage form, which are not bioequivalent to each other. For example, a generic rated AB1 can be substituted for a brand rated AB1, but cannot be substituted for a brand rated AB2.

iv. **"B" codes:** B-rated drugs are those, which the FDA considers not to be therapeutically equivalent due to actual or potential bioequivalence problems, which have not been resolved. This section is often related to pharmacokinetic differences, which arise due to product dissolution, disintegration, and absorption or metabolism and linked to specific delivery forms rather than safety and efficacy. For example, the calcium channel blocker verapamil is AB-rated but its extended release formulation Covera-HS is BC-rated and thus not substitutable.

47. Pharmacies use the information contained in the drug files along with additional attributes, such as the Generic Product Identifier (GPI) from Medi-Span to link brand and generic medications. These identifiers are used to identify a drug product based on its therapeutic classification and allows for easy identification of therapeutic equivalent products without having to manually review the A and B codes for the product.[33]

48. While PBMs still utilize the same databases that pharmacies use they rely on "MONY" codes for Brand and Generic Drugs to determine brand and generic distinction. These codes do NOT indicate therapeutic equivalence. [34]

g. The "MONY" code is a classification system in the PBM space that helps to distinguish brand drugs from generic drugs and single source drugs from multi-source drugs. It refers to the four codes (M, O, N and Y) in the multi-source indicator system from Medi-

[33] https://www.wolterskluwer.com/en/solutions/medi-span/about/gpi
[34] https://pillarrx.com/what-is-the-mony-code/

Span. Medi-Span is a national, third-party source of drug information used by the pharmacy industry.

h. Three of the four codes (M, O and N) represent brand drugs. The last code (Y) represents generic drugs:

   i. **M:** A single-source, co-licensed product. The product is co-licensed and is considered a single-source product despite being available from multiple labelers. This is also known as a multi-source brand made by more than one manufacturer, and it does not have any generics available.

   ii. **O:** A multi-source originator product. The product is available from multiple labelers, considered to be the industry standard. This is also known as the originator drug or original brand drug that now has generics available.

   iii. **N:** A single-source product. The product is a single-source product available from one labeler. This is also known as a single-source brand made by a single manufacturer and does not have any generics available.

   iv. **Y:** A multi-source product. Multi-source products are available from multiple labelers. This is also known as a generic, usually made by multiple manufacturers.

## *State Generic Substitution Laws*

49. State laws regarding generic drug substitution vary, with some mandating substitution, others allowing it at the pharmacist's discretion, and some requiring patient consent or notification before substitution.

50. Relator has alleged that Defendants violated the laws of the states in which there is a requirement of generic substitution.[35] Based on my own review of the literature, according to a 2020 article in

[35] Those include Florida (Fla. Stat. § 465.025(2)); Hawaii (Haw. Rev. Stat. § 328-92(a)); Indiana (Ind. Code § 16-42-22-10(a)); Kentucky (Ky. Rev. Stat. § 217-822(1)); Maine (Me. Rev. Stat. tit. 32, § 13781); Massachusetts (Mass. Gen. Laws ch. 112, § 12D); Minnesota (Minn. Stat. § 151.21(3)); Nevada (Nev. Rev. Stat. § 639.2583(1)(a)); New Jersey (N.J. Stat. § 24:6E-7); New York (N.Y. Edu. Law § 6816-a); Pennsylvania (35 Pa. Cons. Stat. § 960.3); Rhode

JAMA,[36] 19 states require pharmacists to perform generic substitution; 7 states and Washington, DC, required patient consent; 31 states and Washington, DC, mandated patient notification independent of the drug's packaging. For example, Florida law requires pharmacists to inform patients of any substitution of a generic drug product for a substitution. [37]

51. Pharmacists must take state laws into account before dispensing a brand named product to a patient.

---

*Opinions*

---

**Opinion 1: CVS submitted claims for SilverScript Insurance Part D beneficiaries to CMS that utilized incorrect DAW codes for the Relevant Drugs within the Generic Blocking Strategies in violation of the NCPDP Telecommunication Standard, Version D.0.**

<u>CVS Caremark/SilverScript's Generic Substitution Strategies and DAW 9</u>

52. CVS Caremark/SilverScript's Generic Blocking Strategies were called different names within the company at different times, but overall, they all had the same fundamental effect: excluding the generic or authorized generic form of a drug in favor of the brand drug. Generally,[38] the NCPDP Telecommunication Standard Version D.0 includes a DAW Code for pharmacists to use in a situation where the insurance plan is the one requiring substitution of the brand instead of the generic drug: DAW 9. Specifically, NCPDP Standards require DAW 9 to be used in this instance.[39] From the "Proper Use of the Telecommunication Standard D.0 document:

Island (R.I. Gen. Laws § 5-19.1-19); Tennessee (Tenn. Code § 53-10-205(a)); Vermont (Vt. Stat. tit. 18, § 4605(a)(1)); West Virginia (W.Va. Code § 30-5-12b(b)); Wisconsin (Wis. Stat. § 450.13(1s)); Puerto Rico (P.R. Laws tit. 20, § 410b(b)(1)).

[36] Sacks CA, Van de Wiele VL, Fulchino LA, Patel L, Kesselheim AS, Sarpatwari A. Assessment of Variation in State Regulation of Generic Drug and Interchangeable Biologic Substitutions. *JAMA Intern Med.* 2021;181(1):16–22. doi:10.1001/jamainternmed.2020.3588

[37] Section 64B16-27.530 - Duty of Pharmacist to Inform Regarding Drug Substitution

[38] I address DAW code usage in Mandatory Generic Substitution states below.

[39] Proper Use of the Telecommunication Standard D.0 Document, Section 3.1.6. While this document was written specifically for Medicaid plans, it applies to all plans, not just Medicaid

*What if a preferred product is a multi-source brand (brand named product where generic is available)?*

***Response:***

*In this case the pharmacy would need to dispense the branded product and resubmit using DAW Code 9 which indicates substitution allowed by prescriber, but the Medicaid program requires the brand named product.*

*Until the pharmacy is alerted to a formulary change by the processor/PBM through the claim adjudication process, the pharmacy dispensing system will retain both the DAW Code 9 and the dispensed product from the previous fill. As a result, the appropriate use of DAW code values and reject codes is critical to ensure adherence to formulary rules and appropriate reimbursement.*

*If the formulary status changes and the brand drug is no longer set as the preferred formulary drug, prescription claims submitted by the pharmacy for the preferred brand drug and DAW Code 9 should be rejected by the processor/PBM with Reject Code (511-FB) AJ (Generic Drug Required).*

53. Here, however, an analysis of the DAW Codes in the PDE records submitted by SilverScript Insurance to CMS for the Relevant Drugs shows that there were a significant number of drug claims submitted to CMS with incorrect DAW Codes. The below table shows the number of PDE submissions where claims for brand drugs were submitted utilizing DAW Codes 0, 1, 2, and 9 while each of these drugs were within one of the Generic Blocking Strategies.

