# EXHIBIT 17 to ECF No. 219

# REBUTTAL EXPERT REPORT OF MICHELE DAVIDSON

U.S. ex rel. Ellsworth Associates, LLP v.
CVS Health Corporation, et al.
No. 2:19-cv-02553

Submitted By:
Michele V. Davidson, R.Ph.
MVDavidson Consulting, LLC

## Table of Contents

Brief Background ........ 1

CVS Caremark/SilverScript Must Comply with NCPDP Standards and Cannot Simply Pick which DAW Codes They Will Accept for Particular Claims ........ 1

Plans Have the Ability to and Should Reject Claims with Inappropriate DAW Codes but CVS Caremark on behalf of SilverScript Did Not Reject Improper DAW 0 Claims ........ 5

Pharmacies Also Can Take Steps to Prevent Inappropriate DAW Code Usage, But There Is No Evidence CVS Had Those Edits in Place ........ 8

DAW Codes are an Important Part of the Submission of PDE Data for Reimbursement by CMS and Affect the Prices Charged ........ 11

Conclusion ........ 15

Appendix A ........ 17

## *Brief Background*

1. My name is Michele Davidson. I submitted an expert report in this case on April 11, 2025 (the "Davidson Report"), which includes my qualifications and other background information about me. I incorporate that information here by reference.
2. In forming my opinions and drafting the Davidson Report, as well as this rebuttal report, I have relied on my experience in senior management roles in healthcare organizations over the past 20 plus years including my leadership roles and involvement at NCPDP and my extensive pharmacy experience as well as on testimony given and documents produced in this case.
3. I understand that on April 11, 2025, Defendants offered reports by several pharmacists and consultants– Dr. Ameila Arnold, Angelo Cifaldi, Dr. Anthony Tagavi, Cody Wiberg, Dr. Catherine "Leiana" Oswald, Faith Hicks, Karl G. Williams, Kimberly A. Burns, Reginald Dilliard, Robert Parrado, Timothy D. Gladwell, and Trenton Thiede. Hereafter referred to as "Pharmacy Experts."
4. If I do not directly address a particular opinion that is not an admission that I agree with that opinion. In the Davidson Report I used a set of definitions to identify the various actors. I will continue to use the same definitions in this report
5. For the reasons discussed below, I have concluded that none of the opinions, conclusions, or findings in any of the expert reports submitted by the Defendants have caused me to change or modify my opinions as set forth in the Davidson Report.
6. I relied on all the materials listed in Appendix D to the Davidson Report to form my opinions in this rebuttal. A complete list of the additional materials I relied upon in forming my opinions in this rebuttal report is contained in Appendix A to this rebuttal as well.

## *CVS Caremark/SilverScript Must Comply with NCPDP Standards and Cannot Simply Pick which DAW Codes They Will Accept for Particular Claims*

7. As a HIPAA covered entity, CVS Caremark has the responsibility to properly implement the NCPDP Telecommunication Standard, Version D.0. While CVS Caremark is not a Medicare Part D plan sponsor, it processes pharmacy claims on behalf of the Part D plan sponsors, such as SilverScript, and as a result CVS Caremark is required to abide by CMS rules and regulations. Similarly, CVS Retail, Mail,

and Specialty Pharmacy Operations, as HIPAA covered entities, have an obligation to submit correct information for Part D Beneficiaries.[1] Compliance with NCPDP Standards requires the proper implementation of all mandatory fields and their associated values, such as DAW Codes.

8. DAW Codes have very specific definitions and should only be used accordance with those definitions. In fact, NCPDP recommends that plans reject claims with specific messages to reject inappropriate DAW codes submitted by the pharmacy.[2] In fact, NCPDP added a specific reject code, UU, to the January 2007 Data Dictionary that stated "DAW Ø cannot be submitted on a multi-source drug with available generics."[3] I found no evidence that suggests that CVS Caremark rejected claims submitted with inappropriate DAW codes.

9. Mr. Salvas testified that NCPDP Standards offer a framework for claims adjudication, but there is a variability at times between the way that certain trading partners leverage the standards.[4] However, he also testified that CVS Pharmacy follows the NCPDP Standard, Version D.0, "whenever possible."[5] Even further, Defendants' Pharmacy Experts continue to take this position opining that if the payor has accepted a particular DAW code, then there is nothing improper about using that code for claims reimbursement.[6]

---

[1] 45 C.F.R. § 162.923, https://www.ecfr.gov/current/title-45/subtitle-A/subchapter-C/part-162/subpart-I/section-162.923. Any time a covered entity is transmitting information that meets the definition provided in the regulations for one of the transactions listed above to another covered entity after the effective compliance dates of the standard for both entities have passed, the entity must conduct the transaction as a standard transaction. Conducting a transaction as a "standard transaction" includes compliance with the standard as well as affiliated operating rules, code sets, and unique identifiers for the particular transaction. CMS, HIPAA Administrative Simplification Fundamentals Fact Sheet, https://www.cms.gov/files/document/hipaa-admin-simp-fundamentals-fact-sheet.pdf.

[2] The Proper Use of the NCPDP Telecommunication Standard Version D.0 as it applies to the Implementation of Medicaid Reimbursement Methodologies Based on Actual Acquisition Cost (AAC) Plus a Professional Dispensing Fee, Version 1.2 Published July 2017; and NCPDP ECL published July 2007.

[3] From the July 2007 ECL, page 203.

