**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.*<br>ELLSWORTH ASSOCIATES, LLP, | : <br> : <br> : | |
| Plaintiff-Relator, | : <br> : | Civil Action |
| v. | : <br> : | No. 19-2553 |
| CVS HEALTH CORPORATION, *et al.* | : <br> : <br> : | |
| Defendant. | : <br> : | |

**MEMORANDUM**

**Younge, J.**                                                                 **July 31, 2026**

Since first filing this *qui tam* lawsuit in 2019, Relator Ellsworth Associates, LLP ("Relator") has narrowed the scope of its allegations that four CVS entities—CVS Health Corporation ("Health"), CVS Pharmacy, Inc. ("Pharmacy"), Caremark Part D Services, LLC, Caremark, LLC ("Caremark"), and SilverScript Insurance Company, LLC ("SilverScript"), (collectively "CVS Defendants")—violated the False Claims Act ("FCA"). Yet Relator still hopes to present at trial a broad scheme by which CVS Defendants prevented Medicare beneficiaries from receiving affordable generic drugs, strung the government along with erroneous billing statements, and received kickbacks from brand drug manufacturers for doing so. Currently before this Court are three motions for summary judgment, one filed by each of the CVS Defendants, with Caremark and SilverScript filing jointly. ECF Nos. 190 (Health Mot. SJ), 194 (Pharm. Mot. SJ), 195 (Caremark/SilverScript Mot. SJ). For the reasons set forth in this memorandum, those three motions for summary judgment are granted in their entirety. At base, Relator's theories have been so hollowed out over the course of seven years of litigation that what remains—largely policy

1

disagreements and the intricacies of regulatory compliance—cannot rise to the level of material fraud required for a successful lawsuit under the FCA.

## I.    Background[1]

Understanding Relator's claims requires an understanding of the role various CVS entities play in executing the government-run Medicare Part D Program. This requires the Court to describe some of the intricacies of the Part D Program, including the processes by which prescription drugs are chosen to be covered under the program, how the government is billed for those drugs, and the distinction between brand and generic drugs. After laying out this factual landscape, the Court will describe the False Claims Act before finally addressing the instant case and Relator's claims.

### A.    The Medicare Part D Program

#### 1.    Overview

Medicare is a federally funded and administered health insurance program for people 65 or older and some people under 65 with certain disabilities or conditions. *Medicare Basics: Parts*

---

[1] The information provided in this section comes from relevant statutes and regulations as well as the parties' briefs and statements of fact that have not been disputed by the other party. *See* ECF Nos. 196 (Health SJ Br.), 196-1 (Health SMF), 216 (Pl. Opp. to Health Mot. SJ), 216-1 (Pl. Opp. to Health SMF), 216-2 (Pl. AMF re Health) 247 (Health Reply), 200 (Pharm. SJ Br.), 200-1 (Pharm SMF), 218 (Pl. Opp. to Pharm. Mot. SJ), 218-1 (Pl. Opp. to Pharm. SMF), 218-2 (Pl. AMF re Pharm.) 248 (Pharm. Reply), 248-2 (Pharm Opp. to Pl. AMF), 253 (Pl. Sur-Reply to Pharm Mot. SJ), 201 (Caremark/SilverScript SJ Br.), 201-1 (Caremark/SilverScript SMF), 219 (Pl. Opp. to Caremark/SilverScript Mot. SJ), 219-1 (Pl. Opp to Caremark/SilverScript SMF), 219-2 (Pl. AMF re Caremark/SilverScript), 249 (Caremark/SilverScript Reply), 249-2 (Caremark/SilverScript Opp. to Pl AMF). On numerous occasions, the parties claim to dispute a fact only to essentially agree with the fact and provide superfluous argumentation. In such cases, the Court will treat the fact as undisputed. Genuinely disputed facts and arguments of counsel are indicated as such. *See* Fed. R. Civ. P. 56(e) ("If a party . . . fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion.").

*of Medicare*, Medicare, https://www.medicare.gov/basics/get-started-with-medicare/medicare-basics/parts-of-medicare (last visited July 30, 2026). The Department of Health and Human Services ("HHS") administers the Medicare program through the Centers for Medicare and Medicaid Services ("CMS").

There are four primary components of the Medicare program: (1) Part A, the hospital insurance benefits program, 42 U.S.C. §§ 1395c, 1395d; (2) Part B, the supplemental medical insurance benefits program, which pays for a percentage of certain medical and other health services, 42 U.S.C. §§ 1395j, 1395k, 1395l; (3) Part C, the Medicare Advantage program, which allows CMS to contract with public and private entities to provide benefits to certain Medicare beneficiaries, 42 U.S.C. § 1395w-21–28, *et seq.*; and (4) Part D, the voluntary prescription drug benefit program, which is offered to everyone with Medicare to help pay for prescription drugs, 42 U.S.C. § 1395w-101, *et seq*.

The exclusive focus of this case is the Medicare Part D Program. Part D is based on a private market model whereby Medicare contracts with private entities, known as Part D "sponsors" (i.e. insurance companies), to administer prescription drug plans. Part D plan sponsors may then subcontract with pharmacy benefit managers ("PBMs") who provide drugs through mail order and pharmacies. *See* ECF No. 201-1 ¶ 1 (citing 20 C.F.R. § 418.3005); *id.* ¶ 6. As part of this arrangement, CMS subsidizes Part D sponsors (and sometimes Part D beneficiaries directly) so that beneficiaries have more affordable access to prescription drugs. While the precise workings of CMS' subsidy payments are complex, for the purposes of this memorandum it suffices to state as a general matter that when more costly drugs are dispensed to beneficiaries, some proportion of that higher cost is passed down to CMS. *See generally* William V. Padula, Jeromie Ballreich, & Gerard F. Anderson, *Paying for Drugs After the Medicare Part D Beneficiary Reaches the*

3

*Catastrophic Limit: Lessons on Cost Sharing from Other US Policy Partnerships Between Government and Commercial Industry*, 16 APPLIED HEALTH ECONOMICS AND HEALTH POLICY, 6 (2018).

### 2. How Coverage Determinations Are Made: Formularies and Formulary Exception Requests

Part D plan sponsors do not cover every drug. Instead, to manage costs, steer beneficiaries towards certain drugs, and gain negotiating leverage with drug manufactures, Plan D sponsors cover only a specific selection of drugs. Tasmina Hydery & Vimal Reddy, *A Primer on Formulary Structures and Strategies*, 30 JOURNAL OF MANAGED CARE & SPECIALTY PHARMACY, 2 (2024). This list of covered drugs is known as a formulary. ECF No. 201-1 ¶ 25. Every year, Part D plan sponsors must submit to CMS their formulary, indicating what drugs that the plan sponsor will cover during that year. *Id.* The formulary must then get the approval of CMS, which first must determine that the formulary meets various requirements. *Id.* ¶ 26.

When a Plan D beneficiary goes to purchase a specific prescription drug, the plan sponsor must determine whether the drug is covered by the beneficiary's plan. *Id.* ¶¶ 35, 38. This is known as a coverage determination. *Id.* At the most basic level, coverage determinations involve assessments about whether a drug is included on the plan's formulary. *Id.* ¶ 36; *see* 42 C.F.R. § 423.566.

Even when a particular drug is not included on a plan's formulary, however, a beneficiary may still be able to obtain coverage for the drug by making a formulary exception request. ECF No. 201-1 ¶ 39. CMS in fact requires plan sponsors to establish and maintain procedures through which formulary exceptions requests are entertained. *Id.* ¶ 40; 42 C.F.R. § 423.578. Pursuant to this procedure, a plan sponsor *must* cover an off-formulary drug whenever it determines that two criteria are met: (1) the drug is deemed "medically necessary" by the prescribing physician or other

4

prescriber, and (2) "the drug would be covered but for the fact that it is an off-formulary drug." 42 C.F.R. § 423.578(b).

### 3. How Pharmacies and Part D Sponsors Bill the Government for Prescription Drugs: Prescription Drug Events and Dispense as Written Codes

When prescription drugs are dispensed to Medicare Part D beneficiaries, the dispensing pharmacy submits a claim for that drug to the beneficiary's Part D sponsor, typically through the plan's designated PBM. *See* ECF No. 201-1 ¶ 138; ECF No. 218 at 15. The PBM then adjudicates that claim in real time to determine whether it qualifies as payable under the plan's terms and communicates the outcome to the dispensing pharmacy. ECF No. 201-1 ¶ 139. If approved, the prescription is dispensed to the beneficiary, *id.* ¶ 140, and the PBM reimburses the pharmacy for dispensing the drug, ECF No. 219-2 ¶ 91. The PBM then creates a Prescription Drug Event ("PDE") record, which summarizes the details of the specific claim. ECF No 201-1 ¶ 142. This PDE record is transmitted to CMS to serve as the basis for CMS's subsidy payments under Part D. *Id.* ¶¶ 141–142. As a condition for receiving payment from CMS, a Part D plan sponsor and its PBM must certify the accuracy, completeness, and truthfulness of PDE records. 42 C.F.R. § 423.505(k)(1), (3). Likewise, CMS regulations require that all subcontracts between Part D plan sponsors and downstream entities, including pharmacies and PBMs, contain language obligating the downstream entities to comply with all applicable federal laws, regulations, and CMS instructions. *Id.* § 423.505(i)(4)(iv). As summarized by Relator, "[i]n this manner, each claim travels from the pharmacy, through the PBM and Plan [s]ponsor, and then to CMS, and each participant has the obligation to ensure that the claim is processed pursuant to Part D's statutory and regulatory requirements." ECF No. 219 at 28.