*Table 2. DAW Code Submissions – All Brand Claims*[40]

| Drug Name | Dosage | All DAW Codes | | | |
|---|---|---|---|---|---|
| | | 0 | 1 | 2 | 9 |
| Advair | 100-50 MCG/ACT | 32,480 | 10,710 | 24,967 | 53,953 |
| Advair | 250-50 MCG/ACT | 141,781 | 47,938 | 99,498 | 242,230 |
| Advair | 500-50 MCG/ACT | 44,646 | 17,817 | 38,419 | 79,927 |
| Asacol HD | 800 MG | 20,696 | 9,236 | 12,970 | 20,391 |
| Canasa | 1000 MG | 1,478 | 1,940 | 1,687 | 2,737 |
| Copaxone | 20 MG/ML | 14,785 | 16,847 | 5,768 | 5,852 |
| Copaxone | 40 MG/ML | 9,818 | 41,893 | 11,287 | 10,981 |

[40] To calculate these numbers, I relied on the work done by Dr. John Scoggins, who is an expert in statistical modeling of healthcare data. My understanding is that Dr. Scoggins counted the number of DAW codes used for each PDE submission for the relevant brand name drugs in the PDE data produced by Defendants.

| | | | | | |
|---|---|---|---|---|---|
| Epclusa | 400-100 MG | 5,906 | 1,379 | 302 | 1,770 |
| Exelon | 13.3 MG/24 HR | 29,168 | 9,260 | 16,819 | 40,450 |
| Exelon | 4.6 MG/24 HR | 52,315 | 21,174 | 31,375 | 62,827 |
| Exelon | 9.5 MG/24 HR | 74,086 | 24,366 | 36,777 | 98,393 |
| Harvoni | 90-400 MG | 2,267 | 518 | 76 | 471 |
| Invega | 1.5 MG | 6,422 | 1,645 | 2,923 | 8,395 |
| Invega | 3 MG | 33,653 | 9,522 | 17,780 | 41,125 |
| Invega | 6 MG | 59,014 | 16,369 | 34,898 | 77,615 |
| Invega | 9 MG | 34,381 | 9,832 | 19,573 | 43,495 |
| Istalol | 0.50% | 3,779 | 4,539 | 4,889 | 4,847 |
| Renvela | .8 GM | 3,504 | 631 | 1,123 | 6,943 |
| Renvela | 2.4 GM | 3,597 | 1,033 | 1,885 | 10,759 |
| Renvela | 800 MG | 112,956 | 41,350 | 70,258 | 328,721 |
| Suboxone | 12-3 MG | 2,337 | 1,940 | 2,254 | 5,339 |
| Suboxone | 2-0.5 MG | 2,462 | 2,090 | 3,306 | 6,071 |
| Suboxone | 4-1 MG | 2,515 | 1,809 | 2,835 | 6,419 |
| Suboxone | 8-2 MG | 31,638 | 32,135 | 52,534 | 92,919 |
| Ventolin | 108 (90 Base) MCG/ACT | 1,215,338 | 259,793 | 489,350 | 946,127 |
| Voltaren | 1% | 644,542 | 305,656 | 573,007 | 724,151 |
| Xopenex HFA | 45 MCG/ACT | 146,423 | 30,542 | 65,319 | 81,847 |
| | **Total** | 2,731,987 | 921,965 | 1,621,881 | 3,004,764 |

54. According to the NCPDP standards: "For a multi-source branded product with available generic(s), DAW 0 is not appropriate, and may result in a reject."[41] CVS documents show that a drug is only placed into one of the Generic Blocking Strategies if there is a generic or authorized generic on the market.[42] Therefore, each submission of DAW 0 for the above listed drugs while they were placed within any of the Generic Blocking Strategies were inaccurate submissions to CMS.

55. Josh Fredell, someone with oversight for the Generic Blocking Strategies for a period of time at CVS Caremark admitted that for these strategies DAW 9 was the correct DAW code to use.[43] Further, internal emails showed that other CVS Caremark employees believe that DAW 9 was the correct DAW code to use for these strategies. [44]

[41] 2007 ECL page 30.
[42] CVS-Ellsworth_00026847.
[43] Fredell deposition (5/14/24) at 218:8-12; CVS-Ellsworth_00094608.
[44] Fredell deposition (5/14/24) at 218-220.

56. Conversely, there was confusion about the use of the NCPDP standards at CVS Pharmacy as evidenced by multiple emails attempting to discern the true definitions of the various DAW codes as well as testimony from Brian Salvas (in his representative capacity for CVS Pharmacy). Additionally, Mr. Salvas testified that "Because the trading partners could decide whatever code is appropriate. There's no -- there's nothing binding about the NCPDP standard that indicates that anyone has to use any specific DAW code for any specific use case." .[45]

57. Mr. Salvas testified that CVS Pharmacy follows the NCPDP Standard, Version D.0, whenever possible.[46] However, he also testified that NCPDP Standards offer a framework for claims adjudication, but there is a variability at times between the way that certain trading partners leverage the standards.[47] In all my time at NCPDP, I am unaware of a situation in which companies can change the definition, scope, or applicability of any part of the NCPDP Telecommunication Standard. Yet, Mr. Salvas' testimony—as CVS Pharmacy—indicated that CVS Pharmacy considered the NCPDP Telecommunications Standard as flexible and able to be changed based on CVS Pharmacy's business needs. That is an inappropriate interpretation of the NCPDP Telecommunication Standards and is not in line with industry practice. Therefore, any misapplication in DAW Code usage applied by CVS Pharmacy was also a violation of the NCPDP Telecommunication Standards.

<u>CVS Mail and Specialty Pharmacy Operations and DAW Code Usage</u>

58. The CVS Mail Pharmacy operations also failed to follow NCPDP Telecommunications Standards in relation to the Relevant Drugs.

59. First, CVS Mail Pharmacy's policies and procedures did not properly instruct the mail pharmacist employees on the appropriate DAW Code usage. The policy on DAW Codes[48] only included instructions for usage of DAW codes 0, 1, and 2. There are no instructions regarding when to use DAW 9. Dawn Begley, an Operations Supervisor for Caremark Mail Pharmacy since 2004, further testified

[45] Brian Salvas, CVS Pharmacy – 02-13-2025.pdf page 214 lines 11-15.
[46] Salvas, CVS Pharmacy deposition (02-13-2025) at 143-144.
[47] Salvas, CVS Pharmacy deposition (02-13-2025) at 51 "The NCPDP standard is sort of a framework for claims adjudication, but there is variability at times between the way that certain trading partners will leverage that standard to bring it to life."
[48] Begley deposition Ex. 11, CVS-Ellsworth_00401415.

that the Mail Pharmacy Operations used DAW 9 coding for commercial insurance plans, but did not use it for Medicare plans.[49]

60. Further, upon an examination of the DAW Codes submitted part of the PDE records for drugs in the Generic Blocking Strategies, it appears that the vast majority of DAW submissions were made with DAW 0. The number of DAW 9 submissions by the CVS Mail and Specialty Pharmacies is shocking. Each of the DAW 0 claims should have been submitted as DAW 9s, but they were not. Such a high number of DAW 0s in comparison to the low DAW 9 numbers is likely attributable to the fact that CVS Mail and Specialty Pharmacies policy and procedure was to only use DAW 0, 1, or 2 for Medicare Part D submissions as discussed by Ms. Begley in her deposition.