[4] Salvas Dep. (CVS Pharmacy 30(b)(6)) (Feb. 13, 2025) at 51 ("The NCPDP standard is sort of a framework for claims adjudication, but there is variability at times between the way that certain trading partners will leverage that standard to bring it to life.").

[5] Salvas Dep. (CVS Pharmacy 30(b)(6)) (Feb. 13, 2025) at 143-144.

[6] Expert report of Angelo Cifaldi ("In particular, in situations where a payor requests or has historically accepted other DAW codes (for example, the default code DAW 0) there is nothing improper with using them."); Expert Report of Anthony Tagavi ("Other DAW codes may be appropriate as well to the facts I have been asked to assume. For example, a payer may request or accept a DAW 0, and this is permissible from an industry standard perspective as well."); Expert Report of Catherine Oswald ("Other DAW codes may be appropriate as well to the facts I have been asked to assume. For example, a payer may request or accept a DAW 0, and this is permissible from an industry standard perspective as well."); Expert Report of Faith Hicks ("Under the facts I have been asked to assume, I would expect a Hawai'i pharmacist to use Dispense as Written (DAW) Code 9—substitution allowed but plan requests brand—when dispensing a brand drug covered by a patient's insurance, although other DAW codes, including the default code DAW 0—no product selection indicated—may be appropriate under various circumstances."); Expert Report of Karl Williams ("However, there may be scenarios where other codes, such as DAW 0, may be appropriate.

10. In all my time at NCPDP, I am unaware of a situation in which companies can change the definition, scope, or applicability of any part of the NCPDP Telecommunication Standard. Yet, Mr. Salvas' testimony—as CVS Pharmacy—and the opinions of Defendants' Pharmacy Experts indicate that Defendants consider the NCPDP Telecommunications Standard flexible and able to be changed based on CVS Pharmacy's business needs. That is an inappropriate interpretation of the NCPDP Telecommunication Standards and is not in line with industry practice. Therefore, any misapplication in DAW Code usage applied by CVS's pharmacy operations (including Retail, Mail, and Specialty) was a violation of the NCPDP Telecommunication Standards and any acceptance of improper DAW Codes by CVS Caremark or SilverScript was also a violation of the NCPDP Telecommunication Standards.

11. DAW Code 0, as listed in the July 2007 Version of the External Code List (ECL), DAW 0 is not appropriate for a multi-source branded product with available generic(s)

| | |
|---|---|
| 0 | No Product Selection Indicated[7]<br>*This is the field default value that is appropriately used for prescriptions for single source brand, co-branded/co-licensed, or generic products. For a multi-source branded product with available generic(s), DAW 0 is not appropriate, and may result in a reject.* |

12. CVS documents show that a drug was only placed into one of the Generic Blocking Strategies if there is a generic or authorized generic on the market.[8]

13. According to NCPDP, when the brand is preferred by the plan, DAW 9 is the appropriate code that should be submitted on a claim. Not only does this information come from the ECL that was required

For example, if a payor requests or accepts other DAW codes (like DAW 0), there is nothing improper with using them."); Expert Report of Reginald Dilliard ("Under the fact pattern I have been asked to assume, I would expect a Tennessee pharmacist to use DAW 9 (substitution allowed—plan requests brand dispensed). However, different plans may have different DAW codes that may be used for reimbursement purposes. For example, the Tennessee Medicaid program (Tenncare) uses DAW 5 (substitution allowed—brand drug dispensed as a generic) when the plan prefers brand over generic. Accordingly, if a plan or PBM prefers the use of a particular DAW code under the facts I have been asked to assume or has historically accepted a particular DAW code under those facts, when dispensing under the facts I have been asked to assume it would not be improper for a pharmacist to continue to use such a DAW code."); Expert Report of Robert Parrado ("There are proper DAW codes a pharmacist could use under the fact pattern I have been asked to assume. For example, a Florida pharmacist may use DAW 9, although there are scenarios where other codes, including a DAW 0, would be appropriate. There is also the possibility that a plan might have different requirements for which DAW to use and if I were the dispensing pharmacist I would follow these requirements. As a general matter, if a plan or its PBM has instructed a pharmacy to use a particular DAW code on the facts I have been asked to assume – or has historically accepted a particular DAW code on the facts I have been asked to assume – I would not have any concerns about a pharmacist continuing to use that code or following a plan or PBM's instructions in that regard.").

[7] NCPDP July 2007 ECL.

[8] CVS-Ellsworth_00026847.

to be implemented with NCPDP Telecommunication Standard, Version D.0, but NCPDP published further guidance on the subject in July 2017.[9]

| | |
|---|---|
| 9 | Substitution Allowed By Prescriber but Plan Requests Brand - Patient's Plan Requested Brand Product To Be Dispensed [10]<br>*This value is used when the prescriber has indicated, in a manner specified by prevailing law, that generic substitution is permitted, but the plan's formulary requests the brand product. This situation can occur when the prescriber writes the prescription using either the brand or generic name and the product is available from multiple sources.* |

*What if a preferred product is a multi-source brand (brand named product where generic is available)?* [11]

***Response:***

*In this case the pharmacy would need to dispense the branded product and resubmit using DAW Code 9 which indicates substitution allowed by prescriber, but the Medicaid program requires the brand named product.*

*Until the pharmacy is alerted to a formulary change by the processor/PBM through the claim adjudication process, the pharmacy dispensing system will retain both the DAW Code 9 and the dispensed product from the previous fill. As a result, the appropriate use of DAW code values and reject codes is critical to ensure adherence to formulary rules and appropriate reimbursement.*