CMS requires 51 data fields to be populated in the PDE record. ECF No. 201-1 ¶ 146. These fields provide CMS with general information about the beneficiary and the Part D plan as well as specific details about the dispensation of particular drugs. Examples include the dispensed drug's identification number, the date of service, the quantity of drugs dispensed, whether the drug was covered by the Part D plan, the amount of the cost covered by the Part D plan, and the out-of-pocket cost for the beneficiary. CTRS. FOR MEDICARE & MEDICAID SERVS., *Prescription Drug Event Participant Guide* 72–81 (2011), https://www.csscoperations.com/internet/csscw3_files.nsf/F/CSSCPDEParticipantGuide%20cameraready%20081811.pdf/$FILE/PDEParticipantGuide%20cameraready%20081811.pdf (last visited July 30, 2026).

Pertinent to this case is just one of those fields: the Dispense as Written ("DAW") Product Selection Code field. ECF No. 201-1 ¶ 148. DAW codes are a set of ten numerical codes (from 0 through 9) that provide information on the circumstances in which the decision to distribute a brand drug over its generic alternative was made. *Id.*[2] For example, DAW 4 indicates that a brand drug was permissibly dispensed because the generic was not in stock, while DAW 7 indicates that a brand drug was permissibly dispensed because even though generics were available, the brand version was mandated by law. ECF No. 200-29 (CMS PDE Record Layout (Nov. 9, 2014)). Of these ten codes, this case concerns only two: 0 and 9. At the highest level of generality, the parties agree that CMS defines DAW 0 as "No Product Selection Indicated" and DAW 9 as "Other." *Id.* But the parties vigorously dispute what entity, if any, is sanctioned by CMS to provide the authoritative interpretation of when these codes are appropriately used.

---

[2] The distinction between brand and generic drugs is expounded upon in the following section. *See infra* Part I.B.

6

Relator cites the National Counsel for Prescription Drug Programs ("NCPDP") External Code List for the proposition that DAW 0 is to be used only for "prescriptions for single source brand, co-brand/co-licensed, or generic products" and may never be used for a brand drug when there exists a generic version of the drug on the market. ECF No. 218 at 18. Per the External Code List, DAW 9, by contrast, is to be used when "generic substitution is permitted, but the plan's formulary requests the brand product." *Id.* Stated succinctly, in Relator's view, if a brand drug is dispensed and a generic version of that drug is on the market, DAW 9 is correct and DAW 0 is not.

CVS Defendants, however, counter that the External Code List merely provides non-binding guidance, compliance with which is not mandated by CMS. ECF No. 201-1 ¶¶ 159–163. In CVS Defendants' view, CMS requires only that DAW 0 serve as a "default" code, which can be used in a variety of circumstances, including when prescribers do not specify whether a brand or generic drug should be dispensed. ECF No. 200 at 24–25. Additionally, CVS Defendants assert that DAW 9 is nothing more than a catchall indicating "Other." *Id.* Thus, under CVS Defendants' understanding, even if DAW 9 were appropriate when a doctor prescribes a drug for which there are both brand and generic alternatives, it is not required by CMS, and DAW 0 may be used instead. *Id.*

CMS itself does not appear to have weighed in on this debate. CMS has never taken disciplinary action based on the use of DAW 0 instead of DAW 9, *id.* ¶¶ 79, 81; ECF No. 201-1 ¶ 179,[3] and DAW codes are not highlighted by CMS as one of the eleven fields that must be

---

[3] The Court acknowledges the parties' disagreement about the extent to which CMS audited the PDE data submitted by SilverScript. *See* ECF No. 219-1 at 113–117. Regardless of whether CMS had actual knowledge of CVS Defendants' usage of DAW codes from any audits, the

"carefully consider[ed] when administering the Part D drug benefit," *id.* ¶ 146 (citing U.S. CTRS. FOR MEDICARE & MEDICAID SERVS., *Prescription Drug Event Participant Guide* 4-6 (2011)).[4]

## B.    Brand and Generic Drugs

Central to this case is the distinction between brand and generic drugs. Most prominently, this case involves three brand drugs—Harvoni, Epclusa, and Ventolin HFA—and their authorized generic counterparts.

### 1.    Generally

When a new drug is approved for sale by the Food and Drug Administration ("FDA"), it is considered a "brand" or "brand-name" drug. *In re Suboxone (Buprenorphine Hydrochlorine & Naloxone) Antitrust Litig.*, 967 F.3d 264, 267 (3d Cir. 2020). An approved brand drug enjoys a period of patent exclusivity in the market at the end of which "generic drugs" may enter the market at a lower price to compete with the brand drug. *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 643 (2d Cir. 2015). A generic drug "is required to be the same as a brand-name medicine in dosage, safety, effectiveness, strength, stability, and quality, as well as in the way it is taken." U.S. Food & Drug Admin., *Generic Drug Facts* (Nov. 1, 2021) https://www.fda.gov/drugs/generic-drugs/generic-drug-facts; *see* ECF No. 201-1 ¶ 63.

For the purposes of this memorandum, it is helpful to distinguish between two types of generic drugs: traditional generic drugs and authorized generic drugs.[5] Traditional generic drugs

---

undisputed fact that CMS has never taken disciplinary action for the use of DAW 0 instead of DAW 9 bears at least some relevance to the Court's inquiry.

[4] Relator argues that the words "carefully consider[ed]" are taken out of context and apply only to specific plans; but the same language Relator cites for this proposition states "[t]hese eleven data elements apply to the Basic benefit plan *as well as all other benefit plan types*." ECF No. 219-1 at 91–92 (emphasis added).

[5] Relator quibbles that "[t]he term 'traditional generic drug' is not a recognized term in the pharmaceutical industry. ECF No 219-1 at 28. For the purposes of this memorandum, the Court

(often just called generic drugs) contain the same active ingredients but not necessarily the same inactive ingredients as the pioneer drug that is marketed under a brand name. *See United States v. Generix Drug Corp.*, 460 U.S. 453, 454–55 (1983). Authorized generic drugs, on the other hand have the exact same active *and inactive* ingredients as their brand equivalents. Thus, authorized generics are chemically and therapeutically identical to their brand name counterparts and are often even manufactured by the same company as the brand name drug and are simply marketed without the brand label. ECF No. 119-1 at 31–32. Because they are chemically and therapeutically identical to their brand equivalent, authorized generic drugs do not even have to obtain new FDA approval before going to market, in accordance with FDA regulations. ECF No. 201-1 ¶¶ 70–71.

This memorandum will sometimes use the term "multi-source" to describe brand drugs for which there are generic alternatives on the market. *See* ECF No. 219-2 at ¶ 116.

### 2.    The Relevant Drugs

Fifteen drugs make up the list of "Relevant Drugs" in this case, all of which are brand drugs. Those drugs, along with their respective manufacturers, are: Copaxone (Teva), Exelon (Novartis), Voltaren Gel (Endo), Invega (Janssen), Asacol HD (Allergan), Xopenex HFA (Sunovion), Renvela Packets (Sanofi), Renvela Tablets (Sanofi), Istalol (Bausch & Lomb), Harvoni (Giliead), Epclusa (Gilead), Ventolin HFA (GSK), Advair Diskus (GSK), Canasa Rectal Suppository (Allergan), and Suboxone Sublingual Film (Indivior). ECF No. 200-1 ¶ 5 n.2.

### a.    *Harvoni and Epclusa*

---

adopts the term simply for ease of distinguishing generic drugs that may only contain the same active ingredients as their brand counterparts from those that share both active and inactive ingredients with their brand counterparts.