*Table 3. DAW Code PDE Submission – All CVS Mail and Specialty Pharmacy Brand Claims*[50]

| Drug Name | Dosage | Mail and Specialty - DAW Codes | | | |
|---|---|---|---|---|---|
| | | 0 | 1 | 2 | 9 |
| Advair | 100-50 MCG/ACT | 4,421 | 71 | 5 | 33 |
| Advair | 250-50 MCG/ACT | 11,912 | 244 | 6 | 39 |
| Advair | 500-50 MCG/ACT | 2,931 | 55 | 1 | 32 |
| Asacol HD | 800 MG | 964 | 61 | 3 | 4 |
| Canasa | 1000 MG | 110 | 6 | 1 | 4 |
| Copaxone | 20 MG/ML | 3,723 | 12,606 | 2,872 | 916 |
| Copaxone | 40 MG/ML | 1,588 | 30,808 | 7,284 | 4,637 |
| Epclusa | 400-100 MG | 912 | 160 | 46 | 173 |
| Exelon | 13.3 MG/24 HR | 844 | 35 | 5 | 0 |
| Exelon | 4.6 MG/24 HR | 673 | 27 | 2 | 0 |
| Exelon | 9.5 MG/24 HR | 1,370 | 46 | 5 | 0 |
| Harvoni | 90-400 MG | 375 | 36 | 2 | 62 |
| Invega | 1.5 MG | 24 | 0 | 0 | 0 |
| Invega | 3 MG | 102 | 6 | 0 | 0 |
| Invega | 6 MG | 140 | 25 | 0 | 0 |
| Invega | 9 MG | 97 | 9 | 0 | 0 |
| Istalol | 0.50% | 746 | 80 | 0 | 0 |
| Renvela | 2.4 GM | 24 | 0 | 0 | 0 |
| Renvela | 800 MG | 1,593 | 48 | 19 | 126 |

[49] Begley deposition, at 112:2-20, 113:9-23.
[50] Dr. Scoggins once again provided these calculations. My understanding is that he counted the brand-name prescription submissions made from the list of pharmacies identified by Defendants as CVS Mail and Specialty Pharmacies.

| | | | | | |
|---|---|---|---|---|---|
| Suboxone | 2-0.5 MG | 2 | 0 | 0 | 0 |
| Suboxone | 8-2 MG | 9 | 0 | 0 | 0 |
| Ventolin | 108 (90 Base) MCG/ACT | 26,472 | 666 | 25 | 429 |
| Voltaren | 1% | 10,395 | 351 | 65 | 268 |
| Xopenex HFA | 45 MCG/ACT | 3,404 | 71 | 5 | 31 |
| | **Total** | 72,831 | 45,412 | 10,348 | 6,763 |

61. Allowing DAW 0 to be submitted for a multi-source brand is a direct violation of the NCPDP Telecommunication Standard, Version D.0. As stated previously, DAW 0 is not appropriate for a multi-source branded product with available generic(s).[51]

62. In addition, there is evidence that the CVS Mail Pharmacy staff were tasked with contacting prescribers to obtain authorization to dispense the brand name product using the DAW Code of 1 rather than utilizing DAW 9. According to internal documents, the issue with Ventolin Inhaler was not a manufacturer backorder situation[52]. Pharmacies were instructed to run three test claims for the patient: Albuterol Inhaler (generic ProAir product) with DAW code of 0, and 1 for each of the branded products (ProAir and Ventolin) with a DAW code of 1. If the DAW Code of 1 test claim paid for the Ventolin inhaler, the pharmacy then faxed the prescriber stating that "Generic Ventolin is unable to be sourced. Please consider Brand Ventolin DAW."[53] Staff also reached out to the patient if the brand copay was more than the generic and told that generic Ventolin was unable to be sourced. Patients were told that staff were reaching out to their prescriber to dispense the brand and requested authorization from the patient to dispense the brand. Patients who did not want the brand name product, or whose insurance would not cover the brand were given a letter and told to find another pharmacy that had the generic in stock.[54]

63. Only once approved by the prescriber could the pharmacy then submit the claim with a DAW Code of 1. These procedures are out of compliance with CVS Caremark's own audit policies which refer to desktop audits to ensure that Medicare Part D network pharmacies are in compliance with the CVS Caremark pharmacy provider agreement.[55] The audit policy states:

---

[51] NCPDP External Code List , July 2007 page 30
[52] CVS-Ellsworth_00007278
[53] CVS-Ellsworth_00007230
[54] CVS-Ellsworth_00007278
[55] CVS-Ellsworth_00401300

> *Dispensed as Written (DAW) Code discrepancies:(If applicable) Auditors will check that the prescriber has ordered "DAW" on the prescription and will confirm the DAW complies with applicable state laws. They will also verify that DAW was not arbitrarily added to the claim or rejection form to obtain payment for the prescription where a substitution should have been made. Documentation for a DAW 2 "Patient Requests Brand" will be confirmed.*

Although the pharmacy contacted the prescriber to obtain the DAW to dispense the brand, it was not initially requested by the prescriber but by the pharmacy to implement their Generic Blocking Strategies.

<u>Advair Claims and DAW 9</u>

64. The documents I reviewed showed that the implementation of the Generic Blocking Strategy for the drug Advair and its generics had additional evidence of CVS's non-compliance with the NCPDP standards. When implementing the strategy for Advair, Defendants gave instructions for plans not to use DAW 9 even though CVS Caremark knew that DAW 9 was the correct code to use in this instance.
65. Employees at CVS Caremark acknowledged that they were not able to properly implement DAW 9 in an email from Sergey Rubin, dated June 26, 2019. Joshua Fredell also admitted that CVS was "not using DAW 9 for [Advair] at this time," and that only DAW 1 and 2 were to be used instead,[56] which is out of compliance with the NCPDP Telecommunication Standard and CMS rules. There were also communications to the Sales and Marketing teams at CVS Caremark which included language that went so far as to say that the Advair generic Blocking Strategy "is not a DAW 9 strategy."[57]
66. Furthermore, as indicated in the Fredell deposition[58], reimbursement to pharmacies was adversely impacted for Advair in Medicare claims when using DAW 9. Reimbursement to pharmacies was not adversely impacted when dispensing Advair with a DAW 1 or 2. Once again, this is a violation of the NCPDP standard which indicates that reimbursement for DAW 9 should be at the brand level and not

[56] CVS-Ellsworth_00094608
[57] Fredell Exhibit 19, CVS-Ellsworth_0079730; Fredell deposition (5/14/24) at 222:8-227:23. See also Fredell Exhibit 18, CVS-Ellsworth_00094828 at -829.
[58] Fredell deposition (5/14/24) at 218-220

at the generic rate or MAC.[59] Fredell also noted in his deposition[60] that he was not aware that DAW codes were reported back to CMS (on the PDE). He was only concerned with the pricing and not the accuracy of the DAW code on claims.