*If the formulary status changes and the brand drug is no longer set as the preferred formulary drug, prescription claims submitted by the pharmacy for the preferred brand drug and DAW Code 9 should be rejected by the processor/PBM with Reject Code (511-FB) AJ (Generic Drug Required)***.**

14. Defendants' own expert, Trenton Thiede, stated while discussing a situation where a plan sponsor preferred the brand over the generic in his report "Under those circumstances, a pharmacist seeking to fill the brand might reasonably use DAW 9, which is generally defined to apply to a scenario where, as here, the patient's health insurance plan prefers or requires the branded drug. However, that is

[9] July 2007, NCPDP ECL and Proper Use of the Telecommunication Standard D.0 Document, Section 3.1.6. While this document was written specifically for Medicaid plans, it applies to all plans, not just Medicaid.
[10] July 2007, NCPDP ECL.
[11] Proper Use of the Telecommunication Standard D.0 Document, Section 3.1.6. While this document was written specifically for Medicaid plans, it applies to all plans, not just Medicaid.

not the only DAW code a pharmacist might use. In particular, while not as precise as DAW 9, it would not be unreasonable for a pharmacist to use DAW 0 under these circumstances. DAW 0 is the default code, and it generally indicates that the prescriber has not indicated that substitution is disallowed."

15. Mr. Thiede is incorrect. DAW 0 is not an acceptable DAW code in this instance for all the reasons stated already in the Davidson Report and elsewhere in this report.

## *Plans Have the Ability to and Should Reject Claims with Inappropriate DAW Codes but CVS Caremark on behalf of SilverScript Did Not Reject Improper DAW 0 Claims*

16. PBMs/Plans should reject inappropriate DAW codes and message to the pharmacy appropriate codes for pharmacy to submit. For example, in the Proper Use of the Telecommunication Standard D.0 Document, Section 3.1.6, NCPDP discusses what the plan should do when the pharmacy submits a generic equivalent product with a DAW 0, since they are most likely unaware of the plan's formulary requirements. NCPDP States:

    *The processor/PBM should use **Reject Code (511-FB) 606** (Brand Drug/Specific Labeler Code Required). Additional information should be supplied by the processor/PBM in the Response Claim Segment regarding the preferred product in the **Preferred Product ID (553-AR)**. At a minimum, the following additional fields should be provided:*

    - *551-9F Preferred Product Count*
    - *552-AP Preferred Product ID Qualifier*
    - *556-AU Preferred Product Description*

    *Upon receiving Reject Code 606, the pharmacy will **resubmit** the claim with the preferred brand drug and **DAW Code 9** (Substitution Allowed By Prescriber but Plan Requests Brand)*

17. Defendants' expert Trenton Thiede stated in his expert report that "I have advised pharmacies to consider using DAW 0 where the plan prefers brand, but the PBM has not clearly indicated that DAW 9 should be used. Notably, at the start of the relevant period, three of the four major PBMs (Caremark, OptumRx, and Humana) did not cite the updated NCPDP definition and logic for DAW 9 in their Provider Manual, instead defining it as 'Other' without offering any additional guidance or 'Not in use at this time.'"[12] If this is true, then Caremark and other PBMs identified were out of compliance with the NCPDP Standard.

[12] Thiede April 11 Report, at 7.

18. I find Mr. Thiede's statements to be particularly disturbing because CVS Caremark had direct knowledge that DAW 9 Code was changed from the "Other" definition. I personally worked with members of CVS Caremark's upper management on this, specifically Dan Staniec who was Director of Medicare Part D Network at that time and his coder Damon Tressler, on the Data Element Request Form (DERF) that changed the definition of DAW 9. These discussions were in 2006 prior to the vote on the DERF. The definition of DAW was modified from (Other – Reserved and not in use) to (Substitution Allowed By Prescriber but Plan Requests Brand - Patient's Plan Requested Brand Product To Be Dispensed). This change in definition is reflected in the July 2007 ECL and was required, by HIPAA, to be implemented by January 1, 2012. The DERF was introduced in August of 2006 and passed in November 2006. CVS Caremark had plenty of time to properly implement this value before the implementation of NCPDP Telecommunication Standard, Version D.0 by January 1, 2012.
19. This change in definition was necessary because "Pharmacy providers have been instructed to use DAW 1 on MS Brand claims in which the Plan is mandating the branded product. Use of DAW 1 in this instance is in violation of the NCPDP data dictionary definition. Pharmacy providers must validate that the prescriber has signed and authorized brand medically necessary on the prescription form, before DAW 1 can be used. When the prescriber has not provided this documentation, the pharmacy provider cannot submit DAW 1. Providers have also been requested to submit DAW 0 and DAW 5, which are also in violation of the current definitions and present significant financial risks. This DERF is being submitted to define the use of DAW 9 as Plan Requested Brand, facilitating consistency within the industry and appropriate reimbursement."[13]
20. Mr. Thiede also stated that "It was not until after the Relevant Period of Time that NCPDP issued guidance instructing PBMs and Plans to 'reject claims submitted for the multi-source brand/reference product and DAW 9, when the submitted product is not a plan mandated brand/reference product.'" The guidance I believe he is referring to was released in July 2017 and is cited in Section 15 above. This guidance, taken in context, explains the benefits of using DAW 9 over DAW 0. It allows the pharmacy to be notified when the formulary changes from the branded product to the generic. DAW 0 does not afford this type of notification. If the pharmacy uses DAW 0 instead of DAW 9 and the plan formulary, the patient could be penalized and charged a higher copay/coinsurance since the branded product is no longer the preferred product to be dispensed.[14]

---

[13] Text on business need for DERF 0770 request to change the Definition of DAW 9, July 13, 2006.