9

Central to Relator's formulary exceptions theory are the multi-source brand drugs Harvoni and Epclusa, which are direct-acting antiviral medications launched in 2014 and 2016 respectively by Gilead Sciences, Inc. for the treatment of chronic Hepatitis C. ECF No. 201-1 ¶ 73. In 2019, Gilead Sciences, Inc. launched authorized generics of both Harvoni and Epclusa through its subsidiary, Asegua Therapeutics LLC. *Id.* ¶ 74. The authorized generic of Epclusa is Sofosbuvir/Velpatasvir. *Id.* The authorized generic of Harvoni is Ledipasvir/Sofosbuvir. *Id.*

### b.      *Ventolin HFA*

Central to Relator's conspiracy claim against Pharmacy is the multi-source brand drug Ventolin HFA. Ventolin HFA is a prescription inhaled medicine used to treat or prevent bronchospasm (the tightening of airways in the lugs) in people with reversible obstructive airway disease and to prevent exercise-induced bronchospasm. Ventolin HFA Home Page, https://www.ventolin.com (last visited July 30, 2026). The authorized generic of Ventolin HFA is known as an albuterol sulfate inhalation aerosol. *GSK to Offer Generic Version of Ventolin HFA Albuterol Inhaler*, Asthma & Allergy Foundation of America (Jan. 17, 2019), https://community.aafa.org/blog/gsk-to-offer-generic-version-of-ventolin-hfa-albuterol-inhaler.

### C.      The False Claims Act

The False Claims Act was enacted in 1863 with the principal aim of combating the massive frauds perpetrated by large contractors during the Civil War. *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 182 (2016) (citing *United States v. Bornstein,* 423 U.S. 303, 309 (1976)). Such fraud included billing the government for nonexistent or worthless goods and charging exorbitant prices for goods delivered. *Id.* (citing *United States v. McNinch,* 356 U.S. 595, 599 (1958)). "Since then, Congress has repeatedly amended the Act, but its focus remains on those who present or directly induce the submission of false or fraudulent claims." *Id*.

10

As relevant here, the FCA imposes liability on any person who "knowingly presents or causes to be presented, a false or fraudulent claim for payment or approval," 31 U.S.C. § 3792(a)(1)(A), "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," *id.* § 3729(a)(1)(B), or "conspires to commit" such acts, *id.* § 3729(a)(1)(C).

In order to establish a prima facie FCA violation, a plaintiff must prove that: (1) "the defendant presented or caused to be presented to an agent of the United States a claim for payment" (causation); (2) "the claim was false or fraudulent" (falsity); (3) "the defendant knew the claim was false or fraudulent" (knowledge); and (4) the misrepresentation was "material to the Government's payment decision" (materiality). *United States ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235, 242 (3d Cir. 2004) (internal quotation marks omitted) (causation, falsity, knowledge); *Escobar*, 579 U.S. at 190–192 (materiality). For the falsity requirement to be met, it is sufficient for a plaintiff to show that the claim "makes specific representations about the goods or services provided" and that the defendant's "failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths." *Escobar*, 579 U.S. at 190. This is known as the "implied false certification" theory of falsity. The idea behind this theory is that when a defendant submits a claim to the government, it impliedly certifies its compliance with the conditions of payment. *Id.* at 180.

To recover under the conspiracy provision, §3729(a)(1)(C), a plaintiff must show "(1) a conspiracy to get a false or fraudulent claim allowed or paid and (2) an act in furtherance of the conspiracy." *United States ex rel. Atkinson v. PA. Shipbuilding Co.*, 473 F.3d 506, 514 (3d Cir. 2007). "There can be no liability for conspiracy where there is no underlying violation of the FCA." *United States ex rel. Petras v. Simparel, Inc.*, 857 F.3d 497, 507 n.53 (3d Cir. 2017) (cleaned up).

11

The government may bring FCA actions directly. 31 U.S.C. § 3730(a). Alternatively, under the FCA's *qui tam* provision, a private person, known as a relator, may bring a lawsuit on behalf of the United States and share in any resulting damages award. *See id.* at § 3730(b). In such cases, the government may intervene in the action after investigating the relator's allegations. *United States ex. rel. Druding v. Care Alternatives*, 81 F.4th 361, 366 (3d Cir. 2023) (citations omitted). If the government declines to intervene, the relator may still pursue the action. *Id.* (citation omitted).

### D.    This Case

#### 1.    The Parties

Health is a holding company incorporated in Delaware. ECF No. 196-1 ¶ 1. Health has various wholly owned direct and indirect subsidiaries including Pharmacy, Caremark, and SilverScript. *Id.* ¶¶ 4–5.[6] The parties dispute whether Health has its own employees and whether it has operations—including managing enterprise-wide initiatives and coordinating resources— beyond issuing stock and filing reports with the United States Securities and Exchange Commission. ECF No. 216-1 ¶¶ 2–3.

SilverScript is a Medicare Part D plan sponsor that is contracted by CMS to offer prescription drug coverage to eligible Medicare beneficiaries. ECF No. 201-1 ¶¶ 14–15. Caremark is a PBM, which was contracted by SilverScript to administer Part D benefits. *Id.* ¶¶ 19–20. Since Caremark and SilverScript jointly administered the Part D plan and moved for summary judgment together, they will often be referred collectively in this memorandum as Caremark/SilverScript.

---

[6] Relator argues that Caremark and SilverScript are actually subsidiaries of Pharmacy, which is a subsidiary of Health. ECF No. 218-1 at 2. Such a distinction is immaterial to this memorandum.

Pharmacy fills millions of prescriptions for SilverScript beneficiaries every year, including prescriptions for many of the Relevant Drugs. *Id.* ¶¶ 1, 5.

Relator Ellsworth Associates, LLP is a Delaware limited liability partnership comprised of Alexandra Miller and her spouse, Timothy Miller. *Id.* ¶ 23. Alexandra Miller is a former Caremark employee who held various positions at Caremark between 2012 and 2019. *Id.* ¶ 24.

### 2.    The Facts

This case involves various alleged conduct by CVS Defendants between January 1, 2015, and January 1, 2021 (the "Relevant Time Period"). ECF Nos. 133, 139.

### a.    Development of Formularies

During the Relevant Time Period, CMS contracted SilverScript to offer prescription drug coverage to eligible Medicare beneficiaries under Part D. ECF No. 201-1 ¶ 15. SilverScript subcontracted with Caremark, which served as SilverScript's PBM. *Id.* ¶ 20. It was Caremark's job to assist in the development of SilverScript's formularies by negotiating rebate agreements with drug manufacturers. ECF No. 200-1 ¶ 103. Generally speaking, such rebate agreements entitle Caremark to receive money from drug manufacturers each time a prescription is filled for a particular drug. ECF No. 201-1 ¶ 186. In essence, the rebate negotiation process creates a playing field on which drug manufacturers offer competing financial incentives to get their drugs placed on a sponsor's formulary. *See id.* ¶ 187. Though rebate agreements do not obligate SilverScript to include a drug on its formulary, *id.*, they provide SilverScript with a strong financial incentive to do so, ECF No. 219-1 at 122. Indeed, after rebate agreements were reached for the Relevant Drugs, those drugs were placed on SilverScript's formularies while the authorized generic equivalents of those drugs were not. ECF No. 201-1 ¶ 34. In each of the years during the Relevant Time Period, CMS approved SilverScript's formularies. *Id.* ¶ 32.

      *b.     Processing of Formulary Exception Requests*

During the Relevant Time Period, SilverScript processed more than 35,000 formulary exception requests in which beneficiaries sought the generic or authorized generic forms of the Relevant Drugs. ECF No. 201-1 ¶ 79. Of those requests, between 184 and 245 were for authorized generic forms of Harvoni and Epclusa. ECF No. 219-1 at 37. Relator asserts that nearly all these requests were denied. ECF No. 219-2 ¶ 36.

      *c.     Submission of PDE Records*

As a Part D sponsor, SilverScript was required to maintain a contracted pharmacy network consisting of retail pharmacies where plan beneficiaries can fill prescriptions. ECF No. 201-1 ¶ 8. During the Relevant Time Period, that network included Pharmacy. *Id.* ¶ 9. When filling prescriptions, Pharmacy personnel used a system called RxConnect to submit claim information, including DAW codes, to SilverScript via Caremark. ECF No. 200-1 ¶ 94.

During the Relevant Time Period, Caremark/SilverScript then submitted PDE records to CMS that continued Pharmacy's practice of using DAW 0 for multi-source brand drugs. ECF 248-2 at 37. Relator alleges that Pharmacy via Caremark/SilverScript submitted 96,859 such claims, ECF No. 218-2 ¶ 69, while Pharmacy concedes only that it did so for a "small percentage of the roughly 1.3 million claims at issue in the case," ECF No. 248-2 at 37. Whether CMS had actual knowledge of Pharmacy's usage of DAW 0 is disputed, but it is undisputed that CMS never took any disciplinary action against Pharmacy, or any other entity for that matter, for such usage. ECF No. 200-1 ¶¶ 79, 81; *see* ECF No. 218-1 at 43–44; *supra* Part I.A.3 n.3.

      *d.     Maintenance of Grievance Handling Procedures and Call Scripts*

As a Part D sponsor, SilverScript was required to have established procedures for the receipt, investigation, and resolution of grievances in a timely manner. ECF No. 201-1 ¶ 54 (citing

42 C.F.R. § 423.564). Those procedures must be clearly communicated to beneficiaries, including information on how to submit grievances and the expected timelines for resolution. *Id.* In furtherance of SilverScript's efforts to comply with this requirement, Caremark established a call center for which it maintained call scripts. *Id.* ¶ 182. Those call scripts were used to train employees and for employees to reference during calls. *Id.* In Relator's telling, the call scripts for Harvoni and Epclusa also specifically instructed Caremark representatives how to answer questions from beneficiaries. ECF No. 219-1 at 119.