67. Improper reimbursement of medications based on the DAW code submitted by the pharmacy was further documented in an email from Elena Kinney, from CVS Caremark (June 16, 2020), indicating that DAW code 1, 2, 7 and 8 claims will typically be priced at Brand (AWP) rate and for all other DAW codes they will price out at the generic (MAC) rate.[61] Additionally, the definition of DAW Code 9 is incorrectly indicated as "Other", rather than "Substitution Allowed By Prescriber but Plan Requests Brand - Patient's Plan Requested Brand Product To Be Dispensed" as required by NCPDP Telecommunication Standard, Version D.0.

68. Budget documents show that CVS Caremark acknowledged that their approach was not in line with the industry standard for DAW 9 and did not ensure cost sharing benefits from the strategy in all instances.[62] David Azzolina backs up these claims in his deposition when he agrees that CVS's approach was not in line with the industry standards for DAW 9.[63]

69. CVS Caremark in implementing the SilverScript Generic Blocking Strategies did not require any unique DAW codes be submitted by pharmacies when dispensing Advair, except in states with mandatory substitution laws.[64] Thus, pharmacies could submit any DAW code, including DAW 0, which is not in compliance with the NCPDP Standards since DAW 0 is not allowed for a multi-source branded product with available generic(s).[65]

70. Further, the data from the PDE submission shows that 218,907 brand-name Advair claims submissions were submitted with DAW 0.[66] As discussed above, DAW Code 0 was not appropriate for brands dispensed under the CVS Generic Blocking Strategies. Therefore, CVS's Generic Blocking Strategy for

---

[59] The Proper Use of the NCPDP Telecommunication Standard Version D.0 as it applies to the Implementation of Medicaid Reimbursement Methodologies Based on Actual Acquisition Cost (AAC) Plus a Professional Dispensing Fee states "Based on the current service date covered formulary status, the processor/PBM *accepts* DAW Code 9 and must reimburse the pharmacy according to the Ingredient Cost and Professional Dispensing Fee for the Preferred Product dispensed." Page 10
[60] Fredell deposition (5/14/24) at 221
[61] CVS-Ellsworth_00597386
[62] CVS-Ellsworth_00243148
[63] Azzolina deposition (9/5/24) at 170
[64] CVS-Ellsworth_00247841
[65] NCPDP 2007 Data Dictionary (DAW Code values)
[66] *See* Table 2.

the drug Advair was implemented by CVS with instructions to utilize when CVS's employees acknowledged they knew the correct code to use was DAW 9.

Mandatory Generic Substitution States and DAW Codes

71. From my personal experience as a dispensing pharmacist, I am aware that certain states have mandatory generic substitution laws. Relator informed me of the specific statutes for 17 states where there is a mandatory generic substitution law.

72. While working at NCPDP we never understood a DAW code use case to include being a substitute for complying with any law, whether State or Federal. In fact, NCPDP specifically indicates that pharmacies must dispense prescriptions in accordance with state and federal laws.[67] Instead, DAW Codes are intended to be used to identify the justification for dispensing a brand drug. Notably, none of the DAW codes and none of the guidance given in connection with DAW codes contemplates any overruling of state law, including any state mandatory generic substitution laws.

**Opinion 2: The selection of DAW Code affects the financial reimbursement of prescription claims and can have lasting effects on a beneficiary's overall cost.**

73. CVS's documents show that the DAW code selection has a direct effect on cost charged to both the patient and CMS.[68] However, the adjudication process was done incorrectly and DAW 9 claims were being reimbursed at the generic rate rather than the brand rate—when the brand rate was the one that CVS Caremark intended to charge.[69] The internal documents showed that the reason why they

---

[67] NCPDP External Code List July 2007, pages 71 and 70. Pharmacy Service Type Definitions: **Community/Retail Pharmacy Services**. Storing, preparing, and dispensing medicinal preparations and/or prescriptions for a local patient population in accordance with federal and state law; counseling patients and caregivers (sometimes independent of the dispensing process); administering vaccinations; and providing other professional services associated with pharmaceutical care such as health screenings, consultative services with other health care providers, collaborative practice, disease state management, and education classes. And **Mail Order Pharmacy Services.** Compounding or dispensing prescriptions or other medications in accordance with federal and state law, using common carriers to deliver the medications to patient or their caregivers. Consultation to patients and caregivers (sometimes independent of the dispensing process) through telephone or email contact and provide other professional services associated with pharmaceutical care appropriate to the setting.
[68] *See* Table 1 above; CVS-Ellsworth_00597385.
[69] Fredell Deposition (5/14/24) at Exhibit 18 – CVS-Ellsworth_00094828.

provided the direction that Advair was "not a DAW 9 strategy" was in order to fix the reimbursement issue so that the brand price would be paid for the drug instead of the generic equivalent price. [70]

74. Further, the selection of a DAW Code applies for the life of the prescription and affects whether the brand or generic for any refills for that prescription are refilled. This was confirmed by a CVS Pharmacist Stephen Giardino in his testimony. He stated that in a prescription file if a patient had filed a brand prescription when a generic was available, he would continue to fill the brand drug and not check the price to determine whether the brand was the cheaper option for the patient.[71]

75. An example of this is that once a DAW Code of 1 is entered on a prescription, all subsequent fills of the prescription will result in dispensing of the branded product, even after the generic products are added to the plans formulary, often resulting in a higher copay. There is no way for a pharmacy to indicate on the prescription that the dispensing of the branded product with a DAW Code of 1 is only a temporary situation.

**Opinion 3: The CVS prescription and claim adjudication systems were designed such that it impeded proper DAW code submissions by pharmacists.**

<u>MONY Code Manipulation for Strategies</u>

76. When CVS Caremark/SilverScript decided to add Advair, Harvoni, and Epclusa to the Generic Blocking Strategies drug files had to be manipulated to effectively block the generic products from being dispensed. MONY codes were changed to MONY codes = O from M to block the authorized generics.[72] By manipulating the MONY codes, CVS Caremark was able to submit a DAW code of 0 for the brand name products, eliminating the need to obtain a DAW code of 1 to dispense the brand name product. The NCPDP Standard, Telecommunication Standard, Version D.0 states, "*For a multi-source branded product with available generic(s), DAW 0 is not appropriate*" as such no claims for a multi-source branded product should be submitted with a DAW Code 0. Submitting claims with a DAW Code of 0 for multi-source branded products is a the NCPDP Telecommunication Standard, Version D.0.