[14] The Proper Use of the NCPDP Telecommunication Standard Version D.0 as it applies to the Implementation of Medicaid Reimbursement Methodologies Based on Actual Acquisition Cost (AAC) Plus a Professional Dispensing Fee, Version 1.2 Published July 2017, Section 3.1.6.

21. Despite the claims of Mr. Thiede, CVS Caremark and SilverScript had the responsibility to follow NCPDP standards and apply appropriate edits on claims, including DAW usage, during the relevant time period. Though, it is obvious that CVS Caremark did not have edits or programs in place to prevent the acceptance of improper DAW codes judging by the fact that 2,731,985 claims for Relevant Drugs were submitted with DAW 0 on the PDE.[15]

22. Defendants' expert Benjamin Scher performed an analysis of DAW Codes found in the PDE data produced by the Defendants.[16] I make no opinions regarding the appropriateness of his method of calculation of those numbers or any assumptions he made in determining those counts. However, even if those are the true and correct method of counting the relevant DAW codes, the counts identified by Mr. Scher evidence a significant number of violations of NCPDP standards for the submission of DAW codes. For example, in Figure 17, Mr. Scher's report shows that there is a high percentage of usage for DAW 0 on Copaxone 20mg and 40mg, Xopenex, as well as Harvoni and Epclusa.[17] Further, Figure 21 shows that the submission of DAW Code 0 by Rite Aid pharmacies was extremely high.[18] The fact that a large retail pharmacy was permitted to submit incorrect DAW codes for such a long period of time for a particular drug is more than alarming. It shows that CVS Caremark/SilverScript either did not care about the submission of incorrect DAW Codes or that they did nothing to determine whether the codes submitted to them were appropriate. In either case, CVS Caremark/SilverScript failed to comply with NCPDP Telecommunication Standards.

23. Upon an examination of the counts of DAW Codes submitted as part of the PDE records for drugs in the Generic Blocking Strategies, it is clear that a large portion of the DAW codes submitted to CMS by Defendants included incorrect DAW 0 codes.[19] Interestingly, Mr. Scher's DAW code counts severely under count the number of DAW Codes submitted in the PDE data by Defendants. Mr. Scher only analyzed the claims submitted by pharmacies from CVS Retail, Walmart, Walgreens, and Rite-Aid ("Chain Pharmacies") when discussing the prevalence of specific DAW Codes in the PDE submissions.[20] By failing to include the non-Chain Pharmacies in his analysis, Mr. Scher's numbers make it appear that there was a very low percentage of DAW 0 claims submitted. When in truth, CVS Caremark and

---

[15] The Davidson Report, at 25 (Analysis of DAW Codes submitted on the PDE from Dr. John Scoggins).
[16] Scher April 11 Report, at 30-48.
[17] *Id.* at 40.
[18] *Id.* at 44.
[19] The Davidson Report, at 25 (Analysis of DAW Codes submitted on the PDE from Dr. John Scoggins); *see also* Expert Rebuttal Report of John Scoggins, PhD, at 14-15, 17-18.
[20] *See* Scher April 11 Report at fig.13 to 23.

SilverScript were accepting a significant number of brand drugs submitted with improper DAW 0 designations from pharmacies across the country.[21]

24. The fact that CVS Caremark and SilverScript were accepting such high numbers of incorrect DAW Codes are further indication that there were no true audits of the DAW code submissions by CVS Caremark or SilverScript. The DAW-related audit documents identified by Defendants did not show that there was any analysis of the correct DAW codes being used. The high numbers of incorrect DAW codes being submitted are further proof that CVS Caremark and SilverScript were not taking the necessary steps to ensure that the claims they were submitting as part of the PDE record were accurate or truthful.

25. Plans (through their PBMs) should reject claims with improper DAW usage. They have the ability to do so, and they have the responsibility to do so in order to comply with NCPDP Telecommunication Standards—especially in the case of claims for Medicare beneficiaries which are required to be submitted to CMS for payment in compliance with NCPDP standards. Every claim accepted by CVS Caremark and SilverScript designated with DAW 0 for a branded drug is a violation of the NCPDP Telecommunication Standards.

*Pharmacies Also Can Take Steps to Prevent Inappropriate DAW Code Usage, But There Is No Evidence CVS Had Those Edits in Place*

26. There is no evidence that suggests that CVS's pharmacy operations actually had edits in place to prevent pharmacists from entering a DAW code of 0 for a multi-source branded product with available generics.

27. Pharmacy systems are coded to maintain compliance with the HIPAA-named NCPDP Telecommunication Standard and cannot alter the DAW code logic to support other situations. As a HIPAA covered entity, pharmacies have the obligation to submit correct information on claims for Part D Beneficiaries.[22] Manual exception override processes, such as PBMs improperly requiring

[21] *See* Scoggins Rebuttal Report, at 5 (Table 1), 14-15, 17-18.