### 3.    The Instant *Qui Tam* Lawsuit

Relator's Third Amended Complaint, ECF No. 88 ("TAC") asserts three counts[7] under the FCA against CVS Defendants. Count I alleges that CVS Defendants violated 31 U.S.C. § 3729(a)(1)(A) by "knowingly present[ing], or caus[ing] to be presented, a false or fraudulent claim for payment or approval." Count II alleges that CVS Defendants violated 31 U.S.C. § 3729(a)(1)(B) by "knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement material to a false or fraudulent claim." Count III alleges that CVS Defendants violated 31 U.S.C. § 3729(a)(1)(C) by "conspir[ing] to commit a violation" of § 3729(a)(1)(A) and § 3729(a)(1)(B).

In support of these claims, Relator asserts several theories of liability, which the Court will describe next. While the discussion section of this memorandum tackles each defendant's motion to dismiss separately, here, the Court organizes the claims by Relator's theory of liability to give

---

[7] The TAC also includes a fourth count under 31 U.S.C. § 3729(a)(1)(G) that was dismissed by the Court at the motion to dismiss stage but which Relator pleads to preserve that count for appeal. *See* TAC at 242.

15

a full view to how Relator alleges CVS Defendants interacted with one another to defraud the government.

### a.    The Formulary Exceptions Theory

Relator alleges that Caremark/SilverScript defrauded the government by making it more difficult, if not impossible, for beneficiaries, who were entitled to receive authorized generic versions of Harvoni and Epclusa, to receive those drugs through the formulary exceptions process.[8] According to Relator, by summarily blocking formulary exception request in this way, Caremark/SilverScript required beneficiaries, and by extension the government, to pay for more expensive brand drugs. *See* ECF No. 219 at 14.

Relator alleges that Caremark/SilverScript fraudulently steered beneficiaries towards Epclusa and Harvoni in two ways. Primarily, Relator alleges that Caremark/SilverScript auto-denied formulary exception requests made by beneficiaries who wished to receive authorized generic versions of Harvoni and Epclusa. Relator claims that Caremark/SilverScript adopted a "blanket policy" to deny all formulary exception requests for Harvoni and Epclusa without even reviewing the merits of those requests. *Id.* at 40. Secondarily, Relator argues that SilverScript maintained call scripts and grievance handling procedures that misled beneficiaries into thinking formulary exceptions were either not available or would lead to greater costs.

---

[8] While Relator initially brought this theory of liability with respect to 15 drugs, it has since narrowed its claim and asserts this theory only as to Harvoni and Epclusa. *See* ECF 201 at Ex. 60 (Relator's Third Am. Resps. to SilverScript's First Set of Interrogs., at 3, Answer No. 3 (Sept. 29, 2025)) ("At this time, Relator does not contend that Defendants improperly denied formulary exception requests for Relevant Drugs other than Harvoni's and Epclusa's Authorized Generics.").

Relator asserts that CVS Health participated in this scheme as well, not only by coordinating the activity of its subordinate entities but also through direct involvement by operating the grievance line.

### b.    The DAW Coding Theory

Relator asserts that CVS Defendants directly violated the FCA by submitting, or allowing to be submitted, PDE records containing erroneous DAW codes. Specifically, Relator alleges that Pharmacy entered DAW 0 when only DAW 9 was appropriate, ECF No. 218 at 19–22, and that Caremark/SilverScript incorporated these entries into the PDE records it submitted to CMS. ECF No. 219 at 35–37.[9] According to Relator, these inaccurate submissions constitute false certifications to the government in violation of the FCA.[10]

Relator's theory as to how such allegedly false certifications materially impacted government payment decisions is convoluted, but the Court will attempt to recite it in good faith. Relator appears to argue that the incorrect submission of DAW 0 had a twofold effect. First, it resulted in "overcharging" the government for prescription drugs. ECF No. 218 at 23; ECF No. 219 at 75. Recall that in Relator's view, DAW 0 indicates to CMS that the dispensed drug was either (a) a generic drug or (b) a brand drug for which there are no generic alternatives. *See supra* Part I.A.3. In Relator's view, DAW 0 can never be used for a multi-source brand drug. Thus, when

---

[9] Relator initially challenged Pharmacy's usage of ten different codes, but at this stage has narrowed its claim only to the usage of DAW 0. *See* ECF 200 at Ex. 46 (Relator's Third Am. Resps. to CVS Pharmacy's Second Set of Interrogs.), Nos. 6, 7 (Sept. 29, 2025)); *id.* at Ex. 58 (Relator's Second Am. Resps. to CVS Pharmacy's Third Set of Interrogs., Nos. 18–23 (Sept. 25, 2025)).

[10] Relator notes that its DAW coding theory "sounds in factual falsity as well as both implied and express false certifications." ECF No. 219 at 62 n.12. The distinctions between these forms of falsity are irrelevant to this memorandum because each of them requires a showing of materiality for the FCA to be satisfied.

both brand and generic versions of a drug are available, DAW 0 would lead CMS to believe the generic drug was dispensed and billed for. In this case, however, CVS Defendants used DAW 0 when it dispensed and billed for multi-source brand drugs. Relator argues that by doing so, CVS charged CMS more than CMS would have expected to pay from looking at the DAW 0 code alone. Relator maintains that this practice amounts to overcharging even though beneficiaries undisputably received the brand drugs that CMS paid for and that CMS approved on SilverScript's formulary. *See* ECF No. 218 at 47–49; ECF No. 219 at 75.

Second, Relator implies that CVS Defendants' usage of DAW 0 enabled CVS Defendants to conceal the formulary exception scheme by disguising the fact that Pharmacy was distributing brand versions of the Relevant Drugs even when generic equivalents were available.[11]

Relator asserts that Health also participated in this scheme by directly submitting false PDE data to the government and by directing its subordinate CVS entities to do the same.

### c.    The Conspiracy Theory

Relator alleges that CVS Defendants conspired among themselves and with drug manufacturers to prevent Medicare Part D beneficiaries from accessing cheaper generic versions of brand drugs in order to profit from rebate agreements with brand drug manufacturers. In essence, Relator's argument is that the decision to place the Relevant Drugs on SilverScript's formulary

---

[11] Notably, the DAW coding theory was initially asserted in Relator's complaint in conjunction with Relator's theory that CVS Defendants violated state mandatory substitution laws, which require that generic drugs on the market must be made available to Medicaid Part D beneficiaries. In this context, Relator's DAW coding theory described how CVS Defendants disguised the fact that generics were on the market by using DAW codes that implied they were not available. *See United States ex rel. Ellsworth Assoc., LLP v. CVS Health Corp.*, 660 F. Supp. 3d 381 (E.D. Pa. 2023). Despite dropping its state mandatory substitution laws theory, Relator still chose to proceed with its DAW coding allegations as a standalone theory of liability. *See* ECF No. 200 at Ex. 46 (Relator's Third Am. Resps. to CVS Pharmacy's Second Set of Interrogs. (Sept. 25, 2025) at 8.

was not the product of arms-length negotiations, but rather improper collusion between the drug manufacturers and CVS Defendants.

According to Relator, the scheme worked as follows: First, Caremark, negotiated with drug manufacturers for lucrative rebates in exchange for placing certain brand drugs on SilverScript's formulary while blocking their generic alternatives. Next, SilverScript finalized its formularies on the basis of these rebate agreements, ensured that beneficiaries' requests for exceptions to obtain the generic alternatives were denied, and submitted reimbursement requests to Medicare. Then, Pharmacy sold the branded drugs to its customers and submitted false DAW codes to conceal the scheme. Finally, Health participated in the scheme by tendering fraudulent attestations to the government, coordinating the dissemination of false and misleading information to manage negative public opinion and conceal the true nature of the scheme, and authorizing the scheme at the highest levels of the CVS enterprise. *See* ECF No. 216 at 7–8.

Additionally, Relator's alleges Pharmacy conspired with the other CVS Defendants to violate the FCA by not stocking generic Ventolin HFA in 2019 in order to maximize the rebates that Caremark would receive through its agreement with GSK, the manufacturer of Ventolin HFA.