---

[70] Fredell deposition (5/14/24) at 222-227; Ex. 19 – CVS-Ellsworth_00279730.
[71] Giardino deposition (2/21/25) at 77-79.
[72] Fredell Vol II Deposition at 28-41, Exhibit 32 CVS-Ellsworth_00928794; Fredell Vol II Deposition at 14-20, Exhibit 30 CVS-Ellsworth_00392517; Fredell Vol II Deposition at 127-162, Exhibit 37 CVS-Ellsworth_00392583

77. Manipulation of the MONY Codes is in direct violation of their own Policies and Procedures which states "The Drug File Administration and the Professional Practice Groups will …Ensure appropriate substitution links are available in our computer systems that support the monitoring and updating of our pharmacies…"[73]

78. Any claim submitted to CVS Caremark for a Medicare Part D plan, such as SilverScript, would be submitted to CMS on the PDE record with an invalid DAW. According to NCPDP Guidance, [74] claims submitted with an incorrect DAW code should be corrected and resubmitted if the claim would have paid differently. CVS Caremark acknowledged that submission of DAW 0 on a claim for a brand product (MONY code = O) will result in generic (MAC) reimbursement, which is incorrect reimbursement in this instance since the brand product was dispensed [75] (see *Table 1*)

79. CVS Caremark further acknowledged that they needed to provide direction to retail pharmacies on which DAW code(s) they should submit on a claim since both DAW 0 and DAW 9 would result in the brand product being reimbursed at the generic (MAC) rate since MONY codes and DAW codes may result in different reimbursement.[76] Thus, acknowledging the issues with their own adjudication system.

80. Most pharmacy systems block DAW 0 for multi-source brands as required by the NCPDP Standard to remain compliant with the NCPDP Standards and for optimum reimbursement. However, CVS Retail Pharmacy also does not have these types of edits in place either.[77] In fact, according to testimony from Brian Salvas, it appears that the CVS Retail Pharmacy system, "RxConnect", would allow pharmacy staff to input DAW 0 for multi-source brands, such as Advair. Since claim data shows that Advair was dispensed with a DAW code of 0 when a generic was available.

81. Mr. Salvas was also unaware that NCPDP standards do not allow DAW 0 for multi-source brands, which is clearly stated in the ECL. This is alarming because Mr. Salvas' title as of the writing of this

---

[73] CVS-Ellsworth_00569478

[74] NCPDP Recommendations for Medicare Part D Post Point-of-Sale Claim Adjustments, page 7

[75] Fredell Vol II Deposition, Exhibit 33 CVS-Ellsworth_00597382, at -385.

[76] Fredell Vol II Deposition, at 74-76.

[77] Brian Salvas 30(b)(6) Deposition, at 231-232 "In general, there's a very small amount of brand dispensing when a generic is available. And compliance to DAW codes is -- to the extent that I understand it, in conferring with our third-party audit team, is not of a very high frequency… I said -- what I meant -- I don't know exactly what I just said. But what I certainly intended to say is that compliance is -- to appropriate DAW coding in these rare instances where a multi-source brand is being dispensed is generally high"

report is the Vice President of Pharmacy Operations Innovation, which includes overseeing NCPDP Telecommunication standards.[78]

DAW 9 Entry in the RxConnect System

82. Furthermore, "RxConnect" only provides access to DAW 0 and 1 as the quick codes on the main filling screen.[79] If another DAW code (such as DAW 5 and 9) is necessary, staff are told to use the DAW Code of 0 as a placeholder, enter all information on the fill screen then go to an "Additional Information" screen to enter the appropriate DAW code. In my experience, this type of process often leads to staff not following due to the extra steps involved. A document regarding common mistakes from CVS Health supports this as well including failing to choose the appropriate DAW Code from the later page as a common error pharmacists can make.[80]

**Opinion 4: The employees of CVS that oversaw and enacted the Generic Blocking Strategies for the Relevant Drugs were unqualified for the roles they held and did not act within the standards of the field of claims adjudication and management for a Part D plan sponsor.**

83. The NCPDP Telecommunication Standard, Version D. 0 was named under HIPAA as the required electronic standard for pharmacy claims transactions, including Medicare Part D claims, with covered entity compliance by January 1, 2012. Although CMS did not enforce compliance until March 31, 2012, the compliance date remained January 1[81]. While CVS Caremark is not a Medicare Part D plan sponsor and does not answer directly to CMS, they process pharmacy claims on behalf of the Part D plan sponsors, such as SilverScript, and are required to abide by CMS rules and regulations. Similarly, CVS Retail, Mail, and Specialty Pharmacy Operations, as HIPAA covered entities, have an obligation to submit correct information for Part D Beneficiaries.[82] Compliance with NCPDP Standards requires the proper implementation of all mandatory fields and their associated values, such as DAW Codes.

[78] Salvas 30(b)(6) Deposition, Exhibit 1.
[79] CVS-Ellsworth_00981138 Slide 11 and 13
[80] Brian Salvas 30(b)(6) Deposition, at 227:1-229:18, 248:8-249:15; Brain Salvas 30(b)(6) Deposition, Exhibit 17.
[81] CMS Memo to Part D Sponsors on December 9, 2011, entitled "Implementation of Telecommunication Standard Version D.0"
[82] https://www.ecfr.gov/current/title-45/subtitle-A/subchapter-C/part-162/subpart-I/section-162.923 Any time a covered entity is transmitting information that meets the definition provided in the regulations for one of the

84. For the operations of CVS to properly comply with the NCPDP Standards, the people running the various operations that interacted with Part D claims submissions needed to know what those standards were. Despite the fact that many of the business units of CVS were required to comply with proper NCPDP Standards in the submission of DAW Codes, the personnel running operations related to implementation of the Generic Blocking Strategies or the operational aspects of the pharmacy operations did not have the required knowledge to keep those strategies and operations compliant with the NCPDP Standards.

85. Josh Fredell, who had oversite over the implementation of the Generic Blocking Strategies for a period of time, testified[83] that he was not aware that DAW codes were reported back to CMS (on the PDE). Fredell was someone who began working on the Commercial side of PBM operations and was brought in to handle the Generic Blocking Strategies for the Medicare Part D portion of CVS Caremark's business because he was familiar with such strategies from his work in the Commercial sphere.[84] Fredell's lack of understanding and knowledge that the DAW Codes that his team began altering, including providing the instruction that Advair was "not a DAW 9 strategy," was done without knowledge of CMS requirements for data accuracy. Failing to consider the CMS requirements and NCPDP Standards when making decisions regarding DAW Coding for the Generic Blocking Strategy was not in line with industry standards.