[22] 45 C.F.R. § 162.923, www.ecfr.gov/current/title-45/subtitle-A/subchapter-C/part-162/subpart-I/section-162.923 ("Any time a covered entity is transmitting information that meets the definition provided in the regulations for one of the transactions listed above [D.0] to another covered entity after the effective compliance dates of the standard for both entities have passed, the entity must conduct the transaction as a standard transaction."). Conducting a transaction as a "standard transaction" includes compliance with the standard as well as affiliated operating rules, code sets, and unique identifiers for the particular transaction. *See* CMS, HIPAA Administrative Simplification Fundamentals Fact Sheet, https://www.cms.gov/files/document/hipaa-admin-simp-fundamentals-fact-sheet.pdf.

pharmacies to use DAW codes in situations other than those specified by NCPDP, creates significant barriers to pharmacy workflow processes and negates training and policies that ensure standardization and compliance with the Telecommunication Standard.[23] Once again, this is the main reason that a change in definition for DAW 9 was requested by me on behalf of pharmacy.

28. In the training materials I reviewed, I saw no evidence that CVS Retail Pharmacy informed its pharmacists that DAW 0 is not allowed for multi-source branded products with available generics. The training materials only mentioned that DAW 0 was the default DAW that the definition was "No Product Selection Indicated".[24].
29. According to the same CVS training, "DAW are an indicator to Third Party Plan of the reasoning behind product selection. They determine the reimbursement to CVS…."[25]
30. Further, CVS Mail and Specialty Pharmacies did not even train their employees what DAW 9 was for purposes of Medicare Part D claims.[26] Therefore, it is understandable that most of the pharmacists employed by CVS (for Retail, Mail, and Specialty) did not understand that DAW 0 should not be used for multi-sourced branded products with an available generic.
31. It is my experience that the corporation, the entity offering the tools and environment in which its pharmacists work, must understand the appropriate use of DAW codes and set up its systems accordingly. Which means that it must have the proper system edits in place to block the use of DAW 0 for multi-source branded products with an available generic.
32. NCPDP is the organization responsible for setting up the definitions of the individual values and fields that are used in their standards. CVS currently has 62 members of NCPDP.[27] In fact, CVS has long been very active in NCPDP and served in many leadership roles. I had the privilege to serve on the Board of Trustees with several individuals from CVS throughout my career. As such, I know from personal experience that employees of CVS were on notice of the NCPDP standards and therefore had knowledge of what it took to be compliant with those standards. These individuals should be the ones responsible for ensuring that the mandated standards are properly implemented at the corporate level.

---

[23] The Proper Use of the NCPDP Telecommunication Standard Version D.0 as it applies to the Implementation of Medicaid Reimbursement Methodologies Based on Actual Acquisition Cost (AAC) Plus a Professional Dispensing Fee, Version 1.2 Published July 2017.
[24] CVS-Ellsworth_00394840 (DAW definitions slide).
[25] *Id.* (DAW definitions slide, Facilitator notes).
[26] Begley Dep. at 111:11-113:23; *see also* CVS-Ellsworth_00401415.
[27] Information taken from NCPDP.org/Member Search/CVS.

33. Yet, Defendants' own employees testified in depositions that there was confusion about the use of the NCPDP standards while working in CVS's pharmacy operations as evidenced by multiple emails attempting to discern the true definitions of the various DAW codes as well as testimony from Brian Salvas (in his representative capacity for CVS Pharmacy). Additionally, Mr. Salvas testified that "Because the trading partners could decide whatever code is appropriate. There's no --there's nothing binding about the NCPDP standard that indicates that anyone has to use any specific DAW code for any specific use case."[28]
34. Now, Mr. Theide states in his expert report that "The NCPDP's full External Code List (ECL) is very lengthy, and it is not publicly available to pharmacies. For brevity and display considerations, most Pharmacy Management Systems only display the short-hand explanation of the DAW code (e.g., DAW 0 – No Product Selection Indicated). DAW 0 is the default code used in most pharmacy systems."
35. While it may be true that pharmacy management systems only display shortened versions of the DAW code explanation, the NCPDP Standards are readily available to all members—which includes many employees of CVS. Further, it is CVS's responsibility to ensure that it is complying fully with NCPDP Telecommunication Standards under CMS Regulations. CVS's employees who were members of NCPDP—which include Mr. Salvas—had more than sufficient access and knowledge of these standards to ensure compliance of CVS's various entities.
36. There must be edits in place to ensure that pharmacists are not able to select DAW 0 for these multi-source branded products with an available generic(s). From all the evidence I have reviewed, it does not appear that there were sufficient edits in place to do anything to prevent a CVS pharmacist from entering a DAW 0 when a brand drug was required by the plan.
37. The number of DAW 0 submissions by the CVS Mail and Specialty Pharmacies as calculated by Defendants' expert Mr. Scher shows that 98% of all prescriptions were for DAW 0.[29] Such a high percentage is in direct alignment with the fact that CVS Caremark does not instruct their pharmacists to utilize DAW 9 for mail-order Medicare claims.[30] Each of the DAW 0 claims should have been submitted with DAW 9, but they were not. This extremely high percentage of DAW 0 claims shows that the CVS Mail and Specialty Pharmacies had no edits in place to prevent the incorrect application of DAW 0 to a multi-source brand drug.

---

[28] Brian Salvas Dep. (CVS Pharmacy 30(b)(6)) (Feb. 13, 2025) at 214:11-15.
[29] Expert Report of Benjamin Scher, page 47. I make no opinion as to the method of calculation or the appropriateness of the analysis completed by Mr. Scher.
[30] Begley Dep. at 111:11-113:23; *see also* CVS-Ellsworth_00401415.