### 4.    The Procedural Background

In June 2019, Relator filed under seal the instant *qui tam* action on behalf of the United States government, alleging violations of the False Claims Act. ECF No. 1. In May 2020, Relator amended its complaint for the first time. ECF No. 7. This was followed nearly two years later, in February 2022, by the United States giving notice of its election to decline to intervene in this action. ECF No. 15. In May 2022, Relator filed its Second Amended Complaint, ECF No. 18, after which the United States again declined to intervene, ECF No. 19. CVS Defendants moved to dismiss the complaint. ECF No. 35. In March 2023, the Court granted in part and denied in part

that motion to dismiss. ECF No. 50. In August 2023, Relator filed its TAC, which CVS Defendants answered in October 2023, ECF No. 94. Fact discovery ran until February 21, 2025,[12] ECF No. 151, and expert discovery ran until July 25, 2025, ECF No. 153. In September 2025, the parties submitted a joint stipulation that Relator "will not seek damages or penalties . . . based on claims that Defendants allegedly failed to comply with state laws requiring the substitution of generic drugs when the generic is less expensive than the brand version of the same drug." ECF No. 175. In October 2025, CVS Defendants each filed a motion for summary judgment. ECF Nos. 190, 194, 195.

## II.    Legal Standard

A movant is entitled to summary judgment if it shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Genuine issues of material fact refer to any reasonable disagreement over an outcome-determinative fact." *In re Energy Future Holdings Corp.*, 990 F.3d 728, 737 (3d Cir. 2021). "A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–26 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–52 (1986)). Thus, the "mere existence of a scintilla of evidence" in support of the nonmoving party's position is generally insufficient to defeat summary judgment; "there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson*, 477 U.S. at 252. A moving party is entitled

---

[12] Exceptions were made for agreed-upon Rule 30(b)(6) depositions, and the Special Discovery Master was given until March 14, 2025, to resolve all remaining fact discovery disputes. ECF No. 151.

to judgment as a matter of law where the "nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex*, 477 U.S. at 323. When considering a motion for summary judgment, the Court must "view the record and draw inferences in a light most favorable to the non-moving party." *In re Ikon Off. Sols., Inc.*, 277 F.3d 658, 666 (3d Cir. 2002).

## III.    Discussion

### A.    Overview

Relator alleges that CVS Defendants both directly violated the FCA and conspired to violate the FCA. As to direct FCA violations, Relator first alleges that Pharmacy and Caremark/SilverScript submitted, or allowed to be submitted, PDE records containing erroneous DAW codes. Since it is evident here that any such submissions were not material to government payment decisions, this claim does not survive summary judgment. Second, Relator alleges that Caremark/SilverScript mishandled formulary exception requests to prevent beneficiaries from receiving cheaper generic drugs that they were entitled to. Because this claim rests on the untenable theory that formulary exception requests can be granted on the basis of affordability alone, this claim cannot survive summary judgment. Third, Relator alleges that Health, as the parent company of Pharmacy and Caremark/SilverScript, approved the improper conduct of its subsidiaries, submitted false PDE records itself, and maintained a grievance line to manage the fallout from its scheme to deny access to generic drugs. Because Relator's allegations against Pharmacy and Caremark/SilverScript fail, Health cannot be liable for directing or contributing to the actions of those entities. Thus, this claim cannot survive summary judgment.

Since Relator has no viable claim of any direct FCA violations, Relator's claim that CVS Defendants conspired to violate the FCA necessarily fails as well. The upshot is that none of

Relator's claims against any of the CVS entities can proceed to trial and CVS Defendants' motions for summary judgment are granted in their entirety. Next, the Court elaborates on its analysis by taking each defendants' motion for summary judgment in turn.

### B.        Pharmacy's Motion for Summary Judgment

Relator alleges that Pharmacy violated the FCA by: (1) causing co-defendant SilverScript to submit PDE records containing erroneous DAW codes and (2) participating in a conspiracy to violate the FCA by not stocking the generic version of Ventolin HFA. With respect to both of these claims, Pharmacy's motion for summary judgment is granted.

### 1.        FCA Violations Based on Submission of Erroneous DAW Codes

Relator contends that Pharmacy made false certifications to the government by entering DAW 0 instead of DAW 9 in submissions that were later incorporated by Caremark/SilverScript into PDE records. *See* ECF No. 218 at 19–22. Relator argues that the accurate submission of PDE data is designated by CMS as a condition of payment and that the inaccurate codes resulted in CMS being overcharged for prescription drugs. *See supra* Part I.D.3.b. The Court concludes that even if the entry of DAW codes was erroneous, no reasonable jury could find this error was material to the government's payment decisions. At base, this is because, the government got what it paid for: beneficiaries received the brand drugs listed on the formulary that CMS approved, and the government was billed the appropriate brand price. Relator presents no case since the Supreme Court's heightened the materiality standard in *Escobar* in which a court has found materiality in such circumstances.

### a.        *Materiality Standard*

The term "material" is statutorily defined by the FCA to mean "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C.

§ 3729(b)(4). The Supreme Court analyzed this language in *Escobar*, in which it noted that the materiality standard is "demanding" to help ensure that the FCA is not used as "an all-purpose antifraud statute or a vehicle for punishing garden-variety breaches of contract or regulatory violations." 578 U.S. at 194 (internal quotation marks and citations omitted). To this end, it is insufficient for a finding of materiality that the government "would have the *option* to decline to pay if it knew of the defendant's noncompliance." *Id.* (emphasis added). Instead, materiality "look[s] to the effect on the *likely* or *actual* behavior of the recipient of the alleged misrepresentation." *Id.* at 193 (emphasis added). The Third Circuit has interpreted the Supreme Court's materiality analysis as encompassing the following three non-exhaustive factors:

> (1) whether the government has expressly designated the legal requirement at issue as a "condition of payment"; (2) whether the alleged violation is "minor or insubstantial" or instead goes to the "essence of the bargain" between the contractor and the government; and (3) whether the government made continued payments, or does so in the "mine run of cases," despite "actual knowledge" of the violation.

*Care Alternatives*, 81 F.4th at 367 (quoting *Escobar* 579 U.S. at 193 n.5, 194–95). This is a "holistic, totality-of-the-circumstances inquiry." *Id.* (internal quotation marks omitted); *see id.* at 181 ("What matters is not the label the Government attaches to a requirement, but whether the defendant knowingly violated a requirement that the defendant knows is material to the Government's payment decision.").

Materiality under the FCA may be resolved by the Court at summary judgment. *Escobar*, 579 U.S. at 195 n.6 ("We reject . . . [the] assertion that materiality is too fact intensive for courts to dismiss False Claims Act cases on a motion to dismiss or at summary judgment."); *see Care Alternatives*, 81 F.4th at 376 n.17 (materiality in FCA case may be resolved at summary judgment); *United States ex rel. Spay v. CVS Caremark Corp.*, 875 F.3d 746, 764–65 (3d Cir. 2017) (same); *see also GFL Advantage Fund Ltd. V. Colkitt*, 272 F.3d 189, 213 (3d Cir. 2001) ("Materiality is a

23

mixed question of law and fact and should be decided as a matter of law only when the disclosures or omissions are so clearly unimportant that reasonable minds could not differ.") (cleaned up). Still, "[a]s a general matter, relators are not required to conduct discovery on government officials to demonstrate materiality—an imposition that would find no support in *Escobar*'s holistic approach." *Care Alternatives*, 81 F.4th at 375. "And on a motion for summary judgment, it is the *moving party* who bears the burden of demonstrating the absence of a genuine issue of material fact. *Id.* (citing Fed. R. Civ. P. 56(c)).

Cases in which the Third Circuit has found materiality since *Escobar* are illustrative. In *United States ex rel. Doe v. Heart Solution, PC*, the owners of a diagnostic testing company falsely represented to Medicare that the neurological testing they conducted was being supervised by a licensed neurologist. 923 F.3d 308, 311–312 (3d Cir. 2019). The Circuit held that this falsity was material because, *inter alia*, a regulation prohibited Medicare from paying claims without a certification from a licensed supervising neurologist. *Id.* at 318.  In *United States ex rel. Int'l Bhd. of Elec. Workers Loc. Union No. 98 v. Farfield Co.*, a federal contractor misclassified workers to pay them less than would otherwise be required, resulting in about $150,000 in wage underpayments for a $54,700,000 contract. 5 F.4th 315, 322–323 (3d Cir. 2021). The Circuit held that this falsity was material because, *inter alia*, accurate certified payrolls with proper classifications were a payment condition, and compliance with this condition was central to the contract despite the relatively small amount of wage underpayments. *Id.* at 328 ("We refuse to measure materiality based only on the monetary value of Farfield's wrongdoing in relation to some larger, undefined whole.").

By contrast, the Third Circuit has found materiality lacking in multiple circumstances. Most notably, in *Spay* Medicare Part D sponsors allegedly submitted forms to CMS that contained

24

prescriber identification numbers that did not correspond to anyone with actual prescribing authority. 875 F.3d at 749–751. It was shown at summary judgment that CMS knew these "dummy" identifiers were being used and routinely paid sponsors anyway. *Id.* at 764. CMS did this because it knew there were challenges in obtaining proper identifiers and was concerned principally with filling valid prescriptions regardless of such technicalities. *Id.* The Circuit held that the false claims alleged were not material, explaining that the misstatements allowed patients to get their medication as intended, and are "precisely the type of minor or insubstantial misstatements where materiality cannot be found." *Id.* (cleaned up). Critically, "[t]he government did not pay for services that were not provided, and the Sponsors did not receive any compensation for prescriptions that were never given to Medicare recipients." *Id.* As the Circuit summarized, "this case appears to be nothing more than an effort to convert an unprofitable private audit . . . into a successful recovery of funds under the guise of a *qui tam* action." *Id.* at 765.