86. CVS Pharmacy, Inc.'s corporate designee similarly testified that CVS Pharmacy had no knowledge of where the claims data related to SilverScript Insurance Part D beneficiaries submitted to CVS Caremark were sent after it reached CVS Caremark. Such a stance by CVS Pharmacy, Inc. is not in line with industry standards, and it is not in line with their obligations under the CMS regulations and the NCPDP Telecommunication Standards. A pharmacy certainly has an obligation, as a HIPAA covered entity, to ensure they are submitting claims for reimbursement that include correct information. They are charged not only with preventing fraud, waste, and abuse as a downstream entity, but they are also required under the NCPDP Telecommunications Standard, Version D.0 to submit the necessary

transactions listed above to another covered entity after the effective compliance dates of the standard for both entities have passed, the entity must conduct the transaction as a standard transaction. Conducting a transaction as a "standard transaction" includes compliance with the standard as well as affiliated operating rules, code sets, and unique identifiers for the particular transaction. (HIPAA Administration Simplification Regulations Fact Sheet)

[83] Fredell deposition (5/14/24) at 221

[84] Fredell deposition (5/14/24) at 208-209.

data elements and comply with the definitions within the Standard to be reimbursed for Medicare Part D beneficiary claims. [85]

87. Finally, after reviewing Dawn Begley's deposition, it is clear that her knowledge of DAW Codes and the NCPDP definitions or requirements was inadequate to fulfil the role of overseeing operations related to mail pharmacy. She is not a pharmacist nor is she a pharmacy technician, yet she was fulfilling a role related to overseeing pharmacist's implementation of CVS Mail Pharmacy operations including DAW Code usage. The testimony she provided in her deposition regarding the usage of DAW codes was not in line with CMS regulations or NCPDP Telecommunication Standards.

**Opinion 5: The records produced by CVS do not show that CVS Caremark or SilverScript Insurance Company were performing audits on the improper use of DAW Codes submitted related to SilverScript Beneficiaries.**

88. In the CVS Pharmacy 30(b)(6) deposition, the designee, Brian Salvas, testified that there were audits showing that there were no issues with DAW coding.[86] Defendants then produced the purported underlying audit documents that Mr. Salvas was referring to. After reviewing those audits reportedly related to DAW Code audits, none questioned the use of DAW codes. In fact, only one file even contained DAW codes. That particular file [87]showed Ventolin, Advair and Voltaren Gel dispensed with a DAW code of 0, without any corrective action required. Other documents that I examined all contained issues with quantity/days' supply and directions. The spreadsheets I reviewed demonstrate no evidence of a DAW code audit done as Mr. Salvas testified.

89. I would have expected to see audits for relevant drugs, such as Advair, for DAW 1. Especially since CVS Caremark's own pharmacy provider agreement[88] details the audit of DAW 1 claims to ensure that the

---

[85] HIPAA Administration Simplification Regulation Fact Sheet

[86] Brian Salvas, CVS Pharmacy – 02-13-2025, at 229-247.

[87] CVS-Ellsworth 009854

[88] CVS-Ellsworth 007278 *Dispensed as Written (DAW) Code discrepancies:(If applicable) Auditors will check that the prescriber has ordered "DAW" on the prescription and will confirm the DAW complies with applicable state laws. They will also verify that DAW was not arbitrarily added to the claim or rejection form to obtain payment for the prescription where a substitution should have been made. Documentation for a DAW 2 "Patient Requests Brand" will be confirmed.*

hard copy prescription included a notation from the prescriber for the brand. There was no evidence of such an audit in any of the audit spreadsheets that I reviewed.

90. Brian Salvas also testified that "for the relevant drugs during the relevant time period for SilverScript, there were no third-party audit findings that indicated inappropriate DAW coding."[89] This is concerning given that incorrect DAW 0 was submitted on claims for multi-source branded products when a generic was available. According to CMS, plan sponsors are responsible for ensuring that accurate data is submitted on the PDE, which includes valid DAW codes.[90]

*/s/ Michele V. Davidson* 4/11/25

Michele V. Davidson, R.Ph. Date

[89] Brian Salvas, CVS Pharmacy – 02-13-2025_Condensed PDF pages 230-231

[90] Per 42 CFR 423.505(k)(3) and (5), Part D sponsors are required to certify the claims data and allowable costs that they submit for purposes of risk corridor and reinsurance payment. By signing the Attestation of Data Relating to CMS Payment to a Medicare Part D Sponsor, Part D sponsors certify that PDE data, Summary DIR data, and any other information provided for the purposes of determining allowable reinsurance and risk corridor costs for contract year 2021 are accurate, complete, and truthful.

*Appendix A - Curriculum Vitae*

www.linkedin.com/in/michelevilaretdavidson

## MICHELE V. DAVIDSON, R.PH.

PROFILE

**President, MVDavidson Consulting, LLC**

February 2023 - present

Expert witness testimony

Pharmacy technical standards expert

Ensuring proper implementation of pharmacy standards including pharmacy claims billing, e-prescribing and the various HIPAA standards

Covering HIT issues for the pharmacy Industry

Representing the Pharmacy Industry at Standards Development Organizations

Presentations and/or testifying before CMS, NCVHS or other regulatory agencies.

HIT Legislation review

EXPERIENCE

**Manager, Pharmacy Technical Standards, Development and Policy promoted to Senior Manager in 2016**

**Walgreens**

September 2009 - May 2022; 12 years 9 months

Washington D.C. Metro Area

Worked with all aspects of with the Walgreens Team to help improve efficiencies and assure compliance with various pharmacy technical standards. Ensured Walgreens involvement in every aspect of standards development organizations, especially NCPDP. Acted as the

subject matter expert for questions related to NCPDP standards.
Facilitated interactions between CMS and Walgreens as it relates to Medicare audits, issues and questions.
Worked with Federal and State teams on rules/regulations as they relate to pharmacy, especially claims billing issues.

Instrumental in ensuring nationwide billing of COVID-19 vaccinations and testing to all entities (including State Medicaid programs, Medicare, commercial plans and Federal agencies)

**Director, Telecommunication Standard**

**National Association of Chain Drug Stores (NACDS)**

February 2006 - April 2009; 3 years

Worked as liaison for the chain drug industry between members and processor and payors. Helped our members to understand the pharmacy billing standards and worked with the industry to improve workflow within the pharmacies.
Attended NCPDP, X-12, PSTAC, HITSP and other industry HIT meetings to stay current with the pharmacy billing standards. Was a member of NCPDP Board of Trustees, as well as served on several industry Task groups and state HIT initiatives, including the VA and TN e-prescribing advisory councils.