38. Additionally, the fact that CVS Retail Pharmacy had a large number of DAW 0 claims after the Relevant Drugs became multi-source products shows that there were inadequate edits in place for CVS Retail Pharmacy. Whether you are looking at Mr. Scher's calculations or Mr. Scoggins's calculations to determine the number of claims submitted with DAW 0 by CVS Retail,[31] both counts acknowledge that there were a number of multi-source brand drugs submitted by CVS Retail Pharmacy with the inappropriate code of DAW 0. Had an edit been in place to prevent the application of DAW 0 to a multi-source branded product, then it would have been far more difficult to have claims submitted with improper usage of DAW 0.

### *DAW Codes are an Important Part of the Submission of PDE Data for Reimbursement by CMS and Affect the Prices Charged*

39. Defendants' expert Thomas Kornfield states that it was within his scope of work to evaluate whether DAW codes "are material to CMS's Part D payment decisions" and then concludes that DAW codes "have no impact on CMS's payment decisions." This analysis misses the mark and ignores key information regarding the importance of DAW codes.
40. First, CMS requires plan sponsors to attest that the data is in fact accurate on an annual basis, which include DAW code submissions for each PDE record.[32] Once again, I question the integrity of the DAW codes submitted since there were numerous examples of DAW 0 being submitted for the Relevant Drugs on the PDE during the Relevant time period.
41. CMS has directly asserted that DAW codes are important to the billing process and are a potential point of risk for fraud, waste, and abuse in a Billing Practices handbook created specifically for pharmacies.[33] CMS stated, "Due to the high risk for improper payments, the Centers for Medicare & Medicaid Services (CMS) developed this toolkit to educate pharmacy providers on self-audit precautions related to invoice management, controlled substances management, *proper billing practices*, and proper prescribing practice."[34] CMS then goes on to state that providers should talk to

---

[31] *See* Scher April 11 Report, at 33-47 (Figures 12-23); Scoggins Rebuttal Report, at 5-6 (incl. Table 1), 19 n.28 (Tab ClaimsByPharmNameDAW).
[32] CMS, 2021 Attestations of Prescription Drug Event (PDE) Data, Direct and Indirect Remuneration (DIR) Data, Monthly Plan-to-Plan (P2P) Reconciliation Payments, and the Detailed DIR Report (Sept. 2, 2022), https://www.cms.gov/files/document/2021recondataattestation-memo508v2g.pdf.
[33] Pharmacy Self Auditing – Control practices to Improve Medicaid Program Integrity and Quality Patient Care – Booklet 4: Billing Practices from CMS (2015), at 11-12.
[34] *Id.* at 3 (emphasis added).

pharmacy staff about product selection (DAW) codes and provides the following definitions for DAW 0 and 9:

| | |
|---|---|
| DAW 0 | Appropriate when the prescriber indicates product substitution is allowed or when the prescriber does not include a product selection code on the written prescription. The pharmacy provider may dispense multi-source and single-source generic drugs or single-source brand name drugs using this product selection code. |
| DAW 9 | Appropriate when the prescriber indicates product substitution is allowed, but the beneficiary's prescription drug plan requires the pharmacy to dispense the brand name product. [citation] For example, the SMA may require the pharmacy to dispense the brand name product to meet the requirements of a statutorily defined manufacturer rebate agreement. |

42. First, it is worth noting that CMS acknowledges that DAW 0 is NOT appropriate to submit on a claim for a multi-source branded product with an available generic(s). This is directly in line with the NCPDP definition. Second, CMS goes on to discuss the fact that there is "risk for fraud, waste, or abuse if pharmacy staff members adjudicate claims with inaccurate product selection codes" and that "[e]xcessive uses of certain DAW codes may raise red flags from an audit perspective[.]"[35] CMS continues in this section to discuss the importance of ensuring accurate DAW usage, including as it relates to DAW 9 claims.[36]

43. Further, state level authorities have found and reprimanded entities for improper DAW code usage.[37] The Office of the Inspector General for the Texas Health and Human Services Commission found that in 60 claims audited, 1 had an incorrect DAW submission. The report recommended that ReCept

---

[35] *Id.* at 12

[36] *Id.* It is worth noting that this document from CMS states that DAW 9 is the appropriate code to use when a State Medicaid Agency requests brand instead of generic substitution. This is also in alignment with my opinions in this case and my above discussion that DAW 9 is the appropriate code to use rather than DAW 0.

[37] Texas Health & Human Services Inspector General, OIG Report No. AUD-22-023 (Aug. 22, 2022), https://oig.hhs.texas.gov/sites/default/files/documents/vdp_recept_pharmacy_1_accessible.pdf; Texas Health & Human Services Inspector General, OIG Report No. AUD-24-027 (Aug. 23, 2024), https://oig.hhs.texas.gov/sites/default/files/documents/Pharmacy%20%E2%80%93%20Meadowbrook%20Pharmacy_accessible.pdf; Office of the New York State Comptroller, Report 2020-S-62 (Dec. 2022), https://www.osc.ny.gov/files/state-agencies/audits/pdf/sga-2023-20s62.pdf.

should continue to ensure it accurately submits the correct DAW code for each claim in accordance with contractual and Texas Administrative Code requirements.[38] Additionally, other PBMs, such as Prime Therapeutics, warned that they continued to see inappropriate DAW selection under their Fraud, Waste, and Abuse Updates. "Choosing the correct DAWs code helps control costs and keeps your Pharmacy compliant with the standards set by the National Council for Prescription Drug Programs (NCPDP)."[39]