The Third Circuit also found materiality lacking in *United States ex rel. Petratos v. Genentech Inc.* in which an anti-cancer drug manufacturer allegedly submitted false statements to the Food and Drug Administration by suppressing data and causing doctors to certify incorrectly that the drug was "reasonable and necessary" for certain at-risk Medicare patients. 855 F.3d 481, 485 (3d Cir. 2017). The Circuit affirmed the dismissal of the case for failure to state a claim due to the relator's failure to satisfy the FCA's materiality requirement. *Id.* As the Circuit explained, even though the statutory provision at issue was a "condition of payment," the fact that the relator conceded that the government would have paid the claims with full knowledge of the alleged noncompliance was fatal to the relator's assertion of materiality. *Id.* at 490.

> b.    *Analysis*

25

Pharmacy's alleged submission of erroneous DAW codes was not material to the government's payment decision, and Relator has presented no genuine issue of material fact that could dispute this. That is because under *Escobar*, even crediting that the accurate submission of DAW codes is a condition of payment and assuming that the use of DAW 0 by Pharmacy was incorrect, no reasonable jury viewing the totality of circumstances could find it likely that the entry of DAW 0 influenced government payment decisions in this case.

The Court begins its holistic inquiry with the first *Care Alternatives* factor: whether the government has expressly designated the legal requirement at issue as a "condition of payment." 81 F.4th at 367. This factor weighs in Relator's favor. It is undisputed that the submission of accurate PDE records is a condition of payment. *See* ECF No. 200 at 30. It is also undisputed that these PDE records include DAW codes along with 50 other data points. *Id*. Thus, it stands to reason that the accurate submission of DAW codes is a condition of payment (even if what it means for a particular code to be "accurate" is up for debate). While the label the government attaches to a requirement is far from dispositive, *Escobar*, 578 U.S. at 181, this factor nevertheless lends credence to Relator's theory of materiality by showing that CMS has made some expression—however imprecise—that accurate DAW codes are important to its payment decisions.

Next, the Court turns to the second *Care Alternatives* factor: whether the alleged violation is "minor or insubstantial" or instead goes to the "essence of the bargain" between the contractor and the government. 81 F.4th at 367. This factor weighs in Pharmacy's favor.

In their summary judgment briefs and *Daubert* motions, the parties spill substantial ink speculating about the purpose of DAW codes. According to Pharmacy, DAW codes are primarily a census tool to track prescribing trends. Downplaying the importance of DAW codes, Pharmacy emphasizes that DAW codes are not even highlighted by CMS as one of the eleven fields that must

26

be "carefully consider[ed] when administering the Part D drug benefit." ECF No. 201-1 ¶ 146 (citing U.S. Ctrs. for Medicare & Medicaid Servs., *Prescription Drug Event Participant Guide*, at 4-6 (2011)). According to Relator, however, DAW codes determine the amount the government expects to pay for prescription drugs. In Relator's telling, that is because when a brand drug is multi-source, DAW 0 indicates to CMS that the generic version of drug was dispensed and thus that CMS will be billed a generic price. *See* ECF No. 218 at 47–50; *supra* Part I.D.3.b.

The Court need not speculate on the various purposes DAW codes may or may not serve because Relator's theory contains a more fundamental flaw: on the undisputed facts of this case, any discrepancy between DAW 0 and DAW 9 is necessarily insubstantial because all the Relevant Drugs that were dispensed drugs are brand drugs. Thus, even if CMS, however implausibly, (1) expected that a generic price would be charged based solely on the entry of DAW 0, (2) ignored other PDE data that would have refuted this expectation, such as the dispensed drug's identification number, and (3) overlooked the fact that the formulary it approved dictates that the brand drug be dispensed, CMS' *expectation* never actually resulted in overpayment. Beneficiaries received brand drugs and CMS paid the brand price. Indeed, if CMS had paid the generic price it expected to under Relator's theory, CMS would have *underpaid* Pharmacy. Therefore, Relator's argument that "[c]harging the brand price when DAW 0 is submitted . . . is overcharging Medicare for the drug," ECF No. 219-1 at 118, is categorically wrong on the facts of this case. It would be another story entirely if generic drugs were dispensed and Pharmacy submitted erroneous DAW codes that caused higher brand prices to be paid. That is not this case.[13]

---

[13] This is also not a case where brand prices were paid for brand drugs despite there being a requirement that the brand drugs be substituted with generic drugs. Relator's references to such circumstances are misleading and misplaced. *See* ECF No. 218-2 ¶ 100 (citing ECF No. 218-51). It bears repeating that Relator is no longer pursuing its previously asserted claims that DAW 0 was

27

The Court's conclusion is not meant to suggest that Relator must show actual harm to establish materiality. But in these circumstances, the lack of even the possibility of harm that goes to the essence of the bargain goes a long way towards showing that the alleged violation is minor. Relator has presented no post-*Escobar* case that contravenes this Court's understanding that, generally speaking, an assumed pre-condition for a finding of materiality is that the government got *less* than what it bargained for. *Cf. Heart Solution*, 923 F.3d 308 (neurological testing was not supervised by a licensed neurologist as required); *Farfield*, 5 F.4th 315 (workers paid less than required). This case is clearly closer to *Spay* where the government received the services it paid for. 875 F.3d. 746. That the government requested additional information along with those services does not, without more, make every bit of that information essential to the bargain.[14]

Finally, the Court moves to the final *Care Alternatives* factor: whether the government made continued payments or does so in the "mine run of cases," despite "actual knowledge" of the violation. 81 F.4th at 367. Even when the Court resolves all doubt in Relator's favor, this factor is at best neutral. It is undisputed that during the Relevant Time Period, CMS never took any disciplinary action against any CVS entity, including by denying payment, for the use of DAW 0. ECF No. 200-1 ¶ 81. There is in fact no evidence that CMS has ever rejected a claim submitted by any entity based on the use of DAW 0 when a multi-source brand drug is dispensed. *Id.* ¶ 79 (citing ECF No. 200 at Ex. 46 (Relator's Third Am. Resps. to CVS Pharmacy's Second Set of Interrogs.), No. 12 (Sept. 29, 2025) ("Relator is not aware of instances where CMS had actual knowledge that

---

used to conceal CVS Defendants' scheme to skirt state laws requiring the dispensation of generic drugs. *See supra* Part I.D.3.b n.11.

[14] At best, Relator argues that the government paid not just for prescription drugs but for accurate census information that it did not receive. But establishing materiality with such a theory would erase the entire thrust of *Escobar*: that the FCA is not meant to punish garden-variety breaches of contract or regulatory violations. *See Escobar*, 578 U.S. at 194.

a particular prescription drug claim was submitted with improper DAW codes and where CMS refused to pay or reimburse that claim.")). Indeed, Relator has made no affirmative showing of CMS, through its actions or words, suggesting that the incorrect submission of DAW 0 is a basis on which it would *likely* decline payment.[15]

Nevertheless, Relator contends that CMS' failure to enforce compliance with DAW protocols is meaningless because CMS did not have actual knowledge of the way Pharmacy was using DAW codes. ECF No. 218 at 50–53. Relator argues that to the extent CMS conducted audits of CVS Defendants, those audits did not include a review of PDE data, and even if PDE data was reviewed, that does not prove CMS discovered the allegedly erroneous use of DAW 0 during those reviews. *Id.* To Relator's credit, here, unlike in *Spay*, the government has not conceded its actual knowledge of the alleged falsity. But even assuming there is a genuine issue of material fact on the issue of actual knowledge, that merely makes this factor neutral. The *absence* of actual knowledge is insufficient to persuade a reasonable jury that incorrect usage of DAW 0 is material to CMS payment decisions.