**Brooks/Eckerd Corporation**

1980-2006

**Director Government Programs**

**Brooks Pharmacy**

2005 – 2006; 1 year

Was the Project Manager for the Medicare Prescription Drug Benefit and oversaw the advertising, marketing, training, and system enhancements that needed to be in place to implement this Program in all of the Brooks/Eckerd stores by January 1, 2006. Also worked with various state Medicaid agencies to legislate or facilitate changes in their programs to make these programs more "pharmacy friendly" and

worked with our Managed Care department to implement new billing methods.

**Manager Medicaid Programs**

**Eckerd Drugs**

1978 – 2005; 27 years

Oversaw compliance as well as assisted in implementation of state Medicaid rules and regulations for all 13 state Medicaid programs that Eckerd operated in. Worked closely with NDC Health (now Relay Health) on implementation of claims adjudication rules and edits. Oversaw pharmacy audits and implemented numerous system wide edits to mitigate audit findings.

Pharmacist in a store from 1980 through 1997

Pharmacy Intern 1978 - 1980

## EDUCATION

**1980**

**BACHELOR OF SCIENCE, PHARMACY**

**UNIVERSITY OF FLORIDA, GAINESVILLE, FL**

Senator representing the College of Pharmacy in UF Student Senate (1979-80)

**1977**

**BACHELOR OF ARTS**

**UNIVERSITY OF SOUTH FLORIDA, TAMPA, FL**

Member of the USF women’s swim team (Fall 1975-77)

## PROFESSIONAL LICENSES

Florida Board of Pharmacy (# 18507)

## PROFESSIONAL AFFILIATIONS

Member, National Council for Prescription Drug Programs (NCPDP)

Member, National Association of Chain Drug Stores (NACDS)

Pharmacy HIT Collaborative, past member

American Pharmacists Association (APhA), past member

Academy of Manage Care Pharmacy (AMCP), past member

Workgroup on Electronic Data Interchange (WEDI), past member

ASCX-12, past member

Health Information and Management Systems Society (HIMSS), past member

Health Information Technology Standards Panel (HITSP), past member

Governor Tim Kaine's (VA) e-prescribing advisory panel, past member

---

PROFESSIONAL SERVICE AND AWARDS

**National Council for Prescription Drug Programs (NCPDP)**

Board of Trustees (12 years), Secretary, Board Chair, Education Committee Chair, Nominating Committee Chair, By-laws Chair, Mentor Program Chair, Member Programs Chair, Finance Committee, Strategic Planning

Standardization Committee, member and Chair (4 years)

Buddy Program, participant (14 years)

TIME Award Recipient 2015

Benjamin D. Ward Distinguished Member Award Nominee 2016

Co-Chair Workgroup 9 Government Programs (2 years) and Workgroup 11 Electronic Prescribing (7 years)

Co-lead for numerous task groups, including electronic prescribing of REMs, Emergency Preparedness task group (responsible for billing of COVID vaccines), Dispensed Medication Reporting, 2D Barcode, Patient ID, Billing of Compounds, just to name a few.

**NCPDP Foundation**

Board member (8 years), Chair of Designated Funds Committee (2 years), Chair of Governance Committee (1 year), and Chair of Development Committee (2 years)

*Appendix B - Summary of FDA's Orange Book Therapeutic Equivalence Codes*

| Code | Interpretation |
|---|---|
| AA | No bioequivalence problems in conventional dosage forms |
| AB | Meets necessary bioequivalence requirements |
| AB1 | Meets bioequivalence requirements to AB1 rated reference drug |
| AB2 | Meets bioequivalence requirements to AB2 rated reference drug |
| AB3 | Meets bioequivalence requirements to AB3 rated reference drug |
| AB4 | Meets bioequivalence requirements to AB4 rated reference drug |
| AN | Solution or powder for aerosolization |
| AO | Injectable oil solutions |
| AP | Injectable aqueous solutions |
| AT | Topical Products |
| BC | Controlled-release tablet, capsule, or injectable |
| BD | Documented bioequivalence problems |
| BE | Enteric coated oral dosage forms |
| BN | Product in aerosol-nebulizer delivery system |
| BP | Potential bioequivalence problems |
| BR | Suppository or enema for systemic use |
| BS | Testing standards are insufficient for determination |
| BT | Topical products with bioequivalence issues |
| BX | Insufficient data to confirm bioequivalence |
| B* | Requires further FDA investigation and review |
| EE | This entry has been evaluated by the FDA, but a rating is not available for this labeler's product |
| ZZ | FDA standard with no orange book code |

## *Appendix C- History of NCPDP DAW Codes*

1. The DAW code values have remained largely unchanged since first being implemented in the Telecommunication Standard Version 1.0, published in 1988 and only contained values 0-5. As indicated below:

| | | |
|---|---|---|
| 408 | DISPENSE AS WRITTEN (DAW) | CODE INDICATING WHETHER OR NOT THE PRESCRIBER'S INSTRUCTIONS REGARDING SUBSTITUTION WERE FOLLOWED OR EXPLAINING WHY A GENERIC DRUG WAS NOT DISPENSED.<br><br>0=NO DAW<br><br>1=PHYSICIAN DAW<br><br>2=PATIENT DAW<br><br>3=PHARMACIST DAW<br><br>4=NO GENERIC AVAILABLE<br>5 =OTHER |

2. A second version of the Telecommunication Standard Version 1.0 was later published in 1993 and added the values of 6 and 9. The values of 7 and 8 were added prior to the October 1999 NCPDP Telecommunication Version 3.2.
3. For NCPDP Telecommunication Standard Version D.0, Dispense As Written/Product Selection Code (4Ø8-D8) value "9" (Other – Reserved and not in use) was modified to (Substitution Allowed By Prescriber but Plan Requests Brand - Patient's Plan Requested Brand Product To Be Dispensed - This value is used when the prescriber has indicated, in a manner specified by prevailing law, that generic substitution is permitted, but the plan's formulary requests the brand product. This situation can occur when the prescriber writes the prescription using either the brand or generic name and the product is available from multiple sources).

4. Additionally, the values of 0 and 1 were also modified at that time from:

"0" (No Product Selection Indicated - This is the field default value that is appropriately used for prescriptions where product selection is not an issue. Examples include prescriptions written for single source brand products and prescriptions written using the generic name and a generic product is dispensed.)

And

"1" (Substitution Not Allowed by Prescriber-This value is used when the prescriber indicates, in a manner specified by prevailing law, that the product is to be Dispensed)

to the values in the above chart.

Subsequently, the DAW Code values were further modified in 2022 to take into account biologics. I have not included those new definitions in this report since these modifications to the standard occurred after the timeline of this case.