44. According to NCPDP Guidance,[40] claims submitted with an incorrect DAW code should be corrected and resubmitted if the claim would have paid differently. Selection of DAW Code is something that should affect which price is reimbursed if a drug pricing system is set up correctly. When there is a multisource branded drug on the market (where there are generics available) and a DAW 0 code is entered, then the generic drug price should be applied, because under that scenario, DAW 0 only applies to generic drugs. Only if DAW 1,2,7 8 or 9 is entered on the claim should a brand price be reimbursed. Indicating a DAW 0 on a claim for a multi-source drug designates that the generic price is the appropriate price. During an audit, the state of NY identified 1,024 claims that paid a total of $552,577 for various strengths of brand name Oxycontin ER tablets from July 2016 through March 2017. These claims did not indicate DAW (meaning DAW 0 was submitted on the claims). Additionally, on the claim service dates, Oxycontin ER was multi-source, was not in the BLTG program, and had a generic drug covered by Medicaid. These Oxycontin ER claims were processed using brand name pricing methods instead of generic pricing methods, resulting in an overpayment totaling $54,602.[41] Additionally, Norman Spencer indicates that misuse of DAW codes, such as coding a generic drug as a brand-name to receive higher reimbursement, can lead to scrutiny, or audits from PBMs.[42]

---

[38] Texas Health & Human Services Inspector General, OIG Report No. AUD-22-023 (Aug. 22, 2022), https://oig.hhs.texas.gov/sites/default/files/documents/vdp_recept_pharmacy_1_accessible.pdf.

[39] Prime Therapeutics, Prime Perspective (Dec. 2024), https://www.primetherapeutics.com/documents/d/primetherapeutics/3833_primeperspective_4q24_final-1.

[40] NCPDP Recommendations for Medicare Part D Post Point-of-Sale Claim Adjustments, page 7.

[41] Office of the New York State Comptroller, Report 2020-S-62, at 7 (Dec. 2022), https://www.osc.ny.gov/files/state-agencies/audits/pdf/sga-2023-20s62.pdf.

[42] Norman Spencer, Common Problems Faced by Pharmacies in PBM Audits: Insights into CVS Caremark, OptumRx, and Express Scripts (Aug. 20, 2024), https://www.nycriminallawyers.com/common-problems-faced-by-pharmacies-in-pbm-audits-insights-into-cvs-caremark-optumrx-and-express-scripts/.

45. CVS Caremark acknowledged that submission of DAW 0 on a claim for a brand product (MONY code = O) should result in generic (MAC) reimbursement,[43] which is incorrect reimbursement in this instance since the brand product was dispensed[44] (see *Table 1 below*)

| DAW Code | Code Value | Rate of reimbursement for MONY code = O |
|---|---|---|
| 0 | No product selection indicated | Generic (MAC) Rate |
| 1 | Substitution Not Allowed by Prescriber | Brand (AWP) Rate |
| 2 | Substitution Allowed – Patient requested brand be dispensed | Brand (AWP) Rate |
| 3 | Substitution Allowed – Pharmacist selected product dispensed | Generic (MAC) Rate |
| 4 | Substitution Allowed – Generic drug not in stock | Generic (MAC) Rate |
| 5 | Substitution Allowed – Brand drug dispensed as generic | Generic (MAC) Rate |
| 6 | Override | Generic (MAC) Rate |
| 7 | Substitution Not Allowed – Brand Drug mandated by law | Brand (AWP) Rate |
| 8 | Substitution Allowed – Generic drug not available in market | Brand (AWP) Rate |
| 9 | Other | Generic (MAC) Rate |

*Table 1*

46. However, the PDE claims data shows that the brand price was reimbursed for these drugs regardless of which DAW codes were used. Looking at Scoggins' comparison of prices of brand and generic claims for DAW 0 and 9 codes in his Rebuttal Report, we can see that the Brand claims were reimbursed at the brand rates regardless of which DAW code was used.[45] There is virtually no difference between the DAW 0 code reimbursement rate and the DAW 9 code reimbursement rate. However, there is a substantial difference between DAW 0 for the generic than for the brand. This shows that while the pricing system was supposed to reimburse at a different rate for a DAW 0 claim, it was not doing that. Instead, DAW 0 claims were being reimbursed at the brand rate.

47. Thomas Kornfield incorrectly states in his report that "As to Relator's allegations related to DAW codes, CMS has never considered DAW codes when determining Part D payment amounts for plans; DAW codes have no impact on CMS's payment decisions." Contrary to Mr. Kornfield's opinion, DAW

[43] CVS Caremark defined MAC Pricing as "The upper limit that a pharmacy benefit manager (PBM) will pay a pharmacy for generic drugs and brand name drugs that have generic versions available (multi-source brands). MAC pricing is designed to promote competitive pricing for pharmacies as an incentive to purchase the least costly generic drugs available in the market, regardless of the manufacturer's list price." CVS-Ellsworth_00026849 at -851.
[44] Fredell Vol II Dep., Exhibit 33 CVS-Ellsworth_00597382 at -385.
[45] Scoggins Rebuttal Report, at 19 n.30 (Tab BrandVsGenericPrices).

codes *do* affect CMS reimbursements in that the DAW code determines what price will be reimbursed to the pharmacy by CVS Caremark. As you can see in Table 1 above, claims submitted with a DAW Code of 0 will be reimbursed at MAC (generic) rate, not at AWP (brand) rate. This set up is consistent with NCPDP guidance and the reason NCPDP states that DAW 0 should not be used for a multi-source branded product with available generic(s). However, the pricing data tells a different story and shows that the brand price was being reimbursed for DAW 0 when it should not have been. Therefore, using DAW 0 on a branded price was not in line with NCPDP standards and resulted in an inaccurate representation of the claim submitted.