Viewing this matter in its entirely, it is clear that the accurate submission of DAW codes exists within a vast landscape of regulatory compliance protocols, all of which may be valuable

---

[15] At best, Relator presents statements from CMS that pharmacies need to "[c]onsider the risk for fraud, waste, and abuse if pharmacy staff members adjudicate claims with inaccurate product selection codes," ECF No. 218-2 ¶ 57 (citing ECF No. 218 at Ex. 38 (CMS Pharmacy Self Auditing – Control practices to Improve Medicaid Program Integrity and Quality Patient Care – Booklet 4: Billing Practices), at 11-12), as support for Relator's argument that DAW codes are "important to the billing process," *id*. However, just because, in the abstract, DAW codes can be used to perpetrate fraud does not mean that in this case—where only DAW 0 is at issue and where only brand drugs were dispensed—there is a genuine dispute of material fact as to the impact of Pharmacy's DAW code usage on CMS payment decisions. Indeed, it is notable that the source Relator relies on focuses its attention on DAW 1. ECF No. 218 at Ex. 38 at 12.

for one reason or another, but not all of which are necessarily material to CMS payment decisions under the FCA and *Escobar*. The Court's inquiry is not whether DAW codes are useful or even required, but whether there is any evidence that could lead a reasonable jury to conclude that they were material to a payment decision here. *See United States ex rel. McBride v. Halliburton Company*, 848 F.3d 1027, 1033 (D.C. Cir. 2017) (when allegedly falsified data had "no bearing on costs billed to the Government" that fact is dispositive of immateriality, even when the motive for the tracking that data "remains somewhat of a mystery"). Here, only remarkable oversight would lead CMS to expect to pay a generic price based on DAW 0 despite approving a formulary that dictated the brand drug be dispensed and despite receiving PDE records identifying with specificity the brand drug that was dispensed. It is thus unsurprising that the government has never denied payment on the basis of an incorrect submission of DAW 0. Most importantly, even if CMS was misled into *expecting* to pay a generic price, it cannot be overemphasized that the brand price CMS paid matched brand drugs that were dispensed. The Court makes no determination on whether Pharmacy's use of DAW 0 was correct or whether there might be other more appropriate means for Pharmacy to be disciplined for any malfeasance. But as to the FCA action that is presently before the Court, this is precisely the type of "garden-variety breach[] of contract or regulatory violation[]" for which the demanding standard of the FCA does not apply. *Escobar*, 578 U.S. at 194.[16]

---

[16] While "[a]s a general matter, relators are not required to conduct discovery on government officials to demonstrate materiality, *Care Alternatives*, 81 F.4th at 375, the Court notes for the record that Relator has presented no witnesses from CMS in support of its DAW coding theory. *See* ECF No. 267 (Tr. of 1/27/2026) at 52 ("So our view, Your Honor, is we didn't need to take the depositions of any CMS employers or representatives because we have the documents made in real time by CMS that directs compliance by the plan sponsor with those codes, those values. And it's inappropriate to use that DAW 0 code.").

### 2.    Conspiracy to Violate the FCA Based on Not Stocking Ventolin HFA

Relator alleges that Pharmacy participated in a conspiracy in which CVS Defendants privileged certain brand drugs in exchange for lucrative rebate payments from the manufacturers of those drugs. According to Relator, Pharmacy acted in furtherance of this conspiracy by not stocking cheaper generic versions of Ventolin HFA from approximately February 2019 until at least April 2019. ECF No. 200 at Ex. 46 (Relator's Third Am. Resps. to CVS Pharmacy's Second Set of Interrogs.), No. 15 (Sept. 29, 2025). As Relator has it, this practice benefited Ventolin HFA's manufacturer, GSK, which in turn compensated Caremark through rebate agreements. ECF No. 218 at 24. Since conspiracy theories under the FCA cannot stand on their own without an underlying violation of the FCA, summary judgment with respect to this theory of liability is granted.

"There can be no liability for conspiracy where there is no underlying violation of the FCA." *Simparel*, 857 F.3d at 507 n.53 (cleaned up); *cf. Halberstam v. Welch*, 705 F.2d 472, 479 (D.C. Cir. 1983) ("Since liability for civil conspiracy depends on performance of some underlying tortious act, the conspiracy is not independently actionable; rather, it is a means for establishing vicarious liability for the underlying tort."). Thus, Relator's FCA conspiracy claim "rises or falls with the others." *United States ex rel. Petratos v. Genentech, Inc.*, 141 F. Supp. 3d 311, 317 n.3 (D.N.J. 2015), *aff'd*, 855 F.3d 481 (3d Cir. 2017); *see United States ex rel. Vigil v. Nelnet, Inc.*, 639 F.3d 791, 801 (8th Cir. 2011) ("Because the Complaint fails to state claims under sections 3729(a)(1) and (2), it likewise fails to state an actionable conspiracy claim under § 3729(a)(3).").

Here, Relator has failed to present any viable claims of underlying violations of the FCA. *See supra* Part III.B.1; *infra* Part III.C.1; *infra* Part III.C.2; *infra* Part III.D.1. Thus, Pharmacy

cannot be liable for participating in any such violations by not stocking Ventolin HFA.[17] Without identifying an underlying FCA violation, Relator's conspiracy allegations against Pharmacy amount to nothing more than policy disputes about the rebate agreement process.

### C.    Caremark/SilverScript's Motion for Summary Judgment

Relator alleges that Caremark/SilverScript violated the FCA by: (1) mishandling formulary exception requests, (2) submitting PDE records containing erroneous DAW codes, and (3) conspiring with drug manufacturers and other CVS entities to defraud the government. With respect to all three claims, Caremark/SilverScript's motion for summary judgment is granted.

#### 1.    FCA Violations Based on Mishandling of Formulary Exception Requests

Relator alleges that Caremark/SilverScript defrauded the government by preventing beneficiaries from being granted formulary exceptions they were entitled to. Relator alleges that Caremark/SilverScript did this by (1) issuing blanket denials of formulary exceptions requests without reviewing the merits of those requests and (2) maintaining misleading call scripts and grievance handling procedures. ECF No. 219 at 40 n.7. While Relator initially brought this theory of liability with respect to 15 drugs, it has since narrowed its claim and asserts this theory only as to two Hepatitis-C drugs: Harvoni and Epclusa. *See supra* Part I.D.3.a n.8.

##### a.    Auto-Denials

Relator alleges that Caremark/SilverScript, rather than give the requisite individualized determination, auto-denied formulary exception requests by beneficiaries who wished to receive authorized generic versions of Harvoni and Epclusa. Central to Relator's argument is its contention

---

[17] Relator does not present Pharmacy's alleged failure to stock Ventolin HFA as a standalone basis for FCA liability.

that when a beneficiary cannot afford a brand drug, a cheaper generic off-formulary alternative drug may be deemed "medically necessary" such that it must be made available to the beneficiary as a formulary exception. According to Relator, by not allowing these exceptions, Caremark/SilverScript required beneficiaries, and by extension the government, to pay for more expensive brand drugs. Because this theory of falsity rests on a novel, unworkable, and implausible reading of the relevant regulation, Relator cannot proceed to trial on this theory. *See* 10A Charles A. Wright, et al., *Federal Practice & Procedure* § 2725 (3rd ed. 2002) ("[W]hen the only question is what legal conclusions are to be drawn from an established set of facts, the entry of a summary judgment usually should be directed.").

Formulary exception requests under Medicare Part D function as follows: Medicare Part D requires plan sponsors to "maintain exceptions procedures" by which beneficiaries may request off-formulary drugs. 42 C.F.R. § 423.578(b). The Part D plan sponsor must grant an exception whenever it determines that two criteria are met: (1) the drug is deemed "medically necessary" by the prescribing physician or other prescriber, and (2) "the drug would be covered but for the fact that it is an off-formulary drug." *Id.* The regulation further specifies the bases on which the prescriber may deem a drug medically necessary:

> (i) All of the covered Part D drugs on any tier of a plan's formulary for treatment for the same condition would not be as effective for the enrollee as the non-formulary drug, would have adverse effects for the enrollee, or both;
> (ii) The prescription drug alternative(s) listed on the formulary or required to be used in accordance with step therapy requirements—
>> (A) Has been ineffective in the treatment of the enrollee's disease or medical condition or, based on both sound clinical evidence and medical and scientific evidence and the known relevant physical or mental characteristics of the enrollee and known characteristics of the drug regimen, is likely to be ineffective or adversely affect the drug's effectiveness or patient compliance; or
>> (B) Has caused or based on sound clinical evidence and medical and scientific evidence, is likely to cause an adverse reaction or other harm to the enrollee; or

(iii) The number of doses that is available under a dose restriction for the prescription drug has been ineffective in the treatment of the enrollee's disease or medical condition or, based on both sound clinical evidence and medical and scientific evidence and the known relevant physical or mental characteristics of the enrollee and known characteristics of the drug regimen, is likely to be ineffective or adversely affect the drug's effectiveness or patient compliance.

*Id.* § 423.578(b)(5).

The parties dispute whether the off-formulary authorized generic versions of Harvoni and Epclusa can be deemed medically necessary on the sole basis that they are more affordable and thus are more likely to result in patients' ability to comply with their prescribed regimen. The Court concludes that cost is not a required consideration for medical necessity under the relevant regulations for two reasons.

First, the text of § 423.578(b)(5) does not mention cost or any factor remotely related to socioeconomic considerations. Section 423.578(b)(5)(i) permits an off-formulary drug to be considered medically necessary when the formulary drugs would not be as "effective" or would have "adverse effects" for the enrollee. Under no plain meaning of these terms does affordability make a drug more "effective;" nor would an expensive drug be considered to have "adverse effects" because of its tendency to drain a beneficiary's bank account. Relator focuses its argument instead on § 423.578(b)(5)(ii)(A),[18] but this section does nothing to help Relator's case. Section 423.578(b)(5)(ii)(A) lists "sound clinical evidence," "medical and scientific evidence," "physical or mental characteristics of the enrollee," and "known characteristics of the drug regimen" as bases that together must justify a prescriber's determination that a formulary drug is ineffective or will adversely affect patient compliance. Even giving Relator the benefit of the doubt and assuming

---

[18] Defendant argues this section is inapplicable because it only concerns step therapy treatment. *See, e.g.*, ECF No. 249 at 11. The Court need not weigh in on this argument because the section does not help Relator regardless.

that, in the abstract, cost could be a "clinical" consideration impacting patient compliance, Relator makes no showing of how such a consideration would satisfy the other bases laid out by § 423.578(b)(5)(ii)(A), which that statute joins conjunctively. The clear focus of 423.578(b)(5) is on the medical effects of drugs on the human body and the Court will not read the word "effective" or "clinical" so broadly so as to encompass affordability without even the faintest textual clue that such an interpretation was CMS's intent.[19]

Second, requiring a consideration of cost would raise irreconcilable administrative concerns that are not contemplated by the regulations. How is a physician or other prescriber qualified to assess whether a particular patient can afford a particular drug? What data would be used to make this determination? How large does the price difference between two drugs have to be for the cheaper drug to be medically necessary to improving patient compliance? As a matter of public policy, these challenges may be worth addressing. But there is absolutely no indication that they have been considered by the regulations or that CMS expects prescribers to engage in such inquiries.[20]

_____

[19] CMS' comments accompanying its promulgation of § 423.578 provide further clues that the focus of the regulation is on clinical and therapeutic impediments to taking a medication rather than other matters of convenience that may impact patient compliance. *See* Medicare Program, Medicare Prescription Drug Benefit, 70 Fed. Reg. 4194, 4355–56 (Jan. 28, 2005) (codified at 42 C.F.R. pts. 400, 403, 411, 417, 423). In these comments, CMS notes that a formulary exception may be warranted where the on-formulary version of the drug is in tablet form that an elderly Medicare enrollee cannot swallow, requiring the dispensation of the drug in liquid form. *Id.* CMS contrasts this example with drugs that are packaged differently, which does not warrant a formulary exception "because the packaging of a drug, for example, bubble-wrapping, blistercards, cassettes, does not impact the effectiveness of a medication." *Id.*

[20] By conceding that its theory of medical necessity is novel, *see* ECF No. 267 (Tr. of 1/27/2026) at 107, Relator introduces an additional hurdle to its FCA claim. That is because Relator has not shown the Court how Caremark/SilverScript could be liable for making a false certification to CMS by not complying with a definition of medical necessity that has never been formally adopted by CMS or any court.

35

Relator also makes the related argument that Caremark/SilverScript's blanket denials were deficient because they constitute a "separate . . . process". ECF No. 219 at 45–46. In Relator's words, "although [Caremark/SilverScript] had a 'normal process' for formulary exceptions that complied with Medicare's requirement, they had a separate 'HepC process' for Harvoni and Epclusa patients that auto-denied formulary exception requests without any substantive review." *Id.* at 45. Stated differently, even if the formulary exception requests for Harvoni and Epclusa should have been denied, they cannot be *auto*-denied if that means they were not given equal treatment to all other requests. Indeed, under the CMS regulations, all formulary exception requests must be analyzed under the same process. *See* 42 C.F.R. § 423.562(a)(1)(ii) (requiring "a single, uniform exceptions" process). But here, the denials of formulary exception requests for authorized generics were not made pursuant to a different process—they were made by applying the same definition of medical necessity that Caremark/SilverScript did for every claim. That definition simply does not require the assessment of cost that Relator wishes.

Since Relator has not raised any genuine dispute of material fact regarding whether Caremark/SilverScript was in compliance with CMS's requirements for maintaining a formulary exceptions process, Relator cannot establish the falsity element that is essential to a FCA action. Indeed, since the authorized generics of Harvoni and Epclusa are definitionally identical to their brand counterparts, formulary exception requests for the authorized generics were appropriately denied pursuant to CMS's medical necessity requirement.

b.      *Misleading Call Scripts and Grievance Handling Procedures*

Relator argues that CVS maintained misleading call scripts and grievance handling procedures to steer beneficiaries to brand drugs over their authorized generic counterparts. Relator's briefing is unclear as to whether this argument amounts to a standalone theory of liability

under the FCA or whether it is instead intended as further evidence supporting Relator's formulary exception theory. Oral argument confirmed that the latter is the correct view. *See* ECF No. 267 (Tr. of 1/27/2026) at 135 ("The grievances and call scripts are . . . allegations . . . directly relevant to the formulary exception claims. We don't have separate claims for grievances and call scripts. This is really an issue that should be addressed at the motion in limine stage to see what evidence we could put forward and are entitled to at trial. . . ."). Since the Court has already rejected the foundation on which Relator's formulary exception theory rests—namely in holding that cost is not a factor that can be considered in determining medical necessity and thus that requests for the authorized generic versions of Harvoni and Epclusa were appropriately denied—the Court need not weigh in on superfluous evidentiary issues made in support of Relator's theory.

### 2.     FCA Violations Based on Submission of Erroneous DAW Codes

Relator contends that Caremark/SilverScript "took no measures to prevent" the submission of improperly reported DAW codes in the PDE records it sent to CMS. ECF No. 219 at 36. This claim is substantively identical to that which Relator brought against Pharmacy. Relator alleges that while Pharmacy first entered the DAW codes, Caremark/SilverScript failed to take necessary steps to ensure the accuracy of these codes before submitting them to CMS. *Id.* The Court's analysis and conclusion on this issue are the same as to Caremark/SilverScript as they are to Pharmacy: because, as a matter of law, the usage of DAW 0 in this case was not material to government payment decisions, no genuine issues of material fact remain and thus this theory of liability may not proceed to trial.

### 3.     Conspiracy to Violate the FCA Based on Participation in Fraudulent Scheme

Relator contends that Caremark and SilverScript conspired to violate the FCA by scheming among themselves and with the other CVS Defendants to exclude generics from SilverScript's

formulary in order to benefit from lucrative rebate agreements at the expense of the government and beneficiaries who would have to pay for more expensive brand drugs.

The Court's explanation of why Relator's conspiracy theory fails as to Pharmacy applies with equal force to Relator's allegation of conspiracy against Caremark/SilverScript. Because Relator has no viable claims of direct FCA violations, Caremark/SilverScript cannot be liable for conspiring to violate the FCA.

### D.    Health's Motion for Summary Judgment

Relator alleges that Health violated the FCA by: (1) providing enterprise-level approval for its subsidiaries to submit false PDE data and mishandle formulary exceptions requests, (2) directly submitting false PDE data, (3) operating the grievance line that mishandled formulary exception requests, and (4) conspiring with drug manufacturers and its CVS subsidiaries to defraud the government. With respect to all four, Health's motion for summary judgment is granted.

#### 1.    Direct FCA Violations

Health cannot be found directly liable for violating the FCA. First, since Pharmacy and Caremark/SilverScript have not violated the FCA, Health cannot be found liable for directing these entities to violate the FCA. Second, Relator's DAW coding theory fails against Health for the same reasons it fails against Pharmacy. Third, Relator has conceded that it is not asserting an independent theory of liability for the operation of the grievance line that can survive without the survival of its formulary exceptions theory. *See* ECF No. 267 (Tr. of 1/27/2026) at 135.

#### 2.    Conspiracy to Violate the FCA Based on Participation in Fraudulent Scheme

Relator contends that Health conspired to violate the FCA by colluding with the other CVS Defendants to construct and implement a scheme to exclude generics from SilverScript's

formulary in order to benefit from lucrative rebate agreements at the expense of the government and beneficiaries who would have to pay for more expensive brand drugs.

The Court's explanation of why Relator's conspiracy theory fails as to Pharmacy and Caremark/SilverScript applies with equal force to Relator's allegation of conspiracy against Health. Because Relator has no viable claims of direct FCA violations, Health cannot be liable for conspiring to violate the FCA.

## CONCLUSION

In dismissing Relator's FCA claims, this Court does not condone any regulatory non-compliance CVS Defendants may or may not have participated in. Indeed, on an FCA action this Court does not act as a regulatory body charged with reviewing every intricacy of the sophisticated contracts the government engages in with its private partners. Nor does the Court weigh in on broader policy debates regarding health insurance and Medicare in general, or the rebate agreement process in particular. But after seven years of litigation, which included three complaints, significant discovery, and a stipulation to then further narrow Relator's theories of liability, Relator has simply not presented evidence that could lead a reasonable jury to make a finding of material fraud in the narrow sense defined by the FCA. The motions for summary judgments submitted by Pharmacy, Caremark/SilverScript, and Health must therefore be granted in their entirety. An appropriate order follows.

**IT IS SO ORDERED.**

BY THE COURT:

*/s/ John Milton Younge*
**Judge John Milton Younge**