**Case Documents**

- United States of America ex rel. Ellsworth Associates, LLP v. CVS Health Corporation – Third Amended Complaint (ECF 88)

**Deposition Testimony**

- Deposition of Brian Salvas (CVS Pharmacy 30(b)(6)) and exhibits thereto
- Deposition of Brian Salvas and exhibits thereto
- Deposition of David Azzolina and exhibits thereto
- Deposition of Dawn Begley and exhibits thereto
- Deposition of Joshua Fredell (May 14, 2024) and exhibits thereto
- Deposition of Joshua Fredell (Jan 24, 2025) and exhibits thereto
- Deposition of Stephen Giardino and exhibits thereto

**Production Documents**

**Bates**

- CVS-Ellsworth_00007230
- CVS-Ellsworth_00007278
- CVS-Ellsworth_00026847
- CVS-Ellsworth_00079730
- CVS-Ellsworth_00094608
- CVS-Ellsworth_00094828
- CVS-Ellsworth_00095342
- CVS-Ellsworth_00243148
- CVS-Ellsworth_00247841
- CVS-Ellsworth_00279730
- CVS-Ellsworth_00392517
- CVS-Ellsworth_00401300
- CVS-Ellsworth_00401415
- CVS-Ellsworth_00569478
- CVS-Ellsworth_00597385
- CVS-Ellsworth_00597386
- CVS-Ellsworth_00928794
- CVS-Ellsworth_00981138
- CVS-Ellsworth_00985407
- CVS-Ellsworth_00985408
- CVS-Ellsworth_00985409

- CVS-Ellsworth_00985410
- CVS-Ellsworth_00985411
- CVS-Ellsworth_00985412
- CVS-Ellsworth_00985413
- CVS-Ellsworth_00985414
- CVS-Ellsworth_00985415
- CVS-Ellsworth_00985416
- CVS-Ellsworth_00985417
- CVS-Ellsworth_00985418
- CVS-Ellsworth_00985419
- CVS-Ellsworth_00985420
- CVS-Ellsworth_00985421
- CVS-Ellsworth_00985422
- CVS-Ellsworth_00985423
- CVS-Ellsworth_00985424
- CVS-Ellsworth_00985425
- CVS-Ellsworth_00985426
- CVS-Ellsworth_00985427
- CVS-Ellsworth_00985428
- CVS-Ellsworth_00985429
- CVS-Ellsworth_00985430
- CVS-Ellsworth_00985431
- CVS-Ellsworth_00985432
- CVS-Ellsworth_00985433
- CVS-Ellsworth_00985434
- CVS-Ellsworth_00985435
- CVS-Ellsworth_00985436
- CVS-Ellsworth_00985437
- CVS-Ellsworth_00985438
- CVS-Ellsworth_00985439
- CVS-Ellsworth_00985440
- CVS-Ellsworth_00985441
- CVS-Ellsworth_00985442
- CVS-Ellsworth_00985443
- CVS-Ellsworth_00985444
- CVS-Ellsworth_00985445
- CVS-Ellsworth_00985446
- CVS-Ellsworth_00985447
- CVS-Ellsworth_00985448
- CVS-Ellsworth_00985449
- CVS-Ellsworth_00985450

**Other Materials and Sources**


- Administration Simplification Timeline of Key Statutes and Regulations https://www.cms.gov/Regulations-and-Guidance/Administrative-Simplification/HIPAA-ACA/Downloads/TimelineofKeyStatutesandRegulations20160725.pdf
- CMS Memo to Part D Sponsors on December 9, 2011, entitled "Implementation of Telecommunication Standard Version D.0"
- CMS Memo to Part D Sponsors on March 27, 2012, entitled "Impact of the CMS Announced Delay in Enforcement of Telecommunication Standard Version D.0 on Part D Sponsors ."
- CMS Memo to Part D Sponsors on September 2, 2022, entitled "2021 Attestations of Prescription Drug Event (PDE) Data, Direct and Indirect Remuneration (DIR) Data, Monthly Plan-to-Plan (P2P) Reconciliation Payments, and the Detailed DIR Report"
- CMS, HIPAA Administrative Simplification Fundamentals Fact Sheet. https://www.cms.gov/files/document/hipaa-admin-simp-fundamentals-fact-sheet.pdf
- CMS, HIPPA Administrative Simplification Regulations Overview. https://www.cms.gov/files/document/hipaa-admin-simp-regulations-fact-sheet.pdf
- CMS, Overview of Administrative Simplification. www.cms.gov/files/document/admin-simp-one-pager.pdf
- Dusetzina, S. B., Cubanski, J., Nshuti, L., True, S., Hoadley, J., Roberts, D., & Neuman, T. (2020). Medicare Part D Plans Rarely Cover Brand-Name Drugs When Generics Are Available. Health Affairs (Project Hope), 39(8), 1326–1333.
- Kale VM. FDA's orange book and ab ratings of pharmaceutical drug products: a guide to community pharmacist. MOJ Bioequiv Availab. 2015;1(3):54-55. DOI: 10.15406/mojbb.2015.01.00013.
- Kirchhoff, Suzanne M. (November 14, 2023). Medicare Part D Prescription Drug Benefit (PDF). Washington, DC: Congressional Research Service. Retrieved April 5, 2024
- NCPDP Data Dictionary Quick Reference Manual, Version 3.2, January 1996.
- NCPDP Data Dictionary, Version Date: July 2007.
- NCPDP Data Dictionary, Version Date: September 1999.
- NCPDP Data Element Request Form (DERF)/External Code List (ECL); DERF #: 000770 (July 13, 2006).
- NCPDP External Code List, Version Date: July 2007
- NCPDP Recommendations for Medicare Part D Post Point-of-Sale Claim Adjustments. Version 1.0. September 2015.
- NCPDP Telecommunication Standard Implementation Guide, Version 5, Release 1 (Version 5.1), September 1999.
- NCPDP Telecommunication Standard, Version 1.0, September 1988.
- NCPDP Telecommunication Standard, Version 3.2, February 1992.
- NCPDP Telecommunication Standard, Version D.0, August 2010.

- NCVHS Letter to Sec. Alex Azar, U.S. Dept. of Health & Humana Services (Apr. 22, 2020).
- Prescription Drug Event (PDE) Reports: IAP Errors Report Guide. Acuemn, LLC (March 2017)
- Sacks CA, Van de Wiele VL, Fulchino LA, Patel L, Kesselheim AS, Sarpatwari A. Assessment of Variation in State Regulation of Generic Drug and Interchangeable Biologic Substitutions. JAMA Intern Med. 2021;181(1):16–22. doi:10.1001/jamainternmed.2020.3588
- Socal, M. P., Bai, G., & Anderson, G. F. (2021). Factors Associated With Prescriptions for Branded Medications in the Medicare Part D Program. JAMA network open, 4(3), e210483. https://doi.org/10.1001/jamanetworkopen.2021.0483.
- The Proper Use of the NCPDP Telecommunication Standard Version D.0 as it applies to the Implementation of Medicaid Reimbursement Methodologies Based on Actual Acquisition Cost (AAC) Plus a Professional Dispensing Fee, Version 1.2 Published July 2017


Any and all documents or sources cited in the Report to the extent not already included in this list.