48. Overall, I disagree with Kornfield's opinion that DAW codes have no impact on payment decisions. The DAW codes selected can have a significant impact on reimbursement for the drug, which affects the entire claim for the payor.

## *Conclusion*

49. After a review of the Expert Reports from several pharmacists and consultants– Dr. Arnold, Angelo Cifaldi, Dr. Anthony Tagavi, Cody Wiberg, Dr. Catherine "Leiana" Oswald, Faith Hicks, Karl G. Williams, Kimberly A. Burns, Reginald Dilliard, Robert Parrado, Sharon F. Clackum, Thomas Kornfield, Timothy D. Gladwell, Benjamin Scher and Trenton Thiede my opinions from the Davidson report have not changed. Further I find that:
    a. CVS Caremark/SilverScript must comply with NCPDP standards and cannot simply pick which DAW codes they will accept for particular claims.
    b. Plans have the ability to and should reject claims with inappropriate DAW codes but CVS Caremark on behalf of SilverScript did not reject improper DAW 0 claims.
    c. Pharmacies also can take steps to prevent inappropriate DAW code usage, but there is no evidence CVS had those edits in place.
    d. DAW codes are an important part of the submission of PDE data for reimbursement by CMS and affect the prices charged.

50. I found nothing in any of the reports that I reviewed that proved that DAW 0 was acceptable when a pharmacy is dispensing a multi-source branded product with available generic(s). Additionally, no reports acknowledged that any back-end audits or efforts existed to correct any improper DAW codes before they were submitted to CMS.

| | |
|---|---|
| */s/ Michele V. Davidson* | 5/15/25 |
| Michele V. Davidson, R.Ph. | Date |

*Appendix A*

*Additional Documents Relied Upon*

**Defendants' Expert Reports**

- Angelo Cifaldi
- Benjamin Scher
- Cody Wiberg
- Dr. Ameila Arnold
- Dr. Anthony Tagavi
- Dr. Catherine "Leiana" Oswald
- Dr. John Scoggins
- Faith Hicks
- Karl G. Williams
- Kimberly A. Burns
- Reginald Dilliard
- Robert Parrado
- Timothy D. Gladwell
- Trenton Thiede

**Relator's Rebuttal Expert Reports**

- Dr. John Scoggins

**Depositions**

- Deposition of Brian Salvas (CVS Pharmacy 30(b)(6)) and exhibits thereto
- Deposition of Dawn Begley and exhibits thereto
- Deposition of Joshua Fredell (Jan 24, 2025) and exhibits thereto

**Production Documents**

- CVS-Ellsworth_00026847
- CVS-Ellsworth_00026849
- CVS-Ellsworth_00394840
- CVS-Ellsworth_00597382

**Other Materials and Sources**

- 45 C.F.R. § 162.923, https://www.ecfr.gov/current/title-45/subtitle-A/subchapter-C/part-162/subpart-I/section-162.923
- CMS, 2021 Attestations of Prescription Drug Event (PDE) Data, Direct and Indirect Remuneration (DIR) Data, Monthly Plan-to-Plan (P2P) Reconciliation Payments, and the Detailed DIR Report (Sept. 2, 2022), https://www.cms.gov/files/document/2021recondataattestation-memo508v2g.pdf
- CMS, "Pharmacy Self Auditing – Control practices to Improve Medicaid Program Integrity and Quality Patient Care – Booklet 4: Billing Practices from CMS" (2015)

- CMS, HIPAA Administrative Simplification Fundamentals Fact Sheet, https://www.cms.gov/files/document/hipaa-admin-simp-fundamentals-fact-sheet.pdf
- Office of the New York State Comptroller, Report 2020-S-62 (Dec. 2022), https://www.osc.ny.gov/files/state-agencies/audits/pdf/sga-2023-20s62.pdf
- NCPDP External Code List, Version Date: July 2007
- NCPDP Recommendations for Medicare Part D Post Point-of-Sale Claim Adjustments. Version 1.0. September 2015.
- NCPDP.org/MemberSearch/CVS
- Prime Therapeutics, "Fraud, waste and abuse (FWA) updates." Dec. 2024: Issue 92. https://www.primetherapeutics.com/documents/d/primetherapeutics/3833_primeperspective_4q24_final-1
- Norman Spencer, Common Problems Faced by Pharmacies in PBM Audits: Insights into CVS Caremark, OptumRx, and Express Scripts (Aug. 20, 2024), https://www.nycriminallawyers.com/common-problems-faced-by-pharmacies-in-pbm-audits-insights-into-cvs-caremark-optumrx-and-express-scripts/
- Texas Health & Human Services Inspector General, OIG Report No. AUD-24-027 (Aug. 23, 2024), https://oig.hhs.texas.gov/sites/default/files/documents/Pharmacy%20%E2%80%93%20Meadowbrook%20Pharmacy_accessible.pdf.
- Texas Health & Human Services Inspector General, OIG Report No. AUD-22-023 (Aug. 22, 2022), https://oig.hhs.texas.gov/sites/default/files/documents/vdp_recept_pharmacy_1_accessible.pdf.
- The Proper Use of the NCPDP Telecommunication Standard Version D.0 as it applies to the Implementation of Medicaid Reimbursement Methodologies Based on Actual Acquisition Cost (AAC) Plus a Professional Dispensing Fee, Version 1.2 Published July 